David B. Owens
Loevy & Loevy
c/o Civil Rights And Justice Clinic
University of Washington Law School
William H. Hates Hall, Ste. 265
P.O. Box 85110
Seattle, WA 98145
312-243-5900

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| CODY KLOEPPER,<br><br>    *Petitioner*,<br><br>v.<br><br>JEFFEREY PERKINS, Superintendent<br>Coyote Ridge Corrections Center<br><br>    *Respondent.* | No. _____<br><br>**[PROPOSED]**<br><br>**PETITION FOR WRIT OF HABEAS CORPUS** |

1

## **TABLE OF CONTENTS**

Table of Authorities .........................................................................5

Petition for Writ of Habeas Corpus ............................................7

Summary of Claim...........................................................................7

Jurisdiction.......................................................................................9

Procedural History .........................................................................10

   A. Direct Appeal of Jury Trial Conviction...............................10

   B. State Court Collateral Attacks ..........................................11

   C. Federal Collateral Attacks.................................................15

   D. Attorney Representation Information .................................15

Factual Summary in Support of Claim........................................16

   1. The crime and initial investigation....................................16

   2. Mr. Contreras provided sworn testimony that was relied heavily upon by the State at trial.................................................................18

   3. Post-conviction DNA testing provided new evidence supporting Mr. Kloepper's innocence and contradicting the State's evidence and theory at trial.......................................................................................22

   4. Faced with exculpatory post-conviction DNA results, the State begins its attempts to reconcile the trial evidence with the contradictory DNA results...........................................................................................25

2

5. Mr. Kloepper filed a motion for a new trial based on the exculpatory DNA results, the State presents a new theory contradictory to its presentation at trial based on Salvador Contreras providing new, inconsistent testimony from trial. ....................................................26

6. The State was successful in blocking jurors from hearing the DNA evidence at a new trial based on their new secondary transfer theory presented ..................................................................32

7. In 2025, Mr. Kloepper discovered the State suppressed expert evidence directly contradicting the theory it advanced before the jury and during the CrR 7.8 proceedings ...........................................34

Grounds for Relief ............................................................38

Exhaustion ......................................................................40

Additional Procedural Requirements ......................................41

Second or Successive Petition Status ......................................41

Argument .......................................................................43

1. Cody Klopper meets the procedural requirements for relief............43

2. There is a Due Process Right to Fundamental Fairness in Post-Conviction Procedures...................................................44

3. The tenets of fundamental fairness prohibit prosecutors from intentionally suppressing exculpatory evidence relevant to the post-conviction proceedings and from presenting false or misleading claims or arguments during postconviction proceedings ....................................46

4. The State engaged in outrageous misconduct that prevented Mr. Kloepper from fairly contesting its claims and resulted in a CrR 7.8 hearing decision based on false information .......................................50

5. Cody Kloepper has demonstrated the factual basis of his claim could not have been discovered earlier through due diligence, and that no reasonable jury would have convicted him but for the constitutional violation ...........................................................................................53

Conclusion ...........................................................................................56

Verification  ........................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Caldwell v Mississippi*, 472 U.S. 320 (1985) ...................................................48

*District Attorney's Office for Third Judicial Dist. v Osborne*,

    557 U.S. 52 (2009) ........................................................ passim

*Donnelly v Decristoforo*, 416 U.S. 637, 647 (1974) ............................. 40, 48

*Giglio v U.S.,* 405 U.S. 150 (1972) ...............................................................48

*Grannis v. Ordean*, 234 U.S. 385 (1914)......................................................46

*Gutierrez v. Saenz*, 606 U.S. 305 (2025.......................................................46

*Medina v. California*, 505 U.S. 437 (1992).............................................. 46, 47

*Miller v Pate,* 386 U.S. 1 (1967) ...................................................................48

*Monroe v Butler*, 690 F.Supp. 521 (E.D. La 1988), *aff'd* 853 F.2d 924 (1988)

    .............................................................................................40

*Monroe v. Butler* 883 F.2d 331 (5th Cir. 1988)..............................................49

*Munchinski v. Wilson,* 694 F.3d 308 (3rd Cir. 2012) ......................... 50, 51, 56

*Munchinski v. Wilson*, 807 F.Supp.2d 242 (W.D. Pa. 2011)................... 50, 51

*Napue v People of Illinois*, 360 U.S. 264 (1959) .................................. 40, 48

*Shaw v Murphy*, 532 U.S. 223 (2001...........................................................46

*Thomas v Goldsmith,* 979 F.2d 746 (9th. Cir. 1992) ........................ 40, 48, 49

## Statutes

28 U.S.C. § 2244(d)(1)(D)...................................................................... 42, 44

28 U.S.C. § 2254(d) ...................................................................................41

28 U.S.C. §2244 .........................................................................................9

28 U.S.C. §2244(b) ...................................................................................42

28 U.S.C. §2244(b)(2) ...............................................................................42

28 U.S.C. §2244(b)(2)(B) ..........................................................................43

28 U.S.C. §2244(b)(3)(A) ..........................................................................43

28 U.S.C. §2244(b)(3)(C) ..........................................................................43

28 U.S.C. §2244(b)(4) ...............................................................................42

28 U.S.C. §2254 .......................................................................................7, 9

28 U.S.C. §2254(a) ....................................................................................42

Revised Code of Washington 10.73.170 ....................................................23

**Rules**

Washington State Criminal Rule 7.8 ..................................................... passim

Washington State Rule of Appellate Procedure 1.2(c) .................................15

Washington State Rule of Appellate Procedure 16.11 ..................................15

Washington State Rule of Appellate Procedure 16.17 ..................................15

Washington State Rule of Appellate Procedure 16.4 ....................................45

Washington State Rule of Appellate Procedure 16.4(c)(3) ...........................14

Washington State Rule of Professional Conduct 3.8(g) ................................14

<u>Petition for Writ of Habeas Corpus</u>

Petitioner Cody Kloepper, represented by David B. Owens, submits the following petition under 28 U.S.C. §2254 for a Writ of Habeas Corpus. This petition addresses his conviction in Benton County Superior Court case 10-1-01156-4 for charges of burglary, assault, and rape entered on September 23, 2011. An amended judgment and sentence was entered on March 30, 2016.

Mr. Kloepper seeks a writ of habeas corpus granting a new trial or, alternatively, remanding for a new evidentiary hearing on his Washington State Criminal Rule (CrR) 7.8 motion. Mr. Kloepper filed a motion for leave to file a second or successive petition with the 9th Circuit Court of Appeals on March 16, 2026 as required under 28 U.S.C. 2244; that motion is still pending.

<u>Summary of Claim</u>

Despite compelling exculpatory DNA evidence, Benton County prosecutors (the State) deprived Cody Kloepper of fundamental fairness in state court post-conviction proceedings, preventing a jury from ever considering evidence that strongly demonstrates his actual innocence. DNA testing obtained in 2018 revealed another man's sperm cell derived DNA

across the inside and outside of the clothing that the victim wore during the attack. Mr. Kloepper's DNA profile was excluded from all semen stains tested. The same testing revealed that a small rubber fragment found on the floor in the victim's apartment containing a Y-STR profile consistent with Cody Kloepper—something the state argued was strong evidence of his guilt despite his work as a handyman at the apartment complex—was also consistent with the other man, who had no legitimate reason to have ever been inside the complex or D.W.'s apartment.

Notwithstanding its prior agreement to DNA testing or the testing results, the State opposed every effort to present this evidence to a jury. Instead, it presented a brand-new theory of guilt which directly contradicted both witness testimony and its original theory at trial. Specifically, it argued that the "most likely" explanation for the presence of the other man's sperm cell DNA—purportedly consistent with scientific literature and the experts the State had interviewed—was through secondary-transfer from that man to Mr. Kloepper and then from Mr. Kloepper to the victim.

Public records obtained in 2025 uncovered how the State reconciled Mr. Kloepper's convictions and the new, objective DNA evidence: by suppressing its own expert's exculpatory opinions and presenting false and misleading statements to both the trial court and Mr. Kloepper's counsel.

8

The State's knowing misrepresentations and suppression of exculpatory evidence deprived Mr. Kloepper of meaningful consideration of the DNA evidence and fundamental fairness in the post-conviction hearings, to which he had a right to access.

Jurisdiction

This Court has jurisdiction to hear Mr. Kloepper's claim under 28 U.S.C. §2244 and 28 U.S.C. §2254 because he is in custody pursuant to a state judgment. Cody Kloepper was charged in Benton County Superior Court of the crimes of Rape 1st Degree, Assault 1st Degree, and Burglary 1st Degree (with deadly weapon enhancements) in case number 10-1-01156-4. He entered a plea of not guilty and proceeded to a jury trial; he testified in his own defense at trial. He was represented by counsel Dan Arnold and Alexandria Sheridan. He was convicted on all three counts by the jury on August 15, 2011 and sentenced on September 23, 2011 to an indeterminate sentence with a minimum term of 294 months served in prison. Exhibit 21 (Judgment and Sentence, *State of Washington v. Kloepper,* 10-1-01156-4).

Upon completion of his minimum prison term, any potential release date is subject to the determination of the Indeterminate Sentence Review Board. On the rape count, he is subject to lifetime community custody

9

supervision. In 2016 his judgment and sentence was modified to correct the community custody term imposed on the assault count. Exhibit 22 (Order Amending Judgment and Sentence, *State of Washington v. Kloepper,* 10-1-01156-4). He is currently under the jurisdiction of the Washington State Department of Corrections, DOC #351638, at Coyote Ridge Corrections Center in Connell, Washington.  Mr. Kloepper does not have any other sentence to serve aside from the judgment challenged in this present petition.

## Procedural history

A. Direct Appeal of Jury Trial Conviction

After his jury trial, Mr. Kloepper timely filed a direct appeal with the Washington State Court of Appeals Division III, case number 302946, represented by attorney David Koch. He raised the following constitutional grounds: a federal due process violation pertaining to in court identification procedure, ineffective assistance of counsel claims. He raised the following non-constitutional grounds: sentencing error. His appeal was denied on February 4, 2014. Mr. Kloepper petitioned for review with the Washington State Supreme Court in case number 90007-8 after the denial of his direct appeal, again represented by David Koch. His petition was denied on June 4, 2014.

B. <u>State Court Collateral Attacks</u>

Mr. Kloepper then filed a timely personal restraint petition with the Court of Appeals Division III under case number 333248. He was pro se for this petition. He raised the following constitutional grounds: ineffective assistance of counsel. He raised the following non-constitutional grounds: sentencing error. No evidentiary hearing was held on his petition. His petition was denied on the merits except for an adjustment to his community custody term on March 24, 2016. His pro se motion for discretionary review with the Washington State Supreme Court on this petition was denied on December 9, 2016.

After challenging his conviction through both direct appeal and collateral attack, Mr. Kloepper sought DNA testing under Revised Code of Washington (RCW) 10.73.170 which authorizes post-conviction DNA testing in cases where presumed favorable results would demonstrate the petitioner's innocence on a more probable than not basis. Washington Innocence Project (WashIP) began representing him during that process and obtained agreement to testing from the State.

Based on the newly discovered DNA testing results, WashIP filed a Criminal Court Rule (CrR) 7.8 motion for a new trial in Benton County

Superior Court on September 29, 2021 under the trial case number of 10-1-01156-4, arguing that newly discovered evidence entitled him to a new trial pursuant to CrR 7.8(b)(2). Mr. Kloepper was represented by WashIP attorneys Lara Zarowsky and Jacqueline McMurtrie, as well as attorney Mark Mestel. An evidentiary hearing with testimony was held on Mr. Kloepper's motion. The trial court denied Mr. Kloepper's motion for a new trial on May 2, 2022. Mr. Kloepper filed a motion for reconsideration of that denial, under the same case number, which was denied on May 27, 2022.

Mr. Kloepper timely appealed this trial court ruling, represented by attorney Gregory Link in Court of Appeals Division III case number 390764. He raised the following non-constitutional grounds: abuse of discretion in denying the CrR 7.8 motion. The Court of Appeals affirmed the trial court decision on April 16, 2024. Mr. Kloepper filed a motion for reconsideration of this decision through attorney Gregory Link which was denied on May 21, 2024. Through attorney Gregory Link he subsequently petitioned for review of the Court of Appeals decision with the Washington State Supreme Court under case number 1031840, which denied his petition on October 9, 2024.

On April 17, 2025, WashIP received public records that unexpectedly contained a previously undisclosed forensic report signed in 2021 by

13

forensic scientists Derek Cutler and Daniel Hellwig with Intermountain Forensics (IMF). The existence of the IMF report and opinions contained therein directly contradicted several representations made by the State in its opposition of Mr. Kloepper's motion for a new trial. Additional investigation led to the discovery of internal communications about IMF report and the receipt of a signed declaration from forensic scientist Derek Cutler.

Cody Kloepper, represented by WashIP attorney Sarah Johnson, filed a personal restraint petition raising this newly discovered exculpatory evidence with the Washington State Court of Appeals on October 9, 2025 – within one year of the mandate affirming the denial of Mr. Kloepper's motion for a new trial and approximately six months after discovery of the suppressed IMF report. The petition was assigned a case number of 415716. He raised the following constitutional grounds: a due process violation based on the State's suppression of the IMF materials and making false and misleading statements to the trial court. He raised the following non-constitutional grounds: vacation of the conviction was required based on material facts which had not previously been presented or heard pursuant to Rule of Appellate Procedure (RAP) 16.4(c)(3) and prosecutorial misconduct violating caselaw and the Washington State Rules of Professional Conduct (RAP) 3.8(g).

On January 23, 2026 Mr. Kloepper, through counsel Sarah Johnson, filed supplemental briefing raising the following grounds: a state constitutional due process analysis paralleling the federal due process analysis. In addition, Mr. Kloepper filed as a motion for leave to file supplemental briefing pursuant to RAP 16.17 and RAP 1.2(c). On February 5, 2026 Mr. Kloepper's motion for leave to file supplemental briefing was granted and his supplemental briefing was accepted for filing. On February 9, 2026, the Court of Appeals ordered the State of Washington to respond to the petition and provided a briefing schedule. Response briefing is currently due on April 10, 2026 and Mr. Kloepper's reply will be due 30 days later.

Pursuant to RAP 16.11, once all briefing is submitted the chief justice of the Court of Appeals Division III must take one of three actions: assign the case for consideration with a panel of judges in the Court of Appeals, assign the case to the Superior Court to conduct a reference (evidentiary) hearing in order to determine contested facts, or dismiss his petition as frivolous. Cody Kloepper moved for the Court of Appeals to grant a reference hearing in his petition.

15

C. Federal Collateral Attack

Mr. Kloepper filed a timely pro se federal habeas corpus petition in the Eastern District of Washington on February 9, 2017 under case number 4:17-CV-5008-TOR. He raised the following constitutional grounds: a due process violation pertaining to in court identification procedures, ineffective assistance of counsel, and a cruel and unusual punishment challenge to his sentence. His petition was denied on the merits in federal district court on December 14, 2017 and the Court denied his request for a certificate of appealability. Exhibit 23 (Order Denying Petition, *Kloepper v. Uttecht,* No. 4:17-CV-5008-TOR); Exhibit 24 (Judgment, *Kloepper v. Uttecht,* No. 4:17-CV-5008-TOR). His 2017 habeas corpus petition was brought prior to when the post-conviction DNA testing occurred and raised distinct claims from this current petition.

D. Attorney Representation Information

In pre-trial, trial, and sentencing proceedings Cody Kloepper was represented by appointed counsel Dan Arnold (WSBA No. 10575, 451 Nicklaus Ct. Richland, Washington 99353) and Alexandria Sheridan (WSBA No. 40058, Kelly Law PLLC, 2300 McDermott Rd. Ste. 200-238, Plano, Texas 75025). On direct appeal Mr. Kloepper was presented

16

by appointed counsel David Koch (WSBA # 23789, Nielsen Koch & Grannis, PLLC, 2200 6th Ave Ste. 1250, Seattle, WA 98121). In his CrR 7.8 proceedings Mr. Kloepper was represented by pro bono counsel Jacqueline McMurtrie (WSBA #13587, Washington Innocence Project, PO Box 85869, Seattle, WA 98145); Lara Zarowsky (WSBA #40745, Washington Innocence Project, PO Box 85869, Seattle, WA 98145); and Mark Mestel (WSBA #8350, Mark Mestel, Inc. P.S., 2235 Fairview Ave E, Unit 12, Seattle, WA 98102). In his direct appeal of the CrR 7.8 proceedings Mr. Kloepper was represented by appointed counsel Gregory Link (WSBA #25228, Washington Appellate Project, 1511 3rd Ave Ste. 610, Seattle, WA 98101). For Mr. Kloepper's personal restraint petition currently ongoing in Washington State courts, he is represented by pro bono counsel Sarah Johnson (WSBA #50985, Washington Innocence Project, PO Box 85869, Seattle, WA 98145).

Factual Summary In Support of Claim

1. The crime and initial investigation.

In 2009, D.W. was brutally beaten and raped inside her home at the Villas apartment complex in Richland, Washington. Cody Kloepper worked

17

in maintenance at the Villas complex. RP 628 [1]. D.W. had woken up and put on clean fresh clothing just prior to the attack. RP 126. D.W. admitted that she sometimes forgot to lock her door at night. RP 93; 124; 160-61.

During the investigation, the Washington State Patrol Crime Laboratory (WSPCL) conducted Y-STR testing (testing that isolates the male only Y-chromosome) on a rubber fragment found in D.W.'s apartment. RP 581. In addition to D.W.'s DNA, analysts found two male profiles. RP 582. While the WSPCL concluded the major male profile present was consistent with Mr. Kloepper, Y-STR analysis cannot provide individualized results as it only tracks paternal lineage. RP 584. As such, it could not establish that Mr. Kloepper specifically contributed to the genetic material found on the fragment. RP 582-83. Further, while the State hypothesized the rubber fragment was part of a glove the attacker used, no testing was conducted confirming that claim. RP 701.

[1] Trial Verbatim Report of Proceedings, *State of Washington v. Cody Kloepper*, No. 10-1-01156-4 [hereinafter 'RP'] – Volume 1: pg. 1-35; Volume 2: pg. 36-64; Volume 3: pg. 47-202; Volume 4: pg. 203-386; Volume 5: 387-565; Volume 6: pg. 566-751; Volume 7: pg. 752-763; Volume 8: pg. 764-766.

Soon after the attack, D.W. identified her attacker as Carl Goehring multiple times. RP 157. She recognized Mr. Kloepper from the Villas and, after being shown photo montages that included him, she clearly stated Mr. Kloepper was *not* the perpetrator. RP 552, 524-26. It was only several months later, after law enforcement told D.W. about the Y-STR testing results, that she eventually changed her identification of the attacker to Mr. Kloepper. RP 158-59.

2. Mr. Contreras provided sworn testimony that was relied heavily upon by the State at trial.

At trial the State of Washington called Salvador Contreras as a witness. He testified that Mr. Kloepper came to his home sometime between approximately midnight to 1:00 a.m., several hours prior to the time the attack on D.W. occurred. RP 300. He explained Mr. Kloepper arrived in response to a Craigslist[2] ad posted by Mr. Contreras (under a username) seeking a sexual encounter with another man. RP 293; 302-03. Mr. Contreras testified he was not attracted to Mr. Kloepper, so he only offered him a beverage and spoke with him for about 15-20 minutes before Mr. Kloepper left – without ever engaging in sexual activity. RP 298-99. Mr. Contreras

[2] An internet forum website which, at the time, allowed users to post seeking sexual or romantic encounters.

claimed that Mr. Kloepper left upset, told him not to contact him again, and told him to erase his phone number. RP 298. The prosecution ended its examination of Mr. Contreras by confirming his denial of sexual contact between the two men:

> State: "If there was some sexual contact, would you tell us?"
> Mr. Contreras: "If I would recall, I would definitely say so, yes. Since I'm already here."
> State: "Since you're already here – it's all in, right?"
> Mr. Contreras: "Yes." RP 310-311.

By contrast, Mr. Kloepper testified that he lived with his partner and their children, worked in maintenance at the Villas apartment complex, and visited a bar the night prior to the attack. RP 628-29, 633. After returning home from the bar, he browsed the Craigslist website and responded to Mr. Contreras' ad. RP 632-33. He then drove to Mr. Contreras' residence, where Mr. Contreras performed oral sex on Mr. Kloepper. Rp 633-34. Feeling ashamed of his actions, Mr. Kloepper told Mr. Contreras to delete his phone number and never contact him again. RP 634. Mr. Kloepper left without reciprocating any sexual activity. RP 634.

Too ashamed to return home after cheating on his girlfriend, Mr. Kloepper then drove back to the Villas, entered a vacant unit at the complex

that was under renovation, and slept. RP 634-635. Mr. Kloepper has always denied entering D.W.'s apartment or assaulting her. RP 635.

Notably, both Mr. Contreras and Mr. Kloepper initially misled police about the encounter. Mr. Kloepper admitted he lied to try and conceal his infidelity, first telling officers during the investigation that he followed a friend after leaving the bar. RP 635; 636. Mr. Contreras admitted he "probably" first told police he met Mr. Kloepper in a store parking lot instead of their Craigslist encounter, "to protect myself from telling [police] that we met at my place." RP 296.

The State's trial theory was that Cody Kloepper, alone, assaulted D.W, citing anger and sexual frustration over being rejected by Mr. Contreras as a supplied motive. RP 690; 701. The prosecution emphasized the importance of Mr. Contreras' credibility and portrayed him as fully forthcoming, contrasting his testimony with Mr. Kloepper's: "Sal Contreras must be lying if you believe the defendant's version of events." RP 707. Their theory was Mr. Kloepper "lied about whether he had sex with Mr. Contreras." RP 742.

During closing argument, the State argued Mr. Contreras had no reason to lie when he claimed no sexual contact occurred and was "all in" once he agreed to testify:

21

"[…] Mr. Contreras, who didn't have to come here at all, who could have just ignored the calls from the prosecutor's office and police, flew to Washington State, got on the stand, told you that he solicited sex online […] actually gave a complete stranger his address […], met that person for sex. But then decides, oh, I'm too embarrassed to talk about the rest? I don't want to tell you that I actually had sex because I would be so humiliated? Like none of this before was humiliating?

….That doesn't add up. That doesn't make sense. Mr. Contreras testified he was all in on this. Once he decided to cooperate, he is gonna tell you what happened." RP 708.

The prosecution urged jurors to accept Mr. Contreras' denial of any sexual contact and reject Mr. Kloepper's testimony, using that credibility contrast to argue motive and identity. The State also focused on the Y-chromosome DNA analysis from the rubber fragment to corroborate guilt:

"I can guarantee you the defendant would be the only one who is out there looking for random sex… and whose DNA ended up in [D.W.'s] apartment. […] The DNA of the defendant, matching DNA is on that glove. And that this glove was used at that point is really, really significant. And you need to consider that. […] The defendant is the sole person that we can say had DNA in that apartment […] The defendant is the sole person that we can say lied – lied repeatedly about what he was doing." RP 741; 746; 749.

3. <u>Post-conviction DNA testing provided new evidence supporting Mr. Kloepper's innocence and contradicting the State's evidence and theory at trial.</u>

Mr. Kloepper has never wavered in his proclamations of innocence since he was first arrested. He pursued post-conviction DNA testing under RCW 10.73.170. To do so, Mr. Kloepper was required to establish that DNA evidence was material to the identity of the perpetrator and a showing of a likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis. RCW 10.73.170(2)-(3). The Benton County Prosecuting Attorney's Office agreed to the testing without contesting Mr. Kloepper could meet the legal standard for DNA testing. WSPCL contracted with DNA Labs International (DLI) to conduct the testing. Forensic scientist Darren Wright performed the analysis.

In his report dated June 26, 2020, Mr. Wright shared his findings from analysis of cuttings of stains found on the interior and exterior of the sweatshirt and sweatpants D.W. wore at the time of the attack. Exhibit 11 (DLI reports). The male DNA profile obtained entirely excluded Mr. Kloepper. Instead, it revealed an unknown male profile, which later matched

23

the CODIS profile for Mr. Contreras [3]. Exhibit 11; Exhibit 12 (WSPCL reports). Mr. Wright used a method known as "differential extraction" and was able to confirm the male DNA was derived from sperm cells. Exhibit 11; Exhibit 9 (Dr. Charlotte Word letter). Unlike Y-chromosome testing, this method is more discriminating and can provide individualized results. RP 583—84.

After obtaining a reference sample from Mr. Contreras to confirm the CODIS match, DLI issued a second report which found astronomical likelihood ratios showing that Mr. Contreras is the source of the sperm cell derived male DNA profile on the clothing items. Exhibit 11:

---

[3] The CODIS hit was to the name 'Salvador Castillo-Sanchez'. Mr. Contreras has several aliases and is referred to by various names in the record below. This pleading matches the Washington State Court of Appeals Division III opinion's use of the identifier 'Salvador Contreras' or 'Mr. Contreras'.

24

| Item / Stain | Likelihood Ratio (Contreras & D.W. vs. D.W. & Unknown Male) |
|---|---|
| Sweatpants stain 2 | 54,000,000,000,000,000 |
| Sweatpants stain 3 | 190,000,000,000,000,000 |
| Sweatpants stain 8 | 110,000,000,000,000,000 |
| Sweatshirt stain 2 | 200,000,000,000,000,000 |
| Sweatshirt stain 4 | 190,000,000,000,000,000 |
| Sweatshirt stain 7 | 200,000,000,000,000,000 |

The WSPCL later released a report regarding the Y-STR analysis conducted on the rubber fragment prior to trial. Exhibit 12. Previous findings indicated the major Y-STR profile was consistent with Mr. Kloepper, any of his paternal male relatives, and approximately 1 in 440 random U.S. males. RP 586. The new WSPCL report determined the minor male profile was consistent with Mr. Contreras, any of his paternal male relatives, and approximately 1 in 250 random males in the U.S. Exhibit 12.

25

4. <u>Faced with exculpatory post-conviction DNA results, the State begins its attempts to reconcile the trial evidence with the contradictory DNA results.</u>

On August 17, 2020, when law enforcement collected the DNA reference sample from Mr. Contreras, they also interviewed him about the post-conviction DNA testing results. Exhibit 13 (Incident/Investigation Report dated 8-25-2020). In that initial unrecorded interview, a detective informed Mr. Contreras that his semen was on the victim's clothing, explaining this meant either "he was there, or [the semen] was transferred from another source." Exhibit 13. Despite this explanation, Mr. Contreras denied sexual contact with Mr. Kloepper, saying he could not see himself doing anything with him. Exhibit 13.

Days later during a recorded interview with law enforcement Mr. Contreras' account shifted repeatedly. He began by saying he did not remember any sexual contact between himself and Mr. Kloepper. Exhibit 14 (Transcript of Video Interview of Salvador Contreras, *State of Washington v. Kloepper*, No. 10-1-01156-4 (August 19, 2020)) at 18. He then indicated he did not recall Mr. Kloepper touching his penis but that Mr. Kloepper's thumb got close to it. Exhibit 14 at 27. Later, he said Mr. Kloepper touched his penis through the fabric of his boxer shorts. Exhibit 14 at 31. Eventually, he claimed Mr. Kloepper "did touch me there [the penis], of course going up

26

and down, but I don't remember him like really getting into it other than just running the hands slowly up and down." Exhibit 14 at 47. Mr. Contreras did not remember ejaculating during this encounter but said it was a possibility. Exhibit 14 at 40.

     5.  <u>Mr. Kloepper filed a motion for a new trial based on the exculpatory DNA results, the State presents a new theory contradictory to its presentation at trial based on Salvador Contreras providing new, inconsistent testimony from trial.</u>

Mr. Contreras testified at an evidentiary hearing for Mr. Kloepper's CrR 7.8 motion. Exhibit 17 (CrR 7.8 motion Verbatim Report of Proceedings, *State of Washington v. Kloepper,* No. 10-1-01156-4)). There, his testimony contradicted not only his prior trial testimony but also his more recent statements to law enforcement.

First, Mr. Contreras testified the only physical contact between the two men occurred when "[Mr. Kloepper] came close to me and grabbed me, as in holding me." And, yet, he denied remembering any additional contact, said he did not remember ejaculating, but said he most likely did ejaculate. Exhibit 17 at 50; 52. When asked if Mr. Kloepper "maybe just in passing" touched Mr. Contreras' penis, Mr. Contreras clearly answered "no." Exhibit 17 at 52-53. Mr. Contreras instead claimed the two merely hugged while Mr. Kloepper was on top of him. Exhibit 17 at 52-53. He specifically denied

recalling Mr. Kloepper's hand ever going inside his boxer shorts. Exhibit 17 at 53.

Mr. Contreras' testimony was that he wore boxers, a robe, and a T-shirt during their encounter. Exhibit 17 at 82. He admitted Mr. Kloepper spoke mostly about his job at an apartment complex. Exhibit 17 at 81. He described any touching between the two men as "body pressure" only, with Mr. Kloepper's hands remaining wrapped around his body in a hugging position. Exhibit 17 at 86-87. He again indicated he was not positive he ejaculated, but conceded if he had done so from the body pressure contact, the ejaculate would have gone into his boxer shorts and possibly onto his robe. Exhibit 17 at 88.

28

In total, the evidentiary hearing testimony constituted Mr. Contreras' fourth version of events:

| Trial testimony (2011) | Denied any sexual contact; said he would say so if he remembered any sexual contact; agreed that he was 'all in' regarding his testimony. Time spent together was 15-20 minutes. |
|---|---|
| Initial statement (2020, reference sample interview) | Denied remembering any sexual contact; said he did not see himself doing anything with Mr. Kloepper. |
| Recorded interview (2020) | Initially denied remembering any sexual contact between the two of them; later admitted Mr. Kloepper put his hands inside his boxer shorts and used hand to rub his penis in an up and down motion; did not remember whether he ejaculated but was likely or probable. |
| CrR 7.8 evidence hearing testimony (2022) | Claimed only "body pressure" contact while hugging; denied Mr. Kloepper's hand going inside his boxer shorts or touching his penis; did not remember whether he ejaculated but was likely or probable. Agreed if he did ejaculate, the ejaculate would have gone inside his boxer shorts or robe. Time spent together was 45 minutes-1.5 hours. |

Some notable similarities exist between the four different accounts provided by Mr. Contreras. Mr. Contreras never admitted to ejaculating outside of his own clothing, let alone onto Mr. Kloepper, nor did he describe any actions taken by Mr. Kloepper to collect his ejaculate. In fact, Mr. Contreras never expressed certainty he ejaculated at all in these accounts.

Mr. Kloepper submitted a declaration in support of his CrR 7.8 motion. Exhibit 3 (Declaration of Cody Kloepper, *State of Washington v. Kloepper,* No. 10-1-01156-4). His declaration remained consistent with his trial testimony: that Mr. Contreras performed oral sex on him only and he left without reciprocating any sexual contact on Mr. Contreras. Exhibit 3.

The State abandoned its trial theory when eventually responding to Mr. Kloepper's CrR 7.8 motion. Exhibit 16 (Response to Motion for a New Trial, *State of Washington v. Kloepper*, No. 10-1-01556-4 (October 7, 2021)). It did so in favor of a new theory that did not align with Mr. Contreras' prior accounts, deciding—instead—to try and reconcile the objective DNA results. The prosecution asserted that Mr. Contreras and Mr. Kloepper had a sexual encounter, Mr. Contreras ejaculated, and Mr.

Contreras' ejaculate was secondarily transferred [4] by Mr. Kloepper to the Villas complex and onto the victim's clothing. Exhibit 16 at 18.

The State's framed the question to the trial court as:

> "Mr. Contreras' DNA was on three stains on both D.W.'s sweatpants and sweatshirt. Did the defendant transfer the DNA onto D.W. or did Contreras directly deposit his DNA on her clothing?" Exhibit 16 at 10.

The State endorsed the former theory claiming, "Contreras's DNA on the victim's pants and sweatshirt was most likely transferred from the defendant to D.W." Exhibit 16 at 9. To support this theory, the State cited to academic articles, studies, and a health website. Healthline.com was specifically cited to argue that a 'typical' ejaculation contains 5-200 million sperm cells, therefore concluding that the "minimal number of spermatozoa

---

[4] A DNA profile can be transferred directly from the human source to the evidence item being tested ("primary transfer") or from the source to one or more objects or persons then onto the item being tested ("secondary transfer"). Exhibit 10 (Dr. Charlotte Word Supplemental Letter). DNA transfer occurs in either scenario; in this pleading primary transfer is referred to as 'direct deposit' of DNA for clarity.

found on D.W.'s clothing indicates the ejaculate was transferred, not directly, onto D.W." Exhibit 16 at 11.

The prosecution also attacked Mr. Kloepper's DNA expert Dr. Charlotte Word, arguing if Dr. Word concluded the State's secondary transfer theory in this case was implausible or not scientifically supported "she would be an *outlier among scientists* and that opinion would be contrary to scientific literature." Exhibit 16 at 12 (emphasis added). It further claimed that "the scientific literature and the experts thus far interviewed" supported the State's secondary-transfer theory. Exhibit 16 at 11. At the evidentiary hearing, the State went further, arguing that the new evidence only showed that Mr. Kloepper transferred a "couple" sperm cells of Mr. Contreras' DNA onto the victim's clothing items without transferring any of his own DNA. Exhibit 17 at 123. The State asserted affirmatively that Mr. Contreras' DNA on the victim's clothing "was the transfer [5]". Exhibit 17 at 128.

Both parties relied on forensic scientist Darren Wright, who conducted the post-conviction DNA testing. Notably, Mr. Wright declined to provide an opinion on the probability or likelihood of either secondary transfer direct transfer theory accounting for the DNA results in the case. Exhibit 15

---

[5] The State appears to be referring specifically to secondary transfer here.

32

(Incident/Investigation Report dated 9-2-2020). The State did not present any expert witness evidence pertaining to the likelihood or probability of their proposed secondary transfer theory occurring, instead relying on the generalized academic articles, studies, and Healthline.com information as support for its contention.

6. <u>The State was successful in blocking jurors from hearing the DNA evidence at a new trial based on their new secondary transfer theory presented.</u>

The Superior Court denied Mr. Kloepper's CrR 7.8 motion. Exhibit 18 (Trial Court Decision, *State of Washington v. Kloepper,* No. 10-1-1156-4 (May 2, 2022)). While the ruling lacked formal findings and conclusions, the court unmistakably adopted the State's secondary-transfer theory:

> "Given the evidence from the trial that Mr. Contreras and Mr. Kloepper were in close physical contact prior to the attack on D.W., and given the testimony from the reference hearing about the nature of the physical contact between the two men, testimony from forensic experts entered into evidence at the reference hearing about the transfer of one person's DNA to another person, the Court does not believe that the identification of Mr. Contreras as the minor contributor to the glove DNA would likely result in a different outcome at trial if the jury were to have that information. The Court does not believe that the jury would change its verdict if it knew the identity of the minor contributor was the man the defendant had intimate physical contact within the hours prior to the attack, in light of the overall evidence." Exhibit 18 at 48.

33

Division III of the Court of Appeals affirmed, expressly embracing the State's secondary-transfer theory. *State v. Kloepper*, 30 Wn.App.2d 1046, 4-5 (2024), *review denied,* 3 Wn.3d 1024, 556 P.3d 1097 (2024). It emphasized the same generalized literature "verifying the phenomenon of transfer DNA" and concluded that the "new DNA evidence would not probably change the result." *Id.* at 5. It erroneously reasoned that Dr. Word's report "suggest[ed] that transfer deposits of DNA are an unlikely occurrence [6]" and that "in this instance, both Mr. Contreras' DNA and Mr. Kloepper's DNA were discovered at the crime scene." *Id.* It continued:

> "Because D.W. testified only one person attacked her, we must conclude that a transfer DNA deposit, however unlikely, occurred in this case… the unlikelihood of such a transfer makes no difference to our analysis because the unlikelihood applies equally to both scenarios." *Id.*

Both courts embraced the State's claim that secondary-transfer was more or as likely as direct-transfer. Public records would later reveal that the State's

---

[6] Dr. Word indicated "The principle of transfer of evidence from one item or person to another item or person is the foundation of several areas of testing. *It is clear that all items of clothing tested in this case had DNA deposited on them via some form of transfer.*" Exhibit 10.

own expert contradicted the arguments raised to mislead the courts and counsel.

7. <u>In 2025, Mr. Kloepper discovered the State suppressed expert evidence directly contradicting the theory it advanced before the jury and during the CrR 7.8 proceedings.</u>

After reports from the DNA testing were issued and before the CrR 7.8 evidentiary hearing, Mr. Kloepper's counsel worked diligently to prepare and sought disclosure of forensic materials in communications with the State. Exhibit 19 (Emails between WashIP and State). This included requests to be present for any conversations the prosecution had with forensic scientist Darren Wright, citing a need to determine whether live testimony at the evidentiary hearing was required. Exhibit 19 at 15. The parties also specifically discussed written expert reports. In one such email exchange, Deputy Prosecutor Terry Bloor provided a seemingly complete list of DNA expert reports in the State's possession:

"This agreement would only extend to documents we have in our possession which are:

6-15-10:  Kevin Jenkins

6-18-10:  Lorraine Heath

7-16-10:  Lorraine Heath

9-7-10:   Lorraine Heath

6-26-20:  DNA Labs International

10-8-20:  DNA Labs International

8-6-20:   Denise Rodler

1-7-21:   Anna Wilson

4-9-21:   Charlotte Ward

10-21-21: Charlotte Ward [7]" Exhibit 19 at 10.

However, unbeknownst to either Mr. Kloepper's counsel or the court, at that time, the State possessed another DNA expert report–authored by forensic scientists Derek Cutler and Daniel Hellwig of Intermountain Forensics (IMF) and dated September 8, 2021. Exhibit 2 (IMF Report dated 9-8-2021).

The IMF materials did not surface until April 2025 through public-records disclosures, which contained the report and partially redacted

---

[7] A reference to defense expert witness Dr. Charlotte Word.

36

communications between the State and IMF scientists.[8] Exhibit 6 (Declaration of WashIP paralegal) Exhibits 4, 5, 7, 8 (Declarations of postconviction counsel for Cody Kloepper). Those materials showed that the State had consulted IMF extensively before briefing and the evidentiary hearing. Exhibit 4 at 10-12.

Even with significant redactions, the disclosures show the State actively sought IMF's assistance to prepare for the CrR 7.8 motion. Exhibit 20 (Internal State correspondence regarding IMF). Prosecutors referred to the IMF forensic scientists as 'experts', shared draft briefing prior to receiving the report, and even requested status updates tied to court deadlines and hearings. Exhibit 20 at 14; 29; 33; 41- 42. Yet, the State never disclosed the IMF report or opinions to counsel or the court.

In the IMF report, Derek Cutler concluded "primary transfer is generally much more likely than secondary transfer." Exhibit 2. In follow-up emails sent before the State filed its briefing, Mr. Cutler opined regarding estimated amounts of male DNA found on the cuttings sampled: "This info does not rule out either form of transfer but would indicate that a significant

---

[8] The IMF report was released for download in the public records portal on April 17, 2025. Exhibit 6 at 2; Exhibit 4 at 10-11.

amount of DNA (sperm cells) would need to be present in order to support a secondary transfer scenario." Exhibit 1 (Declaration of Forensic Scientist Derek Cutler with Attachments) at 21-22. Mr. Cutler also reaffirmed in a follow up email that "Primary transfer is more likely than secondary." Exhibit 1 at 19.

Upon discovery of the IMF materials in 2025, counsel interviewed Derek Cutler and obtained a sworn declaration confirming his prior opinions and adding the following conclusions:

- The State's conclusions regarding the number of spermatozoa observed under a microscope are not scientifically supported. Exhibit 1 at 6.

- Mr. Kloepper's Y-STR consistency with the major Y-STR profile on the rubber fragment could have resulted from secondary transfer. Exhibit 1 at 6.

- For the secondary transfer theory to be the cause of the DNA results obtained, semen or pre-ejaculate would have to have been collected from Mr. Contreras, transported to the crime scene, and deposited onto the evidence all without the perpetrator transferring any of their own

38

DNA while collecting, storing, transporting, and depositing the other man's semen or pre-ejaculate[9]. Exhibit 1 at 3.

- The amount of male DNA present on the clothing is not inherently supportive of the secondar transfer theory without further context and could be consistent with ejaculation. Exhibit 1 at 3, 5.

- In any secondary transfer scenario, he would expect some of the perpetrator's DNA to be detected on the evidence. Exhibit 1 at 4.

Grounds for Relief

**Ground One**: When state courts provide post-conviction procedures for seeking relief, such as CrR 7.8 motions, defendants are entitled to fundamental fairness in those proceedings. *District Attorney's Office for Third Judicial Dist. v Osborne*, 557 U.S. 52, 69 (2009). The State violated Mr.

---

[9] This aligns with Defense expert Dr. Charlotte Word's opinion that the secondary transfer scenario would require collection of a sufficient amount of ejaculate, maintenance of the ejaculate while transporting to the crime scene, deposit of the ejaculate on multiple areas of the clothing items, and to do so in a way that did not introduce any DNA from the perpetrator during the collection, storage, transport, and depositing of that ejaculate. Exhibit 9 at 5-6.

Kloepper's due process right to fundamental fairness in post-conviction proceedings by suppressing exculpatory expert evidence supportive of his actual innocence and presenting misleading arguments and evidence. This misconduct resulted in Mr. Kloepper being denied relief based on false information.

Due process forbids convictions obtained through misleading evidence or the "nondisclosure of specific evidence in the prosecutions possession supportive of the defense's theory." *Donnelly v Decristoforo*, 416 U.S. 637, 647 (1974); *see also Napue v People of Illinois*, 360 U.S. 264, 269 (1959). The same principles apply when the State sustains a conviction in post-conviction proceedings through misleading argument and nondisclosure of exonerating evidence. Such tactics block a defendant from effective or fair engagement with lawful post-conviction procedures and a fair ruling based on all evidence. *Thomas v Goldsmith,* 979 F.2d 746, 749-50 (9th. Cir. 1992); *Monroe v Butler*, 690 F.Supp. 521, 526 (E.D. La 1988), *aff'd* 853 F.2d 924 (1988).

40

Exhaustion

Cody Kloepper raised his due process claim in his personal restraint petition filed on October 9, 2025, which remains pending in the Washington State Court of Appeals, Division III. On February 9, 2026 the Court of Appeals called for the prosecution to respond to Mr. Kloepper's filed petition. Therefore, he also seeks a stay and abeyance while exhausting state remedies.

28 U.S.C. § 2254(d) indicates that once a claim is exhausted in state court, a writ of habeas corpus shall be granted if the decision on the claim was adjudicated in a way that was contrary to, or involved an unreasonable application of, clearly established federal law or involved an unreasonable determination of the facts in light of the evidence presented in support of the claim. As Mr. Kloepper's claim is still pending in state proceedings, no determination has been made. However, the factual and legal support for Mr. Kloepper's claim is extremely strong. Should his claim be adjudicated on the merits in state court, and Mr. Kloepper is denied relief on his federal due process claim, Mr. Kloepper would be entitled to a writ of federal habeas corpus. Mr. Kloepper is entitled to relief, and denying the claim on the merits would be contrary to or an unreasonable application of federal law or involve an unreasonable determination of facts.

## Additional Procedural Requirements

To obtain relief, Mr. Kloepper must show that he is in custody in violation of the Constitution and that his claim satisfies the gatekeeping requirements for a successive petition. 28 U.S.C. §2254(a). 28 U.S.C. §2244(b)(4) indicates for second or successive petitions, district courts are required to dismiss these petitions even if the appropriate Circuit Court granted authorization to file the petition unless the presented claim meets the requirements of 28 U.S.C. §2244(b)(2).

Federal habeas petitions brought by individuals in state court custody are subject to a 1-year statute of limitations. This 1-year statute of limitations begins to run from the latest of four circumstances. Pertinent to this petition is 28 U.S.C. § 2244(d)(1)(D), "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

## Second or Successive Petition Status

28 U.S.C. §2244(b) prohibits consideration of a second or successive habeas corpus petition if the claim presented was presented in a prior habeas petition. For claims not presented in a prior application, an exception applies where the petitioner can demonstrate "the factual predicate for the claim could

42

not have been discovered previously through the exercise of due diligence and the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. §2244(b)(2)(B). As discussed below, Mr. Kloepper's petition meets this requirement, and a writ of habeas corpus should issue.

28 U.S.C. §2244(b)(3)(A) further indicates that prior to filing a second or successive petition in district court "the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." Circuit courts may grant the motion for an order authorizing a second or successive petition "only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." 28 U.S.C. §2244(b)(3)(C). Cody Kloepper intends to file such an application with the 9th Circuit.

Argument

1. Cody Kloepper meets the procedural requirements for relief.

Cody Kloepper satisfies AEDPA's procedural requirements. He is in custody due to a state court judgment, and his claim is based on the State's violation of the Due Process Clause of the Constitution of the United States. As established in the facts section of this petition, and elaborated more below, the prosecution intentionally suppressed the exculpatory IMF materials. This suppression was effectuated through the prosecution making false representations regarding what expert materials were in their possession to Mr. Kloepper's counsel, as well as making false and misleading claims and arguments in the CrR 7.8 litigation. Further, as explained below, no reasonable juror would convict Mr. Kloepper in light of the exculpatory expert evidence the prosecution suppressed, as the IMF materials contradict the only two theories the State presented to account for Mr. Kloepper's guilt.

Mr. Kloepper also filed this petition in a timely matter under § 2244(d)(1)(D). The IMF report that forms the factual predicate for Mr. Kloepper's claim was initially suppressed and first discoverable on April 17, 2025, when it was released through public records. Given the material was previously intentionally suppressed, this constitutes the date on which the

factual predicate of the claim could have been discovered through the exercise of due diligence. As this petition is being filed within one year of that date, Mr. Kloepper's petition has been filed within the statute of limitations.

2. <u>There is a Due Process Right to Fundamental Fairness in Post-Conviction Proceedings.</u>

In Washington, individuals convicted of felonies may collaterally attack their conviction by filing a motion in Superior Court under CrR 7.8. That rule states, in relevant part, that "On motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for the following reasons:… (2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5." CrR 7.8(b). Washington State Rule of Appellate Procedure 16.4 similarly allows individuals convicted of felonies to collaterally attack their conviction through a personal restraint petition brought in the court of appeals on various grounds.

When state courts create a procedure for petitioners to collaterally attack their convictions through post-conviction proceedings, this creates a limited "liberty interest" for the petitioner to meaningfully and fairly pursue their claim. *District Attorney's Office for Third Judicial Dist. v Osborne*, 557 U.S. 52, 68-69 (2009) (citing *Medina v. California*, 505 U.S. 437, 446-48

(1992)). States have "flexibility in deciding what procedures are needed in the context of postconviction relief". *Id.* However, the framework of the state's procedures for postconviction relief may not "transgress[..] any recognized principle of fundamental fairness in operation". *Id.* "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914).

Individuals convicted of crimes in this country maintain due process protections related to their convictions and status as convicted persons. *Shaw v Murphy*, 532 U.S. 223, 228-29 (2001) ("Incarceration does not divest prisoners of all constitutional protections. Inmates retain, for example, the right to be free from racial discrimination, *the right to due process*, and as relevant here, certain protections of the first amendment.") (citations omitted) (emphasis added).  The U.S. Supreme Court more recently reiterated that individuals convicted of crimes in state court "have a liberty interest in demonstrating [their] innocence with new evidence under state law." *Gutierrez v. Saenz*, 606 U.S. 305, 314 (2025). Stated differently, the creation of a post-conviction mechanism for seeking relief in state court creates a right under the federal constitution to receiving fundamental fairness in those proceedings.

46

Therefore, in Washington, there exists a due process right to meaningfully and fairly engage with the existing procedures for convicted persons to seek relief through the presentation of new evidence establishing innocence.

3. The tenets of fundamental fairness prohibit prosecutors from intentionally suppressing exculpatory evidence relevant to the post-conviction proceedings and from presenting false or misleading claims or arguments during post-conviction proceedings.

Fundamental fairness requires the opportunity to *meaningfully* present a case, contest the prosecution's evidence, and obtain a decision based on an accurate factual record. The absence of these basic principles deprives a petitioner of the due process rights he is entitled to. The limited liberty interest discussed in *Osborne* and *Medina* requires petitioners be able to fairly present their cases without undue interference or obfuscation by the prosecution. Similarly, judicial determinations based on false and misleading claims presented by the prosecution will always lack fundamental fairness. If state misconduct prevents meaningful, lawful engagement with post-conviction procedures, the resulting proceedings lack the required fundamental fairness.

The criminal legal system rests on a bedrock foundational principle: convictions may not be obtained or sustained through falsehoods or suppression of exonerating evidence. For this reason, prosecutors are barred

from knowingly eliciting false or misleading evidence or failing to correct evidence they know is false or misleading. *Napue v People of Illinois*, 360 U.S. 264, 269 (1959); *see also Giglio v U.S.,* 405 U.S. 150, 154-55 (1972). This principle extends to both the introduction of misleading evidence as well as *withholding* of specific evidence supportive to the defense's theory. *Donnelly v. Decristoforo*, 416 U.S. 637, 647 (1974). When the prosecution's theory is based on deliberate misrepresentations of the truth, this requires relief. *Miller v Pate,* 386 U.S. 1, 6-7 (1967).

This rule prohibiting deliberate misrepresentations on behalf of the prosecution applies in the post-conviction context. A prosecutor's misleading advocacy post-conviction can violate due process. *Caldwell v Mississippi*, 472 U.S. 320, 339-41 (1985) (prosecution's misleading argument in sentencing hearing violated constitutional protections). While not all constitutional protections apply post-conviction; for example, the provisions of *Brady v Maryland* do not apply once someone is convicted (*See Osborne*); the most fundamental tenets of due process always will.

The Ninth Circuit has recognized a present duty of fairness in post-conviction proceedings. *Thomas v Goldsmith*, 979 F.2d 746 (9th Cir. 1992). Specifically, it stated, "[w]e do not refer to the state's past duty to turn over exculpatory evidence at trial, but to its present duty to turn over exculpatory

evidence relevant to the instant habeas corpus proceeding… Under the circumstances fairness requires that on remand the state come forward with any exculpatory evidence it possesses." *Id.* at 749-50. By withholding specific evidence supportive of the defense's claim the State deprives the petitioner of due process. The present duty recognized in the *Thomas* case to turn over exculpatory evidence relevant to ongoing post-conviction collateral attack procedures ensures that those collateral attack procedures are not just symbolic but can provide an actual mechanism for relief when evidence exists in the State's custody supporting relief. It is fundamentally unfair for the State to withhold evidence in their possession that is exculpatory and would be determinative of the post-conviction issue being litigated.

Other courts have reached the same conclusion. *See, e.g., Monroe v Butler*, 690 F.Supp.521, 525-26 (E.D. La. 1988), *aff'd* 883 F.2d 331 (5th Cir. 1988) (finding suppression during collateral review as fundamentally unfair as suppression at trial "where it prevents a defendant from taking advantage of post-conviction relief as it is when it results in the forfeiture of the defendant's right to a fair trial"). If the State's misconduct subverts a petitioner's ability to fairly engage in post-conviction proceedings and obfuscates the truth from the court therefore ensuring the ruling is based on

49

misrepresentations, this deprives the petitioner of fundamental fairness and mandates relief.

The consequences of post-conviction prosecutorial misconduct are severe, as a U.S. District Court for Western District of Pennsylvania case illustrates. In the case of *Munchinski v. Wilson*, 807 F.Supp.2d 242 (W.D. Pa. 2011), *aff'd, Munchinski v. Wilson,* 694 F.3d 308 (3rd Cir. 2012), the federal court granted relief on a successive petition for a writ of habeas corpus by a Pennsylvania State prisoner alleging a variety of *Brady* and other prosecutorial misconduct violations. When the petitioner first raised a *Brady* claim in a State court collateral attack proceeding, the State failed to disclose certain investigation files the court ordered to be turned over and the prosecutor made false representations about the files disclosed being complete. *Id.* at 254.

It was eventually discovered, during the petitioner's *third* collateral attack proceeding in State Court, that the files provided to the trial court by that prosecutor were not in fact complete and lacked crucial records supporting the petitioner's *Brady* claims. *Id.* at 255-26. Misconduct did not occur just at trial but in post-conviction context, causing years of unnecessary litigation and successive petitions in both state and federal courts. The federal district court opinion noted that the "outrageous misconduct" by the

prosecution occurring not just at trial but in prior collateral attack proceedings "casts a pall of doubt over every single piece of evidence presented by the prosecution in support of its case." *Id.* at 258. As the 3rd Circuit Court opinion affirming the granting of a writ of habeas corpus noted, the trial judge for the first collateral attack testified had the prosecution not intentionally withheld materials from in camera review and falsely asserted the complete files had been filed, "he may well have granted relief on Munchinski's PCRA I petition." *Munchinski v. Wilson*, 694 F.3d 308, 321-22 (3rd Cir. 2012). Deprivation of fundamental fairness in post-conviction proceedings through prosecutorial misconduct delays resolutions of issues and can infect the reliability of the conviction itself.

4. The State engaged in outrageous misconduct that prevented Mr. Kloepper from fairly contesting its claims and resulted in a CrR 7.8 hearing decision based on false information.

Here, the State's actions deprived Mr. Kloepper of fundamental fairness. The prosecution suppressed expert evidence relevant to a core issue in the case, misled both opposing counsel and the court, and relied heavily on that misinformation to defeat relief. Without suppressing the IMF materials, the State could not have presented their theory and argument to reconcile the convictions with the DNA results.

The prosecution told the trial court that the experts interviewed by the State in this case supported their secondary transfer theory. Yet, the State's own retained expert told the prosecution—both in a written report and follow-up communications—that, based on the factual record, primary transfer was more likely than their newly presented secondary transfer theory. The State knew this to be the case while claiming the opposite.

Knowing the same information, the prosecution also attacked Mr. Kloepper's expert, indicating Dr. Word would be an 'outlier' for a stance it is now known the prosecution's own expert also held. *See* Exhibit 16 at 12. It also claimed the number of sperm cells observed on sample cuttings from the stains on the victim's clothing supported their secondary transfer theory. *See* Exhibit 16 at 11. And, yet, Mr. Cutler had previously cautioned the State in writing that the opposite was true: "This info does not rule out either form of transfer but would indicate that a significant amount of DNA (sperm cells) would need to be present in order to support a secondary transfer scenario." *See* Exhibit 20 at 35. There is no question that Mr. Kloepper would have benefitted from knowing this information regarding the sperm cells observed under microscope, either to rebut the State's arguments or support his own.

The State's false representations hampered Mr. Kloepper's ability to meaningfully prepare and develop a complete record. Further, had the

52

evidence not been suppressed, Mr. Kloepper's counsel would have followed up on the IMF materials and utilized them in preparing for the case. *See generally* Exhibit 4; Exhibit 5; Exhibit 7; Exhibit 8. In turn, the additional conclusions and opinions expressed by Mr. Cutler in his 2025 declaration would have been considered by the trial court in the first instance. This includes opinions expressed by Derek Cutler which align with opinions expressed by Mr. Kloepper's expert Dr. Word. The prosecution never presented any evidence explaining precisely how the collection, storage, transport, and depositing of Mr. Contreras' ejaculate in their secondary transfer theory occurred without introducing any of the perpetrator's DNA throughout that process as Dr. Word indicated would be required under their theory; simply relying on articles and studies establishing the general principle of secondary transfer that did not account for the specific facts of this case. Knowledge the State's own expert also indicated the same requirements would have made it impossible to reconcile the State's theory with the lack of specific evidentiary support provided. By concealing the IMF materials, the State prevented the defense from presenting a complete case, responding to the State's case, and ensured that the trial court would rule on a distorted factual record.

The violation of fundamental fairness Mr. Kloepper suffered resulted in an unfair denial of his CrR 7.8 motion based on incomplete and misrepresented facts. Had the misconduct not occurred, Mr. Kloepper would have received relief. The suppressed exculpatory materials, along with the post-conviction DNA testing results, completely eradicate the theory and evidence of guilt presented by the State at Mr. Kloepper's original trial. No reasonable jury would convict Mr. Kloepper under these circumstances.

5. <u>Cody Kloepper has demonstrated the factual basis of his claim could not have been discovered earlier through due diligence, and that no reasonable jury would have convicted him but for the constitutional violation.</u>

As this is a second or successive petition, §2244(b)(2)(B) requires two showings: First, that the factual predicate of his claim could not have been discovered earlier through the exercise of due diligence. Second, he must demonstrate by clear and convincing evidence that if the factual predicate of his claim is proven, considering the other evidence, no reasonable fact finder would have convicted him but for the constitutional error.

The factual predicate was undiscoverable earlier because the State intentionally suppressed it. Once discovered, Mr. Kloepper acted with due diligence to file a collateral attack in state court and submit this petition.

54

The factual predicate also demonstrates by clear and convincing evidence that no reasonable jury would have convicted him in light of the suppressed evidence but for the constitutional error. Indeed, the suppression is dispositive when viewed against the trial record. The 2018 DNA testing results already contradicted the core of the State's sole trial theory. It was, in fact, forced to disavow their argument regarding the credibility of Mr. Contreras' testimony denying any sexual contact between himself and Mr. Kloepper, instead arguing that they had a sexual encounter that ended in Mr. Contreras' ejaculation. The State was forced to acknowledge that unlike its trial argument, Mr. Kloepper's was not the only male DNA found in D.W.'s apartment.

The suppressed IMF materials demolish the only theory the State could advance to reconcile the 2018 DNA results with Mr. Kloepper's guilt. Specifically, that someone else must have transported a "couple" of Mr. Contreras' sperm cells to the Villas apartment and spread them across the victim's clothing. It is beyond reason to think the State could have successfully advanced such an argument knowing the conclusions of their own expert witness.

Now, it is known that this new theory, the only theory that could possibly still account for Mr. Kloepper's guilt, is scientifically unsupported

and contradicted by the State's own expert witness. The IMF materials, now that they have come to light despite attempts at deliberate suppression, close the only door available to the prosecution to maintain their claim Cody Kloepper was the perpetrator considering the post-conviction DNA testing results. The IMF materials contradict the only theory the jury convicted Mr. Kloepper on.

In the case of *Munchinski v Wilson*, 694 F.3d 308 (3rd. Cir. 2012), the Court analyzed this standard of proof by clear and convincing evidence no reasonable juror could vote to convict but for the constitutional error. The Court highlighted that the new evidence that was improperly suppressed did not just merely impeach some of the State's evidence but rather "Munchinski's evidence clearly and convincingly shows that the murders *could not* have happened as the commonwealth proposed at trial." *Id.* at 335-36. This is the same situation as in Mr. Kloepper's case. The newly discovered IMF materials do not simply call the State's trial theory into doubt, nor simply call the State's new theory presented at the CrR 7.8 proceedings into doubt. Instead, they definitively contradict the entire basis of *both* the theory Cody Kloepper was convicted on and the new theory the State used to oppose Mr. Kloepper's motion for a new trial. No reasonable juror could reconcile these exculpatory

materials, the post-conviction DNA testing evidence, and the evidence presented at trial and vote to convict Mr. Kloepper.

## Conclusion

Cody Kloepper respectfully petitions this Court for a writ of habeas corpus granting Mr. Kloepper a new trial, or in the alternative, remanding to state court to receive a new evidentiary hearing on his previous Washington State CrR 7.8 motion for a new trial.

Dated this 17th day of April 2026

/s/David B. Owens
David B. Owens
Attorney for Cody Kloepper

<u>Verification</u>

1. I am the pro bono attorney for Cody Kloepper.

2. To avoid unnecessary delay in filing the petition, I am verifying the petition on Mr. Kloepper's behalf.

3. Based on my review of the state court record, I know all the facts described in the petition and verify them to be true.

I swear under penalty of perjury that the foregoing is true and correct.

Signed this 17th day of April 2026 in Seattle, Washington.

<u>/s/David B. Owens</u>
David B. Owens
Attorney for Cody Kloepper

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I electronically filed the foregoing with the Clerk of Court using CM/ECF and served the below following parties via email:

- Washington State Office of the Attorney General, serviceATG@atg.wa.gov; and

- Holger Sonntag, holger.sonntag@atg.wa.gov.

Dated this 17th day of April, 2026.

/s/Bethan Gee
Paralegal