David B. Owens
Loevy & Loevy
c/o Civil Rights And Justice Clinic
University of Washington Law School
William H. Hates Hall, Ste. 265
P.O. Box 85110
Seattle, WA 98145
312-243-5900

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| CODY KLOEPPER,<br><br>    *Petitioner*,<br><br>v.<br><br>JEFFEREY PERKINS, Superintendent<br>Coyote Ridge Correctional Facility<br><br>    *Respondent.* | No. _____<br><br><br>**EXHIBITS 1 – 15 TO<br>PETITION FOR WRIT OF<br>HABEAS CORPUS** |

1

INDEX OF EXHIBITS TO PETITION FOR WRIT OF HABEAS CORPUS

Exhibits 1-15

| | |
|---|---|
| Exhibit 1 | Declaration of Forensic Scientist Derek Cutler |
| Exhibit 2 | Forensic DNA Report, Intermountain Forensics |
| Exhibit 3 | Declaration of Cody Kloepper, Executed July 5, 2021 |
| Exhibit 4 | Declaration of Attorney Sarah Beth Johnson, Executed September 4, 2025 |
| Exhibit 5 | Declaration of Attorney Lara Zarowsky, Executed August 11, 2025 |
| Exhibit 6 | Declaration of Paralegal Justine A. Mclean-Riggs, Executed October 6, 2025 |
| Exhibit 7 | Declaration of Attorney Mark Mestel, Executed July 28, 2025 |
| Exhibit 8 | Declaration of Attorney Jackie McMutrie, Executed August 7, 2025 |
| Exhibit 9 | Letter from Dr. Charlotte Word, Dated April 9, 2021 |
| Exhibit 10 | Letter from Dr. Charlotte Word, Dated October 21, 2021 |
| Exhibit 11 | DNA Labs International DNA Reports, Dated June 6, 2020 and October 8, 2020 |
| Exhibit 12 | Washington State Patrol Crime Laboratory Reports, Dated January 7, 2021 and August 6, 2020 |
| Exhibit 13 | Richland Police Department Supplemental Report, Authored by Det. Dean Murstig, Dated August 25, 2020 |
| Exhibit 14 | Transcript of Salvador Contreras' Statement to Richland Police Department on August 19, 2020 |
| Exhibit 15 | Richland Police Department Supplemental Report, Dated September 2, 2020 |

2

Exhibits 16-25

| Exhibit 16 | State Response to Mr. Kloepper's Motion for New Trial, Dated October 7, 2021 |
| --- | --- |
| Exhibit 17 | Verbatim Report of Proceedings of Mr. Kloepper's Motion for New Trial |
| Exhibit 18 | Judge Joseph Burrowes' Ruling Denying Mr. Kloepper's Motion for New Trial, Dated April 30, 2022 |
| Exhibit 19 | Email Correspondence: Benton Co. Prosecuting Attorney's Office and Washington Innocence Project |
| Exhibit 20 | Email Correspondence: Benton Co. Prosecuting Attorney's Office, Richland Police Department |
| Exhibit 21 | Judgment and Sentence in State of WA v. Cody Kloepper, Benton Co. Superior Court Case No. 10-1-01156-4 |
| Exhibit 22 | Motion and Order to Correct Judgment and Sentence in State of WA v. Cody Kloepper, Benton Co. Superior Court Case No. 10-1-01156-4 |
| Exhibit 23 | Order Denying Petition in Eastern District of Washington Case No. 4:17-CV-5008-TOR |
| Exhibit 24 | Judgment in Eastern District of Washington Case No. 4:17-CV-5008-TOR |
| Exhibit 25 | Washington Court of Appeals, Division 3, Case No. 30294-6<br>Order Affirming Conviction |

3

# EXHIBIT 1

**Declaration of Forensic Scientist Derek Cutler**

Background and qualification:

1. My name is Derek Cutler. I am employed at Resolve Forensics in the position of Laboratory Director. I have been employed at Resolve Forensics since May of 2025.
2. Prior to my employment at Resolve Forensics, I was employed by DNA Labs International from July 2024 until May 2025 in the position of DNA Analyst – NGS Lead.
3. Prior to that position I worked at Intermountain Forensics in the position of Senior DNA Analyst from January 2020 until June 2022. I then served as Laboratory Director of Operations from June 2022 to July 2024. The laboratory division of Intermountain Forensics was then incorporated into DNA Labs International.
4. I have also held multiple positions at Sorenson Forensics. Beginning in February 2012 I served in the roles of Forensic DNA Technician I, Forensic DNA Analyst I, Forensic DNA Analyst II, and DNA Analyst Supervisor until April of 2019.
5. From 2011-2015 I also held the position of Forensic DNA Laboratory Technician with University of Nebraska-Lincoln.
6. I have a Bachelor of Science Degree from Southern Virginia University. I graduated in 2011.
7. Since 2011 I have performed DNA analysis and testing on at least 8,000 cases. I have experience using multiple forms of amplification and quantification kits, and utilizing multiple forms of DNA extraction methods. My experience includes conducting Short tandem repeat (STR) DNA analysis, Mitochondrial DNA (mtDNA) analysis, Single nucleotide polymorphisms (SNP) DNA analysis, Next generation sequencing (NGS) DNA analysis. I also have extensive experience providing consulting and review services to assist with analyzing and interpreting DNA tests conducted by other professionals.
8. I have provided expert witness services through my employment at private DNA laboratories. I have testified in court proceedings approximately 49 times. This includes testifying in one Washington State court proceeding.
9. I have served as an expert witness hired by both prosecuting agencies and defense attorneys. I estimate most times I have served as an expert witness it has been as an expert witness for a prosecuting agency.
10. Each year I complete continuing education trainings. This includes completing trainings specifically regarding Y-STR testing and STRmix (probabilistic genotyping software) training.

Review of Cody Kloepper Case

11. In the year 2021 while employed at Intermountain Forensics, I was retained by the Benton County Prosecuting Attorney's Office (BCPAO) to conduct a case review of post-conviction DNA results obtained by DNA Labs International (DLI) pertaining to the conviction of Mr. Cody Kloepper. I was provided various case materials including DNA testing reports.

12. In addition, I received a summary of the prosecution's theory of secondary transfer regarding the DNA testing results on a pair of sweatpants and sweatshirts worn by the victim in the case during the attack.

13. DLI conducted DNA analysis on several cuttings from the stains. A differential extraction procedure was used. Differential extraction provides a sperm fraction and a non-sperm fraction of DNA. It is used because sperm cells require different procedures to extract their DNA than other types of cells.

14. Cuttings from the sweatpants (from stains 2, 3, and 7) and cuttings from the sweatshirt (from stains 2, 4, and 8) yielded a redundant male DNA profile. Case records indicated the Washington State Patrol Crime Laboratory (WSPCL) submitted the profile into CODIS and a hit was obtained to a Mr. Salvador Contreras. After a reference sample was retrieved for Mr. Contreras, DLI conducted additional analysis and matched the male DNA profile found to Mr. Contreras with a probability ratio in the quadrillions.

15. Analysis of the minor Y-STR profile on the rubber fragment revealed Salvador Contreras was consistent with the minor Y-STR profile, meaning he nor any paternal male family members of his could not be excluded as a potential contributor to the genetic material found on the fragment. Testing prior to Mr. Kloepper's conviction already established he was consistent with the major Y-STR component found on the rubber fragment, meaning he nor any paternal male family members of his could not be excluded as a potential contributor to the genetic material found on the fragment.

16. I conducted my analysis of the proposed transfer scenarios presented in this case adopting the assumption that the major and minor Y-STR profiles from the glove fragment indeed originated from Cody Kloepper and Salvador Contreras respectively, as argued by the prosecution. I also conducted my analysis of the proposed transfer scenarios presented in this case adopting the assumption that the rubber fragment that underwent Y-STR testing was from a glove used by the perpetrator, as argued by the prosecution.

17. I authored a Forensic Case Report dated 9-18-2021 which was provided to the Benton County Prosecuting Attorneys Office. Intermountain Forensics Laboratory

Director Daniel Hellwig co-signed the report after reviewing and approving my work and the report contents. I engaged in an email exchange with the Benton County Prosecuting Attorney's Office discussing the contents of my report. I provided additional opinions in those email exchanges. My report and opinions expressed over email exchange are attached to this declaration.

June 2025 communications

18. In June of 2025, I was contacted by attorneys from Washington Innocence Project (WashIP) via email requesting to speak with me regarding my 2021 report in the Cody Kloepper case. We scheduled a virtual meeting through web conferencing platform 'Zoom' to occur on July 2, 2025. This meeting lasted approximately 1 hour.

19. As I am no longer with Intermountain Forensics I do not have access to the case file. However, I was provided a copy of my report from WashIP. At the July 2025 meeting the emails I sent to BCPAO in 2021 elaborating on my report were displayed to me via the 'screenshare' function on the Zoom application. While I do not recall all details of the Cody Kloepper case, I do have an independent recollection of the general case facts and work I completed.

Opinions Expressed

20. The following is a summary of the opinions I expressed during the July 2nd meeting:

a. I maintain my opinions and conclusions from the 2021 report I authored. This includes my opinion that primary transfer is generally more likely than secondary transfer.

b. I maintain my opinions and conclusions from the emails I exchanged with the BCPAO. This includes my opinion that the amount of male DNA present on the clothing items is not inherently supportive of a secondary transfer scenario without further context.

c. For indirect or secondary transfer to be the cause of the DNA results obtained in post-conviction testing in this case, semen or pre-ejaculate fluids would have to have been collected from the source, stored, transported to the crime scene, and deposited onto the evidence. This would have to occur in a way that the perpetrator did not transfer any of their own DNA while collecting, storing, transporting, and depositing the foreign genetic material during the assault.

d. For primary transfer to be the cause of the DNA results obtained in post-conviction testing in this case, semen or pre-ejaculate fluids would have to have been deposited directly onto the evidence items by the perpetrator

during the assault. There would not be a need for collection, storage, or transport of the genetic material prior to the assault.

e. It is possible for either transfer scenario to be the cause of the DNA results obtained post-conviction in this case. Neither scenario can be completely ruled out to a degree of scientific certainty. DNA testing cannot determine how genetic material was deposited onto a tested surface. In other words, DNA testing cannot determine whether DNA was deposited through direct transfer or indirect transfer.

f. However, relevant facts and information can be used in conjunction with DNA test results to compare the likelihood of a particular proposed transfer theory as compared to other proposed transfer theories.

g. It is my opinion as a forensic scientist, based on my training and experience, that a direct or primary transfer scenario is much more likely to be the cause of the post-conviction DNA testing results on the clothing items in this case than a secondary or indirect transfer scenario when dealing with multiple stains and levels of DNA higher than the recommended DNA input for profiling kits.

h. Due to the inherent requirements of collecting, storing, transporting, and depositing the genetic material in any indirect transfer scenario of body fluids, I am of the opinion it is much more likely some of the perpetrator's DNA would be transferred onto the evidence items as well in that scenario.

i. I am aware that wet environments facilitate the transfer of DNA more so than dry environments. In this case, the clothing items were described as stained with blood, the perpetrator was described as sweaty, and seminal fluid was located on the clothing items.

j. Cody Kloepper was entirely excluded as a contributor to the genetic material found on the clothing items in the post-conviction DNA testing. In contrast, male DNA belonging on Salvador Contreras was located on various locations on the clothing items.

k. In an email exchange with the BCPAO, I provided estimated minimum amounts of male DNA detected on the stain cuttings from the clothing items.

l. For the sweatpants these included 0.328ng (nanograms), 0.660ng, and 0.288ng. For the sweatshirt these included 0.776ng, 6.788ng, and 4.592ng.

m. A single sperm cell contains approximately 3pg (picograms) of DNA. 1 nanogram is equivalent to 1000 picograms.

n. While non-sperm cell originating male DNA can be detected in DNA analysis conducted through differential extraction methods, the majority of male DNA detected was located in the sperm cell fraction. Additionally, a comparison

of the results obtained from the different cell fractions will indicate that different results were obtained indicating that a separation of cell types did occur.

o. This indicates to me that the majority of male DNA on the clothing items, identified as matching to Salvador Contreras, was obtained from sperm cells.

p. I am aware that DLI observed samples of stains under microscope slides and documented the number of spermatozoa seen.

q. The smallest estimated amount of male DNA on a tested stain cutting was 0.288ng. The largest estimated amount of male DNA on a tested stain cutting was 6.788ng. This equates to 288 picograms and 6,788 picograms respectively. As the average sperm cell contains 3 picograms of DNA it is not scientifically supported to conclude the male DNA detected in the sperm fraction resulted from only single digit numbers of spermatozoa.

r. In my opinion, there was a significant amount of male DNA found on the clothing items, especially when considering that there are multiple stains with similar DNA results. The term "trace" DNA generally refers to very low levels of DNA, although the exact threshold may vary by the user. Regardless, given the estimated minimum amounts of male DNA detected, I would not describe the amounts of male DNA as "trace" on any of the stains.

s. I have extensive experience conducting DNA testing in sexual assault cases. On multiple occasions I have undergone differential extraction procedures on swabs from sexual assault kits where the victim reported ejaculation occurred, and the sperm fraction results contained 1ng or less of male DNA. This experience supports my belief that the amount of male DNA obtained from the clothing items was of a significant quantity and could be consistent with ejaculation.

t. There are a variety of reasons that can account for a male having a very low sperm count in an instance of ejaculation. Further, spermatozoa may be found in pre-ejaculate fluids, so sperm cells may be present on a surface even if ejaculation did not occur. Additionally, given the size of the stains, they are consistent with drops of fluid, rather than an entire ejaculate. DNA amounts would vary greatly depending on the amount of semen that made the stain.

u. Microscopic observations of cuttings to detect spermatozoa is a scientifically valid procedure for determining whether sperm cells are present on an evidentiary item. This is a helpful tool in the field of forensic science for determining the appropriate extraction method in DNA analysis.

v.   There is no scientific support for determining the amount of sperm cells deposited onto an evidence item based on the microscopic observation of the number of spermatozoa on a cutting, nor for determining whether ejaculation occurred. There is no correlation between the number of spermatozoa observed on a stain sample cutting and the overall amount of genetic material or sperm cells originally deposited onto the stain being analyzed.

w.   Only a minor portion of the total suspected genetic material present is being observed under the microscope. Sampling only a small cutting to detect spermatozoa is important to preserve the majority of the stain for DNA analysis and ensure the maximum amount of genetic material is available for DNA analysis.

x.   It is my opinion that the Y-STR DNA results on the rubber fragment is explainable by the previous encounter between the two individuals in question.

y.   I hold these opinions to a reasonable degree of scientific certainty.

I declare under penalty of perjury in the laws of the State of Washington the foregoing is true and correct to the best of my knowledge.

Dated this 31 day of July, 2025 in Salt Lake City, Utah.

*Derek Cutler*

Derek Cutler, Resolve Forensics

# DEREK J CUTLER

## EDUCATION

**Bachelor of Science Degree,** Southern Virginia University, Buena Vista, Virginia, 2011
Major Biology
Minor Chemistry

## WORK EXPERIENCE

**May 2025-Current**
**Laboratory Director** Resolve Forensics, Salt Lake Cit, UT

- Supervise and mentoring laboratory personnel and management, supporting training, discipline, and professional development
- Manage laboratory purchasing, resource planning, and contributor to long-term strategic direction
- Lead and maintain the laboratory's Quality Management System, including audit support, corrective actions, and staff competency testing
- Acting as a qualified Forensic DNA Analyst when needed performing DNA testing (STR, SNP, mtDNA, NGS), interpreting results, authoring reports, and testifying as an expert witness
- Identify and implement process improvements to increase operational efficiency, reduce costs, and decrease turnaround time, directly supporting Resolve's core mission of accessibility and affordability
- Support validation efforts, training programs, and collaboration with clients, vendors and business partners
- Participate in ongoing professional development and maintain productivity standards as determined by leadership

**July 2024-May 2025**
**DNA Analyst – NGS Lead** DNA Labs International, Salt Lake City, UT

- Analyst
  - Solves technical problems of existing analytical methods.
  - Validates new analytical procedures.
  - Assist in training, quality control and safety programs.
  - Conducts preliminary testing and preparation of evidence for analysis in DNA
  - Conducts laboratory examinations utilizing procedures applicable to the analytical task(s) assigned.
  - Generates data from laboratory examination and testing; reviews such for determining findings; compiles such for reporting purposes and judicial process as applicable.
  - Testifies to analytical results in depositions and court.
  - Performs routine maintenance and troubleshooting of equipment, to include calibration and sterilization procedures.
  - Maintains current knowledge of trends and developments in the field through training, workshops, seminars, science periodicals, and other information sources; participates in proficiency examinations.
- Team Lead
  - Coordinate the activities of team members
  - Set goals for performance and deadlines for team members
  - Participate in reviews for team members
  - Identify and resolve performance issues for team members
  - Keep Technical Leader and Operations Coordinator updated on team members
  - Assist Technical Leader and Director of Casework Operations with case management as needed

**Ex. 1 at 007**

**June 2022-July 2024**
**Laboratory Director of Operations** Intermountain Forensics, Salt Lake City, UT

- Provide direct supervision of management level personnel
  - Monitor personnel issues, proceed with progressive discipline and/or mentor supervisors through the process
- Act as a purchase agent for laboratory equipment, supplies, and reagents/consumables
- Participate in the design and implementation of laboratory strategies, plans and procedures to align with the laboratory mission, vision, and culture
- Oversee daily operations of the laboratory including:
  - Participation in process improvement, corrective action and/or preventative action as required
    - Perform all administrative duties that include QC documentation, etc.
  - Monitor laboratory metrics and key performance indicators
- Participates in the Quality Management System including, but not limited to,
  - Support of the yearly management reviews concerning audit status, lab operations, and other pertinent items
  - Support of internal and external audits
  - Completion of staff authorization and oversight of competency testing
  - Support of the deviation, conflict resolution, and non-compliance processes, as required
- Serve as the Forensic DNA Technical Leader during extended time periods when the position is vacant or the current Forensic DNA Technical leader is otherwise unavailable (vacation, illness etc.), if qualified
- Perform the duties of a qualified Forensic DNA Analyst
  - Perform scientific examination, all laboratory efforts, and DNA analysis of biological evidence collected in connection with death and criminal investigations, including comparison and interpretation of DNA profiles as well as statistical analysis as applicable
    - DNA interpretation and analysis (STR, SNP, NGS, mtDNA) required as needed
    - Non-criminal casework (private DNA testing, research, genealogy studies etc.) may be required as needed
  - Crafting and authorizing laboratory reports as a result of testing, interpretation and analysis
    - Provide Forensic DNA technical and/or administrative peer review
  - Testify as an expert witness in court proceedings
  - Successfully complete proficiency testing requirements
- Participate in validation processing and summary, as necessary
- Participate in continuing education (workshops, training courses, conferences etc.) as per laboratory policy and applicable accreditation, certification, and FBI QAS requirements
  - Maintain documentation of above participation as per policy
- Provide training to laboratory staff and external entities
- Establish and maintain relationships with customers, vendors, and business partners
- Maintain at least a minimum level of productivity as determined by scientific board for review
- Adhere to all safety procedures and protocols as mandated by the laboratory management system

**January 2020-June 2022**
**Sr. DNA Analyst** Intermountain Forensics, Salt Lake City, UT

- Act as a qualified Forensic DNA Analyst
  - Perform scientific examination, all laboratory functions and STR DNA analysis of biological evidence collected in connection with death and criminal investigations, including comparison and interpretation of STR DNA profiles as well as statistical analysis as applicable
    - Other relevant DNA interpretation and analysis (SNP, NGS, mtDNA) may be required as needed
    - Non-criminal casework (private DNA testing, research, genealogy studies etc.) may be required as needed

- o Crafting and authorizing a laboratory report as a result of testing, interpretation and analysis
  - o Provide Forensic DNA technical and/or administrative peer review
  - o Testify as an expert witness in court proceedings
  - o Successfully complete proficiency testing requirements
- Participate in continuing education (workshops, training courses, conferences etc.) as per laboratory policy and applicable accreditation, certification and FBIQAS requirements
- Maintain documentation of above participation
- Maintain at least a minimum level of productivity as determined by relevant management staff
- Adhere to all safety procedures and protocols as mandated by the laboratory management system
- Assist in hiring process of Forensic DNA Analyst (and other positions as needed by relevant management staff)
- Provide technical training and mentorship of Forensic DNA Analyst and Forensic Molecular Biologist staff
- Assist and/or manage projects and validations as needed by relevant management staff or Forensic DNA Technical Leader.

**August 2017-April 2019**
**DNA Analyst Supervisor** Sorenson Forensics, Salt Lake City, UT
- Setup new team of completely remote DNA Analysts.
  - o Interviews, hiring, process design and setup, training, and supervision of 13 analysts
- Prepare and conduct annual performance reviews.
- Initiate and participate in employee disciplinary procedures, when necessary.
- Solve technical problems and propose new or modified analytical procedures.
- Ensure all technical staff is properly trained when new technical procedures are implemented.
- Maintain records of test results; and performing related work as required.
- Participate in proficiency testing in accordance with DAB standards.
- Perform duties of Forensic DNA Analyst.
- Update personal skills and knowledge to remain current and become efficient and proficient in the position.
- Perform other duties as directed by Laboratory Director.

**February 2015-August 2017**
**Forensic DNA Analyst II** Sorenson Forensics, Salt Lake City, UT
- Evaluate and prepare a written opinion concerning the identification and comparability of biological samples; and testify as an expert witness in a Court of Law.
- Solve technical problems and propose new or modified analytical procedures.
- Ensure all technical staff is properly trained when new technical procedures are implemented
- Participate in proficiency testing in accordance with DAB standards.
- Update personal skills and knowledge to remain current and become efficient and proficient in the position.
- Perform other duties as directed by the DNA Analyst Supervisor.

**October 2012- February 2015**
**Forensic DNA Analyst I** Sorenson Forensics, Salt Lake City, UT
- Evaluate and prepare a written opinion concerning the identification and comparability of biological samples; and testify as an expert witness in a Court of Law.
- Solve technical problems and propose new or modified analytical procedures.
- Ensure all technical staff is properly trained when new technical procedures are implemented
- Participate in proficiency testing in accordance with DAB standards.
- Update personal skills and knowledge to remain current and become efficient and proficient in the position.
- Perform other duties as directed by the DNA Analyst Supervisor.

**February 2012 – October 2012**
**Forensic DNA Technician I** Sorenson Forensics, Salt Lake City, UT

**Ex. 1 at 009**

- Serology duties including casework examination, Cutting for DNA, and Y-screening.
- Extraction of DNA using Organic SoPure extraction method, DNA IQ extraction method on Hamilton STARlet liquid handling robot, and Chelex extraction method.
- Quantification of DNA using Plexor HY Quantification Kit manually and automated on Hamilton STARlet.
- Amplification of DNA using Identifiler, Identifiler Plus, Y-filer, Mini-filer, PowerPlex 16, PowerPlex 16 Hot Start, and PowerPlex Y.
- Maintain laboratory and laboratory equipment including centrifuges, Hamilton robot, 7500 Real-time PCR, and 3130 XL genetic analyzer.
- Use good laboratory practice, SOP's and LIM's sample tracking system to avoid contamination and sample switches.

**July 2011 – 2015**
**Forensic DNA Laboratory Technician,** University of Nebraska-Lincoln, Lincoln, Nebraska
- Optimize PowerPlex 16 kit using individual forward and reverse primers
- Optimization of a new nested protocol for low copy or degraded samples (Targeted Genome Amplification, TGA)

## COURT TESTIMONY

| Location | Number |
|---|---|
| Salt Lake City, UT | 6 |
| Logan, UT | 1 |
| Tucson, AZ | 2 |
| Kent, WA | 1 |
| Pocatello, ID | 2 |
| Broward Co., FL | 3 |
| Detroit, MI | 6 |
| Honolulu, HI | 1 |
| Washington DC | 5 |
| Los Angeles, CA | 1 |
| Riverside, CA | 1 |
| Fairbanks, AK | 2 |
| Kodiak, AK | 1 |
| Fond du Lac, WI | 1 |
| Portland, OR | 3 |
| Memphis, TN | 8 |
| Lamoure, ND | 2 |
| Alamogordo, NM | 1 |
| Marietta, GA | 1 |
| Fort Worth, TX | 1 |

Total: 49

## CERTIFICATES
**Lean Six Sigma**

Yellow Belt Certification (2014)
Green Belt Certification (2015)

## TRAINING
**Continuing Education:  8 hours minimum required and completed**

2012
2013
2014

**Ex. 1 at 010**

|  |  |
|---|---|
|  | 2015 |
|  | 2016 |
|  | 2017 |
|  | 2018 |
|  | 2020 |
|  | 2021 |
|  | 2022 |
|  | 2023 |
|  | 2024 |

**Y-STR Workshop**                                                                August 2012
Sorenson Forensics Salt Lake City, Utah


**American Academy of Forensic Sciences Annual Meeting**            February 2012
Atlanta, Georgia

**California Association of Criminalists Spring Seminar**                  May 2016
Hollywood, California

**STRmix Training**                                                              December 2018
Provided by ESR
Sorenson Forensics Salt Lake City, Utah


## PRESENTATIONS/POSTERS/PUBLICATIONS
**Strategies for the Enrichment of Low Copy DNA Templates**
        February 2012
**(Poster Presentation)**
American Academy of Forensic Sciences Annual Meetings

Updated 6/10/2025

# ATTACHMENTS



# Intermountain Forensics

**(801) - 904 - 2230**
**4885 South 900 East, Suite 300**
**Salt Lake Utah, 84117**
www.intermountainforensics.com

## Forensic Case Report

### Case Review

Date: 9/8/2021

Request: 001

| | |
|---|---|
| Benton County Prosecuting Attorney<br><br>Attn: Andrew J. Clark<br><br>7122 Okanogan Place, Building A<br><br>Kennewick, WA 99336 | IMF Case Number: IMF-21-0064<br><br>Client Case Number:<br><br>Agency Name: Washington State Patrol, DNA Labs International<br><br>Agency Case Number: 209-001537, DLI 20-1410<br><br>Report Date: April 9, 2010 (WSP); June 18, 2010(WSP); June 26, 2020 (DLI); October 8, 2020 (DLI); 08/06/2020 (WSP); January 7, 2021;<br><br>Offense: Rape, Assault, Burglary<br><br>Case Names: Cody Kloepper, Salvador Cosio-Contreras, Dana Widrig |

## Applicable Items Tested:

| Client Item Number | Item Name | Type of Testing | Result |
|---|---|---|---|
| RS5 | Glove | Y-STR | Mixture of two haplotypes, the major matches Cody Kloepper and a minor matches Salvador Cosio-Contreras. |
| RS-8 (20-02136.01) | Buccal swabs from Cody J. Kloepper | STR and Y-STR | DNA profile and DNA Haplotype obtained |
| DM-1 (20-02135.01) | Buccal swabs from Dana Widrig | STR | DNA profile obtained |
| 902831 (20-07980) | Buccal swabs from Salvador Cosio-Contreras | STR and Y-STR | DNA profile and DNA Haplotype obtained |
| RJS-5 (20-02131.01) | Sweatpants – Stain 2 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Major matches Salvador Cosio-Contreras, minor matches Dana Widrig. |

**Ex. 1 at 013**



# Intermountain Forensics

(801) - 904 - 2230
4885 South 900 East, Suite 300
Salt Lake Utah, 84117
www.intermountainforensics.com

| RJS-5 (20-02131.02) | Sweatpants – Stain 2 (CF) | STR | Single source profile matches Dana Widrig. |
|---|---|---|---|
| RJS-5 (20-02131.03) | Sweatpants – Stain 3 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Major matches Salvador Cosio-Contreras, minor matches Dana Widrig. |
| RJS-5 (20-02131.04) | Sweatpants – Stain 3 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-5 (20-02131.05) | Sweatpants – Stain 8 (SF) | STR followed by STRMix | Mixture of three contributors. Dana Widrig is assumed to be present. Major profile matches Salvador Cosio-Contreras. 3rd profile has only 3 alleles that do not match the major or the assumed contributor |
| RJS-5 (20-02131.06) | Sweatpants – Stain 8 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-6 (20-02131.01) | Sweatshirt – Stain 2 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Other profile matches Salvador Cosio-Contreras. |
| RJS-6 (20-02131.02) | Sweatshirt – Stain 2 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-6 (20-02131.03) | Sweatshirt – Stain 4 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Other profile matches Salvador Cosio-Contreras |
| RJS-6 (20-02131.04) | Sweatshirt – Stain 4 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-6 (20-02131.05) | Sweatshirt – Stain 7 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Other profile matches Salvador Cosio-Contreras. |
| RJS-6 (20-02131.06) | Sweatshirt – Stain 7 (CF) | STR | Mixture of two contributors. Major profile matches Dana Widrig. Minor profile in |

## Conclusions and Opinions:

### Basic DNA testing:

1)  DNA testing cannot determine when DNA was deposited on an item.
2)  DNA testing cannot determine how DNA was deposited on an item.
3)  Primary transfer is generally much more likely than secondary transfer.

Multiple scenarios have been given to explain the results of the DNA testing. It is difficult to fully exclude the possibility of nearly any scenario as just about anything can be shown to be possible. Each scenario can be assessed and compared to each other to determine which might be more likely than others.

Page 2 of 4

**Ex. 1 at 014**

# Intermountain Forensics

(801) - 904 - 2230
4885 South 900 East, Suite 300
Salt Lake Utah, 84117
www.intermountainforensics.com

**Discussion:**

Both Cody Kloepper and Salvador Cosio-Contreras have changed their stories

Based on the history provided, the assailant donned gloves and made penile contact with the victim.

The results indicate that semen with a male DNA profile matching Salvador Cosio-Contreras was found on the sweatpants and sweatshirt of Dana Widrig. Also, a mixture of Y-STR haplotypes that match both Salvador Cosio-Contreras and Cody Kloepper and/or their paternal relatives was found on a piece of rubber that is assumed to be from a glove.

**Scenario 1:**

- Semen was deposited directly from the human source to the clothing during (or previous to) the alleged assault.
- Mixture of YSTR DNA on the assumed glove fragment is as a result of primary transfer from Cosio-Contreras wearing them while having secondary transfer DNA from Kloepper.
    - Assumption: YSTR DNA is in fact from Kloepper and Cosio-Contreras and not a match by chance or a male relative.

**Scenario 2:**

- Semen deposited by a second individual
    - Semen first had to be collected during an encounter with Cosio-Contreras, stored, and deposited during the assault without being noticed by the victim. Also, the assault would need to occur without leaving their own DNA behind
- Mixture of YSTR DNA on the assumed glove fragment is as a result of primary transfer from Kloepper wearing them while having secondary transfer DNA from Cosio-Contreras
    - Assumption: YSTR DNA is in fact from Kloepper and Cosio-Contreras and not a match by chance or a male relative.

**Scenario 3:**

- Semen is present on the clothing previous to the assault.
- YSTR mixture includes both individuals as a result of random chance and it is neither are the actual source of the DNA deposited not.

## Additional Notes:

Additional laboratory reports to include the amounts of DNA in the samples and fractions tested may provide additional details about the likelihoods of a deliberate transfer scenario.

Page 3 of 4

**Ex. 1 at 015**



# Intermountain Forensics

(801) - 904 - 2230
4885 South 900 East, Suite 300
Salt Lake Utah, 84117
www.intermountainforensics.com

Signed,

Derek Cutler

Sr. Forensic DNA Analyst

Co-Signed,

Daniel Hellwig

Laboratory Director

**Ex. 1 at 016**

## Andrea Brown

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Wednesday, September 15, 2021 11:12 AM |
| **To:** | Derek Cutler; Andy Miller; Andrew Clark |
| **Subject:** | RE: [EXTERNAL]  Re: State v. Kloepper, IMF No 21-0064 |

Great.  We'll call you at your cell number.

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Wednesday, September 15, 2021 11:07 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** Re: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

4:00 works for me. My cell is 801-644-9691.


*Thank you,*

*Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 12:01 PM
**To:** Derek Cutler <derek@intermountainforensics.com>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton wa.us>
**Subject:** RE: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

Derek,

Ironically we received the below email from Erin Ehlert, a former deputy prosecutor from King County. She is the one

1

BCPA #24-1261, Install No. 2

**Ex. 1 at 017**

who recommended that we contact your lab based on her extensive work with Danny. We have been using her as a sounding board given her expertise in DNA cases. Our office is much smaller than King County meaning that we don't have someone with her type of expertise.

Maybe we could also discuss this when we talk? **Could we call you today at 4:00 pm your time, 3:00 pm our time?**

Here's the email with Erin Ehlert:

**From:** Erin <e.ehlert@comcast.net>
**Sent:** Tuesday, September 14, 2021 6:54 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- CaseReview

Andy:



Let me know if that makes sense or its helpful. This case hurts my head – did I mention to you that in that last big trial I did in King County, the private lab found a mixture of 3 male profiles on the victim's tampon string that had been pulled out of her body. We only had 2 suspects. The lab said the DNA probably came during the manufacturing process of the tampon – but of course that was just a guess. Sigh....

**From:** Andy Miller
**Sent:** Wednesday, September 8, 2021 5:30 PM
**To:** Erin Ehlert
**Cc:** Terry Bloor; Andrew Clark; Andy Miller
**Subject:** FW: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- CaseReview

Erin,

AWP

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Wednesday, September 15, 2021 10:16 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

2

EXTERNAL EMAIL WARNING!!: **This email originated from outside of Benton County.** DO NOT **click links or open attachments unless you recognize the sender and know the content is safe.**

I believe I have pulled out the questions. I am generally in agreement with Mr. Wright. Though DNA testing can't give specific likelihoods in terms of primary and secondary transfer we can use basic generalities to help understand which scenarios may be more likely than others.

1. Is the summary of the interview with DNA Analyst Darren Wright sound?
    a. Yes
    b.
2. Can DNA testing determine if transfer is primary or secondary?
    a. DNA testing cannot tell us <u>when</u> or <u>how</u> DNA was deposited on the item being tested, but it can provide information as to what circumstances would need to be present for the transfer.
    b.
3. Can DNA testing provide how probable secondary transfer would be?
    a. Not numerically but more in generals.
        i. Primary transfer is more likely than secondary
        ii. High amounts of DNA is less likely of a secondary transfer than low DNA amounts.
        iii.
4. Does the packaging affect secondary transfer?
    a. As I understand the response, I believe the intention was to point out that clothing in the package may transfer from one stain to another along the same transfer principals, which may create additional stain areas on the packaged item. If a stain happened to still be wet, the transfer would generally be more substantial.
    b.
5. Clarification on additional reports:
    a. The additional reports would be for the quantification data obtained in the previous testing. Low male DNA give a higher possibility of secondary transfer than a higher amount.

Let me know if you have any additional questions and when you have time for the call.


*Thank you,*

*Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments

3

**Ex. 1 at 019**

thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 12:27 PM
**To:** Danny Hellwig <danny@intermountainforensics.com>; **Derek Cutler** <derek@intermountainforensics.com>; **Andy Miller** <Andy.Miller@co.benton.wa.us>; **Andrew Clark** <Andrew.Clark@co.benton.wa.us>
**Subject:** State v. Kloepper, IMF No. 21-0064

Mr. Hellwig and Mr. Cutler:  Thanks for your report dated September 8, 2021, which is attached.  We would like to set up a time to discuss so we make sure we accurately understand your report.  In the meantime, we had a couple of questions.

We have also attached a summary of the joint interview with DNA Analyst Darren Wright who did the DNA analysis on this case for DNA Labs International.  Is that summary basically sound?  This includes Mr. Wright's conclusion that DNA testing cannot determine if the transfer was direct or secondary, that secondary transfer is possible, but that it cannot be determined how probable the second transfer could be.  We are also curious about Mr. Wright's answer about the packaging of the clothes affecting secondary transfer.

Under your "Additional Notes" you stated that additional laboratory reports to include the amounts of DNA in the samples and fractions tested may provide additional details about the likelihoods of a deliberate transfer scenario.  We are unclear if the additional laboratory reports would involve additional testing or laboratory reports based on testing that is already done.

We look forward to talking to you.  If you could provide days and times that work for you, we can try to fit into your schedule.

4

BCPA #24-1261, Install No. 2

**Andrea Brown**

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Thursday, September 16, 2021 4:35 PM |
| **To:** | Andy Miller; Andrew Clark |
| **Subject:** | RE: [EXTERNAL]   State v. Kloepper, IMF No. 21-0064 |
| **Attachments:** | DLI 20-1410 Case File 1st Report DTW.pdf |

# AWP

Anyway, I'm looking forward to talking to him.

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 4:23 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

AWP

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 3:47 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

Andy and Andrew:  Do you want to try to call him tomorrow?

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Thursday, September 16, 2021 3:42 PM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** Re: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

This is a document that I received. I did find a quant page on PDF page 86 but it only shows concentrations. In order to determine the total amount of DNA we would also need the amount of extract that they have the EZ1 instrument elute to. The instrument has several options so I can give numbers for each one, or a minimum amount but it ranges from 40ul to 200ul which can double the value depending on which one it is.

Below are the expected minimums based on 40ul extraction volume.

Sweat Pants - Minimum amount of male DNA
20-02131.01 -        0.328ng

20-02131.03 -        0.660ng

20-02131.05 -        0.288ng

Sweat Shirt - Minimum amount of male DNA
20-02132.01 -        0.776ng

1

20-02132 03 -      6.788ng

20-02132 05 -      4.592ng

This information does not rule out either secondary or primary transfer but would indicate that a significant amount of DNA (sperm cells) would need to be present in order to support a secondary transfer scenario.

Thank you,

*Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 4:38 PM
**To:** Derek Cutler <derek@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

Derek,

Thanks for meeting with us.  Attached is what we had received from their lab when we had requested their file.



Thanks again for your time on this.

Andrew

Andrew J. Clark

Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark a co.benton.wa.us

**From:** Andrew Clark
**Sent:** Wednesday, August 18, 2021 13:59
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

This is email 2

Lets hope they both went through

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew Clark a co.benton.wa.us

**From:** Andrew Clark
**Sent:** Wednesday, August 18, 2021 12:16
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry Bloor@co benton wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

Thanks. I've submitted it. I've also attached the records for review.

Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 12:12
**To:** Andrew Clark <Andrew Clark@co benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

I am sorry. Go ahead and select anything and once you hit "submit to lims", I will fix it on my end.

3

*Thank you,*
*Alyssa McElreath*
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 1:04 PM
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Danny Hellwig <danny@intermountainforensics.com>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

The problem I'm having with "service type" is there is nothing in that drop down to select from.  The only thing to select under that drop down is what is pictured below which is "please select".  I'm guessing there is a bug on the website with that drop down; I tried it on two browsers (Chrome and Edge) and it did not make a difference.

Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 11:54
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Danny Hellwig <danny@intermountainforensics.com>
**Subject:** [EXTERNAL] RE: Intermountain Forensics

EX_____     This email originated from outside of Benton County.         click links or open attachments unless you recognize the sender and know the content is safe.

Hello Mr. Clark,

You will want to select "Case Review" for both the department and service type.

We are unable to upload files to the portal at this time, however you can still send over any documents directly to me and I will get them to our reviewer.

*Thank you,*
*Alyssa McElreath*
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 12:20 PM
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Intermountain Forensics

Alyssa,

I was on the portal trying to setup a new submission for a case review and had two questions.

First, where do I upload the reports, prior testing etc.? I saw the add evidence tab but it didn't have any option to attach anything.

Second, in the requests, I tried to select case review, but it wants a "service type" as a required field but there was nothing to pick from, so it would not let me save:

| * Department | * Service Type |
| --- | --- |
| Case Review ⌄ | -- Please select -- ⌄ |
| | -- Please select -- |

5

**Ex. 1 at 025**



**\* Department**

Case Review

**\* Service Type**

-- Please select --

Service Type is required

**Complexity**

-- Please select --

**Reason**

-- Please select --

**Notes**



Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Prosecuting <Prosecuting@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 09:56
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; **Andrew Clark** <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: Intermountain Forensics

Here you go.

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 9:53 AM
**To:** Prosecuting <Prosecuting@co.benton.wa.us>
**Cc:** Danny Hellwig <danny@intermountainforensics.com>; **Derek Cutler** <derek@intermountainforensics.com>
**Subject:** Intermountain Forensics

Greetings
I have set you up with an account and I am also attaching the instructions that will help you go
through the steps when adding cases that you would like to have us test

6

**Ex. 1 at 026**

The following is the link to our portal.
https://portal.intermountainforensics.com
Username: **MILLERA**

Temporary Password

You will need to add your case to the portal before we can receive it and start testing. Also, you will need to require a signature and ship overnight Monday thru Wednesday.

If you have any additional questions or concerns, please let me know.
Thank you and have a great day.

*Thank you,*
*Alyssa McElreath*
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com

INTERMOUNTAIN
FORENSICS

PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

7

**Ex. 1 at 027**

# EXHIBIT 2



# Intermountain Forensics

**(801) - 904 - 2230**
**4885 South 900 East, Suite 300**
**Salt Lake Utah, 84117**
**www.intermountainforensics.com**

## Forensic Case Report

### Case Review

Date: 9/8/2021

Request: 001

Benton County Prosecuting Attorney

Attn: Andrew J. Clark

7122 Okanogan Place, Building A

Kennewick, WA 99336

IMF Case Number:  IMF-21-0064

Client Case Number:

Agency Name:  Washington State Patrol, DNA Labs International

Agency Case Number:  209-001537, DLI 20-1410

Report Date:  April 9, 2010 (WSP); June 18, 2010(WSP); June 26, 2020 (DLI); October 8, 2020 (DLI); 08/06/2020 (WSP); January 7, 2021;

Offense: Rape, Assault, Burglary

Case Names: Cody Kloepper, Salvador Cosio-Contreras, Dana Widrig

## Applicable Items Tested:

| Client Item Number | Item Name | Type of Testing | Result |
|---|---|---|---|
| RS5 | Glove | Y-STR | Mixture of two haplotypes, the major matches Cody Kloepper and a minor matches Salvador Cosio-Contreras. |
| RS-8 (20-02136.01) | Buccal swabs from Cody J. Kloepper | STR and Y-STR | DNA profile and DNA Haplotype obtained |
| DM-1 (20-02135.01) | Buccal swabs from Dana Widrig | STR | DNA profile obtained |
| 902831 (20-07980) | Buccal swabs from Salvador Cosio-Contreras | STR and Y-STR | DNA profile and DNA Haplotype obtained |
| RJS-5 (20-02131.01) | Sweatpants – Stain 2 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Major matches Salvador Cosio-Contreras, minor matches Dana Widrig. |

**Ex. 2 at 001**

# Intermountain Forensics

**(801) - 904 - 2230**
**4885 South 900 East, Suite 300**
**Salt Lake Utah, 84117**
**www.intermountainforensics.com**

| RJS-5 (20-02131.02) | Sweatpants – Stain 2 (CF) | STR | Single source profile matches Dana Widrig. |
|---|---|---|---|
| RJS-5 (20-02131.03) | Sweatpants – Stain 3 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Major matches Salvador Cosio-Contreras, minor matches Dana Widrig. |
| RJS-5 (20-02131.04) | Sweatpants – Stain 3 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-5 (20-02131.05) | Sweatpants – Stain 8 (SF) | STR followed by STRMix | Mixture of three contributors. Dana Widrig is assumed to be present. Major profile matches Salvador Cosio-Contreras. 3rd profile has only 3 alleles that do not match the major or the assumed contributor. |
| RJS-5 (20-02131.06) | Sweatpants – Stain 8 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-6 (20-02131.01) | Sweatshirt – Stain 2 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Other profile matches Salvador Cosio-Contreras. |
| RJS-6 (20-02131.02) | Sweatshirt – Stain 2 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-6 (20-02131.03) | Sweatshirt – Stain 4 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Other profile matches Salvador Cosio-Contreras. |
| RJS-6 (20-02131.04) | Sweatshirt – Stain 4 (CF) | STR | Single source profile matches Dana Widrig. |
| RJS-6 (20-02131.05) | Sweatshirt – Stain 7 (SF) | STR followed by STRMix | Mixture of two contributors. Dana Widrig is assumed to be present. Other profile matches Salvador Cosio-Contreras. |
| RJS-6 (20-02131.06) | Sweatshirt – Stain 7 (CF) | STR | Mixture of two contributors. Major profile matches Dana Widrig. Minor profile in |

## Conclusions and Opinions:

**Basic DNA testing:**

1) DNA testing cannot determine when DNA was deposited on an item.
2) DNA testing cannot determine how DNA was deposited on an item.
3) Primary transfer is generally much more likely than secondary transfer.

Multiple scenarios have been given to explain the results of the DNA testing. It is difficult to fully exclude the possibility of nearly any scenario as just about anything can be shown to be possible. Each scenario can be assessed and compared to each other to determine which might be more likely than others.

Page **2** of **4**

**Ex. 2 at 002**



# Intermountain Forensics

**(801) - 904 - 2230**
**4885 South 900 East, Suite 300**
**Salt Lake Utah, 84117**
**www.intermountainforensics.com**

**Discussion:**

Both Cody Kloepper and Salvador Cosio-Contreras have changed their stories.

Based on the history provided, the assailant donned gloves and made penile contact with the victim.

The results indicate that semen with a male DNA profile matching Salvador Cosio-Contreras was found on the sweatpants and sweatshirt of Dana Widrig. Also, a mixture of Y-STR haplotypes that match both Salvador Cosio-Contreras and Cody Kloepper and/or their paternal relatives was found on a piece of rubber that is assumed to be from a glove.

**Scenario 1:**

- Semen was deposited directly from the human source to the clothing during (or previous to) the alleged assault.
- Mixture of YSTR DNA on the assumed glove fragment is as a result of primary transfer from Cosio-Contreras wearing them while having secondary transfer DNA from Kloepper.
    - o Assumption: YSTR DNA is in fact from Kloepper and Cosio-Contreras and not a match by chance or a male relative.

**Scenario 2:**

- Semen deposited by a second individual
    - o Semen first had to be collected during an encounter with Cosio-Contreras, stored, and deposited during the assault without being noticed by the victim. Also, the assault would need to occur without leaving their own DNA behind.
- Mixture of YSTR DNA on the assumed glove fragment is as a result of primary transfer from Kloepper wearing them while having secondary transfer DNA from Cosio-Contreras.
    - o Assumption: YSTR DNA is in fact from Kloepper and Cosio-Contreras and not a match by chance or a male relative.

**Scenario 3:**

- Semen is present on the clothing previous to the assault.
- YSTR mixture includes both individuals as a result of random chance and it is neither are the actual source of the DNA deposited not.

## Additional Notes:

Additional laboratory reports to include the amounts of DNA in the samples and fractions tested may provide additional details about the likelihoods of a deliberate transfer scenario.

**Ex. 2 at 003**



# Intermountain Forensics

**(801) - 904 - 2230**
**4885 South 900 East, Suite 300**
**Salt Lake Utah, 84117**
**www.intermountainforensics.com**

Signed,

Derek Cutler

Sr. Forensic DNA Analyst

Co-Signed,

Daniel Hellwig

Laboratory Director

**Ex. 2 at 004**

# EXHIBIT 3

SUPERIOR COURT OF WASHINGTON COUNTY OF BENTON

STATE OF WASHINGTON,

Plaintiff,

vs.

CODY J. KLOEPPER,

Defendant.

No. 09-1-00109-8

DECLARATION OF CODY J. KLOEPPER IN SUPPORT OF MOTION TO VACATE JUDGMENT PURSUANT TO CrR 7.8 AND ORDER A NEW TRIAL AND/OR REQUEST FOR AN EVIDENTIARY HEARING

I, Cody J. Kloepper, declare as follows:

1. I was born in 1978 in Portland, Oregon and grew up in Portland and Northern California.

2. I am the defendant in this case. I am incarcerated at the Coyote Ridge Corrections Center, serving a 24.5-year (294 month) sentence after a jury convicted me on August 15, 2011, of Rape in the 1st degree, Burglary in the 1st Degree, and Assault in the 1st degree, all with deadly weapon enhancements.

3. I am innocent. I did not have any part of, or role in, the crimes committed against D.W. I respectfully ask that the Court grant me a new trial.

DECLARATION OF CODY J. KLOEPPER - 1

WASHINGTON INNOCENCE PROJECT
P.O. Box 85869
Seattle, Washington 98145-1869
(206) 636-9479

**Ex. 3 at 001**

4. In the late 1990s. I moved to the Tri-Cities to be near my mother, who lived in Kennewick. I met and fell in love with Katie Colleran. Although we never married, I considered her my wife. Our two sons were born in 2002 and 2004.

5. In 2009, I lived in Richland with Katie, our sons, and my sister. I worked as a maintenance man at The Villas, a job I had held for the past year and a half.

6. On December 4, 2009, I went home after finishing my dayshift at The Villas. Shortly afterwards, I got a text asking me to meet a group of friends at Dax's in Richland. I joined them at five or six o'clock and left the bar between 11:00 p.m. and midnight to return home. I was smoking heavily and drinking. When I got home, I logged onto a computer and started looking at the personal ads on Craigslist. I had never done this before but had heard other guys talking about men meeting up with men on Craigslist. My wife and I were having problems at the time and I was curious about Craigslist. I responded to "Tony," who had posted on the site. We exchanged emails and cell phone numbers and agreed to meet. (I later learned that "Tony" was actually Sal Contreras).

7. Tony gave me directions to his house in Finley. I drove there in my 1986 Dodge Ram truck. The truck had a manual transmission and there were manual locks on the car doors.

8. I got lost on my way to Finley and had to ask Tony for better directions at around 12:44 a.m. We were exchanging messages by text.

DECLARATION OF CODY J. KLOEPPER - 2

WASHINGTON INNOCENCE PROJECT
P.O. Box 85869
Seattle, Washington 98145-1869
(206) 636-9479

**Ex. 3 at 002**

9. I arrived at Tony's house well after midnight. He was waiting for me and met me at the door, opening the door before I reached the porch to invite me into the house. I was still wearing my work uniform, a navy-blue polo shirt with The Villas' insignia and a jacket with The Villas' insignia.

10. Tony offered me something non-alcoholic to drink—I believe it was a glass of water. We sat at the dining room table talking while I smoked a cigarette. He told me he was in town for business, and that he had a family in Florida. I told him about my family and talked about my work as a maintenance man at The Villas. He asked me whether I had engaged in these types of encounters before. When I said no, Tony told me he met men for sex regularly when he was in the Tri-Cities and away from his wife in Florida.

11. Tony then walked me from the dining area table to a bedroom. I sat on the bed, took my shirt off, and Tony performed oral sex on me. He remained clothed. Afterwards, I felt ashamed and disgusted and asked him not to contact me again and to erase my phone number from his phone. Tony seemed shocked. He then walked me to the door, and I left.

12. I was at Tony's house for about 20-30 minutes. I did not take a shower at his house.

13. I did not go directly home because I didn't want to face my wife and answer her questions. I drove my truck to The Villas. It was really cold that time of year and the car heater was on during the 20-ish minute ride to The Villas. I had a set of keys that were issued to everyone working in maintenance. I used those keys to open the main door to The Villas. Once inside, I used the keys to open two sets of doors to get into the

DECLARATION OF CODY J. KLOEPPER - 3

WASHINGTON INNOCENCE PROJECT
P.O. Box 85869
Seattle, Washington 98145-1869
(206) 636-9479

manager's office. Inside the manager's office, I opened the drawer which had the key to the lockbox, opened the lockbox to get a key of an empty apartment I had been working on, and put the lockbox key back in the drawer. I left the manager's office, again opening and closing two sets of doors to get back into the main section of The Villas. I let myself into the vacant apartment, covered myself with a canvas drop cloth and slept for a couple of hours before being awoken at about 8:00 a.m. by a text from my sister.

14. Before going home, I replaced the key to the vacant apartment and stopped to talk to the then-groundskeeper for The Villas. When I got home, I still wasn't feeling well and went to bed. Katie woke me up at around 3:00 p.m., saying the police were at our house and had asked her to wake me up to talk to them. The police told me there had been an early morning attack on a woman at The Villas. That was how I learned about the attack for the first time. I don't think they gave me a name at that time, but I later learned it was D.W.

15. In August 2016, after I was convicted and done with my appeal, I sent an application to the Innocence Project Northwest asking them to help me prove my innocence. I first met with the project attorneys and student working on my case in January 2018. We talked about the possibility of postconviction DNA testing and I asked them to test everything, hoping it would prove my innocence.

16. Although I am in prison for a crime I did not commit, I have tried to make the best of my time in prison. For example, although programming is limited for people with lengthy sentences, I earned my GED. I have been employed by the Correctional

DECLARATION OF CODY J. KLOEPPER - 4

WASHINGTON INNOCENCE PROJECT
P.O. Box 85869
Seattle, Washington 98145-1869
(206) 636-9479

Industries for most of the time I've been incarcerated. My first job was cleaning the visitation area. I've worked in the kitchen two different times. Both were in a leadership role, first in the prep department and next in the warehouse. I currently work as a unit porter, disinfecting all the surfaces in the unit and taking out the trash.

17. I have only had one major infraction since I entered prison in 2011. It happened at Shelton in 2011 for failing to respond to a request to return to my cell. I have only had a few minor infractions, which happened some time ago.

18. I have been in the minimum-security unit since the fall of 2012.

///
///
///
///
///
///
///
///
///
///
///
///
///
///

DECLARATION OF CODY J. KLOEPPER - 5

WASHINGTON INNOCENCE PROJECT
P.O. Box 85869
Seattle, Washington 98145-1869
(206) 636-9479

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

DATED this 5ᵗʰ day of July 2021, in Connell, Washington.

Cody J. Kloepper

DECLARATION OF CODY J. KLOEPPER - 6

WASHINGTON INNOCENCE PROJECT
P.O. Box 85869
Seattle, Washington 98145-1869
(206) 636-9479

Ex. 3 at 006

# EXHIBIT 4

### Declaration of Counsel

My name is Sarah Elizabeth Johnson. I am an attorney licensed to practice in Washington State; my bar number is 50985. I currently work at the Washington Innocence Project. I began working at Washington Innocence Project in late fall of 2023 as a staff attorney. I certify the following is true and correct to the best of my knowledge:

1. I am very familiar with Cody Kloepper's case. I have reviewed his trial transcript, the reports of forensic testing conducted pre-trial, police reports, and other investigation materials.

2. I am aware that the Benton County Prosecuting Attorney's Office agreed to post-conviction DNA testing in Mr. Kloepper's case. Clothing items the victim wore during the attack were tested via a differential extraction method. Results from that testing were received in 2020. A male DNA profile was found in the sperm-fraction on

various locations on the victim's sweatshirt and sweatpants.

3. Additional investigation and testing identified the male DNA profile as belonging to Salvador Contreras, a man who testified for the prosecution at Mr. Kloepper's trial. Mr. Kloepper was excluded from all areas of testing.

4. Additional analysis also confirmed that Mr. Contreras was consistent with the minor male Y-STR profile previously located on a rubber fragment taken from the victim's apartment. Prior to trial it was discovered that Mr. Kloepper's Y-STR profile was consistent with the major male profile on that same evidence item, with the minor profile unknown. This was a crucial piece of evidence the State used at trial in their prosecution of Mr. Kloepper.

5. I have reviewed all the laboratory reports associated with the post-conviction DNA testing in this case.

6. After the DNA testing results were received Mr. Kloepper filed a CrR 7.8 motion for a new trial through the Washington Innocence Project. I have read all pleadings and attachments filed by both parties pertaining to the CrR 7.8 motion hearing. I have also read the transcript of the evidentiary hearing and oral argument made regarding the motion for a new trial. I am very familiar with the arguments the State presented in opposition to Mr. Kloepper receiving a new trial.

7. Mr. Kloepper's CrR 7.8 motion was denied. I have read the trial court ruling.

8. Mr. Kloepper filed a direct appeal of the denial of his motion. Mr. Kloepper was appointed to the Washington Appellate Project for representation on his appeal. This was denied. I have read all appellate pleadings and the Court of Appeals opinion.

9. Mr. Kloepper filed a motion for discretionary review with the Washington State Supreme Court after the Court

of Appeals affirmed the Superior Court's ruling, still represented by Washington Appellate Project. I have read all pleadings submitted in that petition for review and I conducted amicus advocacy in support of his petition for review. The petition for review was denied by the Washington State Supreme Court, and a mandate was issued.

10. Beginning in December of 2024 and continuing into 2025 Washington Innocence Project submitted several public record requests pursuant to RCW 42.56 Public Records Act to the Benton County Prosecuting Attorney's Office regarding Cody Kloepper's case. I reviewed and approved the final language for all public record requests before they were submitted. If I was unavailable, this role was covered by my supervisor Mr. Marlow.

11. Washington Innocence Project's paralegal, Ms. Mclean-Riggs, submits and maintains all public record requests,

uploads received records into Washington Innocence Project's file system and notifies the appropriate attorney(s) of their upload as part of her job duties. I am aware that Ms. Mclean-Riggs typically manages over 70 record requests at any given time on top of her other job duties. It is expected that there will be a delay between when an agency releases an installment of a record request after payment and when the records will be uploaded into Washington Innocence Project's filing system and thus accessible for attorneys to review.

12. I am aware from my communications with Ms. Mclean-Riggs and my own personal experience that it very common for it to take multiple months for an installment in a submitted public record request to be prepared and ready for release depending on the agency the request was submitted to, the complexity of the request, and the type and volume of records in an installment.

13. On December 19, 2024 Washington Innocence Project submitted two public record requests to the Benton County Prosecuting Attorney's Office, requests No. 24-1261 and 24-1262.

14. Request No. 24-1261 remains open with four installments released so far. The first installment was released March 13, 2025 and uploaded to Washington Innocence Project's file system April 1, 2025. The second installment was released on April 17, 2025 and uploaded to Washington Innocence Project's file system April 22, 2025. The third installment was released on May 30, 2025 and uploaded to Washington Innocence Project's file system June 23, 2025. The fourth installment was released August 14, 2025 and uploaded to Washington Innocence Project's file system August 20, 2025.

15. Request No. 24-1262 is closed after one installment was released on January 30, 2025. This was uploaded to

Washington Innocence Project's file system on February 25, 2025.

16. On February 3, 2025 Washington Innocence Project submitted one public record request to the Benton County Prosecuting Attorney's Office, No. 25-104. This request remains open, with three installments received so far. The first installment was released on April 11, 2025, and uploaded to Washington Innocence Project's file system on April 23, 2025. The second installment was released on May 8, 2025, and uploaded to Washington Innocence Project's file system May 19, 2025. The third installment was released on July 17, 2025 and uploaded to Washington Innocence Project's file system that same day. On July 30, 2025 another version of installment three was uploaded to Washington Innocence Project's file system after some redactions based on redemptions were challenged in the initial installment.

17. On April 25, 2025 Washington Innocence Project submitted two additional public record requests to the Benton County Prosecuting Attorney's Office, requests No. 25-519 and No. 25-520.

18. Request No. 25-519 remains open, with two installments both released on August 27, 2025 and uploaded to Washington Innocence Project's file system August 28, 2025.

19. Request No. 25-520 is closed, based on no responsive records located.

20. Three requests, No. 24-1261, No. 25-104, and No. 25-519 remain open, and I am anticipating receiving additional installments in the future. Two requests, No. 24-1262 and No. 25-520 are closed with no future records anticipated.

21. I believe it is very likely that Washington Innocence Project filed previous public record requests in Mr. Kloepper's case to various agencies prior to my

employment at the organization and assignment to his case. I believe this because public record requests are one of the primary ways to obtain records and case information in the post-conviction setting. However, I do not have personal knowledge of any record requests submitted prior to December of 2024 in the case.

22. Installment one from request No. 24-1261 was made available for attorney review on April 1st 2025 and I reviewed the installment that day. I noticed this installment contained emails exchanged between members of the Benton County Prosecuting Attorney's Office and private forensic science laboratory Intermountain Forensics. I immediately found these emails noteworthy because no Intermountain Forensics report was ever utilized in any of the pleadings related to Mr. Kloepper's motion for a new trial. A forensic scientist named Derek Cutler was included in the emails,

and I never saw his name mentioned in any pleadings or in the motion hearing transcript.

23. I conducted an electronic word search within Washington Innocence Project's case file for the terms "Derek Cutler", "Intermountain Forensics", and "IMF". I did not find any results aside from the record installment uploaded that same day. In my job I regularly conduct term searches in our case files. It is my experience that the search function provides reliably accurate results if a term is contained somewhere in a document maintained in the file. This led me to believe Washington Innocence Project did not have any record of Mr. Cutler, or any reports issued by him or Intermountain Forensics in our file.

24. On April 22, 2025 Ms. Mclean-Riggs emailed me the second installment from request No. 24-1261. This installment contained two copies of a 2021 expert witness report authored and signed by Derek Cutler and

co-signed by Daniel Hellwig of Intermountain Forensics. I found this very noteworthy because this report was never utilized in any of the CrR 7.8 motion hearing litigation despite it being clear through context Mr. Cutler wrote the report as the State's retained expert.

25. I immediately reviewed the expert report, which provided me with valuable context interpreting the previously received emails sent to and from Mr. Cutler. After reading it I believed that Mr. Cutler's expert opinions and conclusions would have been incredibly relevant to the determination of Mr. Kloepper's CrR 7.8 motion hearing. I also noted that email threads included in the first two installments of that record request mentioned setting up verbal conversations with Mr. Cutler to discuss his report further.

26. I compared Mr. Cutler's statements over email and his written report to the transcript of argument in Mr. Kloepper's CrR 7.8 motion hearing and the State's

responsive briefing filed prior to that motion hearing. I was able to determine based on the dates of the emails that Mr. Cutler provided his report to the State before the State filed their responsive briefing and before the evidentiary hearing on the motion was held. This led me to believe the State was aware of Mr. Cutler's conclusions and expert opinion when they presented their theory and arguments against Mr. Kloepper receiving a new trial.

27. It is my opinion that the things Mr. Cutler said in the emails and in his report directly contradict what the prosecution argued about the DNA evidence in the State's briefing and in oral argument during the motion hearing.

28. I sent emails to each of the three attorneys that represented Mr. Kloepper at his CrR 7.8 motion hearing; Mark Mestel, Jackie McMurtrie, and Lara Zarowsky. Each attorney separately confirmed to me that they did not know about the Cutler report until the record request

installment was brought to their attention, had no record of ever receiving the Cutler report, had no independent recollection of the Cutler report, and believed that Mr. Darren Wright was the only expert witness for the State.

29. Ms. McMurtrie and Ms. Zarowsky both searched through their emails and provided me with email correspondence with the prosecution prior to and during the litigation of Mr. Kloepper's motion. I did not see any indication in any of the emails I reviewed that Mr. Cutler, Intermountain Forensics, or the existence of another expert witness was ever disclosed by the State.

30. In one of the emails provided, I noted an exchange between Mark Mestel and the prosecutor's office that Ms. Zarowsky and Ms. McMurtrie were forwarded or copied onto. In that exchange, Deputy Prosecutor Terry Bloor provided Mr. Mestel with a list of DNA expert reports in the State's possession while discussing stipulating to evidence admissibility at the upcoming

motion hearing. There was no mention of Derek Cutler, Daniel Hellwig, or Intermountain Forensics in that email, even though that email was dated after the prosecution received Mr. Cutler's report and had follow-up email exchanges with Mr. Cutler.

31. I found this very notable. Because of my familiarity with the case file and knowledge of materials of the case, I recognized every expert report listed in that email. I noted that everything listed in Mr. Bloor's email was a report that Washington Innocence Project would have already had at the time that email was sent. I was able to verify this by speaking with each attorney that represented Mr. Kloepper at that time and looking through the case file and noting when records appeared to have been received or uploaded. This indicated to me the only expert report Mr. Bloor failed to disclose in that email was also the only expert report Washington

Innocence Project did not have a copy of or any knowledge of.

32. All three attorneys for Mr. Kloepper at the CrR 7.8 motion have now signed sworn declarations regarding their lack of knowledge of the Cutler report at the time of Mr. Kloepper's CrR 7.8 motion hearing and regarding their reliance on the prosecution's representations regarding expert reports in the prosecutor's possession.

33. I was not employed with Washington Innocence Project at the time of the CrR 7.8 litigation and do not have personal knowledge of any specific exchanges between the prosecution and Mr. Kloepper's attorneys. While I do not possess personal knowledge, my belief is that Washington Innocence Project was never provided with any sort of disclosure as to the existence of an expert report authored by Derek Cutler, never knew Mr. Cutler or Intermountain Forensics was retained by the prosecution, and Mr. Cutler's conclusions and opinions

were never disclosed to Washington Innocence Project. I believe this because I first did a thorough review of Washington Innocence Project's entire file and any emails and records from that period of litigation available to me, and found no reference to Mr. Cutler, Intermountain Forensics, or Daniel Hellwig. I next contacted each attorney for Mr. Kloepper who worked on the case and confirmed they each agreed this information was never provided or disclosed in any way. Finally, I have reviewed every received installment of records obtained from the prosecutor's office from the December 2024 and 2025 public record requests made by Washington Innocence Project. I never found any emails or records that indicated this information was provided, mentioned, or otherwise disclosed to Washington Innocence Project in any way. I never saw anyone associated with Mr. Kloepper's legal team on any of the emails exchanged between Mr. Cutler, Mr. Hellwig, or

any other Intermountain Forensics employee and the Benton County Prosecuting Attorney's Office. Many of the internal emails seemingly in relation to Mr. Cutler's report were redacted under the Public Record Act exemption of Attorney Work Product. Because work product by its very nature would not be something provided to opposing counsel, I feel confident none of the redacted emails contained any disclosures to Mr. Kloepper's legal team of the opinions expressed by Mr. Cutler.

34. Washington Innocence Project sent out the two April 2025 public record requests to the prosecutor's office in response to finding out about the Derek Cutler report. While one request was closed for no responsive records located, another is open with two installments received in late August of 2025 and at least one more installment pending. As that open request was the first that specifically included a request for records including the

terms "Derek Cutler" and "Intermountain Forensics", I believe there is a strong likelihood any future installments provided in that request will contain additional information never disclosed to Mr. Kloepper's counsel.

35. The most recent installment from one of the public record requests sent in December 2024 was emailed to me on August 19, 2025. I reviewed that installment the next day on August 20, 2025. This installment contained records not previously received in prior installments relevant to Mr. Kloepper's personal restraint petition.

36. The most recent installments of any submitted requests were uploaded onto Washington Innocence Project's file system on August 28, 2025. These were the first two installments of public record request No. 25-519, submitted in April of 2025. Both installments were released together on August 27th. These two installments both contained records not previously received in other

record request installments relevant to Mr. Kloepper's personal restraint petition.

37. On September 4, 2025 Ms. Mclean-Riggs forwarded me an email regarding record request No. 25-104. In that message from a legal secretary with the Benton County Prosecuting Attorney's Office, it was explained an installment initially estimated to be available for release on September 4th 2025 would not be available until approximately October 9th 2025.

38. When Washington Innocence Project submitted the first batch of requests in December 2024, I had no reason to think or expect I would receive a previously undisclosed expert report as part of the records received.

39. As I received and reviewed Mr. Cutler's report in mid-April 2025 and got the full context regarding the email exchanges received on April 1st 2025, I determined it was appropriate to draft a personal restraint petition on Mr. Kloepper's behalf. While still maintaining my other case

assignments and job duties, to the greatest extent possible I have prioritized working on Mr. Kloepper's case since finding out about the Cutler report. This is because I know the mandate issued after the Washington State Supreme Court denied Mr. Kloepper's petition for review expires in October of 2025, and because I know Washington State caselaw requires petitioners act with due diligence when seeking relief based upon newly discovered evidence.

40. In July of 2025 I spoke with Mr. Cutler over a Zoom video conference meeting, to ask further questions and clarification regarding his opinions in this case. This conversation revealed even more expert opinion evidence that supported Mr. Kloepper's claim for relief and contradicted the State's arguments regarding the DNA testing results in this case. Mr. Cutler signed a declaration pertaining to the opinions he expressed in that conversation.

41. I believe those additional helpful opinions would have

been elicited by Mr. Kloepper's legal team prior to his

CrR 7.8 motion had the existence of Mr. Cutler's report

not been suppressed by the prosecution.

Signed under penalty of perjury this __4__ day of September,

2025

_____
Sarah Johnson, WSBA 50985
Attorney for Cody Kloepper

# EXHIBIT 5

Declaration of Counsel

I declare under penalty of perjury under the laws of the state of Washington, that the following is true and correct to the best of my knowledge:

1. My name is Lara Zarowsky. I am an attorney licensed to practice in Washington State. My bar number is 40745. I have served as the executive director of Washington Innocence Project since 2019. Prior to this position I served for 10 years as the organization's policy director.

2. Washington Innocence Project and its predecessor entity as a clinical program at the University of Washington School of Law represents Mr. Cody Kloepper. In 2011 Mr. Kloepper was convicted of rape, burglary, and assault charges in Benton County, Washington. He has always maintained his innocence and remains currently incarcerated.

3. Washington Innocence Project contacted the Benton County Prosecuting Attorney's Office in 2019 seeking post-conviction DNA testing on behalf of Mr. Kloepper. The Benton Counting Prosecuting Attorney's Office agreed to testing, and evidence items – including previously untested clothing that was worn by the victim during the attack – were submitted to the Washington State Patrol Crime Lab and outsourced to DNA Labs International for forensic analysis.

4. In a report dated June 26, 2020 post-conviction test results revealed another man's DNA on multiple locations on the sweatshirt and sweatpants the victim was wearing during the assault and rape. Mr. Kloepper was conclusively excluded as a possible contributor of the male DNA on the clothing.

5. I began working on Mr. Kloepper's case in 2020 when the exonerating DNA test results were received by Washington Innocence Project. I am familiar with the trial, appellate, and postconviction records in Mr. Kloepper's case.

6. On August 6, 2020 the Washington State Patrol Crime Lab performed a search of the Combined DNA Index System (CODIS) and identified a CODIS hit to a profile associated with the male DNA found on the victim's clothing. That profile identified Salvador Castillo-Sanchez, an alias for Salvador Contreras, also known as Salvador Cosio-Contreras.

7. Jackie McMurtrie and I participated in phone and online Zoom meeting discussions with members of the Benton County Prosecuting Attorney's Office and detectives from the Richland Police Department regarding the significance and meaning of the DNA results. The Benton County Prosecuting Attorney's Office repeatedly indicated that they were "keeping an open mind" about the significance of the DNA results in the context of the case.

8. The Benton County Prosecuting Attorney's Office indicated that they would like to set a meeting with Darren Wright – the analyst who drafted the DNA report of testing on the victim's clothing on behalf of DNA Labs International – to ask questions to better understand the scientific findings. Jackie McMurtrie and I joined the call on behalf of Washington Innocence Project. This call occurred on August 13, 2020.

9. Discussions between Washington Innocence Project, the Benton County Prosecuting Attorney's Office, and the Richland Police Department included the specific steps that would be taken by Richland Police Department to reconcile the known aliases of the person associated with the CODIS profile, to ensure an accurate positive identification and the location of the man whose DNA was found on the victim's clothing.

10. The Richland Police Department discussed their plan to obtain a reference sample from the suspect to confirm his identity, and to conduct an interview to question him about the new DNA results. At this time Washington Innocence Project specifically requested that all questioning of the suspect be recorded.

11. I was part of the Washington Innocence Project team that filed a CrR 7.8 motion for a new trial on Mr. Kloepper's behalf based on the newly discovered

DNA results.  Co-counsel working with me on this case included Jackie McMurtrie and Mark Mestel.

12. Throughout the process of obtaining post-conviction DNA testing results and preparing for the CrR 7.8 motion hearing, Washington Innocence Project was in communication with the Benton County Prosecuting Attorney's Office. Washington Innocence Project requested investigation updates and relevant documents during this time frame.  In addition, on one or more occasions the Benton County Prosecuting Attorney's Office provided Washington Innocence Project with relevant documents prior to Washington Innocence Project making an affirmative request.

13. I believed that the Benton County Prosecuting Attorney's Office was sharing all information relevant to their evaluation of the case, particularly information about expert witnesses and the forensic scientists they consulted.

14. On November 9, 2021 Mr. Mestel was engaged in an email exchange regarding the admissibility of expert materials.  I was copied onto Mr. Mestel's emails.

15. In one of these exchanges Deputy Prosecuting Attorney Terry Bloor indicated: "Just to follow up on our conversation Friday, you mentioned stipulating to the affidavits of the experts.  Did you mean the reports of the DNA scientists?

The reports are acceptable to us. This agreement would only extend to documents we have in our possession which are:

6-15-10: Kevin Jenkins

8-18-10: Lorraine Heath

7-16-10: Lorraine Heath

9-7-10: Lorraine Heath

6-26-20: DNA Labs International

10-8-20: DNA Labs International

8-6-20: Denise Rodler

1-7-21: Anna Wilson

4-9-21: Charlotte Ward

10-21-21: Charlotte Ward[1]"

16. Washington Innocence Project's understanding was that forensic scientist Darren Wright was the only forensic DNA expert the prosecution consulted to support their position. Washington Innocence Project interviewed Mr. Wright regarding the work he did on Mr. Kloepper's case.

17. Upon receiving the November 9, 2021 email, I believed Washington Innocence Project already possessed every DNA scientist report considered

---

[1] I believe "Ward" is a misspelling of Dr. Charlotte Word, the expert witness retained by Mr. Kloepper.

by the Benton County Prosecuting Attorney's Office.  Washington Innocence Project prepared its CrR7.8 presentation under that belief.

18. I did not learn about Derek Cutler's 2021 report until the year 2025.

19. I believe the existence and contents of Mr. Cutler's report would have been highly relevant to the determination of Mr. Kloepper's CrR 7.8 motion.

20. I was not aware that the Benton County Prosecuting Attorney's Office had consulted with any forensic analyst other than those listed in the November 21, 2025 email to Mark Mestel.

21. In my opinion the Benton County Prosecuting Attorney's Office deliberately withheld all information related to the consultation with Intermountain Forensics and Derek Cutler, and in doing so misled Mr. Kloepper's legal team in the November 21, 2021 email exchange with Mark Mestel.

22. In the report written by the State's retained and undisclosed expert, Mr. Cutler states "primary transfer is generally much more likely than secondary transfer." In his 2025 declaration Mr. Cutler states "the amount of male DNA present on the clothing items is not inherently supportive of a secondary transfer scenario without further context." He also opines that "a direct or primary transfer scenario is much more likely to be the cause of the post-conviction DNA testing results on the clothing items in this case than a secondary or indirect transfer scenario". Cutler Decl.

23. In my opinion Derek Cutler's report and additional expressed opinions refute the prosecution's theory of the case and supports Mr. Kloepper's claim of innocence.

24. In my opinion the Benton County Prosecuting Attorney's Office statement "the experts thus far interviewed say the evidence is consistent with a transfer from Mr. Contreras, to the defendant, to the victim." (Response 11) was misleading. The prosecution had already received Mr. Cutler's written report and additional opinions expressed over email when that pleading was filed.

25. Had I known that the State had solicited a report from Derek Cutler and that the State was in possession of the 2021 Derek Cutler report, Washington Innocence Project would have demanded to interview Mr. Cutler prior to the motion hearing.

26. Based on the conclusions Mr. Cutler expressed in his written report and in his emails to the Benton County Prosecutor's Office, Washington Innocence Project would have called Mr. Cutler as a live witness at the CrR 7.8 motion or at least issued a subpoena for him to serve as a potential rebuttal witness.

27. It is my opinion that Mr. Kloepper was prejudiced by the Benton County Prosecuting Attorney Office's decisions to withhold the evidence that Derek Cutler was retained as an expert, and the content of Mr. Cutler's report which

directly contradicts their representations to the Court during the CrR 7.8 proceedings and on appeal.

Signed in Seattle, Washington this 11th day of August 2025,



Lara Zarowsky, WSBA #40745

# EXHIBIT 6

Declaration of Justine Alma Mclean-Riggs

1. My name is Justine Alma Mclean-Riggs. I currently work as a paralegal for the Washington Innocence Project (WashIP). I certify the following is true and correct to the best of my knowledge.

2. I began working at WashIP in August 2023. I previously worked for a private criminal defense attorney in a similar role.

3. One of my job duties is to submit and manage public record requests. This includes tracking when installments are due and released, making payments, uploading records into Washington Innocence Project's file system, and updating attorneys when requested records are received.

4. On average, I manage over 70 pending records requests at any given time. Depending on the agencies' installment release schedules, the quantity of pending requests, and my workload as a whole, attorneys are

generally notified of any new installment between one and four weeks after it is released.

5. I have submitted several public records requests pertaining to Cody Kloepper's case, including requests to the Benton County Prosecuting Attorney's Office (BCPAO).

6. On December 19, 2024, I submitted BCPAO Request No. 24-1261.

   a. The request remains open, and installments have been released on a rolling basis. Four installments have been released. The first installment was released on March 13, 2025, the second on April 17, 2025, the third on May 30, 2025, and the fourth and most recent installment was released on August 14, 2025.

   b. The request is on-going. When the August 14, 2025, installment was released, BCPAO notified me to expect the next installment on September 25,

2025. On that date, I was notified that BCPAO needed more time for legal review of exemptions. BCPAO has notified me that they expect to release the next installment by October 9, 2025.

7. The second request, submitted on December 19, 2024, BCPAO Request No. 24-1262, is closed. On January 30, 2025, BCPAO released one installment of responsive records via the records portal. Upon the release of records, BCPAO closed the request and notified me that the installment was their final response to Request No. 24-1262.

8. I submitted a third records request to BCPAO, Request No. 25-104, on February 3, 2025.

   a. The first installment was released on April 11, 2025. The second installment was released on May 8, 2025, and the third installment was released on July 17, 2025.

**Ex. 6 at 003**

b. On July 28, 2025, I requested that BCPAO review the redactions applied to the third and most recent installment in Request No. 25-104. BCPAO reviewed the redactions and corresponding exemptions and re-released a corrected third installment on July 30, 2025.

c. The request is on-going. On July 17, 2025, when the incorrectly redacted records were initially released, BCPAO notified me that they expected to release the next installment of records on September 4, 2025. On that date, BCPAO notified me that they needed more time and expect to release the next installment on October 9, 2025.

9. On April 25, 2025, I submitted two additional requests to BCPAO, numbered 25-519 and 25-520, respectively.

a. On May 2, 2025, BCPAO notified me that they found no responsive records for Request No. 25-520. BCPAO closed the request on that date.

**Ex. 6 at 004**

b. Request No. 25-519 remains open. I was notified of an available invoice for the first installment on July 2, 2025. On July 3, 2025, I communicated through the BCPAO portal that their online payment system was not working. I followed up twice via the portal before the August 1, 2025, deadline to pay for records. I was able to connect with the records officer on July 29, 2025, via a separate email outside of the portal. I mailed a physical check to the agency. BCPAO released installments one and two on August 27, 2025.

c. The request is ongoing. BCPAO has notified me that they expect to release the next installment by October 23, 2025.

10. Agencies communicate with requestors when requests are received, when records are released, when the timeline for release changes, and upon closure of a request. If a records request is open, I generally expect

**Ex. 6 at 005**

that the agency is either searching for further responsive records or reviewing responsive records in order to withhold exempt records in part or in whole. In my experience, if a request is still listed as open after the production of a first installment of records and an estimated date for the release of a second installment is provided, we are likely to receive further responsive records.

11. In my four years of experience in records management in criminal cases, the vast majority of public records requests for files on serious felonies take one year or more for prosecuting attorneys' offices in Washington to fulfill and close. I am managing ongoing requests to other prosecuting attorneys' offices in Washington that were initially submitted as early as April 2022. The timeline for agencies to respond to records requests is based on many variables. Some of the factors often communicated by agencies when they need more time to

**Ex. 6 at 006**

produce an installment include the complexity of the records and the corresponding time needed to review them for exemptions, the volume of responsive records, the staffing of the agencies' records department, and the volume of requests the agency receives.

Signed this 6th day of October, 2025 in Seattle, Washington,

_____

Justine Alma Mclean-Riggs

# EXHIBIT 7

Declaration of Counsel

I declare, under penalty of perjury under the laws of the State of Washington, that the following is true and correct to the best of my knowledge:

1. My name is Mark Mestel. I am an attorney licensed to practice in Washington State, my bar number is 8350. I am a solo practitioner.

2. I assisted Washington Innocence Project in representing Mr. Cody Kloepper in his CrR 7.8 motion for a new trial, serving as co-counsel for Mr. Kloepper.

3. I am aware that before my involvement in Mr. Kloepper's case, Washington Innocence Project contacted the Benton County Prosecuting Attorney's Office seeking post-conviction DNA testing on behalf of Mr. Kloepper. The Benton County Prosecuting Attorney's Office agreed to testing, and evidence items were submitted for testing.

4. In 2020, post-conviction DNA test results revealed that another man's DNA was found on multiple locations on the sweatshirt and sweatpants the victim was wearing during the assault and rape. Mr. Kloepper was excluded as a possible contributor to the male DNA found.

5. Additional analysis was conducted which led to the identification of a CODIS profile associated with the male DNA found on the clothing.

**Ex. 7 at 001**

Washington Innocence Project filed a CrR 7.8 motion for a new trial based on newly discovered evidence on Mr. Kloepper's behalf.

6. Throughout the process of obtaining post-conviction DNA testing results and preparing for the CrR 7.8 motion hearing Washington Innocence Project was in communication with the Benton County Prosecuting Attorney's Office. Washington Innocence Project requested investigation updates and relevant documents during this time frame. In addition, on one or more occasions the Benton County Prosecuting Attorney's Office provided Washington Innocence Project with relevant documents prior to Washington Innocence Project affirmatively requesting them. I believed that the Benton County Prosecuting Attorney's Office was sharing all relevant information in their possession, including information about expert witnesses and forensic scientists involved in the case.

7. I worked with counsel Jackie McMurtrie and Lara Zarowsky in this case.

8. On November 9, 2021, I was engaged in an email exchange with the prosecuting attorney's office regarding the admissibility of expert materials in this case.

9. In one of these exchanges Deputy Prosecuting Attorney Terry Bloor indicated: "Just to follow up on our conversation Friday, you mentioned stipulating to the affidavits of the experts.  Did you mean the reports of the

DNA scientists?  The reports are acceptable to us.  This agreement would only extend to documents we have in our possession which are:

6-15-10:  Kevin Jenkins

6-18-10:  Lorraine Heath

7-16-10:  Lorraine Heath

9-7-10:   Lorraine Heath

6-26-20:  DNA Labs International

10-8-20:  DNA Labs International

8-6-20:   Denise Rodler

1-7-21:   Anna Wilson

4-9-21:   Charlotte Ward

10-21-21:  Charlotte Ward[1]"

10. My understanding was forensic scientist Darren Wright was the only expert witness the prosecution used in support of the State's motion stance. Mr. Wright authored the DNA Labs International reports referenced in the above email. Washington Innocence Project interviewed Mr. Wright regarding the work he did on the Cody Kloepper case.

---

[1] I believe the name "Charlotte Ward" is a misspelling of Dr. Charlotte Word, the retained expert witness for Mr. Kloepper.

11. Upon receiving the November 9, 2021 email, I believed we already possessed all of the DNA scientist reports the State indicated was in its possession. We prepared Mr. Kloepper's CrR 7.8 presentation under that belief.

12. Had I known the State was in possession of the 2021 Derek Cutler report, I would have requested that Mr. Cutler be made available for a defense interview prior to the motion hearing.

13. Had I known the content of the 2021 Derek Cutler report and opinions he expressed over email, I would have requested Mr. Cutler write a statement to the Court in advance of the motion hearing setting out the reasons why he believed that the DNA found on the clothing was more likely from a direct, rather than secondary transfer.

14. Based on the conclusions Mr. Cutler expressed in his written report and in emails to the Benton County Prosecutor's Office, I would have considered calling Mr. Cutler as a live witness at the CrR 7.8 motion hearing as well.

15. I did not find out about the Cutler report until the year 2025.

16. I believe the contents of the Cutler report would have been highly relevant to the determination of Mr. Kloepper's CrR 7.8 motion.

Signed in Seattle, Washington this __28__ day of July 2025,

*Mark D Mestel*

_____

Mark Mestel, WSBA#8350

# ATTACHMENTS

Case 4:26-cv-05057-TOR    ECF No. 1-1    filed 04/17/26    PageID.149    Page 90 of 231

 **Gmail**

**Peno Mclean-Riggs <peno.mclean-riggs@wainnocenceproject.org>**

---

## Re: State v. Kloepper

6 messages

---

**Mark Mestel** <mark.mestel@gmail.com>                   Tue, Nov 9, 2021 at 9:40 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andrew Clark <Andrew.Clark@co.benton.wa.us>, Andy Miller <Andy.Miller@co.benton.wa.us>

Terry:  Let me look through the material and get back to you prior to
Friday.

Mark

On Tue, Nov 9, 2021 at 8:59 AM Terry Bloor <Terry.Bloor@co.benton.wa.us>
wrote:

Mark:  Just to follow up on our conversation Friday, you mentioned
stipulating to the affidavits of the experts.  Did you mean the reports of
the DNA scientists?  The reports are acceptable to us.  This agreement
would only extend to documents we have in our possession which are:

6-15-10:  Kevin Jenkins
6-18-10:  Lorraine Heath
7-16-10:  Lorraine Heath
9-7-10:   Lorraine Heath
6-26-20:  DNA Labs International
10-8-20:  DNA Labs International
8-6-20:   Denise Rodler
1-7-21:   Anna Wilson
4-9-21:   Charlotte Ward
10-21-21:  Charlotte Ward

Was there any other report the defense was planning to submit?

We need to get an affidavit or declaration from Darren Wright, the
forensic scientist for DNA Labs International that is consistent with the
police report we submitted.  I will volunteer to draft the affidavit and
run it by you before sending it to him.  We're open to other options if
you have any.

Concerning Salvador Contreras, do you have an objection if we submit his
video interview at the Richland Police Department on August 19, 2021?
You've already submitted the transcript from that interview.

--

Mark Mestel
2707 Colby Avenue, Suite 901

Ex. 7 at 007

Everett, WA. 98201
425.339.2383
mark.mestel@gmail.com

NOTICE: This communication and the information contained within, along with any items attached as an enclosure, are privileged and confidential. This communication is intended solely for the use of the individual(s) named above. If you are not one of the intended addressee(s) or you believe you have received this communication in error, you are hereby notified that any consideration, dissemination or duplication of this communication is strictly prohibited. In addition, you shall not print, copy, retransmit,
disseminate or otherwise use this information in any form without first receiving specific written permission from the author of this communication. If you have received this communication in error, please reply to the sender indicating that fact and delete this message from your system immediately.

📄 **winmail.dat**
7K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                                      Tue, Nov 9, 2021 at 9:49 AM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andrew Clark <Andrew.Clark@co.benton.wa.us>, Andy Miller <Andy.Miller@co.benton.wa.us>

Mark: If I wasn't clear, we are willing to stipulate to the reports as written, without the need to get further declarations or affidavits from the scientists.

Also, I'm working on a motion asking the court to request Judge Runge hear the motion for new trial. I should have that done today, and will email it to you three.

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Tuesday, November 9, 2021 9:40 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Jacqueline McMurtrie <jackiem@uw.edu>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Andrew Clark <Andrew.Clark@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
Subject: [EXTERNAL] Re: State v. Kloepper

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.
[Quoted text hidden]

📄 **winmail.dat**
9K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                                      Tue, Nov 9, 2021 at 3:18 PM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark <Andrew.Clark@co.benton.wa.us>

I have no objection to you submitting the Contreras video so long as we also can admit the transcript. That's acceptable.

Ex. 7 at 008

With regard to retired Judge Runge, is your intent to argue the motion this Friday?  No, unless you want to argue it.   But you haven't seen it at this point.

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Tuesday, November 9, 2021 3:08 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Jacqueline McMurtrie <jackiem@uw.edu>
Subject: Re: [EXTERNAL] Re: State v. Kloepper

Terry:  We will stipulate to the reports that you identified, without need to submit them as affidavits.  I'll withhold judgment on a statement from Darren Wight until you send it to me.  In addition to the documents identified in your email, we also may want to introduce Exhibits B (Dr. Ross) and E (4/9/10 Crime lab report authored by Heath) attached to our Reply Brief.  We anticipate obtaining a new report from Dr. Ross and will send it to you for your review once received.  I have no objection to you submitting the Contreras video so long as we also can admit the transcript.

With regard to retired Judge Runge, is your intent to argue the motion this Friday?

My thought with regard to Friday's hearing is that we obtain a date for the hearing and set a schedule for disclosure of exhibits and witnesses, if any, perhaps 2 weeks prior to the hearing.  That should give the Judge ample time to review the material prior to the hearing.

Mark

On Tue, Nov 9, 2021 at 9:49 AM Terry Bloor <Terry.Bloor@co.benton.wa.us>
[Quoted text hidden]

---

📄 **winmail.dat**
12K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                    Tue, Nov 9, 2021 at 6:01 PM
To: Mark Mestel <mark.mestel@gmail.com>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark <Andrew.Clark@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>

Mark:  I haven't finished the motion to request Judge Runge.  That should be done tomorrow.  It won't be fair to either you or Judge Swanberg to have the motion argued Friday.   I'd rather have a specific time for the argument.

I may have spoken too soon concerning a stipulation to the reports.  We'll agree on Charlotte Word's reports, and the DLI reports as long as there is an agreement that we can submit a summary of the conversation with Darren Wright.  I'll aim for a declaration from him with the process outlined by my earlier email—I'll draft the affidavit and run it by you.

We're concerned about the report from Dr. Ross.  Although his report was dated before the motion for a new trial was filed, it was provided as a rebuttal to our response, which means that we did not have an opportunity to comment on it.  And now there is another report coming from him?

Perhaps it would be better to state on Friday that the parties have a general agreement but we are still working on the specific exhibits that will be considered by the Judge.  We could set a time to argue the motion

Ex. 7 at 009

to request Judge Runge hear the case and have another pre-hearing that could be waived upon entry of an agreed order of what exhibits will be admitted at the hearing.

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Tuesday, November 9, 2021 3:08 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Jacqueline McMurtrie <jackiem@uw.edu>
Subject: Re: [EXTERNAL] Re: State v. Kloepper

Terry:  We will stipulate to the reports that you identified, without need to submit them as affidavits.  I'll withhold judgment on a statement from Darren Wight until you send it to me.  In addition to the documents identified in your email, we also may want to introduce Exhibits B (Dr. Ross) and E (4/9/10 Crime lab report authored by Heath) attached to our Reply Brief.  We anticipate obtaining a new report from Dr. Ross and will send it to you for your review once received.  I have no objection to you submitting the Contreras video so long as we also can admit the transcript.

With regard to retired Judge Runge, is your intent to argue the motion this Friday?

My thought with regard to Friday's hearing is that we obtain a date for the hearing and set a schedule for disclosure of exhibits and witnesses, if any, perhaps 2 weeks prior to the hearing.  That should give the Judge ample time to review the material prior to the hearing.

Mark

On Tue, Nov 9, 2021 at 9:49 AM Terry Bloor <Terry.Bloor@co.benton.wa.us>
[Quoted text hidden]

---

📄 **winmail.dat**
13K

---

**Mark Mestel** <mark.mestel@gmail.com>          Tue, Nov 9, 2021 at 6:43 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark <Andrew.Clark@co.benton.wa.us>, Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>

Terry:  I'm going to confer with my associates.  I do think that it would be beneficial for us to sit down on Friday, after the hearing assuming you have some time, and go over exactly what each side wishes to admit as evidence.  I'm not convinced that I need the State's stipulation to admit the substance of an exhibit.  My concern is whether I need "affidavits" rather than reports/letters and/or witnesses rather than documents.  We can discuss how many hoops each of us will make the other jump through and how that may impact the length of the substantive hearing.

Mark

On Tue, Nov 9, 2021 at 6:01 PM Terry Bloor <Terry.Bloor@co.benton.wa.us>
[Quoted text hidden]

---

📄 **winmail.dat**
13K

Ex. 7 at 010

Case 4:26-cv-05057-TOR    ECF No. 1-1    filed 04/17/26    PageID.153    Page 94 of 231

**Andy Miller** <Andy.Miller@co.benton.wa.us>                                   Wed, Nov 10, 2021 at 10:59 AM
To: Mark Mestel <mark.mestel@gmail.com>, Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Andrew Clark <Andrew.Clark@co.benton.wa.us>, Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>

Terry has been the lead on this but has been keeping me in the loop.
Unfortunately, on Friday I am doing a resentencing on a defendant who was
convicted of murder 24 years ago and was sentenced to LWOP but needs to be
resentenced as his prior strikes were for Robbery 2. It may take a long
time because defense counsel and I disagree about whether Oregon
convictions are comparable for purpose of determining sentencing range,
surviving family members plan on giving victim impact statements and
defense wants to emphasize the defendant's progress in prison.

I do agree with Mark's suggestion in general. I don't think they all need
to be in affidavit form, but I had noted that past email exchanges seemed
to use the words affidavit and report almost interchangeably. I think the
main thing is that we all need to be on the same page with our
understanding of what will be admitted. Again, I agree with Mark that it
will be best of all if the hearing itself can focus on the substantive
issues

[Quoted text hidden]

---

📄 **winmail.dat**
15K

Ex. 7 at 011

# EXHIBIT 8

Declaration of Counsel

I declare under penalty of perjury under the laws of the state of Washington, that the following is
true and correct to the best of my knowledge:

1. I am currently Of Counsel to the Washington Innocence Project and the Betts, Patterson
   and Mines Professor Emerita at the University of Washington School of Law. I founded
   the Washington Innocence Project (formerly Innocence Project NW) in 1997 as a
   volunteer organization and began supervising students' work on innocence cases in the
   clinical law program in 2003. As the organization grew, I served as its Director,
   supervising the work of staff attorneys, as well as law students. I have decades of
   experience investigating and litigating motions for postconviction DNA testing, and
   litigating motions for new trials and personal restraint petitions based on postconviction
   DNA test results. I have written scholarly articles about DNA evidence and obtained
   federal grants to conduct postconviction DNA case investigations in partnership with the
   Washington State Patrol.

2. I began working on Cody Kloepper's case in 2018. I was part of the Washington
   Innocence Project team that requested postconviction DNA testing on Mr. Kloepper's
   behalf, as well as the litigation team for Mr. Kloepper's CrR 7.8 motion based on the
   postconviction DNA test results. I am familiar with the trial, appellate and postconviction
   records in Mr. Kloepper's case.

3. Washington Innocence Project contacted the Benton County Prosecuting Attorney's
   Office seeking post-conviction DNA testing on behalf of Mr. Kloepper. The Benton
   County Prosecuting Attorney's Office agreed to testing, and evidence items were
   submitted for testing.

4. In 2020, postconviction DNA test results revealed that another man's DNA was extracted
   from multiple stains containing sperm found on the sweatshirt and sweatpants the victim
   wore during the assault and rape. Mr. Kloepper was excluded as a possible contributor in
   every DNA profile obtained from the victim's clothing.

**Ex. 8 at 001**

5. Additional analysis was conducted which led to the identification of a CODIS profile matching the male DNA found on the stains containing sperm on the victim's clothing.

6. Washington Innocence Project filed a CrR 7.8 motion for a new trial on Mr. Kloepper's behalf, based on the newly discovered postconviction DNA results.

7. Throughout the process of obtaining postconviction DNA testing results and preparing for the CrR 7.8 motion hearing, Washington Innocence Project was in communication with the Benton County Prosecuting Attorney's Office. Washington Innocence Project requested investigation updates and relevant documents during this time frame. In addition, on one or more occasions the Benton County Prosecuting Attorney's Office provided Washington Innocence Project with relevant documents before Washington Innocence Project affirmatively requested them.

8. I believed that the Benton County Prosecuting Attorney's Office was sharing all relevant information in their possession, including information about expert consultants and forensic scientists involved in the case. As an example, Washington Innocence Project and the Benton County Prosecuting Attorney's Office conducted a joint interview with DNA Labs International analyst Darren Wright.

9. In February 2021, the Benton County Prosecuting Attorney's Office inadvertently revealed an email exchange attached to this declaration, documenting it was consulting with Erin Ehlert, a former prosecutor from King County, who had purported expertise in DNA cases. In a follow-up email, the Benton County Prosecuting Attorney's Office stated Elhert "was not part of the prosecution team."

10. Mark Mestel, Lara Zarowsky, and I were co-counsel on the CrR 7.8 motion in this case. On November 9, 2021, Mr. Mestel engaged in an email exchange with the Benton County Prosecuting Attorney's office regarding the admissibility of expert materials in this case. I reviewed a copy of this email exchange.

11. In one of these exchanges Deputy Prosecuting Attorney Terry Bloor stated: "Just to follow up on our conversation Friday, you mentioned stipulating to the affidavits of the experts. Did you mean the reports of the DNA scientists? The reports are acceptable to us. This agreement would only extend to documents we have in our possession which are:

6-15-10:  Kevin Jenkins

**Ex. 8 at 002**

6-18-10:  Lorraine Heath

7-16-10:  Lorraine Heath

9-7-10:   Lorraine Heath

6-26-20:  DNA Labs International

10-8-20:  DNA Labs International

8-6-20:   Denise Rodler

1-7-21:   Anna Wilson

4-9-21:   Charlotte Ward[1]

10-21-21:  Charlotte Ward[2]

12. My understanding was forensic scientist Darren Wright was the only expert witness the prosecution consulted in support of the stance the State advanced during the motion proceedings. Mr. Wright authored the DNA Labs International reports referenced in the above email.

13. Washington Innocence Project possessed all the reports Mr. Bloor email listed as the reports "we have in our possession." At that time, I believed Washington Innocence Project possessed all the DNA forensic scientist reports the State had in its possession. Washington Innocence Project prepared Mr. Kloepper's CrR 7.8 presentation under that belief.

14. In 2025, I found out that in 2021, the State retained DNA analyst Derek Cutler as an expert witness, received a report of his findings, and had follow up email communications with him in which he elaborated upon his findings. Mr. Cutler's 2021 report was in the State's possession before the email exchange referenced above.

15. In 2025, I learned more about Ms. Ehlert's role consulting with the prosecution. Emails received by Washington Innocence Project in public disclosure requests reveal that it was Ms. Ehlert who referred the State to "Danny," (who I believe is Daniel Helwig) at Intermountain Forensics as a reputable and knowledgeable expert with experience working for the prosecution. Despite this notable level of cross-jurisdiction collaboration, the State never affirmatively disclosed additional information about the extent of its work

---

[1] I believe "Ward" is a misspelling of Dr. Charlotte Word, the expert witness retained by Mr. Kloepper.

with Ms. Ehlert and did not disclose that the State retained an expert at a laboratory recommended by Ms. Ehlert.

16. I have since reviewed Mr. Cutler's 2021 report, which is co-signed by Daniel Hellwig. I have also reviewed Mr. Cutler's July 31, 2025, declaration and its attachments.

17. Had I known the State had retained Mr. Cutler as a DNA forensic expert, I would have demanded to interview Mr. Cutler before the motion hearing.

18. Had I known the content of the 2021 Derek Cutler report and the opinions he expressed over email, I would have requested Mr. Cutler write a statement to the Court before the motion hearing. I believe Mr. Culter would have provided a report in line with his 2025 declaration.

19. Based on the conclusions Mr. Cutler expressed in his written report and in emails to the Benton County Prosecutor's Office, and in his 2025 declaration, I would have considered calling Mr. Cutler as a live witness at the CrR 7.8 motion hearing and would have subpoenaed him to call as a potential rebuttal witness.

20. I believe the contents of Derek Cutler's 2021 report and 2025 declaration would have been highly relevant to the determination of Mr. Kloepper's CrR 7.8 motion. Mr. Cutler's 2021 report and 2025 declaration provide strong support for concluding the sperm and semen on the victim's clothing were deposited through a primary transfer. Mr. Cutler's 2021 report and 2025 declaration directly refute the secondary transfer theories advanced by the State during the motion proceedings and hearing. Notably, Mr. Cutler opines in a sworn declaration:

   a. Primary transfer is generally more likely than secondary transfer.

   b. The amount of male DNA present on the victim's clothing in this case is not inherently supportive of a secondary transfer.

   c. Based on his training and experience, primary transfer is "much more likely" than secondary transfer in this case, given there were multiple stains, and a high level of DNA found.

   d. Kloepper was excluded from all postconviction DNA tests conducted on the victim's clothing. Had a secondary transfer occurred, it is "much more likely" that some of his DNA would have been transferred to the victim's clothing.

21. It is my opinion the State's ability to legitimately argue its secondary transfer theory would have been hampered - if not prevented - by the disclosure that it retained Derek Cutler as an expert witness. Mr. Cutler, the State's retained and undisclosed expert, opines that a direct or primary transfer scenario is "much more likely" to be the cause of the postconviction test results from the victim's clothing than secondary transfer. Had the State disclosed it retained Mr. Cutler, it could not have legitimately argued in its Response that secondary transfer was "most likely." Response 9. Nor could the State have argued that any forensic scientist who opined its secondary transfer theory was implausible (i.e. not likely), was an "outlier." Response 12. Mr. Cutler, the State's retained and undisclosed expert, opines that a direct or primary transfer is "much more likely" in this case. Cutler Decl.

22. Mr. Cutler further refutes the State's theory that its secondary transfer theory is supported because the "sperm expected in a normal ejaculation is not present here." Response 11. The State continued down this scientifically unsupported path during the motion hearing (Transcript of Motion Hearing Proceedings pp. 125-127). Mr. Cutler, the State's retained and undisclosed expert, rebuts the State's theory by opining "the amount of male DNA obtained from the clothing items was of a significant quantity and could be consistent with ejaculation" and that "there is no scientific support" for "determining whether ejaculation occurred." Cutler Decl.

23. It is my opinion that the State misled the defense in the November 2021 email exchange with Mark Mestel regarding expert witnesses. When listing the reports "we have in our possession," the State withheld disclosing it had retained expert witness Derek Cutler, withheld that it had received a written report from Mr. Cutler, and withheld its follow-up emails with Mr. Cutler. Records also indicate the State set up a time to interview Mr. Cutler on September 15, 2021. Cutler Decl.

24. It is my opinion that the State misled the defense and the Court in its October 7, 2021, Response when stating "the experts thus far interviewed say the evidence is consistent with a transfer from Mr. Contreras to the defendant, to the victim." Response 11. The State received Mr. Cutler's report, exchanged follow up emails with Mr. Cutler, and potentially interviewed him before filing its response. Cutler Decl. Mr. Cutler, the State's

retained and undisclosed expert, stated in his communications with the State that primary transfer was "more likely" than secondary transfer in this case. Cutler Decl.

25. It is my opinion that Mr. Kloepper was prejudiced by the State's withholding evidence that it retained expert witness Derek Cutler.

Signed in Seattle, Washington this 7th day of August 2025.

Jacqueline McMurtrie, WSBA #13587

**Ex. 8 at 006**

# EXHIBIT 9

Att. C-1, p. 1 of 9

*Charlotte J. Word, Ph.D.*
*P.O. Box 35153*
*Richmond, VA 23235-0153*
*804-320-0616*
*cjword@comcast.net*

April 9, 2021

Christopher Graves, Esq.
Washington Innocence Project
University of Washington School of Law
P.O. Box 85110
Seattle WA  98195-1110

RE:    *State of Washington v. Cody J. Kloepper*
       Washington State Patrol Laboratory Number: 209-001537
       DNA Labs International Case #: 20-1410
       Consultation Case No.: W210009

Dear Mr. Graves:

Per your request, I have reviewed several reports and case files associated with the DNA testing conducted in the above-referenced case by the Washington State Patrol Crime Laboratory and DNA Labs International. The information provided in this letter is based on the review of the: 1) report dated 08/06/2020 from the Washington State Patrol (WSP); and 2) reports dated June 26, 2020 and October 8, 2020, and their associated laboratory case files, from DNA Labs International (DLI).

Below I provide some key highlights of the testing performed and some general comments regarding the testing. This is followed by a more detailed summary of the testing, and the results and the conclusions reported by DLI, as well as some additional conclusions and opinions from my review of the files and data. Table 1 provides a summary of the testing conducted by DLI with the reported results and conclusions.

**KEY HIGHLIGHTS OF TESTING**
1) Semen and/or sperm were identified on 7 stains on the interior, exterior, front and back of the sweatpants.
2) Semen and/or sperm were identified on 6 stains on the exterior, front and back of the sweatshirt.
3) DNA testing was conducted on a total of 6 stains that contained sperm (3 stains from front, back and interior of the sweatpants and 3 stains from front and back of the sweatshirt). A DNA profile consistent with Salvador Cosio-Contreras was found in the sperm fraction from all 6 of the stains.
4) The DNA from the sperm fraction for all 6 stains tested cannot be from Cody J. Kloepper.
5) If it is assumed that the semen was deposited on the clothing during the commission of the crime, then any scenario considered must address the presence of the many semen stains in multiple diverse areas of the clothing as well as the presence of DNA from only Salvador Cosio-Contreras and Dana

**Ex. 9 at 001**

Widrig, and the absence of DNA from Cody J. Kloepper. As detailed below, the two possible scenarios under these circumstances are: (a) direct deposition of a fresh ejaculate by and from the assailant; or (b) deposition of ejaculate collected at a prior time (i.e., "planting" of the semen).

## GENERAL COMMENTS

Based on documentation in the laboratory case files from DLI, it seems the DNA testing, the analysis and interpretation of the results, and the reporting of the conclusions provided in the reports dated June 26, 2020 and October 8, 2020, were performed according to generally accepted practices for forensic DNA testing. All conclusions and opinions provided below using information from any of the reports and the case files are assuming the premise that all testing was properly performed using procedures appropriately validated in each of the laboratories and accurately documented; all controls were correctly employed during all stages of the testing and gave the expected typing results; all samples were correctly labeled and no sample switching or contamination occurred during the testing of any of the items; and no deviations, errors, etc. in the testing occurred. I agree with the conclusions as reported in the two reports.

## SUMMARY OF TESTING CONDUCTED, RESULTS OBTAINED AND CONCLUSIONS REPORTED FROM DNA LABS INTERNATIONAL

At DLI, various stained areas on a pair of sweatpants (11 stains) and a sweatshirt (7 stains) reported to have been worn by Dana Widrig during the assault were screened: 1) visually for stains; 2) for the presence of blood using a presumptive assay (KM); 3) for the presence of p30, a component of semen, using an immunological assay; and 4) for the presence of sperm, the cellular component of semen, by staining and microscopic examination.

Three areas from each of the two items of clothing found to be positive for sperm were selected for DNA testing. The laboratory used a differential extraction procedure for the recovery of the DNA from each of the items. This is the extraction method of choice when a sample is known to contain sperm and the identity of the sperm donor is of primary interest. The use of this procedure results in two DNA extracts being generated from each item and is designed to assist with the evaluation of DNA from a mixed DNA sample. DLI refers to these two extracts as the "cell fraction" (or CF) and the "sperm fraction" (or SF). The "cell fraction," also commonly referred to as the "non-sperm" or "epithelial fraction," generally contains DNA recovered from cells other than sperm, such as cells present in blood, saliva, semen or skin/tissue. The "sperm fraction" is generally enriched for the DNA from the male sperm donor; however, it is fairly common to see DNA from the female in the sperm fraction when there is a higher amount of DNA present in the sample from the female relative to the amount of DNA from the male based on how the sample tested was collected.

Table 1 provides a summary of the information from the DLI reports dated June 26, 2020 and October 8, 2020, and the associated documentation in the laboratory case files for the screening of 18 areas of the clothing for the presence of p30 and sperm; and the subsequent DNA testing on 6 of the stains. Please note that the DNA results and conclusions listed in Table 1 are for the sperm fraction obtained from each of the items tested. Information regarding the screening for the presence of blood is reported in the DLI June 26, 2020 report and is not repeated in this table as the areas tested cannot be directly related to the stains noted in the table. Additional comments from my review of the data for each of the items and DNA fractions are provided below.

Page 2 of 6

CELL FRACTION OF ALL SIX STAINS TESTED – The complete single source DNA profile obtained from the cell fraction of each of the samples tested is consistent with being from a single individual and matches the DNA profile of Dana Widrig. The presence of DNA from Dana Widrig on the clothing that she was wearing is expected, particularly clothing that is stained with her blood and feces. It is similarly expected that the bulk of her DNA would be present in the cell fraction from each item. There was no indication of DNA from any other individual in any of the cell fractions from any of the items, with the single exception of stain 7 of the sweatshirt (see additional discussion below).

SWEATPANTS – STAINS 2 AND 7 – SPERM FRACTION – A major[1] contributor profile from a male that matches the profile of Salvador Cosio-Contreras was obtained. A partial profile from a minor contributor consistent with the profile of Dana Widrig was also observed. No indication of DNA from any other individual was present, with the exception of a single allele[2] reported for stain 2 of the sweatpants (see additional discussion below).

SWEATPANTS – STAIN 3 – SPERM FRACTION AND SWEATSHIRT – STAINS 2 AND 4 – SPERM FRACTION – A mixture of two DNA contributors, one male and one female, was obtained. The DNA profile is consistent with a mixture of DNA from Salvador Cosio-Contreras and Dana Widrig. No indication of DNA from any other individual was present.

SWEATPANTS – STAIN 8 – SPERM FRACTION – A mixture of possibly three DNA contributors was obtained, with a major contributor profile from a male that matches the profile of Salvador Cosio-Contreras. A partial profile from a minor contributor profile consistent with the profile of Dana Widrig was observed.

## ADDITIONAL POSSIBLE RESULTS OBTAINED
It is common to observe some artifacts of DNA testing that give the appearance of alleles in DNA profiles when a large amount of DNA from a single individual is amplified; the most common of these being stutter[3] and pull-up[4]. Stutter artifacts are also observed when a small amount of DNA from one or more individuals (referred to as "low template DNA") is amplified during DNA testing. Both of these circumstances exist for the DNA samples tested in this case. These artifacts are well known to occur as part of the

---

[1] In a DNA profile resulting from the mixture of DNA from two or more contributors, a "major contributor profile" is the distinguishable portion of the DNA profile having the highest peak heights for the alleles of the profile. It is considered to be from the "major contributor," that is, the individual from whom the most DNA is present. The lesser amount(s) of DNA present in the DNA profile is (are) from the "minor contributor(s)".
[2] An allele is the observed DNA result used for comparing two DNA profiles. For example, the genotype 15, 17 observed at a particular locus for an individual is comprised of two alleles – a 15 and a 17 – with one each having been inherited from the individual's parents. The variation of alleles within a population allows for differentiating the DNA of two individuals; this permits the exclusion of an individual as the contributor to DNA from a biological sample when that individual's DNA profile contains different alleles. The number assigned to the allele is based on the number of repeated units in the DNA at that short tandem repeat (STR) locus (e.g., allele 15 has 15 repeated units; allele 17 has 17 repeated units).
[3] Stutter refers to a common known "mistake" of the amplification step of the polymerase chain reaction (PCR) process that results in the appearance of a peak in the DNA profile that is generally one or two repeat units smaller or larger than the true allele present in the sample from the true DNA source. This artifact is clearly distinguishable in samples known to be from a single DNA contributor (e.g., known reference samples), but may confound the interpretation of data from evidence items where the number of contributors to the DNA is unknown, especially when DNA from one or minor contributors may be present.
[4] Pull-up refers to signal from one fluorescent dye color channel producing artificial peaks in another color channel. This commonly occurs when a large amount of DNA is amplified and subsequently undergoes capillary electrophoresis.

Page 3 of 6

routine DNA testing process, but may not always be distinguishable as artifacts vs. true alleles. Their presence can make the interpretation of DNA results more complicated. For example, their presence can make it impossible to know if the DNA is from a single individual vs. a mixture of DNA with a major contributor and a very limited minor contributor. It can further confound the interpretation of mixtures where the possible additional alleles may suggest the presence of one or more additional minor contributors, but due to the extremely small amount of data may prevent the interpretation of those data without making certain assumptions. While some individuals may be excluded as a possible minor contributor if the unaccounted for data are from true contributors, generally the limitation and insufficiency of the data and the frequency of the various alleles in the human population make it impossible to provide any meaningful conclusions regarding any possible individuals who cannot be excluded as a possible contributor, and thus these results are often reported as being inconclusive. A few additional alleles were observed for some of the stains tested and are discussed in the following paragraphs.

Two additional alleles plus the Y allele at the amelogenin locus[5], all with very low peak heights, were reported for the cell fraction from stain 7 of the sweatshirt by DLI. This indicates that there may be at least one minor DNA contributor who is male. DLI states in the report "Additional alleles were detected in the cell fraction at the D12S391 and D18S51 loci, which may indicate an additional contributor; however, due to the limited information obtained this data is inconclusive for comparison purposes." If these two reported alleles are true alleles from a single minor contributor and not due to artifacts, Cody Kloepper cannot be excluded as a possible source of the two alleles. However, since these two alleles: 1) are common in the population and *many* other individuals would also be expected to share these two alleles; 2) it is unknown if these are artifacts or true alleles; and, 3) if true alleles, it is unknown if the two alleles are from a single individual, the reported inconclusive statement is appropriate.

A single allele not consistent with the DNA profiles of Dana Widrig or Cody Kloepper was reported at D13S317 in stain 2 of the sweatpants. The possible presence of this additional single allele is not meaningful.

For the sperm fraction of stain 8 from the sweatpants, four additional alleles were reported possibly from a third (or more) contributor(s) who may be male (due to the presence of a reported 11 allele at the DYS391 locus, but which is also in a stutter position and present at a low level). Some of the additional results may be due to stutter artifacts that are known to commonly occur in DNA profiles. If the data are true alleles from a single third contributor, Cody Kloepper is excluded as the third contributor. If there are four or more contributors to the DNA mixture, then no conclusions can be made regarding the very low level contributors due to insufficient data.

The presence of DNA on clothing from individuals other than the owner/wearer is expected, especially on external areas commonly exposed to other individuals. Its presence may be due to deposition: 1) from everyday life of the individual wearing, washing and/or handling the clothing prior to the assault; 2) during the commission of the

---

[5] Data from the amelogenin locus is used to determine the sex/gender of the contributor of the DNA. Both an X and a Y allele are observed when the DNA is from a male. Only the X allele is observed when the DNA is from a female. It is sometimes possible to determine if DNA from both a male and a female is present based on the ratio of the X and Y allele peak heights in a mixed DNA profile.

Page **4** of **6**

crime; and/or 3) by any medical, law enforcement or laboratory staff during the handling or talking over the clothing after the crime occurred. The insufficiency of the possible additional minor data makes it impossible to identify the individual(s) whose DNA may be present in very small amounts on the clothing. It is also not possible to associate the presence of any minor amount of DNA directly with the commission of the crime vs. another activity that occurred prior to or after the crime that may account for its presence given the evidence tested.

## KEY POINTS FOR CONSIDERATION OF THE TEST DATA

When evaluating the screening and DNA test results from the two items of clothing in this case and addressing possible scenarios related to the commission of the crime, there are several key points that need to be considered:

1) A total of 13 different areas on the two items of clothing tested positive for the presence of semen. Semen and/or sperm were identified on 7 different stains on the interior (crotch), exterior, front and back of the sweatpants. Semen and/or sperm were identified on 6 different stains on the exterior, front and back of the sweatshirt.

2) Cuttings from three different areas of the sweatpants (inside in the crotch area, exterior front leg, and exterior rear buttocks area) that were positive for sperm were selected for DNA testing. A DNA profile consistent with Salvador Cosio-Contreras was found in the sperm fraction of the DNA test results from all three samples tested.

3) Cuttings from three different areas of the sweatshirt (front exterior chest, front exterior of the right arm, and back of sweatshirt) that were positive for sperm were selected for DNA testing. A DNA profile consistent with Salvador Cosio-Contreras was found in the sperm fraction of the DNA test results from all three samples tested.

4) DNA results consistent with the DNA profile from Dana Widrig were also obtained from all six samples tested.

5) No DNA from any other individual was detected on the clothing in any sufficient amount for meaningful comparison.

6) The DNA profiles obtained from all six of the areas tested are different from the DNA profile obtained from Cody J. Kloepper. Therefore, Cody J. Kloepper is excluded as a possible contributor and thus cannot be the source of the DNA obtained from the sperm fraction or the cell fraction of any of the six samples tested.

7) Any scenario considered must fit with and provide a reasonable explanation for the DNA data obtained.

## POSSIBLE SCENARIOS

Working under the assumption that the semen was deposited on the clothing during the commission of the crime, there are two possible scenarios that may be considered for its presence:

1) Direct deposition of a fresh ejaculate by and from the assailant on the interior, exterior, front and back of the clothing of Ms. Widrig – This fits the key points listed above based on the screening and DNA testing results obtained without additional conditions.

2) Deposition of ejaculate collected at a prior time (i.e., "planting" of the semen) – This scenario would require the: 1) collection of a sufficient amount of ejaculate, presumably without knowledge of the donor, for future deposition at the numerous various sites on both items of clothing; 2) transport of the collected

Page 5 of 6

semen to the crime scene and maintenance in a manner to preserve it in a form suitable for deposition and retention on the clothing; 3) deposition on multiple areas (front and back, internal and external) of both items of clothing by the assailant; 4) constraint that all actions were performed without the introduction of DNA from the assailant during the collection, maintenance and storage of the semen, and deposition on the clothing in detectable amounts; and 5) absence of deposition of DNA from the assailant while removing the clothing, handling Ms. Widrig, and talking/yelling in close proximity to the clothing during the commission of the crime in all of the areas tested.

I reserve the right to modify my opinions and conclusions if any additional information is provided for this case. A copy of my *curriculum vitae* is attached.

Please let me know if you have any questions or need any additional information.


Sincerely,

Charlotte J. Word, Ph.D.


Attachments: Table 1 and CV

Page 6 of 6

Att. C-1, p. 7 of 9

Table 1: Summary of Testing Results and Conclusions from DNA Labs International*

| Item | Description of Area | Cuttings for Screening | p30 Results | Sperm Observed (# observed) | Cuttings for DNA Testing | DNA Test Results/Conclusions (Sperm Fraction Only) |
|---|---|---|---|---|---|---|
| Sweatpants – stain 1 | Center of waistband by tag, interior | 4 – ~¼" x ¼" | NEG** | NEG | none | |
| Sweatpants – stain 2 | Small (1" x 1 ½") area near right of crotch, exterior | 3 – ~¼" x ¼" | NEG | POS (5) | 4 – ~¼" x ¼" | Mixture of at least two individuals with at least one male contributor. Salvador Cosio-Contreras cannot be excluded as a contributor. Cody Kloepper is excluded as a contributor. The DNA profile obtained from this sample is ~54 quadrillion times more probable if the sample originated from Contreras and Widrig than if it originated from Widrig and an unknown person. |
| Sweatpants – stain 3 | Large (19" x 7") area on right front leg exterior | 8 – ~¼" x ¼" | POS | POS (0-1) | 16 – ~¼" x ¼" | Mixture of at least two individuals with at least one male contributor. Salvador Cosio-Contreras cannot be excluded as a contributor. Kloepper is excluded as a contributor. The DNA profile obtained from this sample is ~190 quadrillion times more probable if the sample originated from Contreras and Widrig than if it originated from Widrig and an unknown person. |
| Sweatpants – stain 4 | Small stain to the left of knee on front leg exterior | 3 – ~¼" x ¼" | POS | NEG | none | |
| Sweatpants – stain 5 | Large area on left front leg exterior | 8 – ~¼" x ¼" | POS | NEG | none | |
| Sweatpants – stain 6 | Small area on interior crotch | 5 – ~¼" x ¼" | NEG | NEG | none | |
| Sweatpants – stain 7 | Large area on left back leg exterior, below knee, near left exterior leg seam | 8 – ~¼" x ¼" | POS | NEG | none | |

Ex. 9 at 007

Att. C-1, p. 8 of 9

| Item | Description of Area | Cuttings for Screening | p30 Results | Sperm Observed (# observed) | Cuttings for DNA Testing | DNA Test Results/Conclusions (Sperm Fraction Only) |
|---|---|---|---|---|---|---|
| Sweatpants – stain 8 | Large (5" x 3") stain on left exterior buttock near left exterior seam | 5 – ~¼" x ¼" | POS | POS (1) | 8 – ~¼" x ¼" | Mixture of at least three individuals with at least one male contributor. Salvador Cosio-Contreras cannot be excluded as a contributor. Kloepper is excluded as a contributor. The DNA profile obtained from this sample is ~110 quadrillion times more probable if the sample originated from Contreras, Widrig, and an unknown person than if it originated from Widrig and two unknown persons. The DNA profile of the remaining contributor to the mixture was not determined; however, the results are suitable for comparison. |
| Sweatpants – stain 9 | Small area on left exterior buttock near interior seam | 3 – ~¼" x ¼" | NEG | NEG | none | |
| Sweatpants – stain 10 | Large area on right exterior buttock, seam to seam | 8 – ~¼" x ¼" | POS | NEG | none | |
| Sweatpants – stain 11 | Small stain on right exterior leg below buttock; near right exterior leg seam | 1 – ~¼" x ¼" | NEG | NEG | none | |
| Sweatshirt – stain 1 | Large area on front of hood | 10 – ~¼" x ¼" | POS | POS (1) | none | |
| Sweatshirt – stain 2 | Large (12" x 5") oval area on right exterior front, from neck to waistband | 10 – ~¼" x ¼" | POS | POS (4) | 20 – ~¼" x ¼" | Mixture of at least two individuals with at least one male contributor. Salvador Cosio-Contreras cannot be excluded as a contributor. Kloepper is excluded as a contributor. The DNA profile obtained from this sample is ~200 quadrillion times more probable if the sample originated from Contreras and Widrig than if it originated from Widrig and an unknown person. |
| Sweatshirt – stain 3 | Oval area in middle of front exterior | 6 – ~¼" x ¼" | NEG | NEG | none | |

Ex. 9 at 008

Att. C-1, p. 9 of 9

| Item | Description of Area | Cuttings for Screening | p30 Results | Sperm Observed (# observed) | Cuttings for DNA Testing | DNA Test Results/Conclusions (Sperm Fraction Only) |
|---|---|---|---|---|---|---|
| Sweatshirt – stain 4 | Large (16" x 7") oval area on right front exterior arm, shoulder to wrist | 10 – ~¼" x ¼" | POS | POS (0-1) | 20 – ~¼" x ¼" | Mixture of at least two individuals with at least one male contributor. Salvador Cosio-Contreras cannot be excluded as a contributor. Kloepper is excluded as a contributor. The DNA profile obtained from this sample is ~190 quadrillion times more probable if the sample originated from Contreras and Widrig than if it originated from Widrig and an unknown person. |
| Sweatshirt – stain 5 | Oval area on left front exterior arm, shoulder to wrist | 10 – ~¼" x ¼" | POS | POS (0-1) | none | |
| Sweatshirt – stain 6 | Large oval area on exterior back, from above to just below shoulder blades | 10 – ~¼" x ¼" | POS | NEG | none | |
| Sweatshirt – stain 7 | Large (11" by 6") oval area in middle of exterior back, below shoulder blades to waistband | 8 – ~¼" x ¼" | POS | POS (6) | 16 – ~¼" x ¼" | Mixture of at least two individuals with at least one male contributor. Salvador Cosio-Contreras cannot be excluded as a contributor. Kloepper is excluded as a contributor. The DNA profile obtained from this sample is ~ 200 quadrillion times more probable if the sample originated from Contreras and Widrig than if it originated from Widrig and an unknown person. |

\* The information in this table is from the DLI case file and the two reports dated June 26, 2020 and October 8, 2020. In addition, Karl Goering was excluded as the contributor of the DNA in the report dated 08/06/2020 from the Washington State Patrol.

\*\*NEG = negative results; POS = positive results

# EXHIBIT 10

*Charlotte J. Word, Ph.D.*
*P.O. Box 35153*
*Richmond, VA 23235-0153*
*804-320-0616*
*cjword@comcast.net*

October 21, 2021

Mark Mestel, Esq.
2707 Colby Avenue, Suite 901
Everett, WA  98201

RE: *State of Washington v. Cody J. Kloepper*
     Washington State Patrol Laboratory Number: 209-001537
     DNA Labs International Case #: 20-1410
     Consultation Case No.: W210009

Dear Mr. Mestel:

This letter is written as a supplement to my previous letter dated April 9, 2021, for the above-referenced case based on my reading of the State's Response to Defendant's Motion for New Trial dated October 7, 2021 [hereafter "Response"]. Below are some comments and opinions based on my reading.

1. The opinions expressed in my previous letter remain unchanged.
2. The principle of transfer of evidence from one item or one person to another item or person is the foundation of several areas of forensic testing. It is clear that all items of clothing tested in this case had DNA deposited on them via some form of transfer; however, it is impossible for me or any other analyst or expert to determine whether the transfer occurred from direct contact of a person with the clothing or via secondary (or tertiary, etc.) transfer by means of another person or object. I agree with the statements on page 8 of the Response attributed to Darren Wright, that there is no way to determine based on the nature of the stain or the DNA profile whether the DNA found on the clothing was from direct or indirect (e.g., secondary) transfer.
3. Several cases and published studies where transfer of a biological sample/DNA had been demonstrated to occur are outlined starting on the bottom of page 9 through page 10 supporting that direct, secondary and even tertiary transfer of DNA can occur. There is no question that transfer of biological fluids and DNA is a very common event and that the possibility of transfer and the mode of transfer often must be considered when evaluating data in forensic cases. While it is generally not possible to determine how transfer occurred in a particular case, it is possible to outline the various events that would have to occur under various scenarios to achieve the test results obtained in a particular case.
4. For this case, any scenario proposed to have occurred must account for the following observations: a) the presence of semen stains and/or sperm on multiple areas of the sweatpants and sweatshirt; b) the presence of semen stains and/or sperm on the interior, exterior, front and back of the clothing; c) DNA test results from the sperm fractions from multiple stains consistent with the DNA profile of

Ex. 10 at 001

Salvador Cosio-Contreras; and d) the complete absence of detectable amounts of DNA from Cody Kloepper in any of the samples tested.

5. Direct transfer of a biological fluid, for example in this case semen, from the assailant via his hands, penis or other body parts to the body and clothing of the complainant is straight forward and easy to explain. Furthermore, direct deposition of semen and DNA from Mr. Cosio-Contreras is consistent with the presence of semen (and sperm) on the clothing and with the DNA test results obtained in this case and easily accounts for the absence of DNA from Cody Kloepper.

6. Secondary (or tertiary, etc.) transfer of semen and DNA from Mr. Cosis-Contreras via Cody Kloepper, while not impossible, requires a significantly more complex series of events to occur in order to generate the DNA test results obtained. Cody Kloepper would have had to collect and transport semen obtained from Mr. Cosio-Contreras in such a manner as to preserve a sufficient amount and in the proper state to be deposited on the clothing in multiple areas during the assault on the complainant, all without the introduction of any of his DNA from his body, semen or saliva.

7. It is unclear how the low number of sperm found on the clothing proves that secondary transfer occurred as stated on page 11 of the Response and, furthermore, that it had to have occurred via the defendant. There are several viable explanations for a semen sample having a low number of sperm, none of which can be resolved by the DNA testing in this case. It is also unclear how the information regarding the persistence of sperm after laundering is relevant to this case.

8. It is very unlikely that Lorraine Heath would opine "that the tip of the rubber glove...was a mixture of D.W.'s blood and the defendant's" as stated near the bottom of page 3 of the Response for a number of reasons. A similar misstatement is made on page 11. While I have not seen the data and the case file for the testing conducted on the tip of the rubber glove, it seems impossible to make that statement based on the information provided. Similarly it is unlikely that an analyst from DNA Labs International would opine that Salvador Cosio-Contreras is the minor contributor of the DNA and that the defendant is the major contributor as stated on page 6 of the Response. Both of these statements are misleading as they provide conclusions that are not possible to be derived from the DNA testing conducted in this (or any) case. In addition, the statements presented in the Response regarding the likelihood ratios reported in this case by DLI are incorrectly stated in the Response on page 6.

I reserve the right to modify my opinions and conclusions if any additional information is provided for this case.

Please let me know if you have any questions or need any additional information.

Sincerely,

Charlotte J. Word, Ph.D.

# EXHIBIT 11

Att. B-2, p. 1 of 4



**DNA LABS**
INTERNATIONAL
EXPERIENCE • TECHNOLOGY • RESULTS

260 SW Natura Avenue, 2ⁿᵈ Floor • Deerfield Beach, FL 33441 • Ph: 954.426.5163 • Fax: 954.697.0218 • www.DNALabsInternational.com

| | | |
|---|---|---|
| **To:** Washington Innocence Project | **DLI Case #:** | 20-1410 |
| Washington State Patrol Crime Laboratory | **Agency Case #:** | 209-001537 |
| 2203 Airport Way S. Suite 250 | **Report Date:** | June 26, 2020 |
| Seattle, WA 98134 | | |

**Victim:**  Dana Widrig
**Suspect:**  Cody J. Kloepper

## CERTIFICATE OF ANALYSIS

**The following evidence was received by this laboratory on February 25, 2020 by USPS delivery:**

| Agency Item # | DLI Item # | Description |
|---|---|---|
| RJS-4 | 20-02130 | Underwear from Dana Widrig |
| RJS-5 | 20-02131 | Sweatpants from Dana Widrig |
| RJS-6 | 20-02132 | Sweatshirt from Dana Widrig |
| SP0028 | 20-02133 | Hairs |
| SP0029 | 20-02134 | Tape lifts |
| DM-1 | 20-02135 | Buccal swabs from Dana Widrig |
| RS-8 | 20-02136 | Buccal swabs from Cody J. Kloepper |

NOTE: Sample description (including any reference to the identification of biological fluids) is based on documentation received from the submitting agency.

## METHODS

The indication of blood, semen and saliva utilize chemical or immunological tests; the components of the body fluid tested are not unique to that body fluid and are therefore considered presumptive. The identification of spermatozoa utilizes microscopic examination and is considered confirmatory.

The method of deoxyribonucleic acid (DNA) analysis used was the Polymerase Chain Reaction (PCR). The real-time PCR quantitation kit used was the PowerQuant system which targets total human and total male DNA as well as assesses DNA degradation. The PCR amplification kit used was the PowerPlex Fusion 6C DNA profiling system which includes 27 genetic loci: Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, Penta E, D16S539, D18S51, D2S1338, CSF1PO, Penta D, TH01, vWA, D21S11, D7S820, D5S818, TPOX, D8S1179, D12S391, D19S433, SE33, D22S1045, DYS391, FGA, DYS576, DYS570.

## RESULTS/CONCLUSION

**RJS-4          20-02130          Underwear from Dana Widrig**

Blood was indicated on the underwear. No spermatozoa were identified and no seminal fluid was indicated on the underwear. No further analysis was performed at this time.

No analysis was performed on apparent hairs/fibers observed on the underwear.

Att. B-2, p. 2 of 4



**DLI Case #: 20-1410**

**RJS-5          20-02131          Sweatpants from Dana Widrig**

Blood was indicated on the sweatpants. Seminal fluid was indicated on stains designated as Stain 4 and Stain 5 on the wearer's left exterior front of the sweatpants; however, no spermatozoa were identified. Seminal fluid was indicated on a stain designated as Stain 7 on the wearer's left exterior back of the sweatpants; however, no spermatozoa were identified. Seminal fluid was indicated on a stain designated as Stain 10 on the wearer's right exterior back of the sweatpants; however, no spermatozoa were identified. No further analysis was performed on these stains.

Spermatozoa were identified on stains designated as Stain 2 and Stain 3 on the wearer's right exterior front of the sweatpants. One spermatozoon was identified on a stain designated as Stain 8 on the wearer's left exterior back of the sweatpants. Samples were collected from these stains for DNA analysis.

> **Stain 2**
> The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.
>
> Assuming Dana Widrig as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.
>
> **Stain 3**
> The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.
>
> Assuming Dana Widrig as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.
>
> **Stain 8**
> The DNA profile obtained from this sample indicates a mixture of at least three individuals with at least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.
>
> Assuming Dana Widrig as a contributor to this mixed DNA profile, a DNA profile for one of the contributors to the mixture was determined when a proposition of three overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile. The DNA profile of the remaining contributor to the mixture was not determined; however, the results are suitable for comparison.

No analysis was performed on apparent hairs observed on the sweatpants.

**RJS-6          20-02132          Sweatshirt from Dana Widrig**

Blood was indicated on the sweatshirt. One spermatozoon was identified on a stain designated as Stain 1 on the wearer's exterior hood of the sweatshirt. Spermatozoa were identified on a stain designated as Stain 5 on the wearer's exterior left sleeve of the sweatshirt. Seminal fluid was indicated on a stain designated as Stain 6 on the wearer's exterior upper back of the sweatshirt; however, no spermatozoa were identified. No further analysis was performed on these stains.

Att. B-2, p. 3 of 4

 **DNA LABS** INTERNATIONAL
EXPERIENCE • TECHNOLOGY • RESULTS

**DLI Case #: 20-1410**

Spermatozoa were identified on stains designated as Stain 2 and Stain 4 on the wearer's exterior front and right sleeve of the sweatshirt, respectively, and on Stain 7 on the wearer's exterior lower back of the sweatshirt. Samples were collected from these stains for DNA analysis.

### Stain 2
The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.

Assuming Dana Widrig as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.

### Stain 4
The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.

Assuming Dana Widrig as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.

### Stain 7
The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.

Assuming Dana Widrig as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered and is suitable for comparison. This determined DNA profile will be labeled as UNKNOWN#1.

Additional alleles were detected in the cell fraction at the D12S391 and D18S51 loci, which may indicate an additional contributor; however, due to the limited information obtained this data is inconclusive for comparison purposes.

No analysis was performed on apparent hairs observed on the sweatshirt.

| | | |
|---|---|---|
| SP0028 | 20-02133 | **Hairs** |
| SP0029 | 20-02134 | **Tape lifts** |

No analysis was performed on these items at this time.

| | | |
|---|---|---|
| DM-1 | 20-02135 | **Buccal swabs from Dana Widrig** |
| RS-8 | 20-02136 | **Buccal swabs from Cody J. Kloepper** |

DNA profiles suitable for comparison purposes were obtained from these swabs.

## REMARKS

Additional DNA comparisons can be conducted upon submission of a reference standard from a consensual partner, suspect, and/or other individual(s) of interest.

Page 3 of 4

**Ex. 11 at 003**

Att. B-2, p. 4 of 4



**DLI Case #: 20-1410**

The probabilistic genotyping method utilizes STRmix™, an internally validated expert forensic software. STRmix™ uses a fully continuous approach for DNA profile interpretation.

Laboratory activity was performed between the date items are received and the date the report is issued unless otherwise indicated.

Only those items discussed in the results above were examined for this report.

If you have questions or need assistance, please contact the laboratory at (954) 426-5163 or info@dnalabsinternational.com.

## DISPOSITION

All items and DNA extracts (if applicable) will be returned to the submitting agency.

This report represents the opinion and interpretation of the undersigned analyst.

Respectfully submitted,

Darren Wright
Forensic DNA Analyst

**-END OF OFFICIAL REPORT-**



ANSI National Accreditation Board
A C C R E D I T E D
ISO/IEC 17025
FORENSIC TESTING
LABORATORY

Ex. 11 at 004

Att. B-4, p. 1 of 4



# DNA LABS
## INTERNATIONAL
EXPERIENCE • TECHNOLOGY • RESULTS

260 SW Natura Avenue, 2nd Floor • Deerfield Beach, FL 33441 • Ph: 954.426.5163 • Fax: 954.697.0218 • www.DNALabsInternational.com

| | | | |
|---|---|---|---|
| **To:** | Washington Innocence Project | **DLI Case #:** | 20-1410 |
| | Washington State Patrol Crime Laboratory | **Agency Case #:** | 209-001537 |
| | 2203 Airport Way S. Suite 250 | **Report Date:** | October 8, 2020 |
| | Seattle, WA 98134 | | Second Report |

**Victim:** Dana Widrig
**Suspect:** Cody J. Kloepper

## CERTIFICATE OF ANALYSIS

**The following evidence was received by this laboratory on August 21, 2020 by UPS delivery:**

| Agency Item # | DLI Item # | Description |
|---|---|---|
| 902831 | 20-07980 | Buccal swabs from Salvador Cosio-Contreras |

NOTE: Sample description (including any reference to the identification of biological fluids) is based on documentation received from the submitting agency.

**The following partial list of evidence was received by this laboratory on February 25, 2020 by USPS delivery and previously analyzed:**

| Agency Item # | DLI Item # | Description |
|---|---|---|
| RJS-5 | 20-02131 | Sweatpants from Dana Widrig |
| RJS-6 | 20-02132 | Sweatshirt from Dana Widrig |

NOTE: Sample description (including any reference to the identification of biological fluids) is based on documentation received from the submitting agency.

## METHODS

The method of deoxyribonucleic acid (DNA) analysis used was the Polymerase Chain Reaction (PCR). The real-time PCR quantitation kit used was the PowerQuant system which targets total human and total male DNA as well as assesses DNA degradation. The PCR amplification kit used was the PowerPlex Fusion 6C DNA profiling system which includes 27 genetic loci: Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, Penta E, D16S539, D18S51, D2S1338, CSF1PO, Penta D, TH01, vWA, D21S11, D7S820, D5S818, TPOX, D8S1179, D12S391, D19S433, SE33, D22S1045, DYS391, FGA, DYS576, DYS570.

## RESULTS/CONCLUSION

A DNA profile was previously obtained from Dana Widrig (DLI item 20-02135) and reported in the Certificate of Analysis dated June 26, 2020.

**RJS-5        20-02131        Sweatpants from Dana Widrig**

The sweatpants were previously analyzed and reported in the Certificate of Analysis dated June 26, 2020. Samples were previously collected from stains designated as Stain 2, Stain 3, and Stain 8 for DNA analysis.

Page 1 of 4

**Ex. 11 at 005**



**DLI Case #: 20-1410**
**Second Report**

### Stain 2
Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 54 quadrillion times more probable if the sample originated from Salvador Cosio-Contreras and Dana Widrig than if it originated from Dana Widrig and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and Dana Widrig contributed to this DNA profile, rather than Dana Widrig and an unknown person.

### Stain 3
Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 190 quadrillion times more probable if the sample originated from Salvador Cosio-Contreras and Dana Widrig than if it originated from Dana Widrig and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and Dana Widrig contributed to this DNA profile, rather than Dana Widrig and an unknown person.

### Stain 8
Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 110 quadrillion times more probable if the sample originated from Salvador Cosio-Contreras, Dana Widrig, and an unknown person than if it originated from Dana Widrig and two unknown persons. Therefore, there is extremely strong support that Salvador Cosio-Contreras, Dana Widrig, and an unknown person contributed to this DNA profile, rather than Dana Widrig and two unknown persons.

**RJS-6          20-02132          Sweatshirt from Dana Widrig**

The sweatshirt was previously analyzed and reported in the Certificate of Analysis dated June 26, 2020. Samples were previously collected from stains designated as Stain 2, Stain 4, and Stain 7 for DNA analysis.

### Stain 2
Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 200 quadrillion times more probable if the sample originated from Salvador Cosio-Contreras and Dana Widrig than if it originated from Dana Widrig and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and Dana Widrig contributed to this DNA profile, rather than Dana Widrig and an unknown person.

### Stain 4
Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

Att. B-4, p. 3 of 4



**DNA LABS**
INTERNATIONAL
EXPERIENCE · TECHNOLOGY · RESULTS

**DLI Case #: 20-1410**
**Second Report**

The DNA profile obtained from this sample is approximately 190 quadrillion times more probable if the sample originated from Salvador Cosio-Contreras and Dana Widrig than if it originated from Dana Widrig and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and Dana Widrig contributed to this DNA profile, rather than Dana Widrig and an unknown person.

**Stain 7**
Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 200 quadrillion times more probable if the sample originated from Salvador Cosio-Contreras and Dana Widrig than if it originated from Dana Widrig and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and Dana Widrig contributed to this DNA profile, rather than Dana Widrig and an unknown person.

**902831         20-07980         Buccal swabs from Salvador Cosio-Contreras**

Two samples were collected from the swabs for DNA analysis. No reportable DNA results were obtained from the first sample due to quality control reasons. A DNA profile suitable for comparison purposes was obtained from the second sample.

**REMARKS**

The probabilistic genotyping method utilizes STRmix™, an internally validated expert forensic software. STRmix™ uses a fully continuous approach for DNA profile interpretation. The propositions used to determine the likelihood ratios for this report were calculated from the information available at the time the report was written. Should any additional information become available it may be necessary to reconsider these interpretations. Additional propositions may be considered upon request if instructed to do so prior to testimony.

The reported likelihood ratio was derived from the Expanded Federal Bureau of Investigation (FBI) DNA population database (2016) for the Caucasian, Southeast Hispanic, Southwest Hispanic and African American/Bahamian/Jamaican populations. The stratified likelihood ratio, incorporating all four population groups was selected for reporting. The value reported is an estimate that accounts for possible co-ancestry between individuals within racial sub-populations, sampling uncertainty of the allele frequencies, and variability within the STRmix™ deconvolution process.

Laboratory activity was performed between the date items are received and the date the report is issued unless otherwise indicated.

Only those items discussed in the results above were examined for this report.

If you have questions or need assistance, please contact the laboratory at (954) 426-5163 or info@dnalabsinternational.com.

Att. B-4, p. 4 of 4



**DLI Case #: 20-1410**
**Second Report**

## DISPOSITION

All items and DNA extracts (if applicable) will be returned to the submitting agency.

This report represents the opinion and interpretation of the undersigned analyst.

Respectfully submitted,

Darren Wright
Forensic DNA Analyst

**-END OF OFFICIAL REPORT-**



ANAB
ANSI National Accreditation Board
A C C R E D I T E D
ISO/IEC 17025
FORENSIC TESTING
LABORATORY

Page 4 of 4

# EXHIBIT 12

Att. B-5, p. 1 of 2



JAY INSLEE
Governor

JOHN R. BATISTE
Chief

STATE OF WASHINGTON
## WASHINGTON STATE PATROL
580 West 7th Street • Cheney, WA 99004-2492 • 509-625-5401 • www.wsp.wa.gov

## CRIME LABORATORY REPORT

**Agency:** Richland Police Department
**Agency Case Number:** 0930208
**Agency Rep:** Dean Murstig
**Suspect:** COSIO-CONTRERAS, SALVADOR
**Victim:** WIDRIG, DANA L.

**Laboratory Number:** 209-001537
**Request Number:** 0013

### Results and Conclusions

The Y-STR profile previously obtained from the glove fragment (Item RS5) is of mixed origin consistent with having originated from two male individuals. A minor male component was deduced and matches Salvador Cosio-Contreras. Therefore, neither Salvador Cosio-Contreras nor any of his paternal male relatives can be excluded as a minor contributor of male DNA from this sample. This minor Y-STR profile has been observed 96 times in the Y Chromosome Haplotype Reference Database and is not expected to occur more frequently than 1 in 250 male individuals in the U.S. population.

Salvador Cosio-Contreras is not the source of the STR DNA profile obtained from the staining on the sock (Item #JMT12), previously designated Individual A.

Salvador Cosio-Contreras can neither be included nor excluded as a possible contributor to the mixed Y-STR DNA profile obtained from the left fingernail swabs (Item #JMT40).

Salvador Cosio-Contreras is not the source of the Y-STR DNA profile obtained from the left fingernail scrapings (Item #JMT42), previously designated Individual C.

Salvador Cosio-Contreras is not the source of the major Y-STR DNA profile obtained from the head hair from the sweatshirt (Item #RJS-6), previously designated Individual D. Salvador Cosio-Contreras can neither be included nor excluded as a possible contributor to the mixed Y-STR DNA profile from the head hair from the sweatshirt.

### Evidence

Item 902830: Sealed DNA reference sample for Salvador Cosio-Contreras

The STR DNA profile from the staining on the sock (Item #JMT12) and the Y-STR DNA profiles from the glove fragment (Item #RS5), the left fingernail scrapings (Item #JMT42), and the left fingernail swabs (Item #JMT40). See Washington State Patrol (WSP) Crime Laboratory Report 209-001537 Requests 0001 and 0008, 0009 by Forensic Scientist Lorraine Heath.

_____
Anna J.B. Wilson, Forensic Scientist

January 7, 2021
_____
Date



**Ex. 12 at 001**

Att. B-5, p. 2 of 2

**CRIME LABORATORY REPORT** Continued

**Agency:** Richland Police Department
**Agency Case Number:** 0930208

**Laboratory Number:** 209-001537
**Request Number:** 0013

Evidence (cont.)

Items not listed above were not examined at this time.

Methods and Observations

A portion of the reference sample was removed and extracted using a direct to amplification procedure. The sample was quantified for total human and male DNA content using standard procedures.

The DNA profile from the glove fragment (Item RS5) was re-evaluated.

The DNA profile was generated using PowerPlex® Fusion 6C or PowerPlex® Y23 amplification kit. A capillary electrophoresis instrument was used to analyze the resulting products. Statistics were calculated using the Y Chromosome Haplotype Reference Database, release 63, https://yhrd.org.

Remarks

The submitted items of evidence in this case will be retained at the WSP Spokane Crime Laboratory pending return to the submitting agency.

A onetime search of the DNA profile obtained from the reference sample of Salvador Cosio-Contreras was performed against the state level of the Combined DNA Index System (CODIS) database and no probative matches were found.

The results and conclusions presented in this report include the interpretations of the analyst whose signature appears on the report.

_____
Anna J.B. Wilson, Forensic Scientist

January 7, 2021
Date

Page 2 of 2

**Ex. 12 at 002**

Att. B-3, p. 1 of 1

JAY INSLEE
Governor



JOHN R. BATISTE
Chief

### STATE OF WASHINGTON
## WASHINGTON STATE PATROL
2203 Airport Way South, Suite 250 • Seattle, WA 98134-2045 • (206) 262-6020 • www.wsp.wa.gov
### CRIME LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Agency:** | Richland Police Department | **Laboratory No.:** | 209-001537 |
| **Agency No.:** | 09-30208 | **Request No.:** | 0011, 0012 |
| **Agency Rep:** | Sergeant Jeff Taylor | | |
| **Suspect:** | Kloepper, Cody J. | | |
| **Victim:** | Widrig, Dana | | |

## CONCLUSIONS

A male DNA profile obtained from the sweatshirt (Item RJS-6; DNA Labs International item 20-02132) was entered into the Combined DNA Index System (CODIS) databank and searched.

A match to **Salvador Castillo-Sanchez** (DOB: 08/02/1967, FBI# 852944EA8, BOP# 17543-085, alternate name and DOB listed) was declared. It is requested that a reference sample for **Salvador Castillo-Sanchez** be submitted to DNA Labs International to confirm this match. Please contact the Washington State Patrol Seattle Crime Laboratory to arrange for this submission.

Cody Kloepper (Item RS-8, DNA Labs International item 20-02136) was excluded as the source of this DNA profile.

Individual A (Item JMT12) and Karl Goering (Item JMT37) are also excluded as the source of this DNA profile.

Routine, scheduled searches of CODIS will be conducted. If a potentially probative match should occur, a subsequent report will be issued.

For previous analysis of these items, please refer to the following reports:
- Items RJS-6 and RS-8: DNA Labs International case 20-1410 dated June 26, 2020 signed by Forensic DNA Analyst Darren Wright
- Items JMT12 and JMT37: Washington State Patrol case 209-001537 dated April 9, 2010 by Forensic Scientist Lorraine Heath

Denise N. Rodier, Forensic Scientist

08/06/2020
Date

1 of 1 dnr



**Ex. 12 at 003**

# EXHIBIT 13

# Incident/Investigation Report

**Agency:** RPD          **Case Number:** 09-30208          **Date:** 08/25/2020 08:10:55

## Supplement Information

| Supplement Date | Supplement Type | Supplement Officer |
|---|---|---|
| TH Aug 20, 2020 | SUPPLEMENTAL REPORT | (R45) MURSTIG, DEAN |
| **Contact Name** | | **Supervising Officer** |
| | | (R18) SWANSON, SHAWN |

**Ex. 13 001**

# Incident/Investigation Report

**Agency:** RPD                **Case Number:** 09-30208                **Date:** 08/25/2020 08:10:55

## Supplement Notes

8/17/2020
Salvador Cosio-Contreras contacted

On 8/17/2020 at about 1345 hours I located a vehicle that was registered to Salvador Cosio-Contreras parked in front of MBM Express, 1117 W. Court St. in Pasco. MBM Express is where Salvador is the reported owner of the business.

I watched the vehicle leave occupied by two males. I was some distance off and could not identify for sure if Salvador was in the vehicle. I followed the vehicle to the area of Court St. and 34th Ave. where it entered the Goodwill parking lot. The two males in the vehicle walked away from the vehicle and I was able to get a close visual confirmation on the subjects and could clearly identify one of the subjects as Salvador Cosio-Contreras from his DOL photos.

I parked in the area and contacted RPD Detective Flohr to assist with making contact. Up to this point Salvador had not been seen at the business or his home and I felt the matter was urgent to contact him to complete the task of serving a search warrant for his DNA. It was not the perfect scenario to contact him given he was in a public place and in the company of another person, but he needed to be contacted.

Det. Flohr arrived and we positioned ourselves near his vehicle where we could contact him as he approached his vehicle. At about 1415 hours I saw Salvador coming out to his vehicle and we planned on me contacting him and Det. Flohr distracting the other subject. Upon Salvador arriving at his vehicle I approached him dressed in a tactical vest clearly identifying myself as a Police Officer. I called out to him by name and asked him to move away from his car and talk and he willingly did so. He seemed somewhat alarmed, but passive and cooperative. I quickly introduced myself and asked if he remembered me from a trial he testified at 10 years ago. He paused for a moment and then looked at me a little puzzled and then said he did remember me. I reminded him that I worked for Richland Police and I was involved in the investigation where he came and testified about meeting up with a guy from Craigslist 10 years ago. I explained to him that some new developments had come up in the case and in fact his DNA had come up at the crime scene. He said something to the effect that was not possible. I explained to him that it was true and that I had a search warrant to collect his DNA and finger prints. He said he was willing to cooperate in anyway, but asked if we could meet in a few hours. I explained that due to the fact that I had a search warrant and he was hard to locate to that point I would want to do this now. I quickly asked if he was still married and he said no. I asked who the guy he was with was and he said it was "Chris" and that he is his care taker for the state. I asked if Chris knew anything about the trial 10 years ago and he did not. Salvador explained that Chris was disabled and could not be left alone so he could not leave him there stranded. He requested we follow him to his business and he could drop Chris off there and he could go take care of this. We agreed and followed Salvador to his business where he dropped off his passenger.

Salvador then drove himself to RPD for an interview and we followed him.

Once at RPD I went to an interview room where we had the capability to record a conversation. I asked Salvador initially if we could record the interview and he said he would rather not unless he had an attorney present. I told him we would talk without recording the interview as he was not comfortable doing so. I explained to him that he was not under arrest and that I was not advising him of his rights and that he could leave at any point. He said he understood and agreed to stay and talk. He was not handcuffed or restrained and the door was not locked preventing him from leaving if he chose to do so. He was given water at his request and allowed to use the restroom.

At the initial part of the interview I started talking about who he was and his identity and names. In talking to Salvador I learned that he was born in Mexico and come to California when he was 19-20 years old. He said he had come on a medical visa because his younger brother needed treatment at the Shriners Hospital so he was taking care of him at that time. He talked about in the early 1990s he married his wife whom he had 3 biological children with. We talked about him moving to Pasco after being married and then later they moved to Florida. He talked about his wife living in Florida while he traveled back and forth to Pasco to run his business, MBM Express. He said he is a IRS certified tax filer. He advised that he has done interpreting services in the past for the Benton County District Courts. He advised that in 2018 he divorced his wife. When I asked why he told me she made him choose between his parents and her. He went on to explain that his parents needed full time care a few years ago and he felt obligated to stay in Pasco to help and this did not sit well with his wife. He advised that his parents have since passed away in the past year. He described that he has been depressed due to their passing and has been to a counselor.

# Incident/Investigation Report

**Agency:** RPD          **Case Number:** 09-30208          **Date:** 08/25/2020 08:10:55

Moving on in the interview I then brought up again that his DNA had been found in the crimes scene related to this case. Many times he stated he was puzzled as to how that could be. I went on to explain to him that it was his semen specifically and that there was sperm identified. I explained there was only a couple of possibilities of how that could be. I told him he was there or it was transferred form another source. When I stated he was there he very clearly stated he was not there and was not involved in any way. He was very clear on this denial.

We then moved on to talking about transfer possibilities and specifically brought up his encounter with Cody Kloepper. I had him tell me about that from his own recollection. He recalled that he had placed an ad on "social media" to explore with another man. He remembered that a person responded to the ad and that they text and maybe talked on the phone. He described that the other party was very eager to meet up. He said that he gave the person directions to where he was staying, which at that time was a family farm in Finley. He described that the person actually showed up at the front door and he let him inside the home. He described that the person was not who he envisioned as someone he might be interested in "playing around with". He went on to describe that the person was intoxicated, smelled of cigarettes and was dirty. He described that he made the subject coffee and had him remain at the house for some time to sober him up. Salvador described that he believed he was there for at least 30 minutes but more likely up to an hour and a half. He described that the subject used the bathroom like three times. He described that the subject was sitting at the kitchen table drinking coffee at one point and then later he was on the couch sitting with Salvador. Salvador then remembered that he said to the subject it was not working out and he should leave. Salvador remembers that the subject was upset when he left, but he did not confront him or remember exactly what he said. He mentioned something about "worthless".

I talked about any type of sexual encounter with the subject. He stated that he did not recall at this time anything specific. He stated that knowing himself he did not believe he would have had any sexual contact because he was so turned off by the person. He was not denying he had a sexual encounter, he kept stating he did not recall or recollect specifically at this time. I asked if there was any reasons why he would not tell us now pointing out he was married ten years ago so he certainly would not want anyone to find out then. He said his biggest concerns back then were his parents knowing, because he was raised in a religious background, and the stigma of having homosexual contact. He stated in the hispanic community he certainly would be embarrassed about the sexual contact with a man. He went on to say that his former wife and kids never knew about any of his exploring with men. He advised that he was still concerned that his children would know.

We asked in several different ways about any type of contact sexually and various scenarios and he continued to say he did not remember or recall. He would mention each time that he really did not see himself doing anything. He never did say, or make a firm denial, that he did not have a sexual encounter back then.

Salvador expressed during the interview that he was tired and had not eaten that day and offered that he would contact us if he remembered anything. It did appear that he was tired and probably needed some time and space to regroup given the circumstances of this being brought up suddenly after 10 years. I provided both contact number for Det. Flohr and I.

The search warrant for his person was served on him and the saliva samples collected via buccal swab in two kits. He was also fingerprinted by RPD Professional Staff Julie Miller.

Salvador left RPD on his own at the conclusion of the interview.

**Ex. 13 003**

# EXHIBIT 14

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF BENTON

STATE OF WASHINGTON,               )
                                   )
        Plaintiff,                 )
                                   )
    vs.                            )        NO. 10-1-01156-4
                                   )
CODY KLOEPPER,                     )
                                   )
        Defendant.                 )

VIDEO INTERVIEW OF SALVADOR CONTRERAS

Taken at the Richland Police Department

802 Center Parkway
Richland, Washington

Wednesday, August 19, 2020

10:30 a.m.

TRANSCRIPT OF THE VIDEO RECORDING

TRANSCRIBED BY:    CHERYL A. PELLETIER, CCR 2344

1

APPEARANCES:

SALVADOR COSIO CONTRERAS -- INTERVIEWEE

OFFICER DEAN MURSTIG -- RICHLAND POLICE DEPARTMENT

DETECTIVE LUKE FLOHR -- RICHLAND POLICE DEPARTMENT

2

August 19, 2020

Richland, WA

OFFICER MURSTIG:  Okay.  Today's date is August the 19th.  The time is 10:23 in the morning.  This is Officer Murstig.  I'm with the Richland Police Department.  We are currently at the Richland Police Department in an interview room.  In the interview room present with us is Salvador,  it's Cosio Contreras.  Salvador's date of birth is 8-1 of 1966.

Sal, do I have your permission to record this conversation?

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Okay.  And then will you just state your name so that it's on record for voice recognition?

MR. CONTRERAS:  Yes.  Salvador Cosio Contreras.

OFFICER MURSTIG:  Okay.  And then also present in the room is Detective Luke Flohr with the Richland Police Department.

Detective Flohr, will you put your name and do you consent to this recording?

DETECTIVE FLOHR:  Yeah.  Detective Luke Flohr, Richland Police Department and, yes, I

3

consent.

OFFICER MURSTIG:  Okay, all right, thanks, Sal.  Like I said, we'll get all that out of the way.

And Sal, I'm just -- I'm just going to put this out there, as well on the recording, is that you are here voluntarily?

MR. CONTRERAS:  I am, yes.

OFFICER MURSTIG:  You drove yourself here today?

MR. CONTRERAS:  I did.

OFFICER MURSTIG:  Okay.  And so you've arrived here on your own today and,and you're here voluntarily and you can leave at any point you want; okay?

MR. CONTRERAS:  All right.

OFFICER MURSTIG:  Just tell me I'm done with the interview and,  and you can go on.  And, and I think you understand that --

MR. CONTRERAS:  I do.

OFFICER MURSTIG:  -- from dealing with us in the past.  Okay.

So, Sal, reason we've asked you here today is a couple days ago we approached you.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  You were outside the

4

**Ex. 14 at 004**

Goodwill store.  And myself and Detective Flohr approached you out in a parking lot -- you were with another person and we approached you and informed you that we had a search warrant for your person to collect DNA and fingerprints.

And the way that we did that, I think it caught you off guard a little bit; is that correct?

MR. CONTRERAS:  That's correct, yes.

OFFICER MURSTIG:  Okay.  And so, and whenever we talk, we were talking about a case that was ten years old.  And so, did that catch you off guard a little bit?

MR. CONTRERAS:  Of course it did.

OFFICER MURSTIG:  Of course, okay.  And, and we assumed that.  And we gave you the opportunity to deal with the person that you were with, go to your work, make the arrangements at work, and then you drove yourself to Richland P.D. to where we talk --

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  -- and then --

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  And we collected the samples.  And so we're just trying to do a follow-up with that because we understand that being approached

5

in a parking lot ten years after an event, when you're in the presence of somebody else that doesn't know about what was going on.  That person didn't know; correct?

MR. CONTRERAS:  Right, doesn't know still.

OFFICER MURSTIG:  And that was Chris.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And he still doesn't know you're telling --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  And, you know, that what we talked about and what was talked about ten years ago was kind of sensitive.

MR. CONTRERAS:  It is very sensitive.

OFFICER MURSTIG:  Sensitive and personal in nature about a relationship and some of the things in your life.

And so we're going to -- I just kind of want to go through that again.  So back it up ten years ago.  You came to Benton County and you testified in a case.

MR. CONTRERAS:  I did.

OFFICER MURSTIG:  You did.  And that's -- you remember doing that.  You were the same person that came.

6

MR. CONTRERAS: That's correct.

OFFICER MURSTIG: Correct. And at that time you were living where.

MR. CONTRERAS: In Florida, Naples, Florida.

OFFICER MURSTIG: Naples, Florida, right. And you came without your family knowing.

MR. CONTRERAS: Correct.

OFFICER MURSTIG: Correct. And at the time you were married.

MR. CONTRERAS: Yes.

OFFICER MURSTIG: And three children.

MR. CONTRERAS: Correct.

OFFICER MURSTIG: And you were going between Naples, Florida and Tri-Cities.

MR. CONTRERAS: Correct.

OFFICER MURSTIG: And Tri-Cities is, is where you had a business and you still have that business.

MR. CONTRERAS: I still do.

OFFICER MURSTIG: And it's MBM Express.

MR. CONTRERAS: That's correct.

OFFICER MURSTIG: In Pasco.

MR. CONTRERAS: Yes.

OFFICER MURSTIG: And your business, you do

7

**Ex. 14 at 007**

some tax accounting -- I'll let you explain. You explained it the other day. You're not a certified public accountant. You are -- go ahead.

MR. CONTRERAS: IRS authorize -- IRS authorized transmitter, which means that I prepare the income taxes along the lines with the IRS rulings and they also authorize me to transmit that documentation to them back and forth. And so pretty much what I do, I take care of the initial and final consultation with a client.

OFFICER MURSTIG: Okay. And so that's the IRS transmission. And then you mentioned the other day you do some other work for like payroll and help people with businesses.

MR. CONTRERAS: We do payroll and that's pretty much bookkeeping for different businesses. We probably have seven, eight businesses that we do payroll and bookkeeping for -- in preparation for taxes pretty much.

OFFICER MURSTIG: Okay. And then is there anything else your business does?

MR. CONTRERAS: We have a notary onsite. We also used to be involved in travel agency services. Right now with the pandemic, of course, we're not active since March or April. So that's

8

kind of on the low side.  But other than that, oh, translations of documents.  I'm a certified translator for Global University and, so just living around the community since 1994, and I lived here for maybe to 2007.  Then I moved to Florida and I came back because of my parents.

But in between I was coming back every month once -- for a week or so to run the business and continue being updated with the business.  That's what pretty much we do.

OFFICER MURSTIG:  Okay.  And then -- so why don't you walk -- some things have changed in your life since ten years ago.  Can you walk me through that a little bit?

MR. CONTRERAS:  Well, the -- well, the most recent one about two years ago, that's when I got divorced.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  I've been married after 25 years.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  So I came to the Tri-Cities two and a half years ago to stay for good.

Well, temporarily it wasn't to stay for good, but it was temporarily.  But then it just arise with

9

**Ex. 14 at 009**

my parents and I had to end up staying.  It just a (inaudible) my wife being in Florida so we ended up getting divorced and I've been staying here for the last two and a half years.

OFFICER MURSTIG:  And what was the reason for your divorce?

MR. CONTRERAS:  Well, that's very personal and I prefer not to go into that one.

OFFICER MURSTIG:  That's fine.  We talked --

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  -- a little bit about that the other day.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  We're good with that.

And so since two years ago you've been living in the Tri-Cities.  You live in Pasco.  Where do you live at?

MR. CONTRERAS:  906 South Tenth Avenue.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  In Pasco.

OFFICER MURSTIG:  And that is a residence that you've always had or --

MR. CONTRERAS:  No, I bought that residence about four years ago, I believe.  Four to five -- I

10

would say four.  And I bought it just as an investment property, but with keeping in mind that since my parents were in one of those care-giving 24-hour service, residential homes.

OFFICER MURSTIG:  Uh-huh.

MR. CONTRERAS:  And they didn't want to stay there.  So I made a commitment to get that house up and, up and running so they could move into that property.  So we did a lot of work on the property and then mom and dad came over to the property.

OFFICER MURSTIG:  Okay.  And where did mom and dad live before that?

MR. CONTRERAS:  In -- it's called a 24-hour care residential home where they had about six other individuals.  A total of six individuals in the house.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  In the same condition that they were pretty much people that needed help.

OFFICER MURSTIG:  And then before that there was a home that they had somewhere in Finley?

MR. CONTRERAS:  Finley that's a property that we opened, my wife and I.  That's a property that we bought even before we moved to Florida.  So they were in the property, that's where they were

11

staying.

OFFICER MURSTIG:  Your parents.

MR. CONTRERAS:  My parents, yes.

OFFICER MURSTIG:  Okay.  Out in Finley.

MR. CONTRERAS:  Before they got real sick, of course.

OFFICER MURSTIG:  Okay.  And you would have moved to Florida in 2007?

MR. CONTRERAS:  I believe it was 2007, yes.

OFFICER MURSTIG:  So you bought the property in Finley prior to that.

MR. CONTRERAS:  Prior to that.

OFFICER MURSTIG:  Do you remember the address?

MR. CONTRERAS:  I don't.

OFFICER MURSTIG:  We asked the other day --

MR. CONTRERAS:  Yeah, yeah.

OFFICER MURSTIG:  -- and you described where it was off of Finley Road up from where the school was?

MR. CONTRERAS:  No, up to where the gas station is and that --

OFFICER MURSTIG:  Yes.

MR. CONTRERAS:  And the Olympic (phonetic) sign.

12

**Ex. 14 at 012**

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Because the street goes up and then to the right and the house is on the left-hand side.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  About three properties down.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  It's like in the middle of the road.

OFFICER MURSTIG:  It's in the --

MR. CONTRERAS:  In the middle of that road, that particular road or that block what we call it.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Once you make the turn.

OFFICER MURSTIG:  Uh-huh, okay.  And so when you went to Florida, when you would come back and forth to Tri-Cities, where were you living or staying when you came to Tri-Cities?

MR. CONTRERAS:  I was staying at the property in Finley.

OFFICER MURSTIG:  In Finley?  And were your parents living there at the time, or --

MR. CONTRERAS:  No, they were actually traveling back and forth from here to Mexico.  So the

13

times when I was here, probably one or two times that I came back, they were in town.

My sisters used to be the ones that pretty much taking care of them, running back and forth until they started -- their health had started going down and they just couldn't move too much. Dad got in a car accident and that was the end of pretty much of traveling for them.

OFFICER MURSTIG: Yeah, and you talk about your dad's accident. He was a quadriplegic.

MR. CONTRERAS: Yeah, he became quadriplegic from that accident, from that car accident, yes.

OFFICER MURSTIG: Remind me of what year that was.

MR. CONTRERAS: I would say that was in -- around 2008 or nine. 2008 or nine, yeah.

OFFICER MURSTIG: Okay. I knew it was someone -- somewhere in there, I couldn't remember the specifics --

MR. CONTRERAS: Right.

OFFICER MURSTIG: -- on the year. Okay. And so then in 2009 time frame, wife, family staying in Florida and then you're traveling back and forth to Tri-Cities.

14

MR. CONTRERAS:  Correct.

OFFICER MURSTIG:  Okay.  And then we'll walk you through the events, I guess, that led up to this.

When you were coming back to Tri-Cities, there was some things going on to where you were putting stuff on social media.

MR. CONTRERAS:  I was either --

(Whereupon a cellphone rang.)

OFFICER MURSTIG:  Go ahead.

MR. CONTRERAS:  I'm sorry.  I didn't even turn it off.  I'm sorry.

DETECTIVE FLOHR:  That's okay.

MR. CONTRERAS:  I try to (inaudible) turn it off.

Yes, I was using social media to connect with other individuals who were pretty much in the same boat that I am.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  What to do with, you know, a situation you -- that I was formally at that point going through.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  I'd been married, but

15

**Ex. 14 at 015**

always wanting a little bit more and trying to explore.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  So I would be chatting with other people about the present situation at that point and came across this gentleman, the one that we're here for.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  In which I remember him very, I'd saying into it, trying to connect.  And I would just text him back and he asked me for directions.  I said -- give him the directions, thinking that he was never going to really make it obviously.  But at the same time, I wanted to meet somebody to explore some.  And I had painted in my head a different person, of course.

But once he arrived, it was quite late.  He arrived and he was not in a good hygiene situation, I guess.  He was very dirty and smelly, like he was been drinking.  He appeared to be really drunk and he just came to the door, came to the door.  I didn't even know what kind of car he drove.  He came to the door and he was the one that was talking to me.

I let him in.  He was too drunk and too smelly. I asked him to come to the kitchen and he sat at the

16

kitchen.  I offered him something to drink, and I believe it was coffee, so I serve him something and he was sitting there.  Across from that kitchen table there was a couch where I normally sit and -- to read or to just lay down.

And so he finished.  He came over to the couch and he was sitting -- we were apart, I would say about three feet apart on the couch.

OFFICER MURSTIG:  Uh-huh.

MR. CONTRERAS:  And he was moving around the other way too much on the couch, like wanting to have sex obviously.  That was the intention.  And I, I had mentioned to him that it was not what I expected.  That's not what I wanted to do.  So basically that's how we ended up meeting.

And I remember him going to the bathroom a couple of times.  Came back and I think one of the times he came back to the bathroom, he came up closer to me, touching my, my, my legs because I was wearing a pair of shorts, and touching my upper body.  And I said, you know what?  This is not what I expected.  This is not what I want.  And I don't want to do this.

So he kept on touching and touching.  I think he said, well, if nothing's going to happen then I

17

have to go.  He was like quite upset.

So he got up and I remember him leaving and I just was watching him through the door going out, get into his car and leaving.

But other than that, that's all I -- the type of contact that I had with him at that point.  And I had no recollection of any event at this point between he and I, I mean, to do anything sexually. Yeah, there was some touching, that he would be touching me, but other than that, I don't, I don't recall any, any, anything -- and I would remember because that's very important thing, of course, in my life that I would either appreciate it or regret it, one of the two, but I don't.

OFFICER MURSTIG:  Okay.  And so how did he act whenever he left?

MR. CONTRERAS:  Oh, when he left, he was mumbling some words and I didn't catch him, what he was saying.  But he was a little bit better than when he arrived because he was walking a little bit straighter, but other than that, I didn't catch it. I didn't want to get into an argument asking him what was that, or something like that for me to understand.  But I knew that -- since I didn't get to play with him, then he, he was upset.

18

OFFICER MURSTIG:  He was upset.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Okay.  And so, yeah, you'd mentioned that before that whenever he left and you felt like he was upset.  And then you watched him leave whenever he left.

How long was he there?

MR. CONTRERAS:  I would say from 30 minutes to an hour and a half, but no more than two hours.

OFFICER MURSTIG:  No more than two hours?

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Okay.  And we've talked a little bit about this before, was this -- what time of day was this?

MR. CONTRERAS:  It was late at night.

OFFICER MURSTIG:  Late at night.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And do you think it was after midnight or before midnight?

MR. CONTRERAS:  I would say that we started chatting before midnight, but he actually showed up, I would say after midnight.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  And so if he showed up

19

after midnight sometime, he was there for up to two hours.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  You don't know exactly when he left.  You had --

MR. CONTRERAS:  Timewise, no, I didn't.

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  I didn't keep track of any of that.

OFFICER MURSTIG:  Right.  And we talked about that you said it was really late.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  You made that comment when we talked before that it was really late and you felt like you needed to go to bed.  This was --

MR. CONTRERAS:  Yes, yes.

OFFICER MURSTIG:  -- a lot later than you would normally be up.

MR. CONTRERAS:  That's right.

OFFICER MURSTIG:  Okay.  And so you have no way now to say, well, it was three, 3:30 in the morning or 2:30.  No, no way to --

MR. CONTRERAS:  I don't think I can pinpoint the (inaudible) --

OFFICER MURSTIG:  Right.

20

**Ex. 14 at 020**

MR. CONTRERAS:  -- time.

OFFICER MURSTIG:  Right, right.  The exact time is unknown --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- at this point.  But we know -- we did have some transactions from some cellphone records and so we do know a specific time that there was some last --

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  -- communications.  And so we know that this had to have happened after that time.  And that was after midnight when that occurred.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And so, you're talking about potentially a couple hour time window that, that he was there.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  And so we've kind of gone through -- is there --are there any reasons why you, you wouldn't remember all the exact details of what was going on at the time?  Were you intoxicated, or --

MR. CONTRERAS:  No, no.

OFFICER MURSTIG:  -- on drugs or anything?

21

MR. CONTRERAS:  No.

OFFICER MURSTIG:  No.

MR. CONTRERAS:  No, no.

OFFICER MURSTIG:  Okay.  And I just throw that out there just to get an idea.  Sometimes that's something we're dealing with.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  With people and recollection of events and time frames.  And so you're saying you didn't -- do you drink at all?

MR. CONTRERAS:  I don't, huh-uh.

OFFICER MURSTIG:  Yeah.  And then no drugs.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  And at that time in your life you weren't drinking or doing drugs.

MR. CONTRERAS:  No, no, not at all.

OFFICER MURSTIG:  Okay.  And so that that wasn't an issue that we need to address --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- as far as your memory.  And so when you're on the couch, you're talking about some touching that's going back and forth.

MR. CONTRERAS:  Yeah.  I think originally I didn't included (sic) that because I didn't remember much of that.

22

**Ex. 14 at 022**

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  But from the two days ago I was thinking this guy was there --

OFFICER MURSTIG:  Yeah --

MR. CONTRERAS:  -- and I felt his hands of course.  Must have been somewhere on the body.  But I don't -- since it was nothing important, nothing interesting that I can, I can try to dial in my memory, I didn't really -- I didn't pay much attention to it.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Because it's not an important thing.

OFFICER MURSTIG:  But you mentioned just a few minutes ago that you were wearing shorts --

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  -- at the time.  And then you said a shirt or your --

MR. CONTRERAS:  I don't remember if I had a shirt on.

OFFICER MURSTIG:  Touching your chest you said.

MR. CONTRERAS:  My chest, yeah, he was.

OFFICER MURSTIG:  Yeah.  And so --

MR. CONTRERAS:  So if it was a shirt --

23

OFFICER MURSTIG:  You said --

MR. CONTRERAS:  -- of course, that he would stick his hands down my shirt, of course.  It was a loose shirt.  It's like for sleeping, a loose shirt and some shorts.

OFFICER MURSTIG:  Okay.  And so are -- do you think you were wearing a shirt or do you know?

MR. CONTRERAS:  I don't recall that.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  I was just assuming because if I was at home and I remember him touching, how else would he have done?  Underneath the shirt or the shirt -- or on top of the shirt?  I --

OFFICER MURSTIG:  But you do know he was touching your chest --

MR. CONTRERAS:  Oh, yeah, he was.

OFFICER MURSTIG:  That's what you're telling me right now.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  He was touching your chest?

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  He was rubbing on your

24

chest.  In a romantic way.

MR. CONTRERAS:  Well, not to me.

OFFICER MURSTIG:  But to him.  He's trying to be romantic with you --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- is what you're describing.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  If he's putting his hands -- and where, where on your legs.

MR. CONTRERAS:  Just on the legs and around.

OFFICER MURSTIG:  Uh-huh.

MR. CONTRERAS:  Well, not really touching me but around the legs, just running across and going out to the --

OFFICER MURSTIG:  Right, and --

MR. CONTRERAS:  -- to the chest and --

OFFICER MURSTIG:  I'm just going to describe.  The motions you're doing is your inner legs.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  You're going up through your groin and then your stomach and your chest area.

MR. CONTRERAS:  Yes.

25

OFFICER MURSTIG:  So that's where his hands were?

MR. CONTRERAS:  That's what I remember feeling the touches.

OFFICER MURSTIG:  Okay.  So all up and down the front of your body.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And so when you just did that motion just now, you were rubbing next to your groin area.  Can you like explain that a little further as far as what touch and where?

MR. CONTRERAS:  Well, either one is that the two thumbs are too close to the groin area so it went across it, but not that I was touching there, I just went across it.

OFFICER MURSTIG:  Okay.  And so what do you remember about him touching specifically?  Describe that in --

MR. CONTRERAS:  Just he --

OFFICER MURSTIG:  -- as much detail as you can.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  All right.

MR. CONTRERAS:  Touching of the legs to the middle part of course, but not in -- nothing as --

26

**Ex. 14 at 026**

and then going up to my stomach and then going up to my chest.

OFFICER MURSTIG:  Okay.  And is this on top of your clothing or under your shorts.

MR. CONTRERAS:  On the -- that part I don't remember the shorts, but I do remember vividly the part of the, of the chest.

OFFICER MURSTIG:  On the bare skin on the chest?

MR. CONTRERAS:  On the bare skin, yes.

OFFICER MURSTIG:  So he's touching your chest on bare skin.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Okay.  Rubbing his hands.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Okay.  And that gives me a better idea.

And then as far as the bare skin, you, you made a comment a second ago that he didn't touch your penis that you remember.

MR. CONTRERAS:  That I remember, no, but, I mean showing the hands of where I was rubbing it, the two thumbs are too close, so if he rubbed it -- the stomach -- and went around, of course he might have had.

27

**Ex. 14 at 027**

I don't remember any type of an oral sex being performed or him going down on me or something or my, or my penis would get hard enough to -- for him to do anything or I would do anything to him.

OFFICER MURSTIG:  Okay.  And so when, when you're describing this, he's rubbing his hands on your chest and around the lower part of your body, we'll just call it that.  How long is he doing that? How long does that take place?

MR. CONTRERAS:  I don't think it was too long because then at that point I just couldn't --

OFFICER MURSTIG:  Throw a time out there. Because "too long" to me is --

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  -- you know --

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  -- could be ten seconds or --

MR. CONTRERAS:  I'd say, I'd say a couple of minutes.

OFFICER MURSTIG:  A few, okay.

MR. CONTRERAS:  A few minutes, uh-huh.

OFFICER MURSTIG:  A couple minutes, or few minutes, or --

MR. CONTRERAS:  Um, I would say no more

28

than five minutes.

OFFICER MURSTIG:  No more than five minutes.

MR. CONTRERAS:  Huh-uh.

OFFICER MURSTIG:  Okay.  Five minutes.  And then is there any kissing or anything like that going on?

MR. CONTRERAS:  No, no kissing.

OFFICER MURSTIG:  Okay.  And this is taking place while you're sitting on a couch.

MR. CONTRERAS:  I was laying down by the time he was doing that.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  On the couch.

OFFICER MURSTIG:  And so when you're laying down, is he laying down on top of you?

MR. CONTRERAS:  At one point he got on top of me, yes.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  One point.

OFFICER MURSTIG:  So he's laying on top of you at one point.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And are his clothes on or are they off?

29

**Ex. 14 at 029**

MR. CONTRERAS:  When he came back from the bathroom, he had -- I assume because I don't remember that part -- he showered or he got some water on him because he was wet.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  So his hands, his body felt wet.

OFFICER MURSTIG:  And so is his clothes off when he comes -- it's --

MR. CONTRERAS:  His clothes off, yeah, out of the bathroom.

OFFICER MURSTIG:  So his clothes are off. And is that -- that's when he lays on top of you?

MR. CONTRERAS:  Well, he was touching first.  He sat down right in the same spot where he was sitting.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  And he started rubbing one hand.  And then he sat down and started rubbing with two hands and then he laid on top of me.  That's when I got up and said, you know, this is not working out.

OFFICER MURSTIG:  Okay.  And you're -- are your clothes still on at this point or are your clothes off?

MR. CONTRERAS:  Let's say I don't have --

30

well, not let's say.  I didn't have a shirt on at that point.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  I do remember still having my shorts on, but those are loose shorts that he was touching from inside, from the sides.

OFFICER MURSTIG:  So he's touching inside your shorts?

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Okay.  And so you have loose shorts on and he's able to put his hand --

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  -- under the shorts and touching --

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  -- inside?

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Okay.  And at one point he doesn't have his clothes on.  He lays on you.  You know he's wet.  And he's rubbing your chest.  You don't have a shirt on, and he's rubbing all over and then he's rubbing inside your shorts --

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  -- with his hands --

MR. CONTRERAS:  Uh-huh.

31

**Ex. 14 at 031**

OFFICER MURSTIG: -- inside your shorts. Okay.

MR. CONTRERAS: He was very pushy about that. That's not what I wanted. Because he was being very pushy about it. And being that he was drunk, I'm not sure if he was all coherent or not and I just didn't think it was a good opportunity for me to explore a part.

OFFICER MURSTIG: Okay. And so if that's five minutes, I'm going to, I'm going to try to piece that event on the couch where he's, he doesn't have his clothes on and he's putting his hands on you. At the what point during -- is that right when he arrives or is that much later?

MR. CONTRERAS: Much later, after he finished sitting down from his, whatever drink he was having. I do recall it was coffee because I had the coffee pot going.

OFFICER MURSTIG: Okay.

MR. CONTRERAS: And so he sat down. He's talking and wanting to do something. I said no. He went to the bathroom once. Came back.

The second time around when he went to the bathroom, that's when he came out naked.

OFFICER MURSTIG: Okay. What was he -- I'm

32

**Ex. 14 at 032**

going to do two things here. What was he saying, do you recall? You said he was talking, so.

MR. CONTRERAS: Yeah, we were talking about -- all right. My personal situation, I was doing most of the talking.

OFFICER MURSTIG: What was --

MR. CONTRERAS: He did not know --

OFFICER MURSTIG: -- your personal situation?

MR. CONTRERAS: About being married.

OFFICER MURSTIG: Okay.

MR. CONTRERAS: And wanting to explore. And he said that was the reason why he came. I want to have sex with you. Everything was related to the -- being married and sex.

OFFICER MURSTIG: Okay.

MR. CONTRERAS: And of course he started touching the second time around when he came back from the bathroom. That's when he was naked. Thinking that probably would happen. Something may happen.

But other than the touching and getting on top of me, that was the only, the only part that I remember the physical contact, and that's when I got up and said, you know, this is not working out. You

33

need to leave.

So at that point, he mumbled some words and I didn't understand what it was.

OFFICER MURSTIG:  You -- oh, you didn't, okay.

MR. CONTRERAS:  And so, I just looked straight at the door and walked away and didn't come back.  But he was saying a lot of stuff going out.  Did not recall what he says, or did not understand what he said.  And if I did, I wouldn't challenge him and asking him what he meant with that because I know he was mad.  The way he was reacting and the sound of the voice.

OFFICER MURSTIG:  Okay.  And so is he putting his clothes on at that point.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Uh-huh, okay.  Where was his clothing?

MR. CONTRERAS:  On the side of the couch where he was sitting at.  So this is the couch, so he was on the right side and I was on the left side.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  And then he had them on the side of the couch, the very corner.  But when he picked them up they were on the floor.

34

OFFICER MURSTIG:  Okay.  And so when you're seeing this and whatnot, is his penis -- is he erect? Is he wanting an encounter?

MR. CONTRERAS:  I don't think it was.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  I don't think it was.  I don't think he could because he was too drunk and stuff like that.

OFFICER MURSTIG:  Okay.  And so what you're describing is when this, when this contact occurs where he's trying to be romantic with you on the couch, that's up to five minutes.

MR. CONTRERAS:  Yes, uh-huh.

OFFICER MURSTIG:  And then when you tell him, you know, this is not going to work, you need to go, he gets dressed and then he immediately leaves your house at that time?

MR. CONTRERAS:  He left the house right after he got dressed, yes.

OFFICER MURSTIG:  Yes.  So there was no, no other talk.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  He doesn't have another cup of coffee.

MR. CONTRERAS:  No.

35

OFFICER MURSTIG:  Nothing else.  And so he leaves.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  Okay.  And then after that, what took place with you?

MR. CONTRERAS:  I remember going to bed and just sleep for the remaining hours that I had for the day and I don't even remember what happened the next day if I went to work or not, or what I did that particular day.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  It all depends on the day of the week.  Because normally I go to work early.  But it all depends on the day of the week.

OFFICER MURSTIG:  Okay.  And so -- go ahead.  You ask a question.

DETECTIVE FLOHR:  Well, I had --

OFFICER MURSTIG:  Yes.

DETECTIVE FLOHR:  I had a question real quick.  Tell me every -- when you were talking about how you guys were talking by the table and talking about exploring or playing or what he might have been suggesting, tell me everything that he said.

MR. CONTRERAS:  Well, I know that everything that he was saying was it -- that he

36

wanted to have sex with me, that he wanted sex.  That he wanted to have sex.  And the way that he came in, I did not tell him no at that point because he was very drunk and I didn't know what his reaction would be.  So my goal was to keep him there for, say, a good hour at least so he can sober up and then leave and he will be more coherent and be able to drive back to wherever he lived.  I didn't even know where he lived.

DETECTIVE FLOHR:  Okay.  And then he goes to the restroom, comes out and he doesn't have any clothes on.

MR. CONTRERAS:  Right.

DETECTIVE FLOHR:  And then he's laying -- tries -- he lays on top of you.

MR. CONTRERAS:  Yes.

DETECTIVE FLOHR:  He's touching you and he ends up putting his hands into the sides of your shorts, under your shorts is how I'm understanding it.

Tell me everything that happened when he put his hand under your shorts.

MR. CONTRERAS:  I remember him touching my legs to my stomach and my upper body.  He did touch me there, of course, going up and down, but I don't

37

remember him like really getting into it other than just running the hands slowly up and down.

OFFICER MURSTIG:  And when you say touch there, what do you mean?

MR. CONTRERAS:  The penis.

OFFICER MURSTIG:  Penis.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Okay.

DETECTIVE FLOHR:  After, after that, after he was touching you underneath your shorts and had touched your penis, did he go to the restroom after that or not anymore?

MR. CONTRERAS:  No, I don't recall him leaving -- or going to the bathroom anymore, just freshening up and leaving.

DETECTIVE FLOHR:  Okay.

MR. CONTRERAS:  So I'm not -- nope that's, that's all he did.  Because he had left and never even contacted me again, or I didn't contact him afterwards and did not know what happened until months later.

DETECTIVE FLOHR:  You never -- had you had any contact with him before all of this?

MR. CONTRERAS:  No, never.

DETECTIVE FLOHR:  And you said you didn't

38

have any contact with him ever after this incident until --

MR. CONTRERAS:  No, huh-uh.

DETECTIVE FLOHR:  -- the case came up.

MR. CONTRERAS:  Yes, I never did any of that.  I mean, I don't recall being in contact after --knowing that he was not going to be a person that -- whom I wanted to explore and I decided not to.

OFFICER MURSTIG:  Okay.  And I'm going to back you up just a little bit.  So you were talking about he touched you there and you're talking your penis.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Is your penis erect?  Is it hard at that point?

MR. CONTRERAS:  I don't think it was because there was no attraction whatsoever.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  So I don't think it was.

OFFICER MURSTIG:  And then was there an ejaculant (sic)?  Did you climax at that point --

MR. CONTRERAS:  Well, back then, I remember ejaculating very fast.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Even from watching a movie

39

or a video clip, whatever it would be.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  I don't recall intentionally cuming or ejaculating.  But I do know and recognize that I am very sensitive and I can ejaculate within a minute or so.

OFFICER MURSTIG:  Okay.  And so on this particular encounter, how did that happen?  What happened?

MR. CONTRERAS:  I don't recall ejaculating.  Then again, it's a good possibility because knowing myself that I would ejaculate quite fast from any touch or anything, and sometimes even if my penis is not erect completely then it would ejaculate.

OFFICER MURSTIG:  Okay.

DETECTIVE FLOHR:  Oh, so you could ejaculate even without an erection.

MR. CONTRERAS:  Yes.

DETECTIVE FLOHR:  Okay.

OFFICER MURSTIG:  And so I want to -- I want to try to pinpoint that down.  So if he's putting his hand under your shorts on your penis, what do you recall about that?  Think about that.

MR. CONTRERAS:  Well, it was natural for me to ejaculate if I'm being touched or if I'm even just

40

watching a magazine, let's say.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Then my mind works real fast and even I cannot stop it.  I just ejaculate.

OFFICER MURSTIG:  Okay.  And so what do you recall about that specific time?

MR. CONTRERAS:  I don't recall ejaculating, but it's most likely that I did.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Because knowing myself that I could ejaculate, ejaculate fast and it could have happened there with a touch and he's so close.

OFFICER MURSTIG:  Okay.

DETECTIVE FLOHR:  Well, what was -- tell me everything about his reaction at that point.

MR. CONTRERAS:  Well, he was (inaudible) of me of course that he wanted to do more, and being so stinky of -- because he smoked cigarettes, I know that.  And I said this is not working out, got up; and when I got up, he got up and hugged me, put his hands around me.

OFFICER MURSTIG:  Oh, okay.

MR. CONTRERAS:  Uh-huh.  And I said, sorry, this isn't working out.  He said, okay, that's fine. And then he went and grabbed his clothes and started

41

mumbling things and walk away.

OFFICER MURSTIG:  Mumbling things making you believe he's upset?

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  That's what I'm trying to figure out.

MR. CONTRERAS:  I don't know if he was saying about himself or myself, you know, this was worthless or whatever it was.  He left, of course.  I was still excited about trying to do something with somebody.

OFFICER MURSTIG:  Okay.  And so he gives you a hug and then he goes to leave and he's mumbling different things that leads you to believe he's upset.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And you don't want to confront him to make him further upset --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  For your own safety.

MR. CONTRERAS:  Right, because I know that at that point he was a little bit more sober than when he arrived, so he could have been more dangerous, of course.  (Inaudible)

OFFICER MURSTIG:  Okay.  So he was -- he's

42

more sober when this is happening on the couch.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And so some time had passed from when he arrived, as far as he was more intoxicated whenever he arrived and you gave it time to -- for him to sober up.

MR. CONTRERAS:  Yes, uh-huh.

OFFICER MURSTIG:  Okay.  And so thinking back, is -- I'm going to focus on this, the ejaculation and whether you ejaculated or not.

Afterwards -- so if you were wearing shorts, do you remember anything particular about that to where it would lead you to think you had?

MR. CONTRERAS:  Not for that particular moment of course.  Again, knowing myself, I could have ejaculated.  From there, I only go to the bathroom before I go to bed and I wash myself off everywhere, doesn't matter if I was touched or not.  It just one of those things I like to do, to go clean in the bed.

OFFICER MURSTIG:  And do you remember doing that on this particular --

MR. CONTRERAS:  I, I --

OFFICER MURSTIG:  -- event?

MR. CONTRERAS:  -- do it every night.  I'm

43

**Ex. 14 at 043**

pretty sure I did.

DETECTIVE FLOHR:  Uh-huh, uh-huh.  And tell us again about how sensitive you are to ejaculation.

MR. CONTRERAS:  Very, very sensitive.

DETECTIVE FLOHR:  What would be --

MR. CONTRERAS:  To today it's not because I'm not active, of course, but back then I would have ejaculations quite a -- quite fast.

DETECTIVE FLOHR:  Even with minimal arousal --

MR. CONTRERAS:  Yes.

DETECTIVE FLOHR:  Minimal touching --

MR. CONTRERAS:  Yes.

DETECTIVE FLOHR:  -- minimal excitement.

MR. CONTRERAS:  Yes.

DETECTIVE FLOHR:  Minimal exploring.

MR. CONTRERAS:  Yes, I would.

DETECTIVE FLOHR:  Is that -- was that anything like any like medical condition at all, or just, just how you are?

MR. CONTRERAS:  No, it's just how I was, I guess.  What I can pinpoint is that growing up I didn't have that chance to explore with myself and so remember being, you know, culturally and religiously, I shouldn't be playing with a penis.

44

OFFICER MURSTIG:  Uh-huh.

MR. CONTRERAS:  And so anything that I would see, of course that be a, an attraction sexually then when I touch it, I would ejaculate.

OFFICER MURSTIG:  Okay.

DETECTIVE FLOHR:  So is it possible, I guess -- or you already said that, I guess that --

MR. CONTRERAS:  It is very possible because the way that I am or was then I would ejaculate.

OFFICER MURSTIG:  Well, yeah.  What did you say earlier, you said --

DETECTIVE FLOHR:  A good possibility.

OFFICER MURSTIG:  More likely that you did.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  Knowing yourself.

MR. CONTRERAS:  Knowing myself, yes.

OFFICER MURSTIG:  Yes.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Do you remember specifically on that occasion with that person ejaculating?

MR. CONTRERAS:  I do not, but the mere fact that he was not someone that I wanted to play with --

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  -- but then again, the

45

touching and all that, it made me sensitive of that part.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  And what I'm saying is most likely that I did.

OFFICER MURSTIG:  Most likely.  Okay.

DETECTIVE FLOHR:  Uh-huh.  Because you know yourself.

MR. CONTRERAS:  Yeah.

DETECTIVE FLOHR:  Uh-huh.

OFFICER MURSTIG:  And because of the type of encounter, you said you were exploring.  And so with another man, had you explored before that?

MR. CONTRERAS:  I had.

OFFICER MURSTIG:  Okay.  How long before that?  How many years or whatever it was?

MR. CONTRERAS:  I would say one year before.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  And -- it goes -- the same thing.  I don't think I would be a good candidate for someone back then that I wanted to explore with because my ejaculation coming fast.

OFFICER MURSTIG:  Okay.

DETECTIVE FLOHR:  Uh-huh.

46

MR. CONTRERAS:  And that's why when you asked me last time about the oral sex and I told you it most likely that I would have been the one performing the oral sex than him because knowing that I would ejaculate, then I would try not to have that sperm in the mouth or the hands or anywhere.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  So that's why I said to you last time it most likely that I would have, if that would have happened.

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  Not that the way he stated it that he's the one -- or I'm the one that -- or he's the one that performed the oral sex on me. Wasn't it that way?

OFFICER MURSTIG:  No.  That at trial, he had testified that you performed oral sex --

MR. CONTRERAS:  Oh, okay, okay.

OFFICER MURSTIG:  -- on him.  Do you remember that part?

MR. CONTRERAS:  Yeah -- I only remember the part where you mentioned it, yes.

OFFICER MURSTIG:  Yes.  And so do you now, looking back, you're remembering a lot more.

MR. CONTRERAS:  Uh-huh, yeah, than before.

47

OFFICER MURSTIG:  You're a lot more comfortable right now.

MR. CONTRERAS:  Uh-huh, yeah.

OFFICER MURSTIG:  Looking back now, did that happen?  You performing oral sex on him?

MR. CONTRERAS:  No, he was very stinky smelly everywhere, even though he was wet.  I did not know if he -- I cleaned up or what, but, no, he was not.  And for the fact that he also did not appear to be erected, then, then it didn't even -- the idea of my doing that, because my idea was to take it slowly, of course, and then perform sex if we need to, or oral sex and whatever happened.  But other than that --

OFFICER MURSTIG:  Okay.

DETECTIVE FLOHR:  -- did you guys ever talk about -- did you ever discuss how sensitive you were to --

MR. CONTRERAS:  I didn't.

DETECTIVE FLOHR:  -- ejaculation with him before?

MR. CONTRERAS:  No.

DETECTIVE FLOHR:  All right.

MR. CONTRERAS:  No, I don't think so. That's not something I'm proud of, and that's not

48

**Ex. 14 at 048**

something I would put it out there for someone to probably -- him, not knowing him, to go out and say something about me or -- on social media or whatever may be, mentioning what, who I was, where I lived and, and what happened.  I think that would be, probably be embarrassing bit.

OFFICER MURSTIG:  Uh-huh.

DETECTIVE FLOHR:  Looking back at that time where his hands were under your shorts, tell me again, tell me everything about, like his reaction and, you know.  Did he realize that you may have probably ejaculated?

MR. CONTRERAS:  If he did it would make sense that he would get up and be mad because there would surely be no more probably after that.

DETECTIVE FLOHR:  Uh-huh.

MR. CONTRERAS:  No more activity together.

DETECTIVE FLOHR:  Uh-huh.

MR. CONTRERAS:  At least he was having fun what he was doing, the touching and laying for a few seconds on top of me and getting up and him give me a hug.  But other than that, me intentionally knowing or me intentionally ejaculating, I don't remember it was much activity doing that.  But knowing myself then, of course, I most likely believe that I might

49

have had ejaculated.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Because I mentioned that to you before, I could have had ejaculated before he arrived in anticipation of thinking what was going to happen, or it happened right when he was there. Because I don't -- I don't ejaculate quite often, it's like maybe once and I'm good for like a couple of days or so.

OFFICER MURSTIG:  And you said before that just looking at a picture in a book can make you ejaculate?

MR. CONTRERAS:  A magazine, uh-huh.

OFFICER MURSTIG:  Without any manual stimulation, like any masturbating.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  You see something and --

DETECTIVE FLOHR:  -- aroused enough.

MR. CONTRERAS:  Aroused, uh-huh.

OFFICER MURSTIG:  And you ejaculate and you can't control that.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  And so you've had that problem -- you had that problem back then --

MR. CONTRERAS:  Yeah.

50

**Ex. 14 at 050**

OFFICER MURSTIG:  -- you were saying.

MR. CONTRERAS:  It's all premature ejaculation, yeah.

OFFICER MURSTIG:  Okay.  So premature ejaculation, so just based off of photos, so you didn't have any control over it.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  And so just the sight of something could make you ejaculate.

MR. CONTRERAS:  Yes, if I'm looking at, into it and I start thinking about it, of course.

OFFICER MURSTIG:  So --

MR. CONTRERAS:  Putting myself in a situation.

OFFICER MURSTIG:  So having the sight of him walking out of the bathroom naked -- thinking -- I'm trying to dig deeper here.

MR. CONTRERAS:  Um.

OFFICER MURSTIG:  -- into that.  Think back to that.  With the sight of him walking out of the bathroom naked, what happened there?

MR. CONTRERAS:  Not from his look (inaudible) but the touching it was different with him.  Of course, he was touching me and then lay on top of me.  That might have had triggered that part.

51

I mean, I wish I could tell you.

OFFICER MURSTIG:  That might have triggered it you say?

MR. CONTRERAS:  Yeah, uh-huh.

OFFICER MURSTIG:  Yeah.  And that's --

MR. CONTRERAS:  I wish --

OFFICER MURSTIG:  And that's what I'm asking is the sight of him coming out naked, did that trigger it?  Or do you recall that?

MR. CONTRERAS:  I don't recall that, but I do recall the touching and that's the part that I felt sensitive and probably getting excited over that.  But, to the point of being coherent and say, this is not what you want, this is not what I want, so, no.  I wouldn't do it.

But then again, from the touching and laying on top of me, knowing myself, I could have ejaculated.

OFFICER MURSTIG:  Okay.

DETECTIVE FLOHR:  Tell me about your level of arousal, starting from like the ad posting and the communication and the --

MR. CONTRERAS:  It was high.

DETECTIVE FLOHR:  -- the potential that --

MR. CONTRERAS:  That was high.

DETECTIVE FLOHR:  Yeah?

52

MR. CONTRERAS:  That was high, high number knowing that might, something might have happened or something is going to happen.

DETECTIVE FLOHR:  Could happen.

MR. CONTRERAS:  In anticipation of it.

DETECTIVE FLOHR:  Yeah.  You find a lot of arousal in the anticipation.

MR. CONTRERAS:  Yes.

DETECTIVE FLOHR:  And then what about, you -- have you every heard of like precum before, have you ever heard of that?

MR. CONTRERAS:  Yes, uh-huh.

DETECTIVE FLOHR:  Tell me about that with you, I mean --

MR. CONTRERAS:  That I know about precum, I don't think I have precum because I feel when it's coming.

DETECTIVE FLOHR:  Uh-huh, yeah.

MR. CONTRERAS:  And that's intense for me.

DETECTIVE FLOHR:  Uh-huh.

MR. CONTRERAS:  That's how I would know that if I do cum.  It's intense.  At that point I don't think in any way that I would have intentionally cum.

DETECTIVE FLOHR:  And I take it -- when I

53

say precum, what I'm talking about is just sometimes there might be some liquid or fluid just --

MR. CONTRERAS:  Right.

DETECTIVE FLOHR:  -- you know as a way to lubricate the urethra, you know, in the male penis, you know.

MR. CONTRERAS:  Uh-huh.

DETECTIVE FLOHR:  As an easier way for the ejaculate to come out and everything.  That's what I mean by precum.  It's --

MR. CONTRERAS:  Right.

DETECTIVE FLOHR:  -- a lot of times based on arousal and whatnot, so.

MR. CONTRERAS:  Yeah, it -- I don't think I have the precum problem.  I don't think so.  But then again, I'm not always --

DETECTIVE FLOHR:  Uh-huh.

MR. CONTRERAS:  Checking there for those liquids and stuff like that.

DETECTIVE FLOHR:  Absolutely.  I understand.

OFFICER MURSTIG:  Okay.  And so you mentioned that, yeah, you had been exploring before this person.  This wasn't the first person that you explored with.

54

MR. CONTRERAS:  No.

OFFICER MURSTIG:  The first male.  And so this wasn't the first encounter with somebody.  So it would be real significant --

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  -- in your mind.  And then we'd talked about before that you've explored with other, other people since then.

THE DEFENDANT:  Uh-huh.

OFFICER MURSTIG:  And you still do to this day; is that fair to say?

MR. CONTRERAS:  That's fair to say, yes.

OFFICER MURSTIG:  Yeah.  When we talked a couple days ago, you talked about condoms.

MR. CONTRERAS:  He had condoms.

OFFICER MURSTIG:  Walk me through that again.

MR. CONTRERAS:  He had brought some condoms he had purchased.  He did mention that he was bringing condoms in one of the texts.  When he arrived, he said I have condoms.  But other than that, I don't recall him pulling them out or using them, or anything.  So that's why -- how I know that there was no sexual interaction much other than the touching.

55

OFFICER MURSTIG:  Right.  And you had mentioned that before and when we talked before, you said I knew there was talk about it, that he's saying he's going to bring condoms, but you don't remember condoms --

MR. CONTRERAS:  No.

OFFICER MURSTIG:  -- that were coming out. They were --

MR. CONTRERAS:  No.  I had some --

OFFICER MURSTIG:  -- not used --

MR. CONTRERAS:  I had some of my own in the past, but I didn't have any at that moment.  I had completely ran out of those.  Because even, even myself, if I intentionally want to ejaculate, I would put a condom so it doesn't go out over the sheets or towels or anything like that.

OFFICER MURSTIG:  Okay.  And so -- you weren't wearing a condom that night.  He didn't put a condom on.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  He didn't put a condom on you.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  There was nothing involving a condom.

56

**Ex. 14 at 056**

MR. CONTRERAS:  Not that I recall because that's something that I would remember.

DETECTIVE FLOHR:  Did you want to take a break at all and --

OFFICER MURSTIG:  That's what I'm thinking. I'm running through my mind.

Before that, the coffee, him arriving.  Yeah, I think we're to the point where we take a quick break. I'm just going to run through these real quick.  We did this the other day, Sal.

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  I'm going to show you Department of Licensing photo of a current driver's license.

MR. CONTRERAS:  Uh-huh, yes.

OFFICER MURSTIG:  From Washington State. Who is that?

MR. CONTRERAS:  That's me.

OFFICER MURSTIG:  That's you.  I want to show you a photo from immigration.

MR. CONTRERAS:  That's from the passport, isn't it?

OFFICER MURSTIG:  It's a passport; correct. It's naturalization.

MR. CONTRERAS:  Oh, naturalization, okay,

57

yeah, uh-huh.

OFFICER MURSTIG:  And then the other photos I want to show you, what is this from?

MR. CONTRERAS:  This is from Yakima where there was an investigation obviously.  And I got arrested and that's when they gave me one year probation.  And that --

OFFICER MURSTIG:  And that was federal probation?

MR. CONTRERAS:  Federal probation, yeah.

OFFICER MURSTIG:  Yes.  And who is that --

MR. CONTRERAS:  That's me.

OFFICER MURSTIG:  -- in that photo?  That's you.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And when you were on federal probation, what, what happened as a part of that?  Did they take a swab from you?

MR. CONTRERAS:  They did take some DNA swab and fingerprints as well.

OFFICER MURSTIG:  And fingerprints, okay.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  And so we did that two days ago.

MR. CONTRERAS:  Correct.

58

**Ex. 14 at 058**

OFFICER MURSTIG:  And I explained to you why, just to confirm that's you.  And then we had talked in the past, you had an old driver's license record here as well.

MR. CONTRERAS:  Yes, uh-huh.

OFFICER MURSTIG:  I'm going to show you that.

MR. CONTRERAS:  Oh, yeah, uh-huh.

OFFICER MURSTIG:  Who is that?

MR. CONTRERAS:  That's me as well.

OFFICER MURSTIG:  That's you.  And that's from when?

MR. CONTRERAS:  It says 2002 to expire in 2007.

OFFICER MURSTIG:  Yep.  Issued seven.  So -- and that's a Washington driver's license.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  The name on that is Salvador Contreras.  The name on your current driver's license Salvador Cosio Contreras.

And then we talked about in the 1980's you had -- I'm just going to paraphrase this.  You were born in Mexico.  You came over to San Diego for treatment at Shriners for a -- you and your brother.

MR. CONTRERAS:  And we went to Los Angeles

59

first.

OFFICER MURSTIG:  Los Angeles first?

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Okay.  And then you ended up in --

MR. CONTRERAS:  San Diego.

OFFICER MURSTIG:  And you were here on a Visa.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  For medical reasons.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  For your younger brother.

MR. CONTRERAS:  Correct.

OFFICER MURSTIG:  And then you had several extensions on your Visa.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Ultimately they told you you had to leave.

MR. CONTRERAS:  Um, not really because --

OFFICER MURSTIG:  (Inaudible)  Any other --

MR. CONTRERAS:  -- the Visa that I receive was indefinite.

OFFICER MURSTIG:  Okay.  And --

MR. CONTRERAS:  And to be in it now.

OFFICER MURSTIG:  They couldn't extend it

60

anymore; is that what --

MR. CONTRERAS:  No, I think those Visas ended in year 2000.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  So prior to that, I had married in '93.

OFFICER MURSTIG:  I'm in the 1980s.  We talked about --

MR. CONTRERAS:  Okay, '80s, uh-huh.

OFFICER MURSTIG:  You were at a party or something and you got picked up by immigration.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  By border patrol or whatever.  And so what happened then?

MR. CONTRERAS:  Only thing I -- well, that was a long time ago.  It was a group of three or four friends that we were in downtown.  That was -- not really partying, but we went to eat at a restaurant. We came out and there was a whole bunch of people there.  All of a sudden there was a raid.

OFFICER MURSTIG:  A raid, okay.

MR. CONTRERAS:  Uh-huh.  They came in and I remember they had taken me to the place where I lived in San Diego because it was only a few blocks away from there.  But I don't recall any deportation at

61

that point or anything like that.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  But if they wrote down everything and they said that I had to leave or left the country, whatever it was.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Because that's not something that I thought it was too important because a later time I became an U.S. citizen and then there was no problem.

OFFICER MURSTIG:  Yeah, and you were processed by border patrol?  Your prints and --

MR. CONTRERAS:  I believe so, yeah, uh-huh.

OFFICER MURSTIG:  Okay.  And so you -- were you -- and so I'm going to back up.  You brought something up that earlier we had talked about you used a different name then because there was a Social Security card for work.  And so when you got picked up, was it while you were working?  They came into your workplace and did that?

MR. CONTRERAS:  Huh-uh.

OFFICER MURSTIG:  I know they used to do that in the '90s.

MR. CONTRERAS:  Right, but, no.

OFFICER MURSTIG:  But they would --

62

MR. CONTRERAS:  We were just on the street.

OFFICER MURSTIG:  You were on the street.

MR. CONTRERAS:  At a restaurant, uh-huh.

OFFICER MURSTIG:  Okay.  And so tell me about the Social Security card that you had back then and what that was for.

MR. CONTRERAS:  Well, to work, of course it requires a Social Security number and a card.  And I remember someone -- I can't recall who it was -- provided me with a card that had the number on it.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  But.  And that's the one I used for work purposes.

OFFICER MURSTIG:  What was the name on that card?

MR. CONTRERAS:  Salvador Sanchez.

OFFICER MURSTIG:  Sanchez?

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Any other family names that would have been on that as well?  Besides Sanchez, or names you would have gone by then?

MR. CONTRERAS:  My dad's last name they usually got the -- he is Castellanos, and so that name could be transposed to mine thinking that it was my family father's name.

63

OFFICER MURSTIG:  Okay.  So Castellanos.  So I'm going to write that down.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  And that's what I recall you telling me before.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  Was the Castellanos and then Sanchez was the other name you used at that time for work.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  To get a job because you had a Social Security card issued under that name and those combination of names.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  Just --

MR. CONTRERAS:  I know that information was close to the Department of Immigration and the Social Security Administration so I could get my credits back from that number to my number.

OFFICER MURSTIG:  Yeah, when you became naturalized.

MR. CONTRERAS:  Correct.

OFFICER MURSTIG:  Through that process, you came clean and told them.

MR. CONTRERAS:  Uh-huh.

64

**Ex. 14 at 064**

OFFICER MURSTIG:  Hey, I used to use this.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  But it was for that purpose.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  But that was me.
And then I'm going to go through your name now. So your last name is Cosio.

MR. CONTRERAS:  Cosio.

OFFICER MURSTIG:  It's your father's name.

MR. CONTRERAS:  Correct.

OFFICER MURSTIG:  And then Contreras is your mother's --

MR. CONTRERAS:  Last name.

OFFICER MURSTIG:  Last name.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And so it's -- you consider it Cosio Contreras is your last name.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  And then Salvador is your first name.

MR. CONTRERAS:  Correct.

OFFICER MURSTIG:  And you don't have a middle name.

MR. CONTRERAS:  I don't have a middle name.

65

OFFICER MURSTIG:  But some people here have used the Cosio as a middle name?

MR. CONTRERAS:  Correct.

OFFICER MURSTIG:  Or the C.

MR. CONTRERAS:  Or the C.

OFFICER MURSTIG:  Yeah.  And I know there has always -- I've been in law enforcement quite awhile and I know there's always that confusion.  You ask somebody what's your middle name they'll say Cosio.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  Or they'll say Contreras. You know, back and forth.  So I'm just trying to establish that with you.

MR. CONTRERAS:  Oh, no, that's fine, that's fine.  And the fact that, for the longest time since even the Department of Licensing California had the, only the C for Cosio.  So my last name had always been Contreras up until, see, 2005, 2006, somewhere around there.  And I went to court and asked the judge to grant me the name of Cosio Contreras.  And when we went to Florida, my license said Cosio Contreras.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  And I had a name change of

66

course, because the C was not a name, it was just a C.  So I switched it over even though my birth certificate says Salvador Cosio.  Father's last name -- Contreras, mother's last name.

OFFICER MURSTIG:  Yeah.  Yeah.

DETECTIVE FLOHR:  And you showed us your driver's -- your current driver's --

MR. CONTRERAS:  Uh-huh.

DETECTIVE FLOHR:  -- license.  And I took a photos of those, your social security --

MR. CONTRERAS:  The social security card, yeah.

OFFICER MURSTIG:  And you have a passport.

DETECTIVE FLOHR:  And your passport card, yeah.  So.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  Okay.  Yeah, we're going to take a break.  You still got water; right?

MR. CONTRERAS:  I got some water still.

OFFICER MURSTIG:  You need to go to the bathroom or anything?

MR. CONTRERAS:  Um, yeah I should.  I don't feel like much going but I do have.

OFFICER MURSTIG:  We're taking a break. The time now is 11:22 in the morning.

67

**Ex. 14 at 067**

(Whereupon everyone left the interview room.)

(Whereupon Mr. Contreras came back into the interview room.)

OFFICER MURSTIG:  Time now 11:24.  Sal is back in the room.

(Whereupon Officer Murstig and Detective Flohr came back into the interview room.)

OFFICER MURSTIG:  Okay, Sal, you still have water.

MR. CONTRERAS:  I do, thank you.

OFFICER MURSTIG:  Again it's Officer Murstig and Detective Flohr.  Time now is 11:32.

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  And we're still being recorded.  All right.  Just a few follow-up questions.

MR. CONTRERAS:  All right.

OFFICER MURSTIG:  And I think we will be done here.

So how well do you know Richland?  Your business is in Pasco.

MR. CONTRERAS:  Correct, Pasco.  I don't.

68

**Ex. 14 at 068**

OFFICER MURSTIG:  That's what I was going to say.  The other day when you came to the station, you tried to go to the federal building.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  You know where the federal building is.

MR. CONTRERAS:  Yes, back there.  Because I --

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  -- used to go to -- IRS office.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  Quite often.  But other than that, the hospital and the surrounding area around the hospital pretty much.

OFFICER MURSTIG:  Which is which hospital?

MR. CONTRERAS:  Kadlec.

OFFICER MURSTIG:  Kadlec.  Okay.  And that's right behind us here.

MR. CONTRERAS:  Okay.  Because that's where mom and dad spent so many times in there.

OFFICER MURSTIG:  Okay.  So you know Kadlec.  You know the federal building.  You now know where the police station is.

MR. CONTRERAS:  Right.

69

OFFICER MURSTIG:  Which is across the street from the federal building.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  Do you go to anywhere else in Richland?  Or what do you know as Richland?

MR. CONTRERAS:  Let's see.  I've crossed to go to Wenatchee and then go through gorge all the way out there.

DETECTIVE FLOHR:  Yeah.

OFFICER MURSTIG:  You go on George?

DETECTIVE FLOHR:  No, like 240 Vantage.

OFFICER MURSTIG:  Oh, the gorge?

MR. CONTRERAS:  The gorge, yeah.

OFFICER MURSTIG:  The gorge, okay.  So that's the bypass highway.

MR. CONTRERAS:  Right, uh-huh.

OFFICER MURSTIG:  240?

MR. CONTRERAS:  I believe it's 240, yeah.

OFFICER MURSTIG:  Where else?  Do you know where Walmart is in Richland?

MR. CONTRERAS:  I, I've seen it on the highway.  I think I've been there only once.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  But the area, I don't know it that much.

70

**Ex. 14 at 070**

OFFICER MURSTIG:  So it's right off the highway.

MR. CONTRERAS:  I drove there a couple of times through that highway taking mom to the Kadlec clinic that is way out there.  Yeah.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  And that crosses that road.

OFFICER MURSTIG:  And then going -- what areas do you know in Kennewick?  What landmarks?  Do you know where the mall is in --

MR. CONTRERAS:  Yes, I do, the Columbia Center Mall?

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  Is that in Kennewick or Richland?

MR. CONTRERAS:  I would say Kennewick.

OFFICER MURSTIG:  Okay.  Do you know where Richland is from the mall?

MR. CONTRERAS:  The only thing that I know by Chuck E. Cheese when I used to take the kids, and they used to say Chuck E. Cheese is Richland.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  So I was always confused about Richland or Kennewick.  But I'm sure they

71

together somehow or there's just a line and divides them both.

OFFICER MURSTIG:  And that's the old Chuck E. Cheese that's on Columbia Center --

MR. CONTRERAS:  Right, uh-huh.

OFFICER MURSTIG:  -- Boulevard.  So you think that's Richland because that's what they said.

MR. CONTRERAS:  That's what they said, but to me --

OFFICER MURSTIG:  You're not sure --

MR. CONTRERAS:  -- it's Kennewick.

OFFICER MURSTIG:  -- if it's Kennewick or Richland.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  Right in that area.  Do you know any other areas of Richland?  Do you have any clients?  Do you know where south Richland is?

MR. CONTRERAS:  No.

OFFICER MURSTIG:  Do you know what south Richland would be?

MR. CONTRERAS:  No, I don't.

OFFICER MURSTIG:  Keene Road?  Have you been --

MR. CONTRERAS:  Keene Road, that's the one where my sister owns a business?

72

OFFICER MURSTIG:  Where at?

MR. CONTRERAS:  It's a salon, beauty salon. Right the corner of Keene Road and Gage, I believe is the one by Costco?

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  All the way down and then curves in into Keene Road.

OFFICER MURSTIG:  Okay.

MR. CONTRERAS:  And right in that plaza, that's where she has her --

OFFICER MURSTIG:  Is that Richland or is that Kennewick?

MR. CONTRERAS:  That's Richland.

OFFICER MURSTIG:  Richland, okay.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  Do you know where Richland is from -- is Costco in Richland or Kennewick?

MR. CONTRERAS:  I would say Kennewick.

OFFICER MURSTIG:  You would say -- you're guessing at Kennewick.

MR. CONTRERAS:  Yeah, I guess Kennewick.

OFFICER MURSTIG:  Where is Richland from Costco?  You are correct it's in Kennewick.

MR. CONTRERAS:  Oh, okay.  Right next door,

73

I guess.  Because then I remember seeing some signs of Richland on it, so perhaps right next door to Costco would be Richland.

OFFICER MURSTIG:  Richland somewhere in that area.

MR. CONTRERAS:  Yeah, because the Social Security -- no, no wait.  Social Security Administration was there right next to Costco in that plaza.

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  And it was considered Kennewick.

OFFICER MURSTIG:  It's Kennewick, yes.

MR. CONTRERAS:  So I have no idea then.  I have no idea where the division is.

OFFICER MURSTIG:  Do you know where the Villa Apartments are?

MR. CONTRERAS:  I don't?

OFFICER MURSTIG:  Okay.  Are they -- you have no idea if it's --

MR. CONTRERAS:  Recently I was looking for an apartments and I remember seeing that name that popped up on the Internet looking for different apartments because I was in the process of thinking selling the house because I just didn't want to be

74

living in the same place with the memories of having mom and dad in there and passed.  But I've never went to see the apartments or anything.  I just remember seeing the name of those.

OFFICER MURSTIG:  And are --

DETECTIVE FLOHR:  In an advertisement.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  Yes.  Why, when was that?

MR. CONTRERAS:  Um, maybe I would say sort of like the beginning of the year.  I was in real estate, the depression, the highest peak in --

OFFICER MURSTIG:  The beginning of what year?

MR. CONTRERAS:  This year.

OFFICER MURSTIG:  This year, okay.

MR. CONTRERAS:  2020, uh-huh.

OFFICER MURSTIG:  And so, had you heard of the Villa Apartments before that?

MR. CONTRERAS:  I don't think so, I don't think so, huh-uh.

OFFICER MURSTIG:  Do you know where they are, or did you ever go there?

MR. CONTRERAS:  I don't know.  You asked me where, I don't know.

OFFICER MURSTIG:  You don't know where they

75

**Ex. 14 at 075**

are.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  Okay.  And so you've never been to the Villa Apartments.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  Don't even know where they are.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  You've seen an advertisement for them because looking for a place, but that was online.

MR. CONTRERAS:  Online, yes.

OFFICER MURSTIG:  Why would that name stick out to you?

MR. CONTRERAS:  Because you said if it was Richland or -- and you mentioned it.  So that name came back and some name that I had already searched on it.

OFFICER MURSTIG:  The Villas.

MR. CONTRERAS:  Uh-huh.

DETECTIVE FLOHR:  Did you look at other apartments?

MR. CONTRERAS:  I did look at a lot of different ones, yeah.  Condos and whatnot.  So I guess in the process of trying to sell that property.

76

OFFICER MURSTIG:  Okay.  And so anything -- what is, what is the term villa mean?

MR. CONTRERAS:  Villa is like a town?

OFFICER MURSTIG:  What language?

MR. CONTRERAS:  Could be Spanish is part of it.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  And Latin also.  And --

OFFICER MURSTIG:  It's more of a Latin or Spanish name --

MR. CONTRERAS:  Latin, Spanish.

OFFICER MURSTIG:  -- correct?

MR. CONTRERAS:  Yeah, uh-huh.

OFFICER MURSTIG:  And I've always, the Villa's stick in my mind --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- because it's, it's more that when you see them it kind of sticks out.

MR. CONTRERAS:  Yeah, everywhere because it's a --

OFFICER MURSTIG:  Have you heard of the Orchard Hills Apartments?

MR. CONTRERAS:  I've seen that but I don't know where they are.  I've seen the name.

OFFICER MURSTIG:  Yeah.  What about

77

Hawaiian Village?

MR. CONTRERAS:  I've seen all of those because I was looking.

OFFICER MURSTIG:  You've seen Hawaiian Village.

MR. CONTRERAS:  Yeah, I've seen a -- all of those names.  I never went to them to see them.  The ones I went to see was -- my dad was at a rehab center, Life Care Center in Richland.

OFFICER MURSTIG:  Uh-huh.

MR. CONTRERAS:  And right next door there was some apartments there.  I remember wanting to rent something out there to be close to dad or dad get out of that center and be in there because he had to be near the hospital.  He couldn't be in Pasco. He preferred to come to Kadlec.

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  So we were -- I was looking into it and I remember just walking through those apartments to see.

OFFICER MURSTIG:  And that was by Life Care?

MR. CONTRERAS:  Yeah, Life Care.  And but that was last year when I started doing that.

OFFICER MURSTIG:  Do you remember the name

78

of those apartments?

MR. CONTRERAS:  I don't.

OFFICER MURSTIG:  And it was right next to Life Care?

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  Columbia Park, or --

MR. CONTRERAS:  No, it's not Columbia Park, it's right here when you get into George Washington Way, coming from Pasco.  And then the first right to the left and then go around all the way down to --

DETECTIVE FLOHR:  I know where you're talking about.

MR. CONTRERAS:  Yeah.

DETECTIVE FLOHR:  On Aaron Drive.

MR. CONTRERAS:  Aaron Drive, Aaron Drive.

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  And so those apartments are Aaron Drive.

OFFICER MURSTIG:  And there are several apartments.

MR. CONTRERAS:  Several apartments, yeah.

OFFICER MURSTIG:  In there.

MR. CONTRERAS:  Different names and stuff.

DETECTIVE FLOHR:  What was the closest one? Was it that apartment complex that was closest to

79

**Ex. 14 at 079**

Life Care Center?

MR. CONTRERAS:  Right, that's the one I walked through around.

DETECTIVE FLOHR:  It might be Aaron Ridge Apartments.

OFFICER MURSTIG:  Yeah, there's Aaron, there is Arbor Point.  There's Green --

MR. CONTRERAS:  Arbor Point, yeah, that's the one I remember.

OFFICER MURSTIG:  Yep.  Then there's the -- yeah.  So we know the general area.  Okay.

So you've never been to the Villas, you don't know where the Villas -- did you, did you go with Cody anywhere after that night?

MR. CONTRERAS:  Never, never.

OFFICER MURSTIG:  And were you at the Villa Apartments --

MR. CONTRERAS:  No.

OFFICER MURSTIG:  -- involved with anything with Cody?

MR. CONTRERAS:  No, not at all.

OFFICER MURSTIG:  And had you ever been there?

MR. CONTRERAS:  No, I never knew what, where he came from.  I never even know what

80

**Ex. 14 at 080**

apartments he lived in, or if he lived in a house or whatever it was.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  He never disclosed any of that information that he -- what he did for a living or we didn't get personal into that.

OFFICER MURSTIG:  And, and just to be clear, your DNA was found at a scene at the Villa Apartments.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  Were you there?

MR. CONTRERAS:  I was not.

OFFICER MURSTIG:  Or involved?

MR. CONTRERAS:  I was not --

OFFICER MURSTIG:  In any way?

MR. CONTRERAS:  Whatsoever.  No, in any way whatsoever.  That I know for sure.

OFFICER MURSTIG:  Right.  And we talked about that before.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  As well, that there is one of two scenarios.  You were there --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- and you did this, or something else happened --

81

**Ex. 14 at 081**

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- and that --

MR. CONTRERAS:  At the house.

OFFICER MURSTIG:  -- that we can link to you.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  Somebody else, an immediate person between Villa Apartments.

Do you know Dana Widrig?  Did you ever worked out in the area?

MR. CONTRERAS:  No, I didn't.

OFFICER MURSTIG:  As a scientist or anything like that?

MR. CONTRERAS:  No.

OFFICER MURSTIG:  At Hanford?  No.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  You were in east Pasco at MBM.

MR. CONTRERAS:  MBM.  I lived in --

OFFICER MURSTIG:  In the courts as an interpreter.

MR. CONTRERAS:  Right, correct.

OFFICER MURSTIG:  In the day.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  And so there is no

82

connection.  You don't know this girl.

And so back at that time --

MR. CONTRERAS:  What was the name again?

OFFICER MURSTIG:  Dana Widrig.  From the trial.

MR. CONTRERAS:  No, I don't.

OFFICER MURSTIG:  You'd never done business with Dana --

MR. CONTRERAS:  No.

OFFICER MURSTIG:  -- and did not know her.

MR. CONTRERAS:  No, huh-uh.

OFFICER MURSTIG:  And so back at that time, I'll back you up to that time frame in your life, were you exploring -- you were exploring, you said, with men.

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  That was my understanding.  Did you have any relationships with girls that you were out on craigslist or any other social media for girls --

MR. CONTRERAS:  Uh --

OFFICER MURSTIG:  -- for women.

MR. CONTRERAS:  I would talk to some girls, but it would be like Facebook.  But those would be like the ones in my contacts, my friends.

83

**Ex. 14 at 083**

OFFICER MURSTIG:  Friends.

MR. CONTRERAS:  Yeah.

OFFICER MURSTIG:  For sexual reasons?

MR. CONTRERAS:  Not, not for sexual reasons, no.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  Just talk, but I don't think I ever had any intentions because I had -- I didn't want to fail my wife being with another woman. Now thinking about a man, I don't know where I got that idea that it wasn't a sin, that it wasn't a bad thing.  Just wanted to explore myself.

OFFICER MURSTIG:  Wanted to explore; right. So at that time, you weren't out -- when you were coming from Florida to here, you weren't hooking up with any women.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  Or involved in any affairs with any --

MR. CONTRERAS:  No.

OFFICER MURSTIG:  -- women.  And so that wasn't your interest --

MR. CONTRERAS:  Right, no.

OFFICER MURSTIG:  -- I guess is what I'm getting at.

84

**Ex. 14 at 084**

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  And so you're wanting to explore your sexuality and other men interested you --

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  -- at that time.

MR. CONTRERAS:  Interest, interest?  No, because I didn't want to establish any relationships.  So if he was to explore --

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  -- one time deal, that was fine.  But I was not with intentions to establish any relationships.

OFFICER MURSTIG:  And I'm glad you clarified that, that you weren't looking for long-term relationships, you're looking more --

DETECTIVE FLOHR:  Just a casual.

OFFICER MURSTIG:  -- a casual encounter.

MR. CONTRERAS:  There you go.

OFFICER MURSTIG:  Call it what it is.  And just to be clear, you weren't having any casual encounters with women at that time.

MR. CONTRERAS:  No, I was not.

OFFICER MURSTIG:  No.

MR. CONTRERAS:  Huh-uh.

85

OFFICER MURSTIG:  Not, not interested.

MR. CONTRERAS:  No.

OFFICER MURSTIG:  And so didn't know Dana. And so I'm just maybe just leave it at this. I think we're about done with our questions. I'll open it up if you've got questions for me at the end. But I want to bring you back one more time. Took a little break, one more time, and you opened up, you talked about this couch incident involving him. Is there anything else that you need to bring up? Anything else that's come to your memory now that you actually talked in quite detail about it.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  And we kind of started digging around --

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  -- looking for any details, and that's what we're doing.

MR. CONTRERAS:  Right, right.

OFFICER MURSTIG:  We're interviewers, we trained --

MR. CONTRERAS:  No.

OFFICER MURSTIG:  We kind of try to ask questions different way because sometimes we'll get --

86

**Ex. 14 at 086**

MR. CONTRERAS:  No, that's understandable.

OFFICER MURSTIG:  -- get different responses.

MR. CONTRERAS:  The part that I'm still very puzzled, of course, and I want to get to the bottom of this, that how my DNA got transferred somehow to her.  Because I had no contact whatsoever with her.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  How is it it got transfer?  I -- that's an area I have not even explored, studying or reading much about it.  So I have no idea how is it that if it is semen DNA, how it was carried out.  To me I thought that it was would be something that it would fade away and after minutes or hours or whatever it was.

So back of my mind it's like if this happened with him --

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  -- and I ejaculated and he had some in him, how is it it got transferred there?  I'm sure that --

OFFICER MURSTIG:  That's for somebody else to explain.

MR. CONTRERAS:  Right, uh-huh.  And I

87

don't, I don't get it.  I still don't get it.

OFFICER MURSTIG:  Right.  And we, we do consult with experts on that --

MR. CONTRERAS:  Good.

OFFICER MURSTIG:  -- that can explain that. I can't --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- explain it other than in layman's terms --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- and I'm sure in the same --

DETECTIVE FLOHR:  Yeah.

OFFICER MURSTIG:  It's hard for me and some people to wrap their minds around them how that would happen, but it happened.

MR. CONTRERAS:  Yeah.  And I was trying to ponder with ideas like how they connect the two. Obviously that's from the DNA sample taken at, in Yakima, the federal building.  And now the new one taken here.  How long would it take to get those results as well, do you know?

DETECTIVE FLOHR:  Well, probably going to be fairly fast, I would think, or fairly quick.

OFFICER MURSTIG:  Yeah.  From the sample we

88

**Ex. 14 at 088**

collected from you the other day, those will be mailed out here within the next few days.

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  I going to guess.  And then based on that timeline, I don't know if it's a week, two weeks.

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  You know, I believe it's going to be fairly quick.

MR. CONTRERAS:  I'm interested in learning how.

OFFICER MURSTIG:  Number one is the confirmation that we're talking about the --

MR. CONTRERAS:  (Inaudible) secrecy.

OFFICER MURSTIG:  (Inaudible) I think we established that that was you because you've identified for me that --

MR. CONTRERAS:  Yes.

OFFICER MURSTIG:  You were the person on federal probation.  The alias name was from you working in the 1980s --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- when you got processed by border patrol back then.  You give them a name on a Social Security card that you're using to work.

89

**Ex. 14 at 089**

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  That's a name affiliated with you.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  But when you're on probation, they take an a buccal swab for your DNA --

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  -- in your mouth and they take --

MR. CONTRERAS:  Fingerprints.

OFFICER MURSTIG:  -- your fingerprints.  To say, hey, has -- we are talking about the same person from 1986 to 2014, '15, whatever that is, to today.

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  That's still you, the same person.

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  And so we're, we're confident, based on talking to you and you running through those events that --

MR. CONTRERAS:  Yeah, I think --

OFFICER MURSTIG:  -- we're talking to the same person.

MR. CONTRERAS:  I still want, for my own sake, I want to find out for what happened.  How did

90

**Ex. 14 at 090**

it get transferred like this?  It just boggles my mind and it's -- doesn't make any sense.

And then if that the case, I want to know, know about, let's say (inaudible) he was living with? This guy that was smart enough or vicious enough to take something and transfer it to somebody else.

OFFICER MURSTIG:  Well, and we have -- I'll tell you this from dealing with -- so if I go into a scene to process a scene, say it's an important case, we'll just say it's a homicide scene --

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  -- or something like that.  You know, I, I put gloves on.  I'll put a plastic suit on, like they use in paint.

MR. CONTRERAS:  Uh-huh.

OFFICER MURSTIG:  We'll wear masks.  Why do I do all of those things?

MR. CONTRERAS:  So you don't --

OFFICER MURSTIG:  So I don't shed my --

MR. CONTRERAS:  Uh-huh --

OFFICER MURSTIG:  -- DNA into a scene and cross --

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  -- contaminate it.  It's cross contamination.  And so if -- and that's just me

91

being -- walking through a scene.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  We have to take those precautions.  So you can imagine if you're talking about fluid transfers.

MR. CONTRERAS:  Right.

OFFICER MURSTIG:  There is a lot higher likelihood of that.

MR. CONTRERAS:  Right.

DETECTIVE FLOHR:  And that's microscopic.

MR. CONTRERAS:  Yeah, it is.

OFFICER MURSTIG:  Microscopic under, under a microscope, right.

MR. CONTRERAS:  Right.  No, and that's understandable.  The part I don't understand is how did it get transferred there --

OFFICER MURSTIG:  Well and --

MR. CONTRERAS:  -- without even any -- well, how long would it last on the body if he took it with him?  I have no idea.

OFFICER MURSTIG:  Right.  And you don't even know where it was found in the scene --

MR. CONTRERAS:  No, I don't.

OFFICER MURSTIG:  -- correct?  I haven't told you.

92

**Ex. 14 at 092**

MR. CONTRERAS:  No, because I came, I came over --

OFFICER MURSTIG:  And I'm not --

MR. CONTRERAS:  -- and from Florida to witness -- be a witness to the trial or just to testify.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  But other than that, I had no idea even of his real name, her name.  I think this is probably the first time I heard the name.  Because I didn't even bother reading about it because I didn't even want to keep it in my mind.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  So.

OFFICER MURSTIG:  And at trial, you were there and you testified and you identified that person at trial.

MR. CONTRERAS:  Him, yes.

OFFICER MURSTIG:  Yeah.

MR. CONTRERAS:  Because I was told that he was there and all that.

OFFICER MURSTIG:  My recollection.

MR. CONTRERAS:  But I don't know she was there that I would have said, yes, I know -- there is no way I could have said I know her or who she is

93

because I don't, I don't know who she is.

OFFICER MURSTIG:  Right.

MR. CONTRERAS:  Dana.

OFFICER MURSTIG:  Uh-huh.  Yeah.

MR. CONTRERAS:  So.

OFFICER MURSTIG:  I don't have any other questions.  Do you?

DETECTIVE FLOHR:  No, I don't.

OFFICER MURSTIG:  Do you have any questions, Sal?

MR. CONTRERAS:  I don't, I don't.

OFFICER MURSTIG:  Okay.  We're going to go ahead and end the recording.  The date is August the 19th still.  The time is 11:50 in the morning.  And we're going to stop the recording.  This is Officer Murstig.

MR. CONTRERAS:  Okay.

OFFICER MURSTIG:  Again Detective Flohr in the room and Sal Contreras.

MR. CONTRERAS:  All right.

(End of tape.)

94

STATE OF WASHINGTON )

                     )  ss.

COUNTY OF BENTON     )


     I, CHERYL A. PELLETIER, Official Court Reporter of the Superior Court of the Kennewick Judicial District, State of Washington, in and for the County of Benton, hereby certify that the foregoing pages comprise a full, true and correct transcript of the proceedings, to the best of my ability, had in the within-entitled matter, transcribed by me from a video file from the Benton County Prosecutor's Office on the date and at the place herein written.

     That I am certified to transcribe court and interview proceedings in the State of Washington.

     WHEREFORE, I have affixed my official signature this 2nd day of November, 2020.


                         _____
                         Cheryl A. Pelletier, RPR, CCR
                         Official Court Reporter

                                                      95

**Ex. 14 at 095**

# EXHIBIT 15

## Incident/Investigation Report

Agency: RPD          Case Number: 09-30208          Date: 09/02/2020 10:54:01

## Supplement Information

| Supplement Date | Supplement Type | Supplement Officer |
|---|---|---|
| TH Aug 20, 2020 | SUPPLEMENTAL REPORT | (R37) FLOHR, LUKE |
| Contact Name | | Supervising Officer |
| | | (R13) FLORENCE, DREW |

RECEIVED
SEPTEMBER 2, 2020
Benton County Prosecutor

Ex. 15 at 001

## Incident/Investigation Report

Agency: RPD          Case Number: 09-30208          Date: 09/02/2020 10:54:01

### Supplement Notes

DNA LABS INTERNATIONAL FORENSIC DNA ANALYST DARREN WRIGHT - CONFERENCE CALL

Detective L. Flohr
Richland Police Department

8/13/20 - Thursday

11:02 AM - Ofc. Murstig and I were present for a conference call at the Benton County Prosecutor's Office. The purpose of the conference call was to speak with Forensic DNA Analyst Darren Wright regarding his report and analysis of items submitted. I summarized the conference call below. Present on the conference call were the following:

Benton County Prosecutor Andy Miller
Benton County Deputy Prosecutor Terry Bloor
Benton County Deputy Prosecutor Kristin McRoberts
Innocence Project Jackie McMurtrie
Innocence Project Lara Zarowsky
Innocence Project Kaylan Lovrovich
WSP Phil Hodge
WSP Christina Hoffman
DNA Labs International Forensic DNA Analyst Darren Wright

After introductions, Andy Miller gave a summary of the relevant facts and asked if it was possible for Cody Kleopper to transfer Salvador Contreras' seminal fluid onto Dana Widrig. Darren Wright said that would be considered a secondary transfer and it is a documented phenomenon that does occur. He also said that there are factors and variables that would affect it, and there is no way to quantify or deteremine whether or not the DNA found was a result of a direct or indirect transfer. Darren said secondardy transfer is possible, but he can't comment on how probable it is.

Jackie McMurtrie asked Darren if he can tell by the nature of the stain if it was a direct or secondary transfer. Darren said that there is no way to visually determine if it's a direct or secondary transfer. Darren did say that a wet stain is easier to transfer, but surfaces need to be considered. He said there's nothing scientifically he can point to that indicates a direct or secondary transfer.

Darren said that he did observe that there was a sufficient quantity of DNA to quantify, and that a direct transfer is going to have a higher level of spermatozoa, as opposed to a secondary transfer, but to be certain there's not enough science to say whether it's direct or secondary transfer. Darren said he had enough for a robust sample, and multiple locations, but there are so many variables and it's difficult to make a conclusion of the likelihood of direct or secondary transfer. He was unable to give a probability. He also said that there's no way to tell if the stain was wet or dry just from looking at it.

Darren was asked if he would expect to see Kloepper's DNA if transferred from Kloepper's skin versus being transferred from fabric. Darren said that it depends on a number of variables, including how well the person sheds DNA, but he would not expect to see the other person's DNA because it would be such low level.

Andy Miller requested the secondary transfer articles from Darren. Darren spoke about a 2019 review paper on the subject, which is a collection of research on the topic.

Jackie McMurtrie requested bench notes and photographs from Darren regarding his testing and analysis.

Terry Bloor asked on behalf of Ofc. Murstig about the possiblity of stains transferring when the items were packaged. Darren said he received the

**Ex. 15 at 002**

## Incident/Investigation Report

**Agency:** RPD            **Case Number:** 09-30208            **Date:** 09/02/2020 10:54:01

clothing in separate brown paper bags. Darren said that it would be similar to any other secondary transfer, where it's a possibility, but other factors, such as whether or not the stain was dry, need to be considered.

At the conclusion of the conference call, arrangements were made to have Salvador Contreras' DNA comparison samples sent to the WSP Crime Lab and DNA Labs International after they're collected.

End of report.

**Ex. 15 at 003**