David B. Owens
Loevy & Loevy
c/o Civil Rights And Justice Clinic
University of Washington Law School
William H. Hates Hall, Ste. 265
P.O. Box 85110
Seattle, WA 98145
312-243-5900

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| CODY KLOEPPER, | No. _____ |
| *Petitioner*, | |
| v. | **EXHIBITS 16-25 TO PETITION FOR WRIT OF HABEAS CORPUS** |
| JEFFEREY PERKINS, Superintendent Coyote Ridge Correctional Facility | |
| *Respondent.* | |

1

INDEX OF EXHIBITS TO PETITION FOR WRIT OF HABEAS CORPUS

Exhibits 1-15

| | |
|---|---|
| Exhibit 1 | Declaration of Forensic Scientist Derek Cutler |
| Exhibit 2 | Forensic DNA Report, Intermountain Forensics |
| Exhibit 3 | Declaration of Cody Kloepper, Executed July 5, 2021 |
| Exhibit 4 | Declaration of Attorney Sarah Beth Johnson, Executed September 4, 2025 |
| Exhibit 5 | Declaration of Attorney Lara Zarowsky, Executed August 11, 2025 |
| Exhibit 6 | Declaration of Paralegal Justine A. Mclean-Riggs, Executed October 6, 2025 |
| Exhibit 7 | Declaration of Attorney Mark Mestel, Executed July 28, 2025 |
| Exhibit 8 | Declaration of Attorney Jackie McMutrie, Executed August 7, 2025 |
| Exhibit 9 | Letter from Dr. Charlotte Word, Dated April 9, 2021 |
| Exhibit 10 | Letter from Dr. Charlotte Word, Dated October 21, 2021 |
| Exhibit 11 | DNA Labs International DNA Reports, Dated June 6, 2020 and October 8, 2020 |
| Exhibit 12 | Washington State Patrol Crime Laboratory Reports, Dated January 7, 2021 and August 6, 2020 |
| Exhibit 13 | Richland Police Department Supplemental Report, Authored by Det. Dean Murstig, Dated August 25, 2020 |
| Exhibit 14 | Transcript of Salvador Contreras' Statement to Richland Police Department on August 19, 2020 |
| Exhibit 15 | Richland Police Department Supplemental Report, Dated September 2, 2020 |

2

Exhibits 16-25

| Exhibit 16 | State Response to Mr. Kloepper's Motion for New Trial, Dated October 7, 2021 |
|---|---|
| Exhibit 17 | Verbatim Report of Proceedings of Mr. Kloepper's Motion for New Trial |
| Exhibit 18 | Judge Joseph Burrowes' Ruling Denying Mr. Kloepper's Motion for New Trial, Dated April 30, 2022 |
| Exhibit 19 | Email Correspondence: Benton Co. Prosecuting Attorney's Office and Washington Innocence Project |
| Exhibit 20 | Email Correspondence: Benton Co. Prosecuting Attorney's Office, Richland Police Department |
| Exhibit 21 | Judgment and Sentence in State of WA v. Cody Kloepper, Benton Co. Superior Court Case No. 10-1-01156-4 |
| Exhibit 22 | Motion and Order to Correct Judgment and Sentence in State of WA v. Cody Kloepper, Benton Co. Superior Court Case No. 10-1-01156-4 |
| Exhibit 23 | Order Denying Petition in Eastern District of Washington Case No. 4:17-CV-5008-TOR |
| Exhibit 24 | Judgment in Eastern District of Washington Case No. 4:17-CV-5008-TOR |
| Exhibit 25 | Washington Court of Appeals, Division 3, Case No. 30294-6 Order Affirming Conviction |

# EXHIBIT 16

JOSIE DELVIN
BENTON COUNTY CLERK

2021 OCT -7 PM 3: 49

FILED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

| | |
|---|---|
| STATE OF WASHINGTON, | **ORIGINAL** |
| Plaintiff, | NO. 10-1-01156-4 |
| vs. | **RESPONSE TO MOTION FOR NEW TRIAL** |
| CODY JOSEPH KLOEPPER, | |
| Defendant. | |

## STATEMENT OF FACTS:

On December 5, 2009, D.W. got up at 4:00 a.m., in her fourth-floor apartment, planning on going to work. (RP[1] 123, 126). D.W. went about her usual morning routine by making coffee when she heard someone behind her. (RP 126).

The man began hitting D.W. with a bar. D.W. tried to block the blows to her head with her arms and ran into the living room. (RP 128). Eventually, hoping that he would stop the assault, D.W. told the attacker, "If you're here to rape me, just do it and get it over with." (RP 129-30).

The perpetrator told D.W. to get on her knees. (RP 130). He pulled her pants down, but he was unable to penetrate her with his penis. (RP 131). D.W. heard a package of latex gloves being opened, and the perpetrator inserted his fingers in her vagina and anus. (RP 130-31). Later, police found a piece of latex glove in a pool of blood on victim's floor. The DNA on the glove matched the defendant's DNA.

The perpetrator told D.W., "If you tell anyone I did this, I'm gonna come back and finish it off." (RP 131). He put a blanket over D.W. (RP 131). She didn't hear him leave and stayed under the blanket for a few minutes. (RP 132). She peeked outside the blanket and then put the blanket back over her and waited a few more minutes. (RP 132). She then called 911. (RP 132).

---

[1] Unless dated, "RP" references the Verbatim Report of Proceedings Volumes 1-8.

**RESPONSE TO MOTION FOR NEW TRIAL -** *1 | P a g e*

The 911 records show the call coming in at 4:43:53 a.m. (CP 174). (D.W.'s testimony is attached as Appendix C.)

D.W. called 911. D.W. in her 911 call said the perpetrator "looked familiar. He looked like one of the Villa people. The Villas' maintenance people." (CP 174). "The Villas" is the name of D.W.'s apartment complex. (RP 86). At the time of the rape the defendant was employed at The Villas as a maintenance man. D.W. stated that he was white, tall, at least six feet, maybe six feet-two, thin, with shaggy brown hair. (CP 176). (The 911 transcript is attached as Appendix A. Officer Nash's testimony about D.W.'s description of the perpetrator is attached as Appendix B.)

An important clue was contained in the following exchange with 911:

911: Did he just break into your apartment or what happened?

D.W.: He said he — he said I left my door open. I know I didn't. **I always lock my door and I just checked it**." (Emphasis added.) (CP 174).

A spare set of keys for the tenants of The Villas apartment complex is kept in a locked box in the manager's office. (RP 413). The manager's office is locked after hours. (RP 412). The defendant was one of the few individuals who could access the manager's office after hours and who could also access that lock box. (RP 413).

At 8:30 a.m. that morning, another employee, Jordan Schlenker, was working in the office when he heard a noise and saw the defendant walking out of the manager's office. The defendant told Mr. Schlenker that he was drinking that night and slept in the manager's office. See statement attached in defendant's motion. This is where the box that had keys to tenants' apartments was kept. The defendant asked Mr. Schlenker not to tell anyone, because he could get fired for sleeping in the apartment complex. (RP 463).

The defendant admitted that he did use his key to unlock the manager's office, unlocked the lock box, and took a key to an apartment on the night of the crime. (RP 646). He was the only one who did so. (RP 647).

Employees of the apartment complex are not allowed to stay on the premises overnight and are not allowed to stay in vacant apartments. (RP 420). The defendant admitted he violated both rules by going onto the premises and getting a key to a vacant apartment. (RP 646). He further admitted this was the only occasion he had done so.

D.W. also stated that the perpetrator was not wearing a shirt. (CP 174). December 5, 2009 was a cold winter day and the defendant had never changed out of his work clothes which had a logo of the apartment complex identifying him as an employee of D.W.'s landlord.

The police found D.W. covered in blood, from her head, hands, shoulders, and hair. (RP 91). The police also noted a large pool of blood in the living room, blood on the living room east wall, blood on a lampshade, blood at the base of a coffee table, blood on the kitchen floor, blood on the kitchen counter, blood spatter on the couch, and hair strands in the kitchen sink. (RP 92, 99-100, 102, 105, 489, 492, 499, 501, 509). A piece of a rubber glove was in the large pool of blood in the living room. (RP 94, 502-03).

Detective Shepherd, who has extensive training in blood spatter evidence, concluded that the blood drops show the perpetrator entered through the front door. (RP 507, 511). The initial assault was in the kitchen by the sink. The assault continued around the pantry and then went into the living room. (RP 511).

The police showed D.W. a series of twenty-three photographs of possible suspects on December 10, 2009, while she was still in Sacred Heart Hospital in Spokane. (RP 140, 521-22). One of the photos was of the defendant with short hair.

D.W. testified that she did not select the defendant because his hair was short in the photo and did not match the perpetrator. (RP 140). D.W. positively identified a Karl Goering as the perpetrator, both via the photo and in an in-person lineup. (RP 143, 44). Later at trial D.W. testified that she did not select the defendant in the photo lineup because his was short and the perpetrator had long hair. Based on D.W.'s positive identification, the State charged Goering with the crimes. (RP 338-39).

Lorraine Heath, Forensic Scientist with the Washington State Patrol Crime Laboratory, found that the tip of the rubber glove found in the blood pool in D.W.'s living room was a mixture of D.W.'s blood and the defendant's. (RP 269, 616-17). The expected frequency of a random match with the defendant's DNA is one in 440, while the expected frequency of a random match with D.W.'s DNA is one in 8.6 quadrillion. (RP 583, 615).

The State reevaluated the case against Goering based on the DNA results. Because Mr. Georing was only 5'10", he did not have a key to D.W.'s apartment and there was no forensic evidence linking him to the crime, the charge against him was dismissed. The State also reevaluated the defendant based on his DNA matching the DNA on the glove.

**RESPONSE TO MOTION FOR NEW TRIAL -** *3 | Page*

D.W., a single female living alone, always locked her door. (RP 124). Her fourth-floor apartment was not accessible via the balcony. (RP 124, 410). Everyone, from the first police officer on the scene to the EMT, to the apartment maintenance supervisor, stated there were no signs of forced entry. (RP 93, 190, 452). D.W. checked the door to make sure it was locked before the perpetrator entered her apartment. As discussed earlier, the defendant had access to the key to D.W.'s apartment.

The police questioned the defendant on the afternoon of December 5, 2009. He stated that he left work at about 4:00 p.m. and went to a bar in Richland with a friend, Jeramie Morrow. (RP 517). He and Mr. Morrow left around midnight. (RP 517). To make sure that Mr. Morrow got home safely, the defendant followed him to Morrow's Kennewick residence. (RP 518). As he was driving back to his Richland residence, the defendant realized he was too intoxicated and decided to spend the night at The Villas apartment complex. (RP 518). The defendant repeated this version in an interview with Det. Shepherd on May 4, 2010. (RP 526). (The defendant's testimony is attached as Appendix G.)

This version was not truthful. The police interviewed Mr. Morrow and his wife, Heather Morrow. Both of the Morrows stated that Ms. Morrow drove the two Morrows home at 8:31 p.m. and that the defendant did not follow them. (RP 245-6). Rather, the defendant went to his Richland residence at about 11:00 p.m., according to his significant other, Katherine Colleran, who was mad at him for arriving at their residence late. (RP 276).

Ms. Colleran's statement that he arrived home around 11:00 p.m. was corroborated by a forensic examination of the defendant's home computer. A forensic examination of the defendant's computer shows he logged onto his computer at 11:44 p.m. that evening. (RP 323. One site he visited was Craigslist, checking ads for a tryst with a stranger. (RP 323). He specifically visited "men seeking men" personal ads with names such as "need some hungry cock," "Want to hook up tonight" and "Bi married male looking for fun." (RP 328). The defendant began to email one certain email address from these ads five minutes later at 11:49 p.m. (RP 328). That email address, Tonybiprof99336@gmail.com, belonged to Salvador Contreras. The defendant logged off his computer at 12:10 a.m. (RP 330).

The police contacted Mr. Contreras who freely stated that he took out the Craigslist "men seeking men" ad and that the defendant responded to the ad, they texted, and the defendant came to his residence early in the morning of December 5, 2009, interested in a sexual encounter. At

**RESPONSE TO MOTION FOR NEW TRIAL - 4 | P a g e**

the time of trial, the nature of their encounter was not important, and Contreras stated they did not have intercourse. In a later statement, Contreras stated that both he and the defendant were at least partially undressed, and that the defendant touched Contreras's penis and chest. Contreras said it was a "good possibility" that he ejaculated at this time. He stated he normally ejaculated quickly with minimum stimulation and even without an erection.

Forensic examinations were done on both cell phones of Mr. Contreras and the defendant. There were text messages between the two of them starting at 12:13 a.m. and continuing, 12:22 a.m., 12:24 a.m.; 12:38 a.m., 12:43:13 a.m., 12:43:44 a.m., 12:43:53 a.m. and 12:44:14 a.m. (RP 308-9). Cell tower forensics show the defendant's cell phone heading toward Mr. Contreras's residence at 12:44:14 a.m. Contreras estimates that the defendant arrived at his residence around 2:00 a.m. (RP 305).

The defendant also gave untruthful and inconsistent alibis to other witnesses. The defendant's statement about his whereabouts in the early morning of December 5, 2009, include:

- To Jeramie Morrow: He met a girl and went to a motel with her. (RP 250).
- To Heather Morrow and Katherine Colleran (his significant other): He stayed in the rec room of the apartment complex, not a vacant apartment. (RP 258, 289).
- To Linda Metz, the apartment manager: He slept in a vacant apartment in the "D" building of the complex. (RP 458).

However, Ms. Metz stated that particular vacant apartment was "dirty" and "nasty," and the carpet had to be changed due to pets. (RP 430, 458). The police did not see any signs that the vacant apartment had been slept in. (RP 480).

By going to the apartment complex at night and entering an apartment, the defendant acknowledged he was violating the complex's rules prohibiting employees from being on-site after hours and being in an apartment after hours. RP 420, 646. The defendant admitted the morning of December 5, 2009, was the only time he violated those rules. RP 646.

The defendant is six feet-four inches and thin. (RP 651). At least as of November 2009 or December 2009, he had shoulder-length hair, which he wanted to grow longer. (RP 421). Detective Murstig and Detective Shepherd both noted the defendant's hair length was short on the afternoon of December 5, 2009. (RP 335, 516). Ms. Metz and another co-worker, Jordan Schlenker, noted that the defendant had cut his hair sometime before his return to work on December 7, 2009. (RP 421-22, 467). The defendant told Mr. Schlenker that he cut his hair

**RESPONSE TO MOTION FOR NEW TRIAL** - *5 | P a g e*

because he looked like the suspect. (RP 467). (Ms. Metz's testimony is attached as Appendix E and Mr. Schlenker's testimony is attached as Appendix F.)

The attack occurred in the early morning hours of December 5, 2009, which was a cold day. One puzzling fact is that D.W. said the perpetrator was not wearing a shirt. This was a cold winter morning. This fact will be discussed more in the argument section, but the defendant was wearing his Villas uniform, which had an insignia identifying him as an employee of the apartment complex throughout the evening and into the morning.

The State agreed to a request by the defendant to have the tip of the rubber glove and the victim's clothing resubmitted for DNA testing by DNI Labs International. The minor contributor to the rubber glove was Salvador Contreras, with the possibility of a random match at one in 250 males in the U.S. population. (See Anna Wilson report, dated 1-6-21, attached as Appendix I). This finding did not contradict the 2010 lab determination that the defendant was the major contributor with the possibility of a random match with his DNA at one in 440 males in the U.S. population. The fact that there was a minor contributor to the glove was known in 2010 and was before the jury. RP 581-582. The new DNA test has now only put a name to that minor contributor.

In addition, there were three stains on the victim's sweatshirt and sweatpants that were Mr. Contreras's DNA. Stain number two on the sweatpants were from the right exterior front and had Contreras's DNA with a random match possible in 1 in 200 quadrillion cases. Stain number three also was on the right exterior front of sweatpants and had a mixture of at least two individuals with Contreras's DNA matching with a possible random match at 1 in 190 quadrillion. Stain number eight was on the left exterior back of the sweatpants and had a mixture of at least three individuals with Contreras's DNA matching with a possible random match at one in 110 quadrillion. The defendant was excluded as a contributor on these stains.

The victim's sweatshirt also had three stains in which the defendant was excluded and the DNA matched Mr. Contreras. Stain number two was on the wearer's exterior front of the sweatshirt and contained Contreras's DNA with the odds of a random match at one in 54 quadrillion. Stain number four was on the wearer's right sleeve and had Contreras's DNA with the odds of a random match at one in 190 quadrillion. Stain number seven was on the wearer's exterior lower back and had Contreras's DNA with the odds of a random match at one in 200 quadrillion.

**RESPONSE TO MOTION FOR NEW TRIAL -** *6 | P a g e*

The State called Mr. Contreras to testify primarily to show that the defendant lied about his whereabouts on the evening of December 4-5, 2009. The exact nature of what occurred between them was not important. Nevertheless, both acknowledged that the defendant responded to Mr. Contreras's ad on Craigslist regarding a homosexual encounter. (RP 293 and 632). Both stated that they had never met before. (RP 294 and 632). Contreras said that the defendant showed up at his Finley residence at about 2:00 a.m. (RP 305). The defendant wanted to engage in sexual activity, but Contreras was not interested, because the defendant was intoxicated. (RP 298). (Contreras's testimony is attached as Appendix D.)

Contreras was concerned about the defendant driving while intoxicated so he made some efforts to keep him at the Finley residence so he could sober up. (RP 298). Contreras estimated the defendant was at the residence for 15-20 minutes at most. (RP 299). Contreras acknowledged this was embarrassing and was asked:

> Q: "It would have been even more embarrassing to you to admit that something actually happened, that there was more than you what you've related?
>
> A: It would be even more embarrassing, yes." (RP 307).

The defendant stated he got lost while driving to the Contreras residence. (RP 634). He stated they "talked for quite a while" once he arrived. (RP 634). He stated that Contreras performed oral sex on him. (RP 634). He also admitted that he possibly took off his shirt while at Mr. Contreras's residence. (RP 651).

After the police learned that his DNA was found on D.W.'s clothes, they questioned Mr. Contreras more extensively and asked for more of an explanation of what happened between he and the defendant. Mr. Contreras stated that the defendant was at his residence somewhere between 30 minutes to one and a half hours, but not more than two hours. He remembers the defendant using the bathroom, and showering, and coming out of the bathroom naked. Mr. Contreras states that he was laying down on a couch and the defendant, still naked, got on top of him and ran his hands from Contreras's legs to chest. At one point, the defendant put his hands under Contreras's shorts, but without touching his penis.

Contreras stated that he has a long history of premature ejaculation and there was a "good possibility" that he ejaculated when the defendant put his hands down his shorts. He ejaculates quickly, without his penis being erect, without masturbation, and with a minimal amount of stimulation.

**RESPONSE TO MOTION FOR NEW TRIAL -** *7 | P a g e*

Contreras recalls he was excited about the touching but was not excited about the defendant. He got out from under the defendant and said this is not working. The defendant hugged him, put on his clothes and left. Contreras does not remember the defendant going into the bathroom after the encounter on the couch.

Contreras stated he did not know D.W., had never been to her apartment complex and did not know where it was located.

The State argues below that Contreras's DNA was transferred from the defendant to D.W. The State and the attorneys for the defendant jointly interviewed Darren Wright, the forensic scientist who found the DNA that is consistent with Contreras. He stated that the DNA could have been transferred from Contreras to the defendant to D.W., as well as it could have been directly transferred. He stated there is no way to quantify or determine whether or not the DNA found was a result of a direct or indirect transfer. He said a secondary transfer is possible, but he could not comment on how probable it is. He stated that he could not tell by the nature of the stain if it was a direct or secondary transfer. That could not be determined visually. There was nothing scientifically that he could point to that indicates whether there was a direct or secondary transfer. See Appendix K.

## ARGUMENT:

### A. *Standard for Motion for New Trial based on Newly Discovered Evidence*:

From a substantial body of cumulative law, come well-defined principles declaring that a new trial will not be granted on the ground of newly discovered evidence unless five elements are established:

(1) The claimed newly discovered evidence must be such that it will probably change the result if a new trial is granted.

(2) The evidence must have been discovered since the trial.

(3) It must be shown that the evidence could not have been discovered before the trial by the exercise of due diligence.

(4) The evidence must be material to the issue and admissible.

(5) The newly discovered evidence cannot be merely cumulative or impeaching. *State v. Letellier*, 16 Wash. App. 695, 699–700, 558 P.2d 838, 841 (1977).

### B. *Contreras's DNA stains on the victim's sweatpants and sweatshirt would not have changed the result of the trial.*

The discovery of Contreras's DNA on the stains of the victim's sweatpants and sweatshirt do not change the key facts. Consider these facts:

- The defendant had access to a key to D.W.'s apartment. Contreras did not.

- The perpetrator used a key to enter D.W.'s apartment. There were no signs of a forced entry and D.W. locked her door religiously, even checking to make sure she locked the door in the morning before the perpetrator entered her apartment.

- D.W. always described the perpetrator as a white man. She told the 911 dispatcher the perpetrator was white, repeated that to the first responding officer and testified that he was white. Contreras is, and appears to be, Hispanic.

- D.W.'s description of the perpetrator—tall, thin, white, with shaggy hair—matched the defendant, at least until he cut his hair shortly after the assault. She even told the 911 caller that the perpetrator "looked like one of the Villa people. The Villas' maintenance people."

- The defendant's DNA matches the major contributor to the glove in the blood pool in D.W.'s apartment.

- The defendant lied about his whereabouts to the police and changed his appearance after the attack on D.W. by cutting his hair. Contreras was forthcoming, even traveling to Washington State from Florida without being subpoenaed.

- The defendant knew where D.W. lived and would have known she lived alone. Contreras did not know D.W. and had no knowledge of where her apartment complex was.

- Contreras would have no reason to take off his shirt before entering D.W.'s apartment. The defendant could have reasoned that the logo on his shirt, identifying him as an employee of The Villas apartment complex, would have given him away. He could have taken off his shirt, even though it was in the middle of winter, to try to hide his identity.

### C. *Contreras's DNA on the victim's pants and sweatshirt was most likely transferred from the defendant to D.W.*

1. *DNA transfer is well-established.*

On November 29, 2012, Raveesh Kumar of California was murdered during a robbery in his home. Lukis Anderson, a homeless man, was charged with his murder after his DNA was

found under the victim's fingernails. However, medical records showed that Anderson had been admitted to a hospital, after drinking the equivalent of 21 beers, on that same day and was not discharged until the following day. It turned out that the same ambulance and the same paramedics who treated Mr. Anderson and took him to the hospital that day also dealt with Mr. Kumar. Anderson's DNA may have been transferred to Mr. Kumar's fingernails through the finger pulse oximeter. *Law.com/lukis-anderson-almost wrongly convicted by his own DNA.* May 14, 2018.

This type of DNA transfer has been replicated in scientific experiments. In an experiment, people shook hands for up to 10 seconds. One person from the pair then picked up a knife. The person who did not touch the knife was the *major* source of DNA on the knife handle one in every 14 times. *Could Secondary DNA Transfer Falsely Place Someone at the Scene of a Crime,* C. Cale, et al. Academy of Forensic Sciences annual meeting, February 21, 2019. See Appendix L. In another experiment, four university students sat around a table and pretended to pour drinks from an empty pitcher into empty glasses. They did not want to risk spilling. These four students only handled their own cups and the pitcher. Still, their DNA ended up on the cups of the other students. Another 12 students watched without sitting at the table. The bystanders were allowed to leave the room and move around. Even some of these 12 students' DNA ended up on the cups of the four participants and the pitcher. The forensic scientist theorized that the bystanders' DNA may have spread to the cups and pitcher when they coughed sneezed or talked. *The strengths and limitations of transfer DNA evidence recovered from objects handled by multiple individuals.* L.G. Rizor, et al. American Academy of Forensic Sciences annual meeting, February 21, 2019, reported in Science News. See Appendix M. Another study found non-self alleles present in 88% of samples from hands of individuals. *Prevalence of human cell material; DNA and RNA profiling of public and private objects and after activity scenarios,* M. van den Berge, et al., Forensic Sci. Int. Genet 21 (2016 (81-89). See Appendix N.

"Over the last several years an increasing number of cases no longer question 'whose DNA it is' but wish to know 'how or when it got there.' Cases thus hinge on the relative likelihoods of the DNA of a certain person being deposited directly by that person or by someone, or something, else." *DNA transfer in forensic science: A review,* van Oorschot, *Forensic Science International, 2019.* See Appendix O. That is the question here. Mr. Contreras's DNA was on three stains on both D.W.'s sweatpants and sweatshirt. Did the defendant transfer the DNA onto D.W. or did Contreras directly deposit his DNA on her clothing?

**RESPONSE TO MOTION FOR NEW TRIAL -** *10 | P a g e*

2. *There are numerous factors indicating Contreras's DNA was transferred by the defendant onto the victim's sweatpants and sweatshirt.*

a) <u>The minimal amount of spermatozoa found on D.W.'s clothing indicates the ejaculation was transferred, not directly onto D.W.</u>

The typical ejaculation contains 5 million to 200 million sperm. *Healthline.com.* Compare this to the total amount of spermatozoa found in all of the stains detected by the new DNA technology.

On DW's Sweatpants:

Stain 1:     No spermatozoa.
Stain 2:     5 spermatozoa.
Stain 3:     0-1 spermatozoa observed per field of view, with 8 representative cuttings made.
Stain 4:     No spermatozoa.
Stain 5:     No spermatozoa.
Stain 6:     No spermatozoa.
Stain 7:     No spermatozoa.
Stain 8:     1 spermatozoa.
Stain 9:     No spermatozoa.
Stain 10:    No spermatozoa.
Stain 11:    No spermatozoa.

On DW's Sweatshirt:

Stain 1:     1 spermatozoa.
Stain 2:     4 spermatozoa.
Stain 3:     No spermatozoa.
Stain 4:     0-1 spermatozoa per field of view, with 10 cuttings made.
Stain 5:     0-1 spermatozoa per field of view, with 10 cuttings made.
Stain 6:     No spermatozoa.
Stain 7:     6 spermatozoa.

These were samples of spermatozoa examined under slides. This does not represent all of the spermatozoa found. Nevertheless, the sperm expected in a normal ejaculation is not present here. If Mr. Contreras, or the defendant, or anyone, had ejaculated onto D.W. or her clothes, there would have been much more spermatozoa found, up to 5 million to 200 million more. D.W. was correct that the perpetrator did not ejaculate. Otherwise, there would have been millions of spermatozoa on D.W.'s clothing.

b) <u>The scientific literature, and the experts thus far interviewed, say the evidence is consistent with a transfer from Mr. Contreras, to the defendant, to the victim, D.W.</u>

**RESPONSE TO MOTION FOR NEW TRIAL -** *11 | P a g e*

**Ex. 16 at 011**

A study, *Persistence of DNA deposited by the original user on objects after subsequent use by a second person,* van Oorschot, et al., Forensic Science International, October 13, 2013, concluded, "the degree of persistence of DNA from a prior user of an object depends on the type of object, the substrate it is made of, the area of the object targeted for sampling and the duration and manner of contact by a subsequent user." See Appendix P. That study found that a USB stick used regularly by a single person for five years and then used for just one minute by a second user, had only the DNA profile of the second user. Another study showed that the degree of DNA transfer from the secondary donor may exceed the primary donor in 20% of the findings. The primary donor in those instances was not detectable in an average of 27% of the samples. *Assessing primary, secondary and tertiary DNA transfer using the Promega ESI-17 Fast PCR Chemistry,* C.Davies, et al, Forensic Science International:   Genetics Supplement Series, September 11, 2015. See Appendix Q. So, it is consistent with studies that Contreras, as the secondary donor, would be on D.W.'s clothing, while the defendant, as the primary donor, would not. It is not surprising that an expert on DNA and DNA transfer will not conclude that the DNA found on clothing either came from a direct deposit or a secondary deposit.

That includes the letter submitted by Dr. Charlotte Word in the defendant's motion. The statement on page five of the motion, "the 'planting' theory is implausible under the facts of this case, while the 'transfer' theory is not scientifically supported" is a statement by the defense attorneys. Dr. Word does not state that the chance DNA was transferred from Contreras to the defendant to D.W. was "implausible" or "not scientifically supported." She does not ascribe any probabilities or likelihoods to either scenario. See attachment C of the defendant's motion. If Dr. Word had done so, she would be an outlier among scientists and that opinion would be contrary to scientific literature.

Contreras does not remember the defendant washing and, although he was not asked about it directly, the defendant did not testify that he washed his hands after the encounter with Contreras. Given the circumstances as described by Contreras, the defendant may not have known that Contreras ejaculated. Whether the defendant washed his hands may or may not be helpful, but it is not determinative. In a study, DNA from semen stains was recovered from a t-shirt even after it had been through a washing machine three times. *Persistence of DNA from laundered semen stains:   Implications for child sex trafficking cases,* Brayley-Morris, et al, Forensic Science International, July 14, 2015. See Appendix R.

RESPONSE TO MOTION FOR NEW TRIAL - *12 | P a g e*

Such studies have led the DNA experts both the defense and prosecution have consulted to not say either theory—direct transfer or secondary transfer—can be ruled out.

c) The collection of D.W.'s sweatshirt and sweatpants and the way they were folded into evidence bags may have added to the detection of the spermatozoa.

The way in which the sweatshirt or sweatpants were folded in evidence bags could have caused transfer of Mr. Contreras's DNA to be transferred on the clothing. Look at stains four, five and seven on the sweatshirt. Stains four and five were on the sleeves and stain seven was on the lower back. (The photos are in Appendix J.) If the sleeves were folded against each other and put behind the sweatshirt, spermatozoa on one spot could have been transferred to the other two.

The possibility of DNA transfer within evidence bags was tested in *DNA Transfer within forensic exhibit packaging: Potential for DNA loss and relocation*, Goray, et al., Forensic Science International: Genetics, March 22, 2011. See Appendix S. Ten new, cotton underwear were divided into two groups of five. Blood from individual A was placed on the front middle on five of the underwear and an equal amount of blood from individual B was placed in the same spot on the other five. The deposits were allowed to dry for 24 hours. Two underwear from both depositors were placed in a bag, regularly used for routine casework. A sample was then taken from the front-outside, the rear-outside and the inside of the underwear, which were "non-deposit areas" of the blood.

DNA from the deposit area was observed on each of the three non-deposit areas of the same underwear in 100% of the garments. DNA derived from the deposit of one individual was also observed on each of the non-deposit areas of the other garment that was within the package in all garments. DNA from both deposits was also found inside the packaging in 60% of the brown bags.

The laboratory scientist from DNA Labs International, who did the testing for the defendant, confirmed that this was possible, even if the spermatozoa had dried by the time the clothing was put in evidence bags. See interview of Darren Wright, Appendix K.

As stated in *Secondary and subsequent DNA transfer during Criminal Investigation,* Fonnelop, et al, Norwegian Institute of Public Health, May, 2015, "great care to prevent transfer and contamination should be taken during handling and examination of evidence. It is not possible to state with certainty that low levels of DNA could not be the outcome of secondary or subsequent transfer." See Appendix T.

**RESPONSE TO MOTION FOR NEW TRIAL -** *13 | P a g e*

d) <u>The time period between the Contreras-defendant contact and the defendant-victim contact was short, probably less than an hour.</u>

How time may impact the discovery of transferred DNA was studied in *DNA transfer through nonintimate social contact,* S. Jones, et al., Science and Justice, 2016. See Appendix U. The study examined whether non-intimate contact between a male and female could result in the female's DNA on the male's underwear. A man held hands with, and touched the cheek of, a woman for a few minutes. The male simulated urination thereafter by holding his penis. Upon testing directly after, in five of the 30 trials the female DNA was on the male's underwear waistband. When waiting six hours for the simulated urination, the numbers dropped to one out of 14 samples of the female's DNA on the waistband of the male's underwear. In addition, the peak levels were lower.

In this case, Contreras testified that the defendant arrived at his residence around 2:00 a.m. He now estimates that the defendant left perhaps an hour and a half later. The defendant left, according to Contreras, soon after Contreras ejaculated while the defendant's hands were under Contreras's shorts. He left Contreras's residence without using the bathroom or washing his hands. Allow 30 minutes for travel from Contreras's residence to The Villas apartment complex. That would have put the time of the defendant's arrival at 4:00 a.m., when D.W. was starting to get up for work.

We do not know exactly when the perpetrator entered her apartment and attacked D.W., but she got up at 4:00 a.m. and was just starting her day when she saw the perpetrator running toward her. The attack was severe and prolonged. A large pool of blood was in the living room, blood was on the living room east wall, blood was on a lampshade, blood was at the base of a coffee table, blood was on the kitchen floor, blood was on the kitchen counter, blood spatter was on the couch, and hair strands in the kitchen sink. (RP 92, 99-100, 102, 105, 489, 492, 499, 501, 509). The perpetrator put a blanket over D.W. and she could not tell if he left her apartment. She waited several minutes before peeking out of the blanket and then waited several more minutes before calling the police. She called 911 at 4:43:53 a.m.

Given these facts, the perpetrator could have entered D.W.'s apartment around 4:15 to 4:30 a.m. The short time period between the Contreras-defendant contact indicates that the defendant may have transferred Contreras's DNA onto D.W.

**RESPONSE TO MOTION FOR NEW TRIAL -** *14 | P a g e*

e) The perpetrator was most likely sweaty and sweat promotes DNA transfer.

The perpetrator most likely was sweaty. He had just unlawfully entered a women's apartment at around the early morning, he ran at the victim carrying a bar, he started hitting the woman with the bar and he pulled off her pants. Sweat has been found to promote DNA transfer. *Prevalence of human cell material: DNA and RNA profiling of public and private objects and after activity scenarios,* M. van den Berge, et. al., Forensic Science International: Genetics, 12-22-15. This study reported, "the sweaty hands had higher DNA yields in 72% of the comparisons (up to 153.6 times higher)." Appendix N.

f) D.W. testified the perpetrator did not ejaculate.

The victim testified that when she lost control of her bowels, the perpetrator became disgusted and did not penetrate her with his penis. He left without Se  Any semen found on her clothing would have been the result of a secondary deposit.

**D. The discovery of Mr. Contreras's DNA on D.W.'s clothing is consistent with the defendant's guilt and does not change all of the direct and circumstantial evidence against him.**

The jury knew that there was unidentified male DNA on the glove and D.W.'s clothing. See Lorraine Heath's testimony, p. 581 and 611-612, Appendix H. Advanced testing has now put a name to that unidentified male: Salvador Contreras. The question is how did Mr. Contreras's DNA get there? The most likely explanation is that the defendant transferred Contreras's DNA from his contact with him to D.W.'s clothes and to the glove. The DNA evidence confirms the defendant's guilt.

The defendant's reliance on *In re Bradford*, 140 Wn.App. 124, 165 P.3d 31 (2007) is misplaced. In *Bradford*, the perpetrator had a stocking over his face and the trial court found that the victim was not able to identify him. The victim in *Bradford* said the perpetrator was "a giant" about 6'0". The defendant was only 5'7 and ½". Here, the victim's description of the perpetrator matched the defendant—tall, thin, with shaggy hair—at least until he cut it. D.W. even said that the perpetrator looked like someone on the apartment complex's maintenance staff.

In *Bradford,* the reference hearing found the evidence conflicted on whether the defendant established an alibi—that he was at work. Here, there is no conflict: The defendant was at the apartment complex, not at his home, when D.W. was attacked. His presence there violated the apartment complex's rules prohibiting employees from staying overnight at the complex. The only

**RESPONSE TO MOTION FOR NEW TRIAL -** *15 | P a g e*

time the defendant violated this rule was the early morning of December 5, 2009. The defendant even accessed a key lock box where he could get a copy of the key to D.W.'s apartment.

In *Bradford*, there was no DNA introduced at the initial trial. The new DNA test showed DNA from an unknown male on a tape the perpetrator used to cover the victim's eyes. Here, the jury knew there was DNA from an unknown male on the rubber glove. With the new DNA test, we now know this unknown DNA belonged to Salvador Contreras.

In *Bradford,* the defendant's DNA was not found on anything. Here, the defendant's DNA was found on the glove, with the odds of a random match 1 in 440.

In *Bradford,* there was almost no evidence except the defendant's confession, which began, "I probably did it" and did not match the victim's description of the crime. Here, this case has both direct and circumstantial evidence against the defendant.

The direct evidence was from D.W., pointing to the defendant and testifying he was the attacker. Nevertheless, a jury could consider that D.W. was being attacked and given her misidentification of Karl Goering may not have convicted the defendant based on her testimony alone. The circumstantial evidence is convincing.

First, the perpetrator had to use a key to enter D.W.'s apartment on the night in question. D.W. locked her door at night and checked to make sure the door was locked when she got up. The defendant was the only person who went into the apartment manager's office and accessed a box holding a key to D.W.'s apartment the morning before the attack. Second, the perpetrator matched D.W.'s physical description to the police and 911, including her statement that she thought the perpetrator was on the apartment complex's maintenance staff. Third, the defendant lied about his whereabouts and his staying overnight in the apartment complex was not allowed by the rules. Fourth, there is strong evidence that the defendant changed his appearance after the attack by going from long hair to a buzz cut. Fifth, the perpetrator was not wearing a shirt on this cold winter night, which is not explained unless the shirt had a logo which could be used to identify him. The defendant that morning was still wearing his work shirt, which had a logo identifying him as an employee of the apartment complex. Sixth, the defendant's DNA was on a key piece of evidence, the piece of the glove found in a blood pool. This has not been explained by the defense. Although the DNA alone would not have convicted the defendant, since the probability it was his was only one in 440, all of the circumstantial evidence together with D.W.'s direct testimony,

**RESPONSE TO MOTION FOR NEW TRIAL -** *16 | P a g e*

presented an overwhelming case for the defendant's guilt. It is still overwhelming. The DNA results do not change that.

## CONCLUSION:

Under CrR 7.8(c)(3) the State does not contend the defendant's motion should be transferred to the Court of Appeals. At the hearing set by this Court, the State will present evidence that the defendant was the only individual who had access to a key to D.W.'s apartment before 4:00 a.m. on December 5, 2009, who matched D.W.'s physical description of the perpetrator, who was not truthful about his whereabouts that night, who had inconsistent statements about where he stayed in the apartment complex, who changed his appearance after the attack, whose DNA was on a key piece of evidence—the glove—in D.W.'s apartment and who might have a reason to go about shirtless on a cold winter morning. Each of these facts in isolation would not have convicted the defendant. Together, the facts remain convincing beyond a reasonable doubt.

The defendant cannot establish that the new evidence would likely have changed the outcome of the case. After a hearing on the evidence, the State will argue that the defendant's motion should be denied.

**DATED**: October 7, 2021.

_____
**TERRY J. BLOOR**, *WSBA #9044*
*Deputy Prosecuting Attorney*
OFC ID 91004

_____
**ANDREW J. CLARK**, *WSBA #46667*
*Deputy Prosecuting Attorney*
OFC ID 91004

**RESPONSE TO MOTION FOR NEW TRIAL -** *17 | P a g e*

# EXHIBIT 17

FILED
Court of Appeals
Division III
State of Washington
3/10/2023 10:31 AM

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF BENTON

DEPARTMENT B          HON. JACQUELINE STAM, JUDGE

STATE OF WASHINGTON,       )
                           )
            Plaintiff,     )      COA NO. 39076-4-III
                           )
      vs.                  )        NO. 10-1-01156-4
                           )
CODY JOSEPH KLOEPPER,      )      09-29-2021, 11-12-2021
                           )      12-03-2021, 03-22-2022
            Defendant.     )      07-13-2022
                           )

Kennewick, Washington    Wednesday    September 29, 2021


TRANSCRIPT OF THE VERBATIM

REPORT OF PROCEEDINGS



APPEARANCES:

For the Plaintiff:       **TERRY BLOOR**
                         Deputy Prosecuting Attorney
                         7122 W. Okanogan Place, A230
                         Kennewick, WA  99336

For the Defendant:       **LARA ZAROWSKY**
                         Attorney at Law
                         **JACQUELINE MCMURTRIE**
                         Attorney at Law
                         PO Box 85869
                         Seattle, WA  98145-1869

                         **MARK MESTEL**
                         Attorney at Law
                         221 Oakes Avenue
                         Everett, WA  98201-4407


Reported by:    RENEE L. MUNOZ, CCR, RPR, CRR, CRC

INDEX OF PROCEEDINGS

| EVENT | PAGE |
|---|---|
| CONTINUANCE | 05 |
| NOVEMBER 12, 2021 PROCEEDINGS | 11 |
| HEARING | 12 |
| AUDIO TRANSCRIPTION CERTIFICATE | 19 |
| DECEMBER 03, 2021 PROCEEDINGS | 20 |
| HEARING | 21 |
| MARCH 22, 2022 PROCEEDINGS | 33 |
| COLLOQUY | 35 |
| SALVADOR CONTRERAS TESTIMONY | 42 |
| COLLOQUY | 94 |
| ARGUMENT - MR. MESTEL | 101 |
| ARGUMENT - MR. BLOOR | 118 |
| ARGUMENT - MR. CLARK | 122 |
| ARGUMENT - MR. MESTEL | 128 |
| COURT'S INQUIRY | 131 |
| ARGUMENT - MR. MESTEL | 143 |
| ARGUMENT - MR. BLOOR | 144 |
| COLLOQUY | 144 |
| JULY 13, 2022 PROCEEDINGS | 147 |
| HEARING | 148 |
| AUDIO TRANSCRIPTION CERTIFICATE | 166 |
| VERBATIM TRANSCRIPTION CERTIFICATE | 167 |

**Ex. 17 at 002**

NUMERICAL INDEX OF EXHIBITS

| NUMBER | IDENT. | EVID. |
|---|---|---|
| A - THUMB DRIVE CONTAINING EXHIBITS | 39 | 39 |
| B - TRANSCRIPT EXCERPT | 65 | |
| C - COPY OF CRAIGSLIST AD | 73 | |

EXHIBIT INDEX                                    3

**Ex. 17 at 003**

INDEX OF WITNESSES

| PLAINTIFF'S | DIR. | CR. | RED. | RECR. | VOIR DIRE |
|---|---|---|---|---|---|
| CONTRERAS, Salvador | 42 | 54 | 90 | 92 | |

| DEFENDANT'S | DIR. | CR. | RED. | RECR. | VOIR DIRE |
|---|---|---|---|---|---|

WITNESS INDEX                                          4

**Ex. 17 at 004**

Wednesday, September 29, 2021, at 8:34 a.m.

Kennewick, Washington


THE COURT:  Good morning, everyone.  This is Judge Stam.  We're here today for the Benton County criminal docket.  I just want to make sure people can hear me on Webex.  If someone wants to say good morning to me, that would be helpful.

(Whereupon no response was given.)

THE COURT:  Anyone?

THE AUDIENCE:  Good morning.

THE COURT:  Not you guys.

UNIDENTIFIED VOICE:  Good morning.

UNIDENTIFIED VOICE:  Good morning.

THE COURT:  All right.  Thanks, guys, that helped.

Number 1:  Cody Kloepper.

MR. BLOOR:  Yes.

Your Honor, I think Mr. Mestel is probably here representing the defendant.

THE COURT:  I have a Lara Zarowsky, I think she's counsel on this matter, and Mark Mestel.  I see him on Webex as well.  I'm un muting Ms. Zarowsky (indicating), and I'm un muting Mr. Mestel (indicating).

MR. BLOOR:  It's their motion.

CONTINUANCE                                    5

**Ex. 17 at 005**

MR. MESTEL:  Good morning, your Honor.

MS. ZAROWSKY:  Good morning.

THE COURT:  Good morning.

MR. BLOOR:  I think they probably don't understand we need a special set on this matter.  It shouldn't be on a docket.

THE COURT:  Not even on the 3.5/3.6?  It's too much?

MR. BLOOR:  I think so, in my opinion.

THE COURT:  Let me hear from Mr. Mestel and Ms. Zarowsky.

MS. ZAROSWKY:  Good morning, your Honor.

THE COURT:  Go ahead, Ms. Zarowsky.

MS. MCMURTRIE:  Good morning.  Good morning, your Honor.

I appear to have a strange connection here. Jacqueline McMurtrie.

THE COURT:  Okay.  I see her as well.

MS. MCMURTRIE:  I'm with the Washington Innocence Project.  We're asking from (audio interrupted) --

THE COURT:  So, Ms. McMurtrie, close out your video because your audio is cutting in and out, and sometimes that is --

MS. MCMURTRIE:  (Indicating.)

CONTINUANCE                                    6

**Ex. 17 at 006**

THE COURT: There you go.

So, start from the beginning because we couldn't hear anything that you had said.

MS. MCMURTRIE: Thank you, your Honor.

I -- is this better now? Can you hear me?

THE COURT: Yes. Yes, it is.

MS. MCMURTRIE: I'm with the Washington Innocence Project with Ms. Zarwosky and Mark Mestel. We are for Cody Kloepper, and we did file the criminal 7.8 motion in August, August 18th, 2020, and set it for a hearing (audio interrupted) as a status hearing because we agree it's not the time to have the motion argued.

It's a (audio interrupted) motion, and I wouldn't say it's complex. It's straightforward based on newly discovered evidence, of DNA testing that was done after the trial, but we set it for today with the intention of requesting that the Court order a briefing schedule on the matter to ask the State to respond to the motion, the time to respond, and give us time to respond to the State's response.

I couldn't quite hear what the prosecutor was saying in regards to having it on this calendar, but it was our intention again to ask the Court to set a briefing schedule and then a hearing after the briefing had been completed.

**Ex. 17 at 007**

THE COURT:  Okay.  Let me hear from the State.

Go ahead and tell me again since she didn't hear you the first time?

MR. BLOOR:  I don't think this docket is really designed to have substantive hearings, even for a briefing schedule.  I don't have any objection if you want to set a briefing schedule, your Honor, but I don't think this is really set for that purpose.

THE COURT:  Yeah, I agree.

I think what needs to happen is you need to work with the State to get a special set hearing in front of one of our judges.  I think, especially if we're going to be having people by Webex and with the technology problems, it's gonna take a little bit more time and energy to hear everyone and make sure everyone's understood.

So, I do think that reaching out to counsel, Mr. Bloor, and working with him and getting a special set hearing for status purposes is probably the most appropriate thing.

MR. BLOOR  And I'd be glad to talk to all three of you.

THE COURT:  Okay.  So, that's what I'm gonna direct that we do.  That we -- I'm gonna direct that you reach out with Mr. Bloor and work on getting a special

CONTINUANCE                                          8

**Ex. 17 at 008**

set with court admin.

MR. BLOOR:  (Indicating.)

THE COURT:  All right.  Any questions at all?

MS. MCMURTRIE:  Your Honor, would that (audio interrupted) be something before this court or --

THE COURT:  You mean before me?

It doesn't have to be before me.  It can be before any judge.

MS. MCMURTRIE:  I would like to note for the record that there have been two notices of disqualification filed and one judge who recused him (audio interrupted).

THE COURT:  Okay.  Understood.

MS. MCMURTRIE:  Mr. Bloor has had this motion since the end of July, and they haven't responded to our -- responded to it in any fashion.  So, if the Court wants us to reach out to the State and set up the hearing, they were aware that the hearing was today.

THE COURT:  So, I'm gonna ask that you each work together to work with court admin in getting a date for a special set.

So, you can reach out to court admin yourself, if you would like, okay?

MS. MCMURTRIE:  Thank you, your Honor.

THE COURT:  Thank you very much.

**Ex. 17 at 009**

MR. BLOOR:  Thank you.

THE COURT:  Thank you.

(Whereupon the proceedings concluded at 8:39 a.m.)

**Ex. 17 at 010**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF BENTON

DEPARTMENT B        HON. SAMUEL SWANBERG, JUDGE

STATE OF WASHINGTON,      )
                          )
          Plaintiff,      )
                          )
     vs.                  )          NO. 10-1-01156-4
                          )
CODY JOSEPH KLOEPPER,     )
                          )
          Defendant.      )
                          )

Kennewick, Washington      Friday      November 12, 2021


VERBATIM TRANSCRIPT OF

AUDIO-RECORDED HEARING


APPEARANCES:

For the Plaintiff:        **TERRY BLOOR**
                          Deputy Prosecuting Attorney
                          7122 W. Okanogan Place, Bldg. A
                          Kennewick, WA  99336


For the Defendant:        **MARK MESTEL**
                          Attorney at Law
                          221 Oakes Avenue
                          Everett, WA  98201-4407


Transcribed by:   RENEE L. MUNOZ, CCR, RPR, CRR, CRC

**Ex. 17 at 011**

Friday, November 12, 2021

Kennewick, Washington

(Whereupon the following transcript was created from an audio recording.)

THE COURT:  Okay.  Let's see here.

Can those on Webex hear me?

(Whereupon no audible response was made.)

THE COURT:  I cannot hear anybody back.  They should be unmuted.

All right.  All right, Mr. Bloor, I think we'll take your matter first since it's --

MR. BLOOR:  I appreciate it.

THE COURT:  -- likely gonna be a little shorter, I think.

MR. BLOOR:  Yes.

This is State versus Kloepper.  We're here for a status conference.

Here's -- here's the situation.  We've -- I don't know if you had a chance to look at our motion, but we've asked the Court to request Judge Runge to hear this matter.  Barring that, if she's -- if the Court denies our motion or she's unwilling to hear the matter, I really think - and I think counsel agrees - that a

HEARING                                                          12

**Ex. 17 at 012**

preassigned judge should be appointed.

We're still -- you know, we've -- I think Mr. Mestel has been very cooperative with us, and I think we've been cooperative with him as far as narrowing down what exhibits we're going to present.  I don't think we have a final order to give to the Court.

Mr. Mestel would like to set up a hearing date on their motion for a new trial.

I'm wondering if he's requesting the week of the 13th of December or the week of the 12th of January, I think?

MR. MESTEL:  Yeah, I think so.

MR. BLOOR:  Well, I don't really have a problem with the January date.  I think the December date might be a little bit aggressive because, you know, as of right now we don't know the status of the hearing judge.

THE COURT:  Have you been able to confirm any dates with court administration as far as availability on those dates?

MR. BLOOR:  Right.  Exactly.

THE COURT:  Have you done that yet?

MR. BLOOR:  We have not done that.

THE COURT:  Okay.  I think I -- I read through the materials.

Is everybody in agreement that if judge -- retired

**Ex. 17 at 013**

Superior Court Judge Runge --

MR. MESTEL:  No, your Honor.

THE COURT:  -- was willing to come back and hear this --

MR. MESTEL:  We're not in agreement.

THE COURT:  -- that that's the right judge or are you opposing that?

MR. MESTEL:  We just received the pleadings, I believe, two days ago.  We -- we are going to oppose it.

THE COURT:  Would you like time to respond to it?

MR. MESTEL:  We don't believe this case --

THE COURT:  Would you like time to respond to it?  Would you like time to respond to it then?

MR. MESTEL:  Yes, your Honor.

THE COURT:  Okay.

MR. MESTEL:  And my understanding is, is it wasn't gonna to be argued this morning or I would have filed something in advance.

THE COURT:  Okay.  That's fair enough.  I'm not gonna make you argue it.  Mr. Bloor is shaking his head at me like he agrees that you shouldn't have to argue it if you're not ready to go today.

It sounds like that would probably be the first issue that needed to be decided as far as before setting

**Ex. 17 at 014**

-- deciding on whether or not to set a preassigned judge because if the Court was to grant the motion to allow Judge Runge to hear it if she -- if she wants to or if she agrees to, I don't think that --

MR. MESTEL:  Well, your Honor, it would seem to me the first step would be somebody from the court administrator to contact the former judge to see if she would come back.  If she won't come back, we don't need to have an argument about whether it's appropriate to bring her back.

THE COURT:  Well, I don't know if I agree with that or not as far as that's the basis.

Before I reach out to Judge Runge I think we ought to have a decision --have a hearing on whether or not that that's the appropriate thing to do or not, and if you're opposing it, then I think that's an issue that needs to be decided.

I'm not in -- I'm not inclined to contact a retired judge and say, "Do you want to take this if I grant a motion to allow to you take it?"

MR. MESTEL:  Well, what if you grant the motion to allow her and she says she doesn't want to come back?

THE COURT:  Then that ends it right there, but the first thing we're gonna talk about is if the Court grants the motion my understanding is that the motion, if

**Ex. 17 at 015**

granted, the order would be that the court administration would reach out to Judge Runge and see if she wanted and was willing to hear it.

MR. MESTEL:  We could be --

THE COURT:  And if she said no at that point in time?  Done deal.  But before we even decide whether or not we're gonna reach out and try that, attempt that contact, I think the motion needs to be heard first.

MR. MESTEL:  Can we get the motion heard perhaps next Friday, your Honor?

THE COURT:  Is that enough time for you?

MR. MESTEL:  Enough time for the defense.

THE COURT:  When can we --

MR. MESTEL:  We can have our pleadings back on Monday.

THE COURT:  Would that give enough time for you, if you needed to do a strict reply on that, to get it done by Wednesday, Mr. Bloor?

MR. BLOOR:  I'm out of town -- I have a vacation Monday and Tuesday of this coming week.  If they want to, you know -- again, I think that's a little bit in question that, you know, if they want to -- if they want to have -- if they're saying that they can have their response by Monday, I can have a response by Thursday.

MR. MESTEL:  That's fine.

**Ex. 17 at 016**

THE COURT:  Does that work?

MR. MESTEL:  Yeah.

THE COURT:  All right.

I'll set this over one week, and the briefing schedule will be that you will have your response in by this coming Monday and you will have yours in by Thursday --

MR. BLOOR:  Thursday.

THE COURT:  -- as far as your reply.

MR. MESTEL:  Your Honor, would you have any objection to my next appearance being by Webex?

THE COURT:  I would not.

MR. MESTEL:  All right.

MR. BLOOR:  Well, thank you.

Did you have anything else?

MR. MESTEL:  Nothing I can't take up next Friday.

THE COURT:  Very well.

THE CLERK:  Will this be required to be re noted or are we automatically setting it on?

THE COURT:  We're automatically setting it on.

MR. MESTEL:  We just need to confirm on Wednesday then?

THE COURT:  Sure.  Please.

MR. MESTEL:  Thank you, Judge.

**Ex. 17 at 017**

THE COURT:  All right.  Thank you both.

MR. BLOOR:  Thank you.

(Whereupon the requested audio-recorded proceedings concluded.)

**Ex. 17 at 018**

STATE OF WASHINGTON      )
                         )          SS.
COUNTY OF BENTON         )


        I, RENEE L. MUNOZ, do hereby declare under penalty

of perjury under the laws of the State of Washington that

the following is true and correct:


        1.    That I am an authorized transcriptionist;

        2.    I received the electronic recording from the

              Benton County Clerk's Office;

        3.    This transcript is a true and correct record of

              the proceedings to the best of my ability,

              including any changes made by the trial judge

              reviewing the transcript;

        4.    I have no financial interest in the litigation.




        Dated in Kennewick, Washington, this _____ day of

_____, 2023.




                              _____
                              RENEE L. MUNOZ, RPR, CRR, CRC
                              State of Washington CCR #2330
                              Official Court Reporter
                              Benton-Franklin Counties


AUDIO TRANSCRIPTION CERTIFICATE                    19


**Ex. 17 at 019**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF BENTON

DEPARTMENT E         HON. ALEXANDER EKSTROM, JUDGE

STATE OF WASHINGTON,        )
                            )
          Plaintiff,        )
                            )
     vs.                    )        NO. 10-1-01156-4
                            )
CODY JOSEPH KLOEPPER,       )
                            )
          Defendant.        )
                            )

Kennewick, Washington     Friday      December 03, 2021


TRANSCRIPT OF THE VERBATIM

REPORT OF PROCEEDINGS


APPEARANCES:

For the Plaintiff:     **TERRY BLOOR**
                       Deputy Prosecuting Attorney
                       **ANDREW CLARK**
                       Deputy Prosecuting Attorney
                       7122 W. Okanogan Place, A230
                       Kennewick, WA  99336

For the Defendant:     **LARA ZAROWSKY**
                       Attorney at Law
                       **JACQUELINE MCMURTRIE**
                       Attorney at Law
                       PO Box 85869
                       Seattle, WA  98145-1869

                       **MARK MESTEL**
                       Attorney at Law
                       221 Oakes Avenue
                       Everett, WA  98201-4407

Reported by:     RENEE L. MUNOZ, CCR, RPR, CRR, CRC

**Ex. 17 at 020**

Friday, December 3, 2021, at 8:31 a.m.

Kennewick, Washington


THE COURT:  Counsel, it seems like we have a fair bit to do.  So why don't we get started, and if and when Ms. Saldua Potvin can join us, we can do those things that require her.

All right, very well.  We're on the record in regards to State versus Cody Joseph Kloepper.  For the record, this is Alex Ekstrom, Superior Court Judge.

Could the representatives of the State of Washington, please, state your appearance?

MR. BLOOR:  Terry Bloor.

MR. CLARK:  Andrew Clark.

THE COURT:  Good morning to you both.

Could the attorneys for Mr. Kloepper, please, make their appearance at this time?

MR. MESTEL:  Good morning, your Honor.  My name is Mark Mestel.  I am one of the attorneys for Mr. Kloepper.

THE COURT:  It appears Ms. Zarowsky is also present on the line, and I notice she is a signor on the motion practice.

MS. ZAROWSKY:  I am, your Honor.  Lisa Zarowsky for the Washington State Innocence Project for

**Ex. 17 at 021**

Mr. Kloepper.

THE COURT:  Good morning to you both.

Counsel, I assume that you have all received the response from our assistant court administrator indicating that Judge Runge has declined to come out of retirement and hear the matter, and it's my understanding that you folks, is it a joint recommendation for preassignment of a judge in this matter?

MR. MESTEL:  Yes, your Honor.

MR. BLOOR:  I think so.  We -- we are -- the State is definitely recommending a preassignment.

THE COURT:  Mr. Mestel, is that your motion as well?

MR. MESTEL:  Yes, your Honor.  There's a significant amount of reading, and we think we'd benefit from having a specific judge assigned to the case.

THE COURT:  All right.  Well, and as you folks know -- well, as particularly the State knows well, we're a jurisdiction that doesn't master calendar.  So, you will be getting the attention of one judge while also being subject to the variability of that judge's schedule since -- by way of example, our weekly schedules for judicial duties are aspirational documents that change throughout the week, and we simply don't know at the start of the week what we'll actually be doing at the

**Ex. 17 at 022**

end.

But with that in mind, and -- and fully understanding what you're getting and what you're giving up, if that is your request, I think it's appropriate for preassignment.

Which I think brings us to the next matter, which is that in a former life I was a member of this prosecutor's office at the time at which this matter was handled.  I was in no way involved in the matter.  I didn't review any of the police reports.  I was not involved in any of the discussions regarding any of the initial charging or decisions at trial.

So, I can tell you that the only way that I know that I was in the office was by reading the date of the charge.  That said, if there's a concern on behalf of the defense, I believe it would be appropriate for me to recuse myself, and if just hearing that you would like the opportunity to speak with counsel and make a decision about whether you would like me to recuse, I'm respectful and would give you that time to do so.

MR. MESTEL:  Your Honor, since I've come into the case later than Ms. Zarowsky, I would like the opportunity to confer with her before we state our position.

THE COURT:  All right.  That's certainly

**Ex. 17 at 023**

appropriate.

All right.  Now, the other end of the spectrum, Mr. Bloor, one of the other signors on this document is Jacqueline McMurtrie.  In addition to her role with the Innocence Project, is as a professor at the University of Washington.  She was my professor, and she was specifically my professor for the trial advocacy practicum.

So, I worked under her supervision for about a year as a defense intern.  That was - oh boy, let me do the math here - 26 years ago, something like that, but it is fair to say that I operated under her direction.  She was my instructor, and if the State has any concerns with respect to that association as well, I will recuse myself.

MR. BLOOR:  At the risk of offending Mr. Miller, our boss, I -- I do not have an objection if you hear this matter -- if you're preassigned to hear this.

THE COURT:  All right, very well.

So, the State is not electing to ask me to -- to recuse on this matter, and the defense will have an opportunity to make that motion should they wish, and again there's simply no -- we've not made that decision as to who would be next on the list.

I see that Professor McMurtrie has joined the call,

**Ex. 17 at 024**

and good morning to you.

All right, what else do we need to discuss at this point with respect to scheduling?

MR. MESTEL:  Your Honor, we're looking to get a hearing date.  The pleadings all have been filed more than five weeks ago, and our client is anxious to get back to court to see whether we can convince the Court that he's entitled to a new trial.

THE COURT:  Very well.

All right, let's see, and again that's dependent upon who you get as the preassigned judge.  I'm trying to work through what's the most efficient way to get you folks an informed judge as early as possible.  How about this?  Our assistant court administrator, who I think is busy trying to reform some of our physical courtrooms so we can conduct two trials at the same time this next week, is not here.

I would propose to ask her who's next on the list.  If it's not me, to simply assign that individual.  If it is me, to have her reach out to defense to see whether they prefer to ask me to recuse.

And again, with respect to both parties, I take no offense at this.  It's a -- I believe I can be fair to both parties, but if there's an appearance concern, I'm respectful of it.  And then I will ask our court

**Ex. 17 at 025**

administrator to allow for chambers time and to set a hearing in consultation with the parties.  I'll ask her to do it as soon as possible, but I simply do not know what our schedule looks like.

Would you folks like to have this matter back on the docket so we don't lose track of it should you not get an answer to your question within the next couple of weeks?

MR. MESTEL:  Yes, your Honor.

MR. BLOOR:  Well, I would.

MR. MESTEL:  Once again, we're anxious to get a date.  So, anything that keeps this on the court's docket is appreciated.

THE COURT:  Mr. Bloor?

MR. BLOOR:  Yes, and just to let you know, we haven't actually -- the State hasn't agreed with the defendant to actually set a trial date at this point. We're still working out whether statements are going to be stipulated to, whether we might need a live witness which will, I think, depend upon, you know, how much time we need for the judge to be away from other responsibilities which, you know, may -- may involve looking at schedules for a prospective witness.

So, you know, I know you haven't set a trial date, but I just wanted to let -- let you know that we haven't actually agreed to do that.

**Ex. 17 at 026**

THE COURT: All right. Well, in any event, regardless of what the agreements or disagreements are between the parties, you would like the earliest available date with your preassigned judge --

MR. BLOOR: Yes. That's true.

THE COURT: -- to begin your discussions and settle your disagreements, which seems reasonable.

So we'll do that, and then so that we do not lose the case -- give me a moment here. Well, counsel, I'll give you two options. I'm respectful that December is one of the few times that counsel can schedule some time off. So, if either of have you some time off, I'll be respectful of that.

I can give you the end of December or I can give you the first week of January as a date just to make sure that this case is proceeding.

What is the preference of the defense?

MR. MESTEL: The end of December, your Honor. I'll be out of the country the first week of January, as well as the third week of January.

THE COURT: I see. Mr. Bloor? Mr. Clark?

MR. BLOOR: Any -- any date is fine with us.

THE COURT: Okay. What I will do, and so counsel, let's see, we'll try not to set it on Friday the 31st. Some time between the 27th and the 30th I'll ask

**Ex. 17 at 027**

for a setting just to make sure that we're on track to have a judge and that you have a date.

Counsel, does that work for you?

MR. MESTEL:  Yes, your Honor.

Are you anticipating having the hearing in front of whichever judge is potentially gonna be the preassigned judge?

THE COURT:  That would be my hope, although as I'm sure you know that is a time when some of the other judges also seek to escape our building.  I suppose it's fair to say if it ends up being me, I'm here, and at least one of your disqualified judges is one of the judges that's on leave.  So, that limits -- there's some chance you can have your assigned judge at that time.

MR. MESTEL:  Then whatever date the Court can give us that week is fine.

THE COURT:  Then I'll ask court administration to do those things and -- and -- and give you a day.

Counsel, about how long do you think you'll need to decide whether you wish to ask me to recuse?  Is it fair to ask you to make that decision by say Monday of next week?  Tuesday of next week?

MR. MESTEL:  Monday's fine, your Honor.

THE COURT:  All right.  All right, thank you.

All right, and again, as I tell my colleagues, we

**Ex. 17 at 028**

exercise challenges for cause and peremptory challenges against jurors.  We tell them not to have their feelings hurt.  We should not have our feelings hurt should the parties seek to exercise the same discretion in their decision maker role.

So, thank you all very much.

MR. MESTEL:  Excuse me, your Honor?

THE COURT:  Yes.

MR. MESTEL:  Is there -- can you give us a contact person in the court administrator's office so I can contact that person by Monday and let him or her know whether we're asking you to recuse yourself?

THE COURT:  We can, and actually, counsel, I see now that your client has joined the meeting, and I was unaware that he was going to be on the call.  I apologize.

Sir, can you both see and hear the Court?

THE DEFENDANT:  (Indicating.)

THE COURT:  All right.  You're not muted from our end, but we're not getting any audio, sir.

THE DEFENDANT:  Yes, sir, I can see you and hear you.

THE COURT:  All right.  Sir, may I ask, when is it that you were able to join the call?  What is it you have heard or not heard?

**Ex. 17 at 029**

THE DEFENDANT:  I literally -- literally just logged in.  I was hearing something about somebody talking about recusing.

THE COURT:  I see.  Okay, very well.

Counsel, I apologize.  You should always feel free to let me know if you believe your client's gonna join and you wish to wait to start the hearing.  I intend your client no disrespect.

MR. MESTEL:  And no disrespect taken, your Honor.

Actually, I wasn't sure whether the arrangements had been made, but I won't let that happen again.

THE COURT:  It's not a problem.

All right, sir, just to recap:  Judge Runge has indicated that she's gonna decline to come back from retirement, and so I've granted the motion for preassignment of a judge.

I've disclosed to both your counsel and to the State the fact that I was a member of the prosecutor's office when you were prosecuted.  However, I was in no way involved in the prosecution of your case.  I never read the materials.  I never was involved in any of the decisions either pretrial or trial.  In fact, the only reason I know this is looking at the date of the case.

I have offered to recuse myself under an appearance

**Ex. 17 at 030**

of fairness grounds.  I believe I can be fair, but if you, after consulting with your attorneys, wish me to recuse myself, I'll certainly do so.  I have as well disclosed to the State that one of your attorneys, Ms. McMurtrie, who is a professor of law, was may professor of law and my supervisor during my trial advocacy practicum, and for that reason I've asked -- I've invited the State, if they wish, to ask me to recuse.  They've declined.

So, your attorneys will speak with you.  Whatever decision you reach I'm respectful of.

Mr. Mestel was asking about a contact number, and that is a 509 - area code - 736-3071, and the extension for Ms. Saldua-Potvin is extension 3219.

MR. MESTEL:  Thank you, your Honor.

THE COURT:  Certainly.

So, with that, anything -- and then, Mr. Kloepper, in this hearing and any other future hearings, if you're appearing remotely, you have the right to have a private conversation with your attorneys at any time, if you wish, and if you wish to have that conversation you can simply raise your hand or otherwise let me know that you want to do that, and we will arrange for that conversation before the hearing proceeds further.

You understand, sir?

**Ex. 17 at 031**

THE DEFENDANT:  Yes, sir.

THE COURT:  Very well.

THE DEFENDANT:  Thank you.

THE COURT:  Anything further from the defense at this time?

MR. MESTEL:  No, your Honor.  Thank you.

THE COURT:  Anything further from the State?

MR. BLOOR:  No, thank you.

THE COURT:  Very well.  Thank you all.

We will end the Webex meeting.  We will be off the record.  A good rest of the day and a good weekend to you all.

THE DEFENDANT:  Thank you.

MR. MESTEL:  Thank you, Judge.

MR. BLOOR:  Thank you, your Honor.

THE COURT:  Certainly.

(Whereupon the proceedings concluded at 8:49 a.m.)

**Ex. 17 at 032**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF BENTON

DEPARTMENT C      HON. JOSEPH BURROWES, JUDGE

STATE OF WASHINGTON,      )
                          )
          Plaintiff,      )
                          )
     vs.                  )          NO. 10-1-01156-4
                          )
CODY KLOEPPER,            )
                          )
          Defendant.      )
                          )

Kennewick, Washington      Tuesday      March 22, 2022


VERBATIM TRANSCRIPT OF

AUDIO-RECORDED HEARING


APPEARANCES:


For the Plaintiff:      **TERRY BLOOR**
                        Deputy Prosecuting Attorney
                        **ANDREW CLARK**
                        Deputy Prosecuting Attorney
                        7122 W. Okanogan Place, Bldg. A
                        Kennewick, WA  99336

For the Defendant:      **MARK MESTEL**
                        Attorney at Law
                        221 Oakes Avenue
                        Everett, WA  98201-4407


Transcribed by:      RENEE L. MUNOZ, CCR, RPR, CRR, CRC


MARCH 22, 2022 PROCEEDINGS      33


**Ex. 17 at 033**

APPEARANCES CONTINUED:

For the Defendant:          **LARA ZAROWSKY**
                            Attorney at Law
                            PO Box 85869
                            Seattle, WA  98145-1869


                            **JACQUELINE MCMURTRIE**
                            Attorney at Law
                            PO Box 85869
                            Seattle, WA  98145-1869

MARCH 22, 2022 PROCEEDINGS                    34

**Ex. 17 at 034**

Tuesday, March 22, 2022, at 9:02 a.m.

Kennewick, Washington

(Whereupon the following transcript was created from an audio recording.)

THE BAILIFF:  Please, be seated.

THE COURT:  Thank you.

MR. BLOOR:  Good morning.

THE COURT:  Good morning.

MR. MESTEL:  Good morning.

THE COURT:  Good morning.

Let me unmute Webex here.

Okay, I'm ready to proceed if the parties are.  Good morning, everybody.

MR. MESTEL:  Good morning, your Honor.

THE COURT:  Nice to see you in person and your faces.  That's always a good thing.

Okay.  Counsel, I will just indicate I haven't seen anything uploaded to eMotion, anything filed with respect to the witnesses.  I will indicate I did sign your stipulated order for the exhibits - and I appreciate that on thumb drive.  It's very helpful for me.  On PDF volumes is way too much - and it's been filed with the clerk.

COLLOQUY                                        35

**Ex. 17 at 035**

MR. MESTEL:  Thank you.

THE COURT:  So, it is defense motion.  So, I'm prepared to go forward when you're ready.

MR. MESTEL:  Well, your Honor, perhaps we can discuss some housekeeping first.

THE COURT:  Sounds wonderful.

MR. MESTEL:  My name is Mark Mestel.  I represent Mr. Kloepper along with Ms. McMurtrie and Ms. Zarowsky.

Your Honor, the idea to try to make this easier for the parties and for the Court was to stipulate to the admissibility of certain reports to allow the Court then to review the trial transcript, as well as a number of laboratory reports establishing the DNA, and experts' opinions concerning those reports.

THE COURT:  Right.

MR. MESTEL:  Referred cross-examination of the people who had prepared those reports either for authenticity, foundation, or for substance really wasn't necessary.  We wanted you to be able to look at the material at your convenience and at your leisure so that you could have the best possible foundation to make the decision.

So, with all of the exhibits being admitted, that is the defense case.  I understand the State has one

COLLOQUY                                    36

**Ex. 17 at 036**

witness, and we have potentially one --

THE COURT:  Oh.

MR. MESTEL:  -- impeachment witness.

THE COURT:  Okay.

MR. MESTEL:  So, with the Court's permission, I really do not see the need for an opening statement.  My preference would be to allow for the State to call its witness and then to move into argument.

THE COURT:  Let me hear from Mr. Bloor if he's acceptable to that.

MR. BLOOR:  No.  That sounds absolutely appropriate.  He wasn't -- the witness, and that's Salvador Contreras - thank you, Mr. Clark - wasn't here when we walked in, which was probably five to 9:00, but Mr. Clark's gonna check.

I do -- I don't think the thumb drive has actually been offered to the clerk and admitted.  So ...

MR. MESTEL:  That's my understanding.  We tried to submit it before the hearing.  We were told to wait until the hearing.  The clerk's office doesn't take thumb drives.

THE COURT:  Okay.

MR. BLOOR:  Do you want to see it?

MR. MESTEL:  Looks just like a thumb drive.

MR. BLOOR:  Okay.

COLLOQUY                                37

**Ex. 17 at 037**

We'll move for the admission of the thumb drive --

THE CLERK:  Okay.

MR. BLOOR:  -- which has the exhibits.

MR. CLARK:  He's gonna be a couple minutes late.

MR. BLOOR:  Okay.

THE COURT:  How would you like the Court to -- strike that.

How would you like to mark the thumb drive, and how would you like to identify it?

MR. BLOOR:  Just as -- we have an envelope. Mark the envelope with, I think, Exhibit A for this hearing.

THE CLERK:  Is it stipulated?

MR. BLOOR:  It is.

THE COURT:  The parties agree that it will be marked Exhibit A and admitted as Exhibit A?

MR. MESTEL:  That's fine, your Honor. The thumb drive should contain an index to the exhibits.  The only other option would be to print out the exhibit index so that there's some cover sheet, but I don't think it's necessary.

THE COURT:  What is your position, Mr. Bloor, on the index or ...

MR. BLOOR:  I -- I agree.  Just the thumb drive is fine.

COLLOQUY                                             38

**Ex. 17 at 038**

THE COURT: Okay.

MR. BLOOR: There's a record of what we're agreeing to --

THE COURT: Okay.

MR. BLOOR: -- and you signed that.

THE COURT: I did.

MR. BLOOR: Uh-huh.

THE COURT: So, I'll admit, based on the stipulated order, Exhibit A into evidence without objection, and Lori, are you okay to just mark it as Exhibit A?

THE CLERK: Yes, your Honor. I have so marked it.

THE COURT: Perfect. Thank you.

Mr. Bloor, did you need a few minutes for your witness?

MR. BLOOR: I think we do.

MR. CLARK: Yeah. I just spoke with our witness coordinator, and he was a few minutes out.

THE COURT: Okay. Yeah, I'll take a brief recess.

Is five or ten minutes okay?

MR. MESTEL: Your Honor, before you leave the bench, is the -- I have to say, I haven't tried anything with this type of technology, but can our client hear at

**Ex. 17 at 039**

this point?  Is he --

THE COURT:  Let's see.  Let's unmute him.

Good morning, sir.

Can you hear and see me okay?

THE DEFENDANT:  Yes, your Honor, I can.  Thank you.

THE COURT:  And could you just tell us your name for the record, please?

THE DEFENDANT:  My name is Cody Joseph Kloepper.

THE COURT:  Okay.

MR. MESTEL:  All right, thank you.

THE COURT:  Sounds good.

MR. MESTEL:  I appreciate that.

THE COURT:  All right.  Thank you for that, sir.

We'll be in recess, and we'll come back once we have a witness.

(Whereupon a brief recess was taken.)

THE BAILIFF:  All rise.  Please, be seated.

THE COURT:  Thanks.  Okay.

And we're back in session.

Mr. Bloor?

MR. BLOOR:  Could we call Salvador Contreras, please?

THE COURT:  Yes.

Good morning, sir.

**Ex. 17 at 040**

THE WITNESS:  Good morning, your Honor.

THE COURT:  Raise your right hand.

Do you swear or affirm the testimony you're about to give is the whole truth and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please, have a seat.

And, sir, before we get started, I have to make a brief record.  I want the parties to know that previously in district court I believe we used this gentleman as an interpreter.  After reading the evidence that was presented to me, it came it my attention that he did work in district court where I was working in district court.

I have reviewed the judicial cannons with respect to that.  I don't believe I have any conflict whatsoever, other than he worked as a part-time interpreter for district court.  I make this only to make a really solid record with respect to my knowledge of the case and this individual witness.  I don't know him personally.  Never interacted with him outside of court.  Have no knowledge of anything about him other than he was an interpreter.

And so, based on my review of the -- the cannons, I have no issues regarding recusal or any issues of conflict with this witness.  I do this in the abundance of caution just so all the parties know the transparency of this Court with respect to any witness that I may have

COLLOQUY                                                    41

interacted during my term in district court or any interaction within this community.  It's a very small community.

So, I'll hear from Mr. -- hear from the State first before I let you quire (sic) -- you inquire of this witness.

Mr. Bloor?

MR. BLOOR:  We have no concerns, your Honor.

THE COURT:  Okay, and then, Mr. Mestel?

MR. MESTEL:  I have no concern, your Honor.

THE COURT:  Okay, thank you.  You may proceed. Thank you.

SALVADOR COSIO CONTRERAS, having been called as a witness on behalf of the Plaintiff, after being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BLOOR:

Q.  Okay.  Would you state your name, please?

A.  Yes.  Salvador Cosio Contreras.

Q.  And would you mind spelling your last -- your middle name or last -- second to the last name and last name?

A.  Cosio, C-o-s-i-o.  Contreras, C-o-n-t-r-e-r-a-s.

Q.  Okay, and you've testified in this matter

before, correct, in 2010?

A.  Yes.

Q.  And could you just tell the Court a little bit about how you came to meet the defendant?

A.  To the best of my recollection, now that it's been over ten years, I'm gonna make this -- this statement that I hope is the same as your last one, the original one, because it's been so long and I may not remember every detail.

But what I remember is that we met through a web site -- chat web site.  We chatted for awhile.  He was supposed to come over to my place to meet in Finley, and -- but he was taking too long to arrive.  Maybe three, four hours to get there.  And once he got there, it was very late.  I want to say it's late 'cause I was sleeping.

I went to the door and --

MR. MESTEL:  Objection, your Honor.  He's -- he's answered the question.

THE COURT:  What's your basis for the objection?

MR. MESTEL:  Not responsive.  He asked him how he met, and now we've gotten how he met and we're going way beyond that.

THE COURT:  Nonresponsive?

MR. MESTEL:  Yes, your Honor.

SALVADOR CONTRERAS - DIRECT - MR. BLOOR          43

**Ex. 17 at 043**

THE COURT:  Mr. Bloor, your response?

MR. BLOOR:  Oh.  Ask -- let me ask another question --

THE COURT:  Okay.

MR. BLOOR:  -- if I could?

THE COURT:  Go ahead, please.

I'll -- I'll sustain the -- the objection as nonresponsive to the question, but you may proceed, Mr. Bloor.

MR. BLOOR:  All right.

BY MR. BLOOR:

Q.  So, you had an ad in -- do you remember if it was Craigslist?

A.  I don't remember the site, but it was either him or I -- one of the two.

Q.  Okay, and this was around the 4th of December 2009, correct?

A.  Around there, yeah.

Q.  And were you living full time in Finley, at that point?

A.  Not full time.  It was my primary residence. I -- I spent time in Florida going back and forth.

Q.  Okay, and this -- you know, basically, it was a -- an ad men-for-men type of -- type of thing?

A.  I would say so, yeah.  Yes.

SALVADOR CONTRERAS - DIRECT - MR. BLOOR                 44

**Ex. 17 at 044**

Q. All right, and you had some communication online?

A. Yes.

Q. And the -- did the defendant or the person you were communicating with eventually to come over -- agree to come over to your place?

A. Yes.

Q. And -- and you don't need to give us an address, but whereabouts in that -- in Finley is -- was your address?

A. The main street, I believe it's Finley Road, and about a block -- the blocks are quite big, and right behind the -- the main street and where they had -- later on they started to sell -- a marijuana store, and right behind there, the street close to that one.

Q. Okay. Is it -- for somebody who's not familiar with that area, is it easy to find?

A. It would be -- well, the location is easy to find.

Q. Okay, and is there --

A. Well, for me it was. So --

Q. In -- in Finley, in general, do you find that those addresses are, you know, well established or easy to get to?

A. With the address that it has, I would say so.

SALVADOR CONTRERAS - DIRECT - MR. BLOOR          45

**Ex. 17 at 045**

It had a name street.  It was not like a -- a -- a name that you can't recognize.

Q.  Okay.  Do you know roughly when the gentleman got to your residence?

A.  I really don't.  I would say around midnight or past midnight.

Q.  Okay.  Would it interest you to -- to know that we have some activities on your cell phone --

A.  Yes.

Q.  -- that were after midnight?  You -- you know, you were -- you were communicating with the gentleman after midnight.

A.  Okay.

Q.  Okay.

A.  Midnight.  Yeah, midnight.

Q.  Did you -- after your communication, did you do anything?

A.  I -- I was in my home alone.  I remember laying down and possibly going to sleep before he got there.

Q.  Okay.  So, you think you might have been sleeping before he got there, right?

A.  I would say so, yes.

Q.  And do you remember or what would you normally wear when you were sleeping?

A.  Normally, just a pair of shorts and -- and

SALVADOR CONTRERAS - DIRECT - MR. BLOOR          46

**Ex. 17 at 046**

nothing on top.  Just a pair of shorts.

Q.  Okay.  So, do you remember a -- a knock on your door?

A.  I remember knocking.  That's what woke me up.

Q.  Okay.  So, you were asleep?

A.  Yeah.

Q.  All right, and did you answer the door?

A.  I went to the door, and I opened the door, yes.

Q.  And could you just take it from there?  Who -- what happened once you opened the door?

A.  To the best of my recollection, once I opened, he came in.  And I noticed that he was extremely drunk because of his odor of alcohol, and he -- he was wobbling as he was entering the house.  I invited him to sit by the kitchen table to drink some coffee so he could sober up, and at that point, of course, I know that he was not probably a person that I wanted to meet based on just the fact that he was -- hygiene was not his best.  He was not his -- at his best, and the fact that he looked as -- he was drunk.  Then I felt that it would be not appropriate.

Q.  So, you weren't -- were you attracted or not attracted to him?

A.  At that point, oh, no.

Q.  And what was your -- you said you offered him coffee.

Why did you do that?

A.  I was hoping that he would sober up somewhat and then take off from there.

Q.  And why were you interested in him sobering up?

A.  He could leave and not create any accidents on the road.

Q.  Okay.  So, did the gentleman, well, make any advances to you?

A.  He came close to me a few times, and I kept on stepping away.

Q.  Did he -- was he always fully dressed?

A.  Yes.  I remember he was.

Q.  Did he take any clothing off?

A.  The only thing I -- I don't 'cause I could say -- the only thing I could possibly say that's in my head is he took off his jacket and put it on the couch, and we sat on the couch.

Q.  Okay.  So, do you remember anything about a shirt -- him taking off his shirt?

A.  I don't remember him taking off his shirt.

Q.  Okay.  Well, did he ever go to the bathroom?

A.  He did go to the bathroom.

Q.  And what happened -- how many times did he go to the bathroom, as you recall?

A.  Two.  When he arrive and then before he left.

SALVADOR CONTRERAS - DIRECT - MR. BLOOR          48

**Ex. 17 at 048**

Q.  Did anything out of the ordinary happen after he came out of the bathroom?

A.  He -- he was forcing me to -- to play, and I was against it, at that point.  But I don't recall more.

MR. MESTEL:  All right.  Can we have the witness repeat that?  I just -- I couldn't follow what he was saying.

THE COURT:  Okay.

MR. BLOOR:  And -- and I couldn't either --

THE WITNESS:  Yeah.

MR. BLOOR:  -- to be honest.

THE COURT:  Could you come a little closer to the microphone?

THE WITNESS:  Sure.

THE COURT:  Let me -- let me just make sure I've got everything up and running here.  Okay.

THE WITNESS:  After he came out of the bathroom, he was more pushy towards getting closer to me, and I'm not sure what was the next step or not -- what not or what followed next after that.  I've been tryin' to remember all these things through all these days, and I haven't been -- pinpoint exactly what -- what happened, at that point, but what I remember is I was not into him whatsoever.

BY MR. BLOOR:

Q. Was there any physical contact between the two of you?

A. There was when he got close to me coming out of the bathroom.

Q. And could you describe that, please?

A. As he was -- I was standing there when he came out of the bathroom, and he came close to me and grabbed me, as in holding me, but -- and that -- that's all I remember.

Q. Okay. Any contact to your chest?

A. If he was standing, I would say so because he was holding me with his arms around me. So, I'm sure my chest was against him.

Q. And were you wearing a -- you were just wearing a T-shirt, at that point?

A. I put on a T-shirt, yes.

Q. Okay. Was there any point on the couch that he did more than that? Did more than just hug you?

A. Not that I can recollect -- remember.

Q. Okay. Do you -- do you recall telling Detective Flohr that he got on top of you on the couch?

A. Yes, I remember that, but I think it's part of the contact of the chest when he was standing up. I would say that, yeah, we were -- he would -- he pushed me

down onto the couch. It was -- he was on top, yes.

Q. Okay, and was there -- could you describe any touching that occurred, at that point?

A. I don't. The only thing I could state is that I ejaculated because -- I'm pretty -- I cum. I pre ejaculate pretty much. It doesn't take me long to ejaculate. So --

Q. Okay. I -- I'm -- I'm -- I'm sorry.

A. Yeah.

Q. And I know this is probably a sensitive area, but I just didn't -- I didn't hear that.

A. I said that I'm a person that premature ejaculates. So, it didn't take me much to -- at that point to ejaculate, and at that point, I know that he got pretty mad that happened. Started cursing me and -- 'cause I -- I had just ejaculated. He left.

Q. Okay. So, you said that you premature -- you have an issue with premature ejaculation?

A. Right.

Q. Would you mind, and I -- I -- I'm not doing this to embarrass you, but would you mind just telling the judge what it takes for you to ejaculate?

A. Rubbing the bodies. Foreplay. That's what I call it. That's -- that's what it takes for me to pretty much ejaculate.

SALVADOR CONTRERAS - DIRECT - MR. BLOOR          51

**Ex. 17 at 051**

Q.  Okay.  Do you need -- do you have to have an erection -- you, yourself?

A.  Now it's not, but back then?  Perhaps it was.  I mean, you need to have an erection.

Q.  Do -- do you -- do you remember ejaculating on this occasion?

A.  I don't remember, but based on the fact that I know myself, that's most likely what happened.

Q.  Okay.  So, how -- how long do you think the gentleman was at your residence?

A.  I would say about an hour.  From 45 minutes to an hour and a half.  Somewhere out there.

Q.  Now, one thing that you did testify to early -- back in 2010 was that he was at your house at most maybe between 15 to 20 minutes.

Is that -- how do you square those two things?

A.  Well, based on the fact that -- I mean, trying to remember everything and trying to put into timing, I would say that was longer than that -- the 15 -- the 15, 20 minutes.  At that point, to me, obviously was different.  I said it was probably different, and that's what I remembered back then.  But now, putting to -- everything into a -- on a time line, now the things that like the getting the coffee and sitting there and coming to the couch, talking a little bit, and you know, going

to the bathroom would have been taken a little bit longer than that time, 15 or 20 minutes.

Q. You said back in the trial that there was no sexual contact between the two of you.

Is -- is that --

A. I would say so still because there was no attraction there.

Q. Did he ever maybe just in passing touch your penis, as you recall now?

A. Oh, there was touching because he hugged me, and he was on top of me. So, I'm sure that there was the contact of the two bodies.

Q. Okay. Do you -- do you recall his hands ever going inside your shorts?

A. I don't recall that.

Q. So, how did this -- how did this end, this encounter with the gentleman, back on the 9th -- the 4th of December of '09?

A. He was not too happy because I was not into him or, you know, wanting to do anything except -- that also with the rubbing of the bodies the ejaculation, but other than that, I just know that he was pretty mad when he left.

Q. Okay. Did he say anything to you that you recall?

SALVADOR CONTRERAS - DIRECT - MR. BLOOR          53

**Ex. 17 at 053**

A. Not that I recall, no.

Q. Okay. So, your testimony to this judge is that you don't remember ejaculating, but you -- how did you phrase it?

A. Most likely it happened.

Q. Okay.

MR. BLOOR: All right, thank you. No other questions.

THE COURT: Thank you.

Cross-examination?

MR. MESTEL: Thank you, your Honor.

THE COURT: You bet.

CROSS-EXAMINATION

BY MR. MESTEL:

Q. Good morning, Mr. Contreras.

A. Good morning.

Q. Give me just one second to get myself organized. Would you like some water or anything?

A. No. I'm fine, thank you.

Q. Okay.

Well, Mr. Contreras, you probably never expected to find yourself back in court ten years later talking about this, did you?

A. No, I did not.

Q. And it must have come as somewhat of a shock to

SALVADOR CONTRERAS - CROSS - MR. MESTEL                54

**Ex. 17 at 054**

you when the police came up to you in August of 2020 and wanted to speak with you about this?

A.  Yes.

Q.  And it's difficult to accurately remember things that happened, it's about, almost 13 years ago now?

A.  Yes.

Q.  And you would agree that your recollection probably is the best when something happens and then kind of fades over time?

A.  I would say so, yes.

Q.  So, in preparation of coming to court today, were you able to review anything from the past trial or police reports or anything like that?

A.  I was not.

Q.  So, you haven't seen a transcript of your testimony from when you testified, I believe, in August of 2011?

A.  There was a transcript offered to me, but I did not read it.

Q.  Okay.  So, who offered you the transcript?

A.  It was at the office of the prosecutor and the detective.  Uh-huh.

Q.  Okay.  So, there was some type of meeting before this hearing -- I assume days before this hearing.

Tell me about that -- how did that happen?

A.  I was contacted by the detective first, and then the prosecutor called me.  My phone wasn't working properly.  So, I was not able to return calls and -- until the detective came by the second time and brought me some documents that I needed to be in contact with the prosecutor.  So set up a time and date, and -- and we met.

Q.  Okay.

A.  (Indiscernible.)  Uh-huh.

Q.  So, prior to the meeting at the prosecutor's office, a detective had come out to either your home or your business and gave you some documents.

Do you have some documents with you?

A.  Yeah.  The prosecutor -- no, he did not give me any documents.  He left a -- a CD or DVD, but I did not check that one either.

Q.  Okay.  So, some detective brought you some type of electronic media?

A.  Yes.

Q.  And what did he tell you was on that media?

A.  It was the transcript of our meeting prior to that date when he brought in the CD.

Q.  Okay.  So, based on the information which the prosecutor provided to me, it appears that the first time the police contacted you in August of 2020 was on August

17th, when you had another individual with you who was in your care.

A. Yes.

Q. Do you recall that?

A. That's right. Yes.

Q. Okay, and on that occasion, I believe the individual's name was Dave; is that right?

A. No.

Q. Who was the individual who was with you?

A. Christopher Pairuz.

Q. Christopher. Okay. You were able to take Christopher and leave him somewhere.

Then you went to the police station?

A. Yes, I did.

Q. Okay, and at the police station that time they offered to tape record the conversation with you, and you indicated you did not want it tape recorded; is that right?

A. I did not. I mentioned that, yes.

Q. All right. So, you and the officers just chatted; is that right?

A. Yes.

Well, at his office back in 2020?

Q. Back in 2020, after you dropped off Chris and went to the police department and said you didn't want to

be tape recorded, you sat and spoke with the police for awhile; is that right?

A.  The first time, and then we set up a meeting for another day.

Q.  Right.

You came back two days later on August 19th; is that right?

A.  Yes.

Q.  And on that occasion it was videotaped and audiotaped; is that right?

A.  Yes, uh-huh.

Q.  Okay, and so, is it your understanding that that was what should have been on the DVD -- a copy of that interview?

A.  Yes.

Q.  Okay.  So, the detective drops off the -- the DVD or whatever type of media it is --

A.  Yes.

Q.  -- and then sets up an appointment for you to come to speak with the prosecutor?

A.  Not at that point.  Not in August.  That was -- it wasn't until just recently.

Q.  Right.

A.  I would say about a month ago.

Q.  So, about a month ago the detective shows up,

SALVADOR CONTRERAS - CROSS - MR. MESTEL          58

**Ex. 17 at 058**

says, "Here's this DVD that has your -- the testimony on it from our interview?"  No?

A.  No.

Q.  Tell me what?

A.  He didn't bring anything this time because he had already given me a DVD.

Q.  When was that?

A.  2020.  When we first got -- had our meeting with him at his office.

Q.  Okay.  So, you -- you have had the DVD for the year and a half or so?

A.  Yes.

Q.  Okay.  All right, but then nothing -- oh, so nothing else happened in August of 2020, right?

So, when was when was the next time you were contacted by the police?

A.  Just recently about a month ago or so.

Q.  Okay, and who contacted you?

A.  The same officer -- the detective.

Q.  This detective here?

A.  Yes.

Q.  Okay, and what was the purpose of this contact?

A.  To meet with the prosecutor.

Q.  Okay.  So, was the prosecutor with him or did he suggest that you come down to the office?

SALVADOR CONTRERAS - CROSS - MR. MESTEL                59

**Ex. 17 at 059**

A.   Because he was trying to get ahold of me.

Q.   And did he physically drive you back to the prosecutor's office?

A.   No, he did not.

Q.   Did you follow him to the prosecutor's office?

A.   No, I did not.

Q.   Well, tell me how you got to the prosecutor's office?

A.   He -- he brought me the paperwork, and then we set up a time and date.  When that happened, then I came by myself to -- to the office.

Q.   And was the paperwork a subpoena?

A.   I believe it was, yes.

Q.   Okay.  All right.

So, then you meet with the prosecutor, right?

A.   Yes.

Q.   And do you go over with the prosecutor what's going to happen at this hearing?

A.   Mention that it was about this individual, but I did not know the whole thing why -- why I was called in to testify again when I had already testified in the past.  And he said it was a trial again, and went over briefly about the charges that he was -- well, not the charges but wanting to know my story about -- again of what happened back then.

Q. Okay, and so did you give -- did you go over your story again?

A. Not completely because I -- many things I didn't remember at that point. The truth of the matter is, that in December I had the corona virus and it -- it made me somewhat disabled all over the place. My body was not reacting right, and so, I've been dealing with that problem since December. And even today, you know, this has created a lot of stress. I may have anxiety or panic attack, which I've been getting 'em recently.

Q. Okay. All right. Well, if you feel yourself getting very anxious and you need a break, we'll ask the judge to give you a few minutes --

A. Okay.

Q. -- to regain your composure, okay?

A. All right.

Q. Okay. Do you recall when you went to the Prosecutor's office whether that interview was tape recorded?

A. No, I do not recall that.

Q. Okay. So, you don't know whether it was tape recorded or not?

A. No.

Q. Do you know whether people were taking notes?

A. I don't think so. I didn't see anybody writing.

Q. Okay.  So, how long do you think you were there?

A. Fifteen minutes at most.

Q. Okay.  Now, as the judge remarked before you started testifying, apparently you had been employed as a interpreter --

A. Correct.

Q. -- for district court; is that correct?

A. Correct.

Q. Okay.  So, you would come into court and take an oath that you would accurately translate what was being said from English into Spanish and from Spanish into English --

A. Yes.

Q. -- is that correct?

A. Yes.

Q. Okay, and on how many occasions did you do that?

A. I don't --

Q. Like was it just a couple or is it a hundred or --

A. Per -- per day you mean?

Q. No.

Over the course of your time doing interpretation?

A. I would say maybe a hundred.

Q. Okay.  So, on each of those 100 occasions, the Court would swear you in unless you were permanently

**Ex. 17 at 062**

sworn in by the Office of the Court Administrator; is that right?

A. Yes.

Q. So, were you permanently sworn in or did you take the oath on each occasion?

A. I believe I was sworn in at the beginning --

Q. Uh-huh.

A. -- and some occasions I would be asked again by the judge.

Q. Okay, and so you recognized how important it was to do your best to accurately tell the Court what somebody was saying in Spanish and to tell the defendant or the witness what had been said in English?

A. Correct.

Q. And you wouldn't just make stuff up to help either side; is that right?

A. I wouldn't.

Q. Okay. It was important stuff?

A. Yes.

Q. Okay, and you recognize this is important stuff also?

A. Yes.

Q. Okay. So, if you had the opportunity for the past -- well, since August. So, that's four -- Well, let's say 16 months to review what you said to the police

SALVADOR CONTRERAS - CROSS - MR. MESTEL          63

**Ex. 17 at 063**

on August 19th, why haven't you done that?

A.  The main reason is because I wanted to just put that one to the past since I had already come and testified once, and I did not want to remember any or go back in -- in my memory and remember the incident of that one.

Q.  So, you didn't want to -- you don't want to -- you don't want today to be from -- well, I'm having trouble making that question.  Give me a second.

You don't want your statement from August 19th, 2020 refreshed in your mind now so that you remember exactly what you said on August 19th?

A.  I didn't find that necessary for me, at that point.

Q.  Okay.  What about your testimony from 2011?  All right.  That's when you testified in court at Mr. Kloepper's trial.

You recall that, don't you?

A.  I do.

Q.  All right.

A.  I do.  When I came and testified, yes.

Q.  Okay, and you know that whenever you're speaking in court that there's a record made of what you said --

A.  Yes.

Q.  -- is that right?

All right.  So, just like this interview on August 19th, 2020, when you testified in 2011, there would be a transcript of what you said --

A.  Yes.

Q.  -- right?

And did you ever have the opportunity to review that transcript?

A.  I did not.

Q.  Okay.  So, in light of the health problems that you've had, and in light of the passage of time, would you say that you really don't recall with any accuracy exactly what you said in 2011?

A.  I do not recall that.

MR. MESTEL:  Your Honor, with the Court's permission, because I think I'm going to need to refresh Mr. Contreras's recollection, I'd like to have what I will represent to the Court is an accurate excerpt from the trial testimony that now has been admitted into evidence, and I'd ask the clerk to mark this either with a number or a letter -- are you using letters or numbers?

THE CLERK:  We'll -- we'll use letters.  We'll do --

MR. MESTEL:  Okay, sorry.

THE CLERK:  -- Defense Identification B.

MR. MESTEL:  And I'm go -- I've provided a copy

to the prosecutor, and I'm going to provide a copy to Mr. Contreras.

THE WITNESS:  Thank you.

THE COURT:  One second, counsel.

Madam Clerk, you indicated you identified it as Exhibit B?  Did I hear you correctly?

THE CLERK:  Identification B.

THE COURT:  Identification.  Thank you.

My apologies for interrupting you, counsel.  Go ahead.

MR. MESTEL:  No.  That's fine, your Honor.

BY MR. MESTEL:

Q.  Mr. Contreras, I am going to ask you some questions and if the need be to refer to your trial testimony, I'm more than happy to allow you time to do that.  I need my glasses.  Oh, thank you.  Give me one second, please, sir.

So, Mr. Contreras, when you were called to testify in 2011, you understood that Mr. Kloepper was on trial for a very serious crime, did you not?

A.  Yes.

Q.  Okay, and you understood, not only because the judge swore you in but because you'd been sworn in on countless other occasions, how important it was for you to tell the truth?

A. Yes.

Q. Okay. Back in August of 2011 when you testified, nobody had told you that your sperm had been found on the victim's clothing of the rape, had they?

A. No.

Q. Okay. So, as far as you knew, you were just coming in to testify about some chance meeting you had had with Mr. Kloepper; is that right?

A. (No audible response was heard.)

Q. Okay. In your testimony, would it be fair to say that you lied?

A. I don't think so.

Q. So, let's look at some of the things you said.

Did you tell the jury that you had had sexual contact with Mr. Kloepper at your place in Finley?

A. I don't remember having sexual contact. We met for the purpose of that, yes, but not -- I don't remember, at this point, obviously. Based on the time frame and my current situation, I don't remember that part. You -- you provided this transcript. I'm trying to read as fast as I can, but --

Q. Okay. That's fair. All right.

Why don't you turn -- there are -- there are two numbers on the top of the document. There's a small number in the upper left, and there's a larger number --

SALVADOR CONTRERAS - CROSS - MR. MESTEL            67

**Ex. 17 at 067**

MR. MESTEL:  May I approach, your Honor?

THE COURT:  Yes, please.

BY MR. MESTEL:

Q.  There's a larger number in the upper right.

A.  Yes.

Q.  Okay.  I'm gonna use these numbers in the upper right.

A.  All right.

Q.  Okay.  So, why don't you turn to page 310.

A.  All right.

THE COURT:  Counsel, if I can interrupt you just for a second?  I want to try to track with you.

MR. MESTEL:  Sure.

THE COURT:  I -- I pulled up the PDF files that I have, my thumb drive, and I'm just trying to ascertain where you're at.

If you could tell me on the index list, if you would, please --

MR. MESTEL:  On the index list there should be trial testimony.

THE COURT:  Okay, and I -- I'm looking diligently -- attempting to.

Are you referring to the report that's been identified as Number 15?

MR. MESTEL:  Yes.

**Ex. 17 at 068**

THE COURT: Okay. So -- and that -- let me just pull that up for a second.

Okay, and what page are you on again?

MR. MESTEL: So, I'm gonna hand this to you, Judge, 'cause there are two numbers, and frankly --

THE COURT: Okay.

MR. MESTEL: -- I don't know which one the electronic one has on it.

THE COURT: I'm gonna look at your -- I think you showed me on the upper right-hand side, I believe, is it 219 or is it 319?

MR. MESTEL: On the upper right-hand side is 291 --

THE COURT: 291.

MR. MESTEL: -- but I -- why don't we have you use the exhibit I gave to the clerk as the bench copy?

THE COURT: One second. 293. I have it. I'm there.

MR. MESTEL: Okay.

THE COURT: I've had to learn how to be technical savvy in the last two years, which I was not previously. But, for the record, I'm looking at the transcript on page, upper right-hand side, 291.

Mr. Bloor, I -- I see that it's marked Salvador Contreras. I think it starts at line 14 by Mr. Bloor.

MR. MESTEL:  That's correct, your Honor.  That's where I am.

THE COURT:  But I'm gonna -- let me make sure I'm -- I'm looking at the right transcript for Mr. Bloor.

MR. BLOOR:  I -- I'm not sure what you're looking at --

THE COURT:  Transcript of the trial.

MR. BLOOR:  -- as far as the 700?  I'm -- I -- it's -- 310 is the transcript number.

MR. MESTEL:  No, he's starting at the start.  So, this is the start --

MR. BLOOR:  Oh, okay.

MR. MESTEL:  -- of the exhibit.

MR. BLOOR:  You're right.  You're right.

THE COURT:  It's okay.

MR. BLOOR:  Yeah.  We're -- we're in line.  310 is --

MR. MESTEL:  What I'm asking him to look at now.

MR. BLOOR:  Yeah.

MR. MESTEL:  I'm asking the witness to read over 310 so I can ask him questions.

THE COURT:  310.  Thank you, Mr. Bloor.  You're correct.  I'll get there.  310.

BY MR. MESTEL:

Q.  Okay.  So, Mr. Contreras, have you had the

SALVADOR CONTRERAS - CROSS - MR. MESTEL                70

**Ex. 17 at 070**

opportunity -- I'm gonna ask you a question about lines 18 through 25 on that page.

A.  Yes.

Q.  Okay.  The prosecutor, during that trial, asked the question,

"If there was some sexual contact, would you tell us?"

And was your answer,

"Um, if I would recall, I would definitely say so, yes, since I'm already here."

But you didn't say there was any sexual contact during that trial, did you?

A.  Not the way it's -- it's worded, yeah.  No.

Q.  You didn't say anything during the trial about ejaculating?

A.  I did not.

Q.  All right.  You said that person who showed up had only been there for about 15 to 20 minutes; is that correct?

A.  Uh-huh.

Q.  Okay, and you basically said you weren't interested in this person who showed up because he was stinky, he smelled from alcohol and cigarettes, and was dirty, right?

A. Yes.

Q. Okay. Are you saying that was the truth -- that you didn't have any sexual contact with him?

A. No, there was contact when we -- when he crossed -- when he crossed into me and then hugged me. That's the contact, but to make into sexual more than that? I don't think so. I -- to the best of my recollection, I don't -- I don't remember that.

Q. Okay, and that was the end of it for you? You testified, you were finished testifying, and you went on with your life?

A. At that point, yes. I went back to Florida, yes.

Q. All right. For another nine years until this came up?

A. Yes.

Q. Now, I was somewhat confused, Mr. Contreras, because when you started testifying I thought you had said that somebody had put an ad in -- looking for companionship --

A. Right.

Q. -- and I think you said it was either you or the other person?

A. Yes.

Q. Okay, but it -- it was you, wasn't it?

SALVADOR CONTRERAS - CROSS - MR. MESTEL                72

**Ex. 17 at 072**

A.  Honestly, I don't remember that, if it was me, 'cause that's the chatting forum where people post.  You can post or they can post, and you reply or either you post something for them to reply.

MR. MESTEL:  Can I have this marked?

BY MR. MESTEL:

Q.  Mr. Contreras, I'm gonna have the clerk mark a piece of paper for me, which I'm expecting will be Exhibit C.

THE CLERK:  Defense Identification C is marked.

THE COURT:  Thank you.

BY MR. MESTEL:

Q.  I'm going to, with the Court's permission, approach you and show you what's been marked as Exhibit C.

So, when we talk, Mr. Contreras, they put the letters on the back.

A.  Uh-huh.

Q.  So, if I ask you about something and you don't know what I'm talking about, if you look on the back it'll help.

A.  Okay.

Q.  So, why don't you take a look at that for a minute.  I'm only interested in the top half.

SALVADOR CONTRERAS - CROSS - MR. MESTEL          73

Okay, did you use a certain email address back in 2009?

A.  (No response.)

Q.  Bi prof?

A.  Bi prof I remember, but the zip code is it -- it's Kennewick.  So, I'm not sure if I used that Gmail 'cause I have my own, and I don't remember this email a hundred percent.  But I -- by the letters "bi prof" that's the one I used, that name, in the past.

Q.  Right.  That was to stand for bisexual professional?

A.  Yes.

Q.  Okay, and this is the ad that you placed on Craigslist, isn't it?

A.  Yeah, that sounds like my writing.  Yeah.

Q.  Okay.  At that time, you were looking to explore your sexual identity give or -- is that basically it?  To see whether you had a sexual interest in men?

A.  I would say so, yes.

Q.  Okay, and you're fairly confident looking at the top half of that document, which is Exhibit C for identification, that that is the ad you placed in Craigslist looking to find another person who might also be interested in some type of sexual relation; is that right?

SALVADOR CONTRERAS - CROSS - MR. MESTEL          74

**Ex. 17 at 074**

A. Yes.

Q. All right. Why don't you read to the Court what the ad says that you placed? You can leave off the email address. It's just the body of it.

A.     "Bi and straight life. Height/weight proportionate. Not over 45. Willing to have an NSA good. Say fuck tonight. Get back at me. I'm horny and can host tonight."

Q. I'd like you to just try to say -- I -- I know this is embarrassing, but this is what it is.

I need you to say that just a little slower so -- everybody couldn't understand what you're saying.

A.     "Bi and straight life. HW proportionate. Not over 45. Willing to have an NSA good. Say fuck tonight. Get back at me now. I'm horny and can host tonight."

Q. All right, and did you get responses to this ad?

A. That gentleman probably is the one that responded.

Q. Okay. Was that the only response?

A. I don't remember 'cause I was chatting with him for awhile, I would say.

Q. Well, all right.

SALVADOR CONTRERAS - CROSS - MR. MESTEL          75

**Ex. 17 at 075**

Leaving that aside, was this going to be your first homosexual sexual encounter?

A.  It would not be, no.

Q.  Okay.  Was it gonna be your 25th encounter?

A.  I wouldn't say so, but I don't know.

Q.  Would it be something that would stand out in your memory, the fact that you were going to have sexual relations with a man?

A.  That's what I was looking for.

Q.  I understand that, but would that have been a memorable event for you?

A.  I don't know.

Q.  Okay.

A.  That's speculating.  I don't know if that would have been or not.

Q.  Okay.  Well, but you're inviting people to contact -- I'm gonna take that document from you.

You're inviting people to come to your house, strangers to come to your house to fuck; is that right?

A.  That's what it says, yes.

Q.  Well, I'm not asking you if that's what it says because I know what it says because you just read it.

I'm asking is that what you wanted?

A.  Yes.  At that point, yes.

Q.  Okay.  So, somebody responds.

SALVADOR CONTRERAS - CROSS - MR. MESTEL          76

**Ex. 17 at 076**

You don't know who the person is because this is all digital stuff, right?

A. Right.

Q. Okay, and you chat with the person who -- what are you chatting about?

A. We are -- if there's any way of connecting. If it wasn't. It's just a chat.

Q. Okay. So, you're -- you're trying to get a feel for whether this is the type of person you might want to spend some time with?

A. Yes.

Q. Okay, and I take it that you conclude, "Okay, this is the type of person I'm interested in spending some time with" --

A. Yes.

Q. -- right?

And so, then you and the person on the other device text directions back and forth so that person can arrive at where you are?

A. Yes.

Q. Okay. When the police initially contacted you before the first trial, you never told them that you had this person come to your house, did you?

A. I don't remember that. I don't.

Q. Well, you testify -- well, you were asked this

in your trial -- in Mr. Kloepper's trial in 2011, and you admitted that you had -- you told the police, because the police were kind of suggesting, that you met this guy in a parking lot; isn't that right?

A.  I don't remember that either.

Q.  Okay, fair enough.  Okay.

So, when the person who you believe was -- you -- when the -- when the person who you believe you were chatting with arrives at --

Is it your house or your business in Finley?

A.  House.

Q.  -- at your house, he appears disheveled?  Dirty, correct?

A.  Yes.

Q.  Drunk?

A.  That too, yes.

Q.  And smelling from cigarette smoke?

A.  Yes.

Q.  Okay, and you're not much of a drinker?

A.  No.

Q.  You're not a smoker?

A.  No.

Q.  And you're a clean man?

A.  Yes.

Q.  Okay.  Why -- why let this man into your house?

A.  Because I was alone, and in the condition he was I was trying to prevent an altercation, prevent probably a scandal that he may -- I don't -- I don't even know much about him except for what we chatted, but once I met with him, of course, he was not someone I wanted to meet.

Q.  But, of course, he also didn't know if you were the person --

A.  Right.

Q.  -- with whom he chatted, right?

A.  That's right.

Q.  You could have just said, "I don't know who you are or what you're talking about.  Go away," right?

A.  That's speculating, but, yeah, that's a possibility.

Q.  Well, it's not speculating.

I mean, you had the capacity to just say, "I don't know who you are.  Go away," didn't you?

A.  Yeah, but I didn't do that.

Q.  You didn't do that, right, because you really were interested in having a sexual relationship, weren't you?

A.  I was.

Q.  Okay.  So, you invite this person in, right, but you're thinking, "I really don't want to get intimate with a drunk, cigarette smoking, dirty person do I,"

SALVADOR CONTRERAS - CROSS - MR. MESTEL                    79

**Ex. 17 at 079**

right?

A. Yes.

Q. All right, but because you want to be a decent person, you try to give him some coffee with the hope of sobering him up so he'll leave without any type of scene; is that it?

A. Yes.

Q. Okay, but you were asleep when the person knocked on the door, right?

A. (Indiscernible.) Yes, I was. It was late, and I didn't remember laying down, and the intention that if he didn't show up I was just -- probably would have continued to sleep.

Q. Okay. So, did you put a pot of coffee on, make a pot of coffee, or was there already coffee somewhere?

A. There was not until he arrived.

Q. So, then you were gonna start making coffee?

A. No. I started making it when he arrived.

Q. Right.

A. Uh-huh.

Q. All right. So, first you have to make the coffee, and I assume you sit and chat with him while you're making the coffee?

A. Yes.

Q. So, what are you chatting about?

A.  He was more chatty than I was.

Q.  Okay.

A.  I was listening, but the whole conversation was about his job and who he was.

Q.  What did he tell you about his job?

A.  He worked at some building.  He knew a lot of people, that he was married, but details I don't remember.

Q.  Okay.  Might -- might he have told you where he worked?

A.  No, he did not.

Q.  You mean he just said, "I work at some building."

A.  (No audible response.)

Q.  Okay, and you don't say like, "Where?  Why?  What do you do?"

A.  I might have asked him, but I remember now, of course, he was a janitor.

Q.  Oh.  He was a janitor, okay.

But at an office building or apartment building?

A.  Apartment building.

Q.  I'm sorry?

A.  Apartments building.

Q.  An apartment building.  Okay.

Was he wearing anything that would identify that he

SALVADOR CONTRERAS - CROSS - MR. MESTEL          81

**Ex. 17 at 081**

worked at some kind of apartment building?

A.  Not that I remember, no.

Q.  So, are you -- are you still just wearing your boxer shorts and a T-shirt now?

A.  I had a -- a robe on.

Q.  You had a robe on?

A.  Yeah.

Q.  Okay.  So, when you hear the knocking on the door -- do you just sleep in boxer shorts?

A.  Yes.

Q.  You put on a T-shirt and your robe --

A.  Yes.

Q.  -- to come to the door to see who it is?

A.  Yes.

Q.  Okay, and you're probably expecting it's the person you were chatting with because it's late at night?

A.  Yes.

Q.  Like, who else is comin' to your door at one o'clock in the morning?

A.  Yes.

Q.  Okay.  Do you tell him, you know, "It's late. Have a cup of coffee.  You know, maybe you'll feel a little better, and then why don't you go on your way? We'll do this some other time?"

A.  I don't -- I don't think I did that -- any of

SALVADOR CONTRERAS - CROSS - MR. MESTEL          82

**Ex. 17 at 082**

that.

Q. Okay. At some point, you said he went to the bathroom?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay, and after he comes out -- how long is he gone for? Is it just, you know, like long enough for somebody to go urinate or is he in there for 20 minutes or what?

A. I don't recall the time frame, but I do recall that it was more than normal -- more time than normal.

Q. Okay, and are you gettin' concerned? I mean, this is a stranger in your house who you don't know, who's drunk, who's now in your bathroom.

Are you concerned about what's goin' on?

A. Yes.

Q. Okay. Do you knock on the door to say, "Is everything okay?"

A. I don't think I knocked on the door, but from the couch I asked him if he was okay.

Q. Okay, and I -- I assume he said he was okay?

A. I assume so, yes.

Q. And so, after he came out, that's when he hugged you?

A. 

Q. you?

A. Yes.

Q. So, when he hugged you, you were wearing a robe, a T-shirt, and boxer shorts; is that right?

A. Yes. Uh-huh.

Q. Okay. Can you give me an idea of the layout -- when you open the door into your house, do you walk into like a living room?

A. You walk --

Q. When you walk through the front door?

A. You walk into the living room, and then on the left-hand side there is a kitchen, dining room table. And as soon as you leave the kitchen, of course, the dining room -- the living room, and it has a couch and that's where we sat on -- on the couch. Then as you move into the -- into the house, there's the first bathroom, and there's a closet, there's a bedroom, another bedroom, another bedroom, and then back into the living room.

Q. Okay. So, how far is the bathroom that he went to from the couch about?

A. I would say about 12 feet.

Q. Okay. So, when he comes out of the bathroom, what I'm understanding is that he hugs you.

Is that a fair description?

A. Yes.

Q. And are you saying that as he's hugging you he

SALVADOR CONTRERAS - CROSS - MR. MESTEL            84

**Ex. 17 at 084**

pushes you back and you both fall onto the couch?

A. Yes.

Q. Okay. So, you're still wearing your robe, your T-shirt, and your boxer shorts?

A. Yes, I am.

Q. Okay. Now, does he say anything to you when he comes out and hugs you?

A. I don't recall him saying anything. Just by his emotion, I figured that he wanted to have sex, at that point.

Q. All right. Well, you invited him over to have sex.

A. Yes.

Q. So --

A. Uh-huh.

Q. -- what did you do?

A. I -- that's when I said, "No," to 'im, and he got out -- off of me and said he was leaving. I didn't want him to leave just yet because he still didn't seem too sober, but he was better than when he had arrived. So, he left.

Q. Okay, and then what do you do?

A. Stay home. Go back to sleep.

Q. Okay. You said he was mad when he left?

A. He seemed to be mad 'cause he wanted to have

more than what happened there.

Q.  More than just a hug?

A.  Hug and then the rubbing on the -- on the couch when he got on top of me.

Q.  So, let's talk about that, 'cause you didn't -- you didn't just say that.

So tell me, who's on the bottom?  Who's on the top?

A.  I'm on the bottom.

Q.  Okay.  The man who's in the room with you is about the same size as you, isn't he?

A.  I would say he was a little bit heavier set.

Q.  Okay, but about your height?

A.  Probably a little bit taller than me.

Q.  Okay.  About an inch or so?

A.  Uh-huh.

Q.  All right, but basically same size give or take a few pounds and an inch?

A.  Yes.

Q.  So, he is lying on top of you, and how -- where is he touching you?

A.  Well, he's touching all over with his body.

Q.  Okay.  So, it's the body pressure that's touching you?

A.  Yes.

Q.  All right, and I take it, his arm's still around

you because you both fell on to the couch?

A. Yes.

Q. And for how long do you two remain in that position?

A. Not very long. I would say maybe two or three minutes.

Q. Okay, and then how does that end? I mean, what happens after two or three minutes that changes?

A. Sure I -- I ejaculated.

Q. You're sure you ejaculated?

A. I -- I'm pretty sure, because that's one of the reasons he got mad because I was not into him at all. After that even -- even before I did it and even after that happened.

Q. All right. So, you weren't into him, you didn't want to have sex with him, he was -- the only touching was his body pressure, and now you're sure you ejaculated?

A. I'm not sure a hundred percent, but I assume I -- I ejaculated because of my personal situation: the one I ejaculate -- ejaculate easy.

Q. Well, okay. So, you -- you have issues with how much stimulation it takes before you ejaculate?

A. Yes.

Q. All right. Have you ever ejaculated when some

SALVADOR CONTRERAS - CROSS - MR. MESTEL          87

**Ex. 17 at 087**

person who you don't want to have sex with, who smells, who is drunk, and you're not into -- is that the type of person you normally would just have pre ejaculation?

A. No.

Q. Okay.

A. No.

Q. All right.

A. But it's a body.  It's a man, so --

Q. So like, your penis has a life of its own.

Is that what you're saying?

A.  I would say that I had no control.

Q. You had no control, but as you sit here today, you're not prepared to tell us under oath that you actually ejaculated, are you?

A. No.

Q. All right.  If, in fact, you had ejaculated, whatever was emitted from your penis would have first gone into your boxer shorts; is that right?

A. Yes.

Q. And next would have gone into your robe?

A. Yes, unless the robe was open.

Q. Oh, but you don't have any recollection of whether the robe was open --

A. I don't.

Q. -- or not?

SALVADOR CONTRERAS - CROSS - MR. MESTEL          88

**Ex. 17 at 088**

A.  I don't.

Q.  In fact, you don't have any recollection of after the man leaving that your boxers had ejaculate on them, do you?

A.  No.

Q.  You don't have any recollection that your robe had ejaculate on it --

A.  No.

Q.  -- do you?

You have no recollection that you had to go clean yourself off because you had ejaculate on your thighs or around your penis?

A.  No, I don't.

Q.  Okay.

MR. MESTEL:  May I have a moment, your Honor?

THE COURT:  Please.

(Whereupon a brief pause was had on the record.)

MR. MESTEL:  Those are all the questions I have at this time, your Honor.

THE COURT:  Okay, thank you.

MR. BLOOR:  I -- I --

THE COURT:  Redirect?

MR. BLOOR:  I do have a couple.

REDIRECT EXAMINATION

BY MR. BLOOR:

Q. You mentioned having the corona virus.

A. December.

Q. When was that?

A. December of last year.

Q. September of?

A. December.

Q. December of '21?

A. December '21, yes.

Q. Okay. Well, I guess I'll ask you something personal, but you're used to that.

How -- what -- was that a serious bout of corona virus?

A. What was -- it was a what, I'm sorry?

Q. Well, did you go to the hospital, for example?

A. I did. I did.

Q. How long were you in the hospital?

A. Two weeks.

Q. Okay. So, it -- I would say that that was a serious bout of corona virus.

A. Yes.

Q. Would you agree?

A. Yes, it was.

Q. Was that -- has that affected your memory?

**Ex. 17 at 090**

A.  In many instances, yes.  Especially events that happened a long time ago.

Q.  My colleague asked you if the gentleman said where he worked, and you don't recall that or do --

A.  No.

Q.  -- do you recall?

A.  Not -- not a specific name or place of employment.  No, I don't.

Q.  If he had said, "Well, I work at the Villas apartment complex," would that mean anything to you?

A.  No, it wouldn't.

Q.  Do you -- do you know where that is?

A.  I now know where it is, but back then in -- at that time, I didn't.  I just learned where that was when I met with the detective in 2020, I believe.

Q.  Okay.  All right, and you live in -- you -- you -- back then, you lived in Finley?

A.  Yes.

Q.  And Florida?

A.  Yes.

Q.  Did you have a place of employment here in the Tri-Cities?

A.  I did.  I did work for my own as a tax preparer.

Q.  And -- and where was your office?

A.  In Pasco.

Q.  So, do you -- did you have occasion to be around the Columbia Center area?

A.  I did not have anything except that later on I found out that I have a friend of mine that used to live not far from those apartments.

Q.  Okay.

A.  I -- I was not aware back then.

MR. BLOOR:  Okay.  No redirect, your Honor.

MR. MESTEL:  I have a small recross, if the Court allows?

THE COURT:  Yes, please.

RECROSS-EXAMINATION

BY MR. MESTEL:

Q.  Mr. Contreras, I don't want to take advantage of your lack of memory based on your corona virus incident.

So, I want to talk to you about something that you told the police before you had corona virus, okay?

A.  Yes.

Q.  So, when you went to the police department after dropping off Chris on August 17th, the police had told you that your sperm had been found at the crime scene, had they not?

A.  They mentioned that the -- the second day, I believe.

Q.  Okay.  The police on the 17th, which is the

SALVADOR CONTRERAS - RECROSS - MR. MESTEL          92

**Ex. 17 at 092**

first of the two occasions when you're talking to them, asked you several times about any sexual contact that you might have had with the individual who responded to your Craigslist ad, and you repeatedly told them, did you not, that you did not remember or recall any sexual contact?

Isn't that what you told them?

A. I -- I believe so, yes.

Q. Well, would you not agree that having another person lie on you and having you ejaculate would fall within the definition of sexual contact?

A. I mean, sexual contact -- well, it -- it -- it is and it's not because I was expecting something different, of course, to be a sexual contact.

Q. Right. So, like performing fellatio, that would be sexual contact, right?

A. Yes.

Q. And you told the police that even though you didn't recall sexual contact, had there been fellatio it would have been you performing fellatio on the other individual rather than him performing it on you, right?

A. I don't remember that, sir.

Q. You don't remember telling that to the police?

A. No, I don't.

Q. Is that true though?

A. It's --

Q. I mean, if based on your expectation placing this ad, if a person had shown up and there was going to be oral sex, would it not have been you performing the oral sex on the other person?

A. Yes, that's what original intentions were.

MR. MESTEL: All right, thank you very much. I appreciate it.

THE WITNESS: You're welcome.

THE COURT: Any more re redirect?

MR. BLOOR: No, your Honor. Thank you.

THE COURT: Okay, and is this witness under subpoena?

MR. BLOOR: I believe he is on our subpoena. So ...

MR. MESTEL: I have no objection to him being excused, your Honor.

THE COURT: Okay. All right.

Thank you for your testimony. You may step down. Watch your step when you step down.

THE WITNESS: Okay.

MR. MESTEL: I'll take those from you, Mr. Contreras.

THE COURT: It's about 10:41.

Mr. Bloor, do you need -- actually, strike that. I think I'm gonna take a five-minute, maybe a ten-minute

COLLOQUY                                        94

**Ex. 17 at 094**

break for my clerk and my staff.  We'll reconvene with your next witness.

I'm assuming your next witness, Mr. Bloor, is -- or do you need me to just keep going?

MR. BLOOR:  No.  Let's take a break.

THE COURT:  Okay.

MR. BLOOR:  And --

MR. MESTEL:  Before you break?

THE COURT:  Yes.

MR. MESTEL:  Since exhibit --

THE COURT:  Why don't you go back to the mike just so we -- I'm really nervous about FTR.  I have every microphone -- just for the record, if it appeals, every microphone is on.  It is up to the max.  I have no stenographer.  I'm trying really hard to have a record.

Go ahead.

MR. MESTEL:  I take it you haven't had an opportunity to review the exhibits yet?  My understanding was the clerk's office wouldn't take them.  So, I don't know if you've seen them.  I know we gave you the trial transcript.

THE COURT:  Okay.  Great question.  I have.

MR. MESTEL:  You have had an opportunity?

THE COURT:  I have not gone through every piece of paper because it's very --

COLLOQUY                                                95

**Ex. 17 at 095**

MR. MESTEL:  It's a lot.

THE COURT:  -- large.

MR. MESTEL:  Yeah.

THE COURT:  I will tell you that I've gone through -- just so you folks know at this juncture, it's a good time to tell ya', I'm gonna make a decision in 30 days.  I think I'm very bound by that.  I also want to tell ya' I've gone through the transcript of the -- the trial, I'm about 99 percent through; I've reviewed some photos, I was trying to get the list; and I believe expert testimony - let me look at my notes.  I can tell you specifically.  My notes are long.  One second - of Charlotte Ward.

MR. MESTEL:  Yes, your Honor.

THE COURT:  I think that's what I've reviewed -- her report.  I think it's nine pages or so with some other --

MR. MESTEL:  There's a CD.

THE COURT:  -- CD.

MR. MESTEL:  And a second short letter.

THE COURT:  Yeah.

MR. MESTEL:  If I can interrupt for a second?

THE COURT:  Those are the only two I've looked at.

MR. MESTEL:  All right, because I'm assuming -

**Ex. 17 at 096**

and I could be wrong - that we're going to argue based on material that's contained in the exhibits --

THE COURT:  Uh-huh.

MR. MESTEL:  -- and I'm just wondering whether it makes more sense for you to actually have had an opportunity to review the exhibits before we argue --

THE COURT:  Uh-huh.

MR. MESTEL:  -- or if it's just as easy for us to argue and then for you to incorporate our arguments into your review of the exhibits.

THE COURT:  Counsel, I will indicate for both of you I've read all of your material up to the point.

MR. MESTEL:  Uh-huh.

THE COURT:  I have your briefings, and I think some of the exhibits are included in your --

MR. MESTEL:  Yeah.

THE COURT:  -- original briefing, and I have some notes and some questions --

MR. MESTEL:  Okay.

THE COURT:  -- regarding your -- your memo -- your memos.

So, if you want me to then review all of them before you make argument that would take me some time, but if you would like to make arguments on the exhibits, I'm happy to do that also.  With respect to the arguments, if

**Ex. 17 at 097**

you just point me to your arguments on the exhibits and I'll be happy to do that.

MR. MESTEL:  And I can do that, your Honor.

THE COURT:  So, I will let the parties know I have a number of questions already --

MR. MESTEL:  Okay.

THE COURT:  -- based on the transcript, and your memos, and -- and - I won't surprise you - just case law on the elements; the evidence the Court's gonna consider, how it applies to the case law, and then specifically the transcript of the case law.

And I just want to put you on notice, the defense, with the -- with respect to the -- the defense that was raised at trial and how it may apply to this case, and then specifically I'll let you - I'm just trying to let you know where I'm going just for clarification - third-party predator defense: <u>Chambers versus Mississippi</u> and <u>Holmes versus South Carolina</u>; testimony of the victim; transcript of the 911 call; Officer Nash's testimony with respect to the blood on the doorknob of transfer and evidence collection.

MR. MESTEL:  All right.

THE COURT:  I'll be in recess.

MR. MESTEL:  Thank you.

THE COURT:  See you in like ten minutes.

**Ex. 17 at 098**

(Whereupon a brief recess was taken.)

THE BAILIFF:  All rise.

MR. MESTEL:  We're waiting for those three bells.

Did you hear three bells?

THE COURT:  Before we proceed, I just want to indicate to the parties, I gave you a synopsis of my -- some of my questions.  That's not to suggest that I have -- I may have some more with respect to transfer DNA and other issues that the State has brought up 'cause I -- I'm prepared to do that, but I wanted to give you a snapshot of where I'm at and thought it might be important for you to hear that from me.

So -- and you asked.

Mr. Bloor, call your next witness, if you'd like?

MR. BLOOR:  We're not going to call Detective Flohr.

THE COURT:  Okay.

MR. BLOOR:  We don't have any other witnesses.

MR. MESTEL:  No witnesses.

THE COURT:  Okay then.  I'm -- all right.  I'm ready for argument, and I think it's --

MR. MESTEL:  It's my motion.  So then, it's my argument.

THE COURT:  Yes, it is.

COLLOQUY                                    99

**Ex. 17 at 099**

MR. MESTEL:  Well, if you'll indulge me, Judge, I think it will be easier for me, I prepared a little PowerPoint --

THE COURT:  Yeah.

MR. MESTEL:  -- but because every time I tried to run the PowerPoint things they do not go well, I printed out the slides.

THE COURT:  Thanks.

MR. MESTEL:  And there's no jury to look at them, and that will enable you to hopefully follow along with the argument.

THE COURT:  Thank you.

First of all, Mr. Bloor, have you had an opportunity to look at the slides?  Do you want a minute?

MR. BLOOR:  I'm just looking at 'em now.

THE COURT:  Why don't you take your time.  Take a look, if you'd like, to see if you might object to any of these.

MR. BLOOR:  I'm sure.  It's argument.  So ...

MR. MESTEL:  And it's all from the material that's in the appendices, your Honor, pretty much.

MR. BLOOR:  That's fine.

THE COURT:  I just wanted your opportunity to object.

MR. BLOOR:  I appreciate it.

**Ex. 17 at 100**

MR. MESTEL:  If he comes across something, I'm happy to deal with it in the middle and strike it or whatever.

THE COURT:  Thank you.

MR. MESTEL:  So, this is a motion for new trial based on CrR 7.8.  There are five factors under State versus Williams.  Our first slide sets out those five factors, and rather than go through each of the factors, your Honor, based on the material we submitted to the Court and the State's response, I think that it's fairly self-evident that we're talking about one thing: whether the new evidence likely would change the result at trial, all right?

I don't think there's gonna be any argument that it -- this has been discovered since trial.  That it could have not been discovered before trial.  That it's material.  It's not merely cumulative or impeaching.  So, my argument is going to focus on how this is going to affect a new trial.

So, we don't need to look at the second slide, but the third slide gets us into the importance of the DNA testimony, and it's just an excerpt from the case.  I think -- well, I don't practice in this jurisdiction.  So, I don't know how long you've been on the bench, but I've been doing this for over 40 years, and I can tell

**Ex. 17 at 101**

you - based on my experience - that jurors are completely convinced that DNA has replaced fingerprints as the gold standard for forensic science.

THE COURT:  Uh-huh.

MR. MESTEL:  If you have a scientist come in and say that somebody left a biological sample, and we can say in one out of ten trillion that it was this individual, the jury's gonna believe it was that individual absent some showing of contamination or some problems in the crime lab or perhaps a transfer argument, which I'll get to later.

So, we know that DNA evidence is important, and I can highlight how important it is to the jury and how important it was to Ms. Widrig, and if you look at the next slide, Ms. Widrig was attacked in the very early -- well, I think around four o'clock in the morning by a person who she did not know -- at least that's what she told 911, all right?

So, a stranger appears in her apartment without any advance notice to her, inflicts serious head trauma, assaults her, rapes her, is there for a fairly significant amount of time.  I believe she testified that she tried to get as good a look as possible so that she could help the police figure out who did this to her, okay?

**Ex. 17 at 102**

All right, she knew Mr. Kloepper because he was a maintenance man at the apartment complex that she lived. She didn't tell 911 that she knew the person, although she knew Mr. Kloepper, and in the first photo array shown to her Mr. Kloepper's photo was in that array and she doesn't pick him.

In the second photo array that's shown to her Mr. Kloepper is in that photo array, and she doesn't pick Mr. Kloepper.  She picks Mr. Goering.  When there is an in-person lineup, she again picks Mr. Goering, who the State then charges with this crime.

Now, I know that Mr. Goering didn't go to trial in this case, and the reason he didn't go to trial in this case is after a piece of latex was examined by the crime lab that had been recovered from the floor of Ms. Widrig's apartment, there was Mr. Kloepper's DNA with a possibility I believe of 1 out of 440.  There was blood that was clearly Ms. Widrig's blood, and there was also an unknown donor, all right?

But the unknown donor wasn't Mr. Goering.  He was excluded.  So, now the State has a piece of evidence lying on the floor that clearly is tied to this assault which is not from Mr. Goering, and they dismissed the case against Mr. Goering.  That's how important DNA evidence is.

ARGUMENT - MR. MESTEL                                   103

**Ex. 17 at 103**

So then the police, after getting the results from the crime lab, go back to Ms. Widrig and they say, "You know, that was Mr. Kloepper's DNA that was found on a piece of in evidence your apartment," and she goes, "That's the man who assaulted me." That's how important DNA evidence was to Ms. Widrig. It was so important that having twice seen photos of potential assailants, including Mr. Kloepper saying it wasn't him, based on the DNA she now says it was him.

The next slide goes through and I -- I can read it into the record, and I think I probably will read it into the record, how important was the DNA to the State? Well, we know it was important enough that they dismissed the charges against Mr. Goering.

The opening statement was not transcribed for the appeal so there's no record of that. So, I can't direct you back to the opening statement, and it won't be in your appendices because it wasn't transcribed, but I did have access to the closing arguments.

So, during the State's closing the prosecutor said,

"The State is not asking you to convict the person who we plucked out of Richland who happens to be a match to 1 in 440, a number like this. We're not saying, you know, we got on some

ARGUMENT - MR. MESTEL                                104

**Ex. 17 at 104**

super-secret database that doesn't really exist and found out that Joe Smith, who works down at the grocery store and lives in West Richland, has a match to this kind of Y-STR DNA.  We didn't do that at all.

This is just one more piece of the puzzle to show you that not only is the defendant there looking for sex, he is lying to everyone.  He comes in contact about where he was, but, oh by the way, his DNA is a match with a bloody glove found in the victim's apartment, and you could only expect that 1 in 440 people to have a match with that kind of Y-STR DNA."

The prosecutor next says,

"In this case we know the defendant's live DNA was the major component on that.  The scientist was able to identify it, and it just seems extremely unlikely to the point of unbelievability that the defendant's DNA from a sloughed skin sat on the carpet in this apartment in one teeny, tiny spot for six months, and then this glove had fallen on that spot and got kind of mixed around with it,

ARGUMENT - MR. MESTEL                    105

**Ex. 17 at 105**

and that's why we're getting the defendant on this."

And I put in the page references so the Court can go back and check.

THE COURT:  Uh-huh.

MR. MESTEL:  The prosecutor next says,

"We're not alone" --

Oh, excuse me.

"We are not asking you to convict based on Dana Widrig's identification alone.  I can understand how that would maybe make you uncomfortable."

And I'll get to that identification later, your Honor.

"What we're asking you to do is consider all the facts.  The facts are the defendant is the only one who was at the Villas, had access to Ms. Widrig's keys, had just been turned down for some random sexual encounter, lied to the police continually, lied to the police and family and friends about his whereabouts that night, and whose Y-STR DNA is a match for that found on a bloody glove in the apartment.  Ms. Widrig described hearing

ARGUMENT - MR. MESTEL                          106

**Ex. 17 at 106**

just before she was raped."

And finally, the prosecutor goes,

"Very significant.  You know the fact that" --

Excuse me.

"You know the fact of when that's occurred, that's when the DNA would have gotten on it.  That's when the gloves were slapped on, and Dana Widrig's blood is all over it.  The DNA of the defendant matching DNA is on that glove, and that -- this glove was used at that point is really, really significant, and you need to consider it.  The defendant is the sole person that we can say had DNA in that apartment in a crucial, crucial item of the crime."

So, the State understands just how important it is, and they know the jury understands just how important it is, and, as any good advocate, they're playing their strong card.  "You don't have to believe the credibility of these witnesses.  We have irrefutable proof that Cody was in that apartment because his is the only DNA we found other than Ms. Widrig's."

So we talked -- and the next line goes into the

ARGUMENT - MR. MESTEL                           107

**Ex. 17 at 107**

identification, and as noted by the State in their closing, "We're not gonna ask you to convict somebody based on Ms. Widrig's identification," because her identification's all over the place.  She was prepared to testify that Mr. Goering had raped her.

Now, only after she's shown the results or told the results of the DNA does she come up with the fact that it was Kloepper.  She never testified that her assailant smelled of alcohol.  She never testified that her assailant smelled of cigarettes.  She never testified that her assailant had tattoos.

Yet in your appendices, you'll see that Mr. Kloepper is covered with tattoos.  You have the testimony of Mr. Contreras that he was drunk and smelled from cigarettes, and the testimony from Ms. Widrig that her assailant was shirtless.  Mr. Contreras doesn't have any tattoos, and we've provided you with photos showing his upper body.  There's nothing there.

And then we have the testimony from -- potential testimony from Doctor Steven Ross, who is an expert in identification, who goes through a litany of reasons why somebody who's suffered head trauma like Ms. Widrig suffered would not be the most reliable reporter.  Not because she wasn't trying as hard as she could but because her cognitive ability is disrupted when she's hit

in the head with a tire iron and goes through a traumatic experience like this.

We next have some of the photos that were used from the photo lineup. We have Mr. Kloepper in the bottom middle, Mr. Goering in the top, and we have the artist sketch, and then we have a side by side of Kloepper and Mr. Goering.

And I think what is going to be or what I'm hoping is going to be the Court's main focus is direct versus transfer deposit of bodily fluid, okay. What do we know and what don't we know? Well, we know there has to be transfer. I mean, I think both sides agree there has to be transfer, and that transfer is a viable scientifically proved phenomena.

The State has a number of scientific articles which they presented to the Court, but we know that there had to be transfer because Kloepper and Contreras' DNA is in the apartment, and Ms. Widrig says there was only one assailant. So, somebody brought in somebody else's DNA with them, all right, and I would be foolish to argue anything else for the Court. I mean, it has to be that way.

So, where was the DNA or the biological fluids or deposits found and how was it deposited? Okay. What I've printed out in my next slides concern the DNA.

ARGUMENT - MR. MESTEL                                    109

**Ex. 17 at 109**

First, I have a picture of the little piece of latex that had the blood.  Mr. Kloepper's 1 out of 440 DNA, and Mr. Contreras' 1 out of 250 DNA.  Yeah.

This is the only item that the State has produced that has Mr. Kloepper's DNA on it, okay?  Just this one piece of latex.  Is it a glove?  Well, we don't know if it's part of a glove, but let's assume it is a part of a glove based on Ms. Widrig's testimony that it's -- as a chemist she uses latex gloves all the time, and she believes she heard a sound that was consistent with somebody ripping open a bag containing latex gloves.

So, we now know that there are two males' DNA in that piece of latex: one from Kloepper, one from Contreras.  One of them had to be there and had to bring in the other's with him.  It's the only plausible explanation unless somebody thinks they were working in concert and they were both in there together, and there's no evidence to support that.

So, let's look at where Mr. Contreras' DNA's found.  The next slide first shows the sweatpants, and there are circles which hopefully -- circles and numbers which you can hopefully see that talk about it, but at first is stain number 2, which is on the right exterior front, with spermatozoa identified in this thing.

There Kloepper's excluded.  Mr. Contreras is not

**Ex. 17 at 110**

excluded. The combination of Mr. Contreras and Ms. Widrig is a possibility of 1 out of 54 quadrillion times that it's more likely that Contreras and Widrig were the persons whose biological DNA was left there.

Stain number 3 is from the right exterior front. Spermatozoa's identified on that stain. Once again, Kloepper is excluded.

The next slide shows the sweatpants, the left exterior back. There's a spermatozoa in stain number 8. Mr. Kloepper is excluded, and Mr. Contreras, once again, it's more likely that it's approximately 110 quadrillion more probable that the sample originated from Mr. Contreras and Dana Widrig than an unknown person.

The next staining with Mr. Contreras' DNA is on the front and the -- I'm sorry, the next staining with spermatozoa is on the sweatshirt on the hood, on the left sleeve, on the back, but there was no further examination on stain number 1, 5, and 6 -- but stains 2, 4, and 7 were examined.

Stain number 2 was, once again, Mr. Kloepper excluded. Mr. Contreras and Ms. Widrig were this time 200 quadrillion times more probable.

Stain number 4 Mr. Kloepper is excluded. Mr. Contreras and Ms. Widrig make 190 quadrillion times more probable.

ARGUMENT - MR. MESTEL                                    111

**Ex. 17 at 111**

And on stain number 7 Mr. Kloepper is excluded. Once again, spermatozoa and 200 quadrillion times more likely if it came from Contreras and from Ms. Widrig.

So, how did Contreras's DNA get into the apartment? What is the possible argument that the State can come up with?  That's why I feel that the piece of latex is so important, your Honor.

According to the testimony from Ms. Widrig, she's first basically beaten into submission.  She's then thrown to the ground.  She then hears a person put on gloves.  The person then attempts to penetrate her, but she's not sure whether she was penetrated.  Certainly not by a penis.  Maybe by a finger or some other instrument.

The State is going to have to argue, one, that even though Mr. Contreras doesn't -- isn't sure whether he ejaculated, he must have ejaculated or had a premature ejaculation because his sperm had to come from somewhere, and the only place it was coming is from him, okay?

Then the State needs to argue that it got onto Mr. Kloepper.  So, without being overly graphic, might I suggest that if you follow along with Mr. Contreras' testimony that he is lying down and that somebody is lying on top of him, and whether or not he's capable of ejaculating without an erection, and whether his penis is either going to be down toward his thigh or up toward his

ARGUMENT - MR. MESTEL                              112

**Ex. 17 at 112**

belly -- it can't be straight up because somebody's lying on top of him.

So, when he ejaculates it's either going to come up onto his abdomen or go down his leg on -- into his boxer shorts, and if it is of sufficient quantity to soak through his boxer shorts it's gonna go into his robe, and then the State's gonna have to argue that -- I guess they can argue it went onto Mr. Kloepper's hands, and that's how it got transferred.

But Mr. Kloepper's hands, by Mr. Contreras' testimony today, were around his back. He was hugging him, and so his arms would have been underneath Mr. Contreras while they were lying on the couch. It couldn't have gotten on his hands. So, maybe they're not gonna argue that.

Maybe they're gonna argue that it was such a voluminous ejaculation that it went all over Mr. Contreras through his boxer shorts, through his robe, onto -- onto what? Did -- do we know what Mr. Kloepper was wearing? Do we know if he was clothed? Did he come out of the bathroom undressed? Did he come out dressed? We don't know.

But let's assume that the State's argument is that it somehow got on Mr. Kloepper's hands. By the time the person in Ms. Widrig's apartment puts on those latex

ARGUMENT - MR. MESTEL                                              113

**Ex. 17 at 113**

gloves - and one would assume if you put on one latex glove you put on two latex gloves or why put on latex gloves at all? - there is no more transfer, all right? Nothing is getting transferred from the assailant's hands who is wearing gloves because there's a barrier between whatever might be on their hands and whatever they're going to touch.

We also know, and Doctor Ward points this out, that Mr. Kloepper would have had to open Mr. Contreras' door to leave.  Then he would have had to touch his car door.  Then he would have had to have his hands on the steering wheel.  Then he would have had to have his hands on the gear shifter.  Then he would have had to open the door again.  Then he would have had to go to the Villa Apartments and open an apartment door.  Then he would have had to go into the manager's.  Then he would have had to get the keys.  Then he would have had to use the keys and insert them into the lock.  He would have had to turn the doorknob.  He would have had to get a tire iron, and the State is -- and then he would have had to have a fight and hit somebody, and then put on gloves.

And there really is no commonsensical approach that he could possibly have transferred sperm that originated with Mr. Contreras through all of those steps, and then deposited it on her and not have any of his DNA on her at

**Ex. 17 at 114**

all.  Not a hair follicle falls onto her.  Nothing.  There's no DNA of his anywhere but the glove.

Now if Mr. Contreras, as Mr. Kloepper testified at trial, performed fellatio on him, as he admitted today that he would have been more likely to do in a sexual relation, he clearly would have had Mr. Kloepper's biological fluid on him, and he may very well have gone through the same type of scenario and had enough on him that, when he put on the latex glove, it got captured in the glove.

There is no plausible argument that there -- we should believe that Contreras can't transfer Kloepper's DNA but we should believe that Kloepper can transfer Contreras' DNA.

Mr. Contreras also was quite candid that he suffers from pre -- pre ejaculation, which is entirely consistent with the limited number of sperm found in these DNA samples, pre-cum, and we submitted an article about that as one of our scientific treatises.

So, your Honor, the question is, is it likely that this would change the result at trial?  I contend that based on the very weak identifications, based on the importance of DNA, based on the importance that the State saw the DNA by dismissing the case against Mr. Goering arguing to the jury that, "You don't need to rely on

ARGUMENT - MR. MESTEL                          115

**Ex. 17 at 115**

identification.  We have the DNA.  We have the only person who was in there that we can tell you whose DNA was in there.  It was Mr. Kloepper."

Well, now the State's gonna tell you that we now know that there were two people's DNA in there, and one of them is Mr. Contreras, and Mr. Contreras tells you that he knows that Mr. Kloepper was a janitor at an apartment complex.

Your Honor, I candidly have to admit to you these are very unusual facts by anybody who's involved in the criminal justice system.  These facts are unusual, but these facts shout out for the fact that had a jury heard that Mr. Contreras' sperm was found on the body -- on the clothing on the body of Ms. Widrig, I don't believe they would have convicted him, and at a minimum, I don't believe the State could have gotten a conviction.  They might have gotten a mistrial and a hung jury, but they would not have convicted based on this evidence.

So, you need to ask yourself when they say, "Is it likely it would change the result?" do you need to show that the person actually is innocent, which our trials aren't designed to know anyway, or is it enough to show that the State can't get a conviction?  Is that not likely a change in the evidence?

'Cause the State's gonna point out, "Well, we have

ARGUMENT - MR. MESTEL                              116

**Ex. 17 at 116**

these evidence about Mr. Contreras -- about Mr. Kloepper lying to the police, which we meet by every lie that Mr. Contreras told about how he was only -- the person was only there for 15 to 20 minutes.  There was no sexual relations.

And so, I believe a jury would find him guilty, but I think that it's clear that looking at this newly-discovered evidence you get to the point where you have to say to yourself this man did not receive a fair trial, not because of anyone's fault but because, one, Mr. Contreras was not in the database until he was convicted in 2016 of a federal felony, and it was only because our legislature was wise enough to enact a statute that allowed for post testing -- post conviction DNA testing that basically did away with the time requirement under 10.73 where it has to be within one year because the science is continually evolving.

And now it evolved to the point where they could figure out the mixture, and they could go back to CODIS. And by the grace of God, Mr. Contreras was in CODIS because of his federal conviction, and so he pops up, and he was always part of this story and now you know the whole story.

And the whole story suggests that Mr. Contreras either followed Mr. Kloepper or somehow made his way

ARGUMENT - MR. MESTEL                          117

**Ex. 17 at 117**

there, either got in because the door was unlocked which Ms. Widrig, you know, reluctantly admits four or five times she might have forgotten to lock the door, or he went into and got the key or somehow other gained admittance.

But we think our showing is sufficient to justify the granting of a new trial.

Thank you, your Honor.

THE COURT:  Thank you.

Mr. Bloor or Mr. Clark?

MR. BLOOR:  We're gonna divide our argument --

THE COURT:  Okay, thank you.

MR. BLOOR:  -- if that's okay?

Well, the first thing is that the issue for this Court is whether or not this new evidence would likely change the result.  Not -- not anything else, but just the evidence about Mr. Contreras' DNA being found on the victim's clothing.

There's been a lot of discussion about relitigating various things like the identification by the victim of the defendant.  They want to talk about relitigation of whether the perpetrator was white, whether the door was locked, but here's the -- here's the evidence that still stands and that I would suggest will not change the result of whether or not the jury heard this -- this new

ARGUMENT - MR. BLOOR                                  118

**Ex. 17 at 118**

evidence.

First of all, the perpetrator had to have a key. I'd cite RP 124 when the victim said,

> "When I come home at night I always lock my door behind me."

She followed up on 127.

> "I check the door pretty much every morning to make sure it's locked."

And then she told the 911 operator that she did that in the morning. She checked the door.

> "He said I left the door open. I know I didn't. I always lock -- I always lock my door, and I just checked it."

There was no forced entry. The defendant was the only person that wrongfully accessed the manager's office and obtained a key to all the tenants' doors on that occasion, on that night, and this was the only time that he did so. So, he had the key. Nobody else did.

Mr. Contreras -- my colleague just suggested that that Mr. Contreras somehow gained access to the manager's office. No, that's not correct. You had to have a key to get into the manager's office. The defendant had that key.

The second thing is that -- the second thing I'd point out what doesn't change is the victim's description

ARGUMENT - MR. BLOOR                                    119

**Ex. 17 at 119**

of the defendant is consistent.  It matches.  She told the 911 operator,

"Oh, he looked familiar.  He looked like one of the Villa's people -- like the Villa's maintenance people."

They asked,

"Where did you meet him at?"

"I don't know.  I don't know if I've ever met him before."

You know, I -- I don't think my colleague is quite correct in saying that she, well, maybe didn't say that, but I had an inference that he was indicating that Ms. Widrig told the 911 operator that she -- she saw the perpetrator and it was not Cody Kloepper.

That's not -- not correct.  Her description of him as being white, tall, thin, maybe 6'2" with shaggy brown hair, that was consistent with what the defendant had or the defendant's physicals.  She also said,

"I hate to say it" --

And then she blanked,

"I don't know who it was."

We argued at trial that she was hesitant to say, to definitely point out Cody Kloepper or the maintenance man was the -- was the perpetrator.

The third thing is that the defendant changed his

ARGUMENT - MR. BLOOR                    120

**Ex. 17 at 120**

hair.  We have Jordan Shankler saying -- a co-worker saying that the defendant told him he cut his hair after this crime because he looked like the police sketch. There's also some testimony that he added -- he, the defendant, added some tattoos after the crime.

I don't think I need to get into the fact that the defendant lied about his whereabouts.  That's adequately covered, but that doesn't change with the new evidence, and it is important that the DNA was -- the defendant had DNA in the victim's apartment, and the DNA was on a crucial piece of evidence.  This bloody glove that had blood all over it from the victim had the defendant's DNA on it.

That was only to 100 -- 1 in 440, and it wasn't really crucial as my colleague will get into, but it is important that the defendant's DNA was found on -- in the victim's apartment.

It's not -- I -- I disagree if the contest comes down between the defendant and Salvador Contreras.  Well, that's clear it's not Mr. Contreras who's the perpetrator.  He doesn't have any knowledge of the Villas Apartments.  He's never been there.  He has no idea whether or not Dana Widrig lives alone or anything else.

She always described him as a white man.  To 911, to the first responder, to the police, on the witness stand.

**Ex. 17 at 121**

Mr. Contreras, I would -- I would ask for a finding by the Court, and you can do this in a written decision that I would ask, that he has a very strong, noticeable Hispanic accent.  She never described the perpetrator as having an accent or being Hispanic.

I will leave it at that, but my colleague -- let me turn it over to Mr. Clark who will talk about our transfer theory.

THE COURT:  Yeah.  Thank you.

MR. BLOOR:  Thank you.

THE COURT:  Mr. Clark?

MR. CLARK:  Your Honor, I think counsel is correct that there's one thing we agree on, and that transfer definitely exists.  It's been well accepted in the scientific community and we have a lot of articles here.

One of the things I wanted to highlight is from "The Prevalence of Human Cell" article.  It really highlighted, you know -- it says,

> "In recent years the sensitivity of DNA profiling methodologies has increased tremendously and now allows for analysis of minute evidentiary samples previously regarded unsuitable for STR profiling. Increased sensitivity, however, has also

ARGUMENT - MR. CLARK                                        122

**Ex. 17 at 122**

lead to an increased possibility of profiling DNA that is not related to a crime."

And so, now when we see these DNA results it's important to, as the scientists are telling us, consider the primary and secondary transfers.  The thing is we even briefed, you know, there's examples out there of secondary transfers from even something like an instrument on someone's finger in an ambulance.

And what's interesting too from some of these studies is whose DNA actually can get transferred.  Looking at the study on, you know, "Secondary DNA Transfer Falsely Placed Someone on the Scene of a Crime" article from *Forensic Science Journal*, there they were actually doing an experiment doing hand-to-hand handshakes and then contacting knives.

But the DNA type results indicate that secondary DNA transfers were detected in 85 percent of the samples.  In five of those the secondary contributor was either the only contributor or the major contributor identified despite never coming into contact with the knives.

When we start talking about, as counsel indicated, how he manages to transfer these couple sperm without transferring any of his own DNA, that's actually what the science is showing is possible.  Even right there where

ARGUMENT - MR. CLARK                                    123

**Ex. 17 at 123**

they're deliberately creating this scenario with these knives, they're getting that result where secondary transfers was the only one found.

So, when we go back and we look at what DNA evidence and what questions about the DNA evidence existed in the first trial, you know, it's important to note that even today there's three DNA profiles that are still unidentified, just like they were back in 2010.

THE COURT:  Say that again, Mr. Clark?

MR. CLARK:  There were three DNA profiles that are still unidentified.  When you go through the lab reports, you know, it's identified and labeled them individuals A, B, C, and D.

Individual A was DNA profile of some socks.  At the time it wasn't identified.  Since?  We know it's Contreras.  Individual C was from some -- DNA from some fingernails.  Individual D was from some head hair from the sweatshirt.

It's important to note that we know individual C was not Contreras or the defendant.  As to evidence item D: It was not the defendant.  It wasn't Mr. Goering.  It wasn't individual C.  Contreras was a possible contributor, but he was not the major Y-STR profile.

And so what we really come down to is the defendant was identified as individual B, and that was what was

ARGUMENT - MR. CLARK                                    124

**Ex. 17 at 124**

known at the time of trial.

So, even to this day we still have three profiles that the jury heard that we still don't know where they came from.  When you go back through the testimony and the closing arguments, you'll see that, you know, it was discussed with the jury they actually did testing on a couple of those individuals in those tox reports that you'll see.

That those were the EMTs because they were trying to figure out who all could have contaminated because even back in 2010 concerns of transfer contamination was something that was discussed with the jury, and in fact, you can see the cross-examination talking about touch and transfer with the expert.

And so, what's also interesting when we go back is the role of that 1 in 440.  Interestingly in closing arguments, one thing the State and the defense agreed on was that 1 in 440.  Going back it's page 716 of the transcript.

THE COURT:  Hold on, Mr. Clark.  I didn't hear your last part.  I heard the 715 argument.

What was your prior statement?

MR. CLARK:  I was just saying there's one point in which the parties interestingly agreed back in the first trial, and it was about the 1 in 440 piece of

**Ex. 17 at 125**

evidence.

Going back to the closing arguments, when defense first got up and closed in their case they said,

"So I want to start with my rebuttal of some of the points in the State's arguments.  There's one point with which I agree.  The State argued that they would not ask you to convict on Y-STR events alone.  I agree.  That's fair of them because Y-STR is only in this case 440 to 1.  It's not eight quadrillion to one."

And proceeds on to attack the State's case.

What is new and what has changed since that argument is solely the existence of Contreras as 1 in 250 in the glove, the minor contributor that was known at the time but we didn't know who, and these sperm results that are taken from the clothing.  That's what's new for the Court to consider in this case under the standard.

And one thing I wanted to point out when it comes to those sperm results, they submitted an article about sperm content and pre-ejaculatory fluid.  There was a lot of discussion with Mr. Contreras:  Did he ejaculate?  Was it pre-cum?  The one thing that I think is important to recognize is how much sperm is actually even in pre-cum or pre-ejaculatory material.

ARGUMENT - MR. CLARK                                    126

**Ex. 17 at 126**

And in the chart, you know, they actually have a column here when they did these tests on the pre-ejaculate samples.  That was really interesting.  So, they actually have a column for total sperm seen and pre-ejaculate submitted in ten to the sixth power.  What we see there is you're talking from 200,000 to 35,000,000 sperm in just the pre-ejaculate matter.

So, whether or not Mr. Contreras ejaculated or it's just pre-ejaculate, we're talking about a considerable amount of sperm can be generated.  It provides for an opportunity for a lot of sperm to be transferred or for even a small amount to be picked up from that matter and get carried on.

We've seen in this case, your Honor, is we have these couple spaces of sperm that were found on the clothing.  It may or may not have been transferred when it was folded.  There's a scientific article here that actually discusses and warns about the concerns with folding clothing and the transfer between the packaging and the clothing items.  So, it's definitely possible of how it gets in different places.

But at the end of the day, what's really new here is does the existence of sperm, new sperm on the scene and his contribution to the glove, change the outcome of this trial?  Is it gonna probably change the outcome of the

**Ex. 17 at 127**

trial? And, as Mr. Bloor indicated, there are so many other factors about access and opportunity and a description to which Contreras doesn't fit.

And so when we're looking at someone's DNA got transferred, the defendant's or Contreras', Contreras is the outlier. He doesn't fit for having gotten in that apartment himself, and that's why his was the transfer and that's why this evidence, these two new discoveries on the glove and these sperm, doesn't change the outcome of the trial.

THE COURT: Thank you, Mr. Clark.

Defense, let me hear from Mr. Mestel.

MR. MESTEL: Your Honor, I think as the State has acknowledged, Ms. Widrig told the 911 operator that she didn't know her assailant. I think that's the last thing she said. She said,

"I'm sorry. I just don't know who it was."

Secondly, when she picked out Mr. Goering, and this is on page 154 of the transcript during her testimony, she said that it was Goering but her hair -- but his hair should -- should be longer.

So, this wasn't a situation where she was going, "Oh, it should be Mr. Kloepper, but his hair is different." She's already recognizing that the person

ARGUMENT - MR. MESTEL                               128

**Ex. 17 at 128**

she's picking out and is certain is her assailant, the hair isn't the same in the picture as the person who attacked her.

On page 160 of her testimony she admits that on four or five occasions she forgot to lock her door, okay? I'm -- I wasn't really following Mr. Clark's argument about the packaging.  I -- I think he was saying that something can get transferred when it's folded over, but is he suggesting that Mr. Contreras put his sperm on the package and that's how it got on to the clothing?

The -- we agree that the sperm originated with Mr. Contreras.  The question is how it got into the apartment.  How it got onto her sweatshirt on the front and the back.  How it got onto her pants on the front and back.

You can't even say with any certainty that Mr. Contreras ejaculated when he was with Mr. Kloepper because Mr. Contreras, who testified at trial, never said that happened, who testified today never said with certainty that it happened.  In fact, when I asked him whether he was certain he said, "No, I'm not.  I'm not certain."

And so, you're left with if there wasn't ejaculation when he was with Kloepper, and clearly you can't say that there was, what other possible way did his sperm get on

**Ex. 17 at 129**

her clothes other than off of his penis?  I think it's pretty clear, and, yeah, there are scientific articles, but if you look at the scientific articles do they really track the facts of this case?  Do they track the number of things that have to be touched or are these more controlled so there's less variables involved?  And I would suggest all these scientific studies have much fewer variables than in this case.

If the glove is important to the State it's equally as important to us because you cannot transfer anything off your hands once you put those gloves on.  So, Mr. Kloepper was not transferring Mr. Contreras' DNA.

And I -- of course Mr. Contreras was never a suspect in the case.  He was never investigated for anything.  We don't know his whereabouts.  We don't know if there could have been cell phone pings off a tower closer to the apartments had he been a viable suspect, but there really was no reason until the DNA testing to focus on him.

This is a case where the police didn't collect a rape kit.  This is a case where the crime scene really wasn't that well processed.  This is a case where Mr. Contreras - who is a tall, thin, man - as you could see today, who is Hispanic but not a dark-complected Hispanic.  Not like a gentleman from Oaxaca who is much more dark skinned.

**Ex. 17 at 130**

At four o'clock in the morning with a person who was just smacked over the head, who clearly identifies the wrong person to start off, and we only know that but for the DNA, we believe we've carried our burden, and the Court should grant the new trial.

THE COURT: Thank you both for your arguments.

I just have a couple questions. I've listened to your arguments, and I really do appreciate your positions. I just want to ask a few questions for the -- first for the State, Mr. Bloor.

I see that you quoted -- strike that.

Would you agree with the elements with respect to the case law in which those four elements the Court has to make a determination to either grant a new trial or -- or deny that motion?

I'm -- I'm quoting for just -- I think you quoted in your brief State versus Letellier.

MR. BLOOR: Correct.

THE COURT: I think that is -- it's spelled last name or the L-e-t-e-l-l-i-e-r, 16 Wn.App. at 695, 699-700.

MR. BLOOR: Correct.

THE COURT: Is that your brief?

MR. BLOOR: Yeah.

THE COURT: Okay, and I think that the defense

**Ex. 17 at 131**

has offered the same elements but with a different case.

Did I get what right or wrong?

MR. BLOOR:  I -- I -- I think we're in agreement about the five elements.

THE COURT:  Okay.

MR. BLOOR:  And just to make sure that we're all on the same page, we're contesting the first element.

THE COURT:  Correct.  That the claim newly-discovered evidence must be such that would, well, probably change the result if a new trial is granted; is that correct?

MR. BLOOR:  Correct.

THE COURT:  Okay, and then let me ask the defense.

Do I have that right also?

MR. MESTEL:  Yes, your Honor.

THE COURT:  Okay, and then, Mr. Bloor, to what extent should the Court consider the evidence in this hearing to the evidence that was presented at trial?

MR. BLOOR:  We've -- well, if I understand your question, we presented Mr. Contreras, who was not asked if he ejaculated at the trial.  You know, basically we asked him if it's possible that he did ejaculate.  You have the answer that he gave, and that was -- that was the purpose of our asking him.

COURT'S INQUIRY                                    132

**Ex. 17 at 132**

THE COURT:  Okay.  Let me hear from defense.

MR. MESTEL:  Your Honor, I think case law suggests that you're entitled to consider the entire trial transcript.

THE COURT:  Thank you for that.  I -- I was getting to that.  The rules of evidence:  What do I consider with respect to the evidence presented at trial and the evidence that has been presented during this evidentiary hearing.

I think, counsel, you're correct.

MR. MESTEL:  And stipulated exhibits.

THE COURT:  And stipulated.  Okay.

Let me ask either party, does materiality make any -- have any factor the Court should consider with respect to the evidence at trial and the evidence as stipulated here today?

I'll start with defense first.

MR. MESTEL:  Your Honor, I think that the DNA is always material if it points out a -- in a case where the person is arguing there was only one person here, and you now have more than one DNA, and it's a sex case, and it's sperm, then I think it's material.

THE COURT:  And, Mr. Bloor?

MR. BLOOR:  I think you're -- maybe I'm wrong, but I think you're asking about whether or not the fourth

**Ex. 17 at 133**

element, the motion for a new trial?

(Whereupon no audible response was made.)

MR. BLOOR:  Okay.

THE COURT:  I am.  For the record, I'm quoting State versus Tracy.  128 Wn.App. 388, 115 P.3d 381 (Division II, 2005).  Go ahead.  I'm sorry.  I wanted to make my record.

MR. BLOOR:  Yeah.

We're not contesting that.  You know, we think the one thing that we're contesting is whether or not the outcome would change.

THE COURT:  Okay, and brief response from the defense about materiality or anything?

MR. MESTEL:  We are of the opinion that it's material, your Honor.

THE COURT:  Okay.

And then for the defense, you make argument about the DNA being identified as Mr. Contreras.

Did the trial court -- strike that.

Did the jury in the trial have an opportunity to -- with respect to the defense, meaning evidence as a defense regarding the other DNA at -- that was located in the crime screen, wouldn't that be persuasive against the defense because there was other DNA present at the crime scene?

**Ex. 17 at 134**

I guess my point is asking you, did they not have knowledge of unknown DNA at the crime scene?

MR. MESTEL:  There was testimony, I believe, your Honor, that items were examined and they didn't have a profile that fit the DNA that they typed.  However, your Honor, there also, I believe, was testimony that we shed our DNA all the time everywhere.  You know, if you were to examine my jacket you'd probably find my dog's hair, my wife's hair.  If I took an Uber you'd probably find something from the last people who were in the Uber.  Maybe the Uber driver.

It's only when we get to the point that not only can we now identify that there's sperm but that we can identify whose sperm it is and, lo and behold, it's a person who actually is -- at least has been tangentially related to this case that it becomes more appropriate.

So I talked, I think, a little about other suspect evidence.

THE COURT:  Correct, and I was movin' toward the third-party perpetrator defense.

MR. MESTEL:  And certainly you could argue reasonable doubt that that's not -- they didn't identify that as my (indiscernible), but you can't bring in another suspect because there's nobody to bring in.  Now there's actually not only somebody to bring in, but you

COURT'S INQUIRY                                    135

**Ex. 17 at 135**

have that person's spermatozoa that has come up through a CODIS check.

So, the argument that was not even theoretical back in 2011 when the case was tried is no longer theoretical or hypothetical. We now have a person who was involved with Mr. Kloepper who it clearly can be argued brought Mr. Kloepper's DNA into that apartment, and that's why it appears on the little bloody piece of latex.

So, I think it's evolved to the point where the Court of Appeals and the Supreme Court would say this is appropriate other suspect evidence.

THE COURT: But isn't -- isn't it -- at least from my perspective, isn't it the jury at the time had a third-party predator that -- that knew there was other DNA evidence at the scene, and that while now I accept your argument about now it's been identified, at least one of them has been identified, does the fact that from the State's argument and -- and the State's argument that it was -- the sperm was -- for a lack of better way of saying it, it was so low that it would -- the amount of that sperm that was located on the victim's pants and -- and jacket would give rise to the -- your argument as you just said about the skin shed, it could be in the Uber, anywhere around that location?

So, my point being is I'm trying to articulate - and

**Ex. 17 at 136**

I'm not doing a very good job - is that at the time the jury knew there was other evidence, other DNA evidence, and that this -- now that we have this evidence now that's been identified as Mr. Contreras, it's so slight would it, in fact, be material and would it, in fact, change the outcome of the trial?

MR. MESTEL:  I'm not sure --

THE COURT:  There was a lot there, I'm sorry.

MR. MESTEL:  I'm not sure of why you're categorizing it as slight when it's 200 --

THE COURT:  It's their argument.  I'm just using the State's argument.

MR. MESTEL:  1 out 200 quadrillion --

THE COURT:  Yeah.

MR. MESTEL:  -- doesn't seem that slight, and while I may slough off skin cells, and clearly I've sloughed off more than my share of hair follicles, I'm not sloughing off spermatozoa.  I mean, it's just a different animal, your Honor.

THE COURT:  I don't mean to suggest that -- that the sperm from Mr. Contreras is sloughing off, and I -- I apologize if I -- if it came off that way.

MR. MESTEL:  No.

THE COURT:  I would agree that that's a very significant bodily fluid, if you will.

**Ex. 17 at 137**

MR. MESTEL: Uh-huh.

THE COURT: Okay.

MR. MESTEL: Okay, and so kind of a rhetorical question, but can you say from Mr. Contreras' testimony that he ejaculated because he can't say that, and if he can't say that, and if he didn't say it at trial, and if he didn't say it when he spoke to police before the trial, then how did it get there, right? I mean there's only one way it got there is 'cause he brought it in there, all right?

What if there had been 12 unknown DNA profiles found on her, but Mr. Contreras' sperm was found in her vagina but he wasn't in CODIS in 2010, and so that came back unknown and now I was in front of you saying, "Well, your Honor, his sperm was found in her vagina," and you're going, "Well, there's ten other unknown DNAs. So, I mean, the jury already knew there was unknown DNA."

THE COURT: Uh-huh.

MR. MESTEL: So, same type of argument, I think.

THE COURT: Okay, thank you.

Mr. Bloor or Mr. Clark, did you want to briefly respond? I do have a very specific question that I -- go ahead.

MR. BLOOR: We agree.

You know, basically -- yes, as Mr. Clark said, we

**Ex. 17 at 138**

basically have the person identified who is on the bloody piece of latex, the glove, as Mr. Contreras, but that was -- that evidence was before the jury.  So that, in itself, doesn't do anything.  It doesn't cause any juror to question things.

THE COURT:  Mr. Bloor, back to the State's argument, do you not believe that the significance of this DNA, if it was skin or a hair follicle or a nail -- a fingernail or something would be one way of categorizing the DNA, but this is a unique -- the sperm is so unique and finding that at the -- at the incident where this occurred, wouldn't that be so persuasive that it would grant a new trial based on that evidence of itself and now the testimony of Mr. Contreras, I'm counting just three different times -- there's three different stories, would it not be persuasive for the Court to grant a new trial or not?

MR. BLOOR:  Well, we're arguing that it's -- it's not, and I hope the Court finds that.  But you have in this case all of the other factors that point to Mr. Kloepper -- Kloepper as the perpetrator.

THE COURT:  Right.

MR. BLOOR:  All of the other factors, and, yes, we do have one factor, one thing that's now pointing to somebody else, but you -- you know, to get there, to get

**Ex. 17 at 139**

to the idea that the verdict would have changed you have to ignore all of the evidence, all of the circumstantial evidence pointing to Mr. Kloepper, and ignore what was in front of the jury anyway as far as DNA evidence, and ignore what Dana Widrig says was -- how she described the perpetrator.

THE COURT:  And then finally, Mr. -- Mr. Bloor, isn't it -- isn't it persuasive to your argument that I believe the jury on maybe three or four different times wanted to get a copy of the transcript of the 911, also wanted to know some information about -- I think there was a jury, at least two - maybe three.  Might be four. I haven't got through that part - about the jury questions about the testimony of the victim, once in the 911 call, and I believe her testimony.  I could be wrong.

MR. MESTEL:  Your Honor?

THE COURT:  Yes, please.

MR. MESTEL:  I don't believe it's -- while I told you that I believe that the trial transcript is certainly something that should be considered, I don't think questions from the jury are something that should be considered in making your decision.  The jury's verdict is the jury's verdict.

THE COURT:  Right.

MR. MESTEL:  And, you know, it's so hard to

**Ex. 17 at 140**

impeach a jury's verdict, and the case law is fairly strict that you can't go into their mind unless you can show misconduct. So while I haven't researched it, I don't think that if one juror said, "You know, I'd like to see that 911 transcript again," that that should then be used to show that there was a collective problem with a certain aspect of the trial, whether it went to identification or something else.

THE COURT: Thank you.

That was -- I want to make on the record clear, because I'm asking that question, what is the purpose of the transcript with respect to the Court's consideration relevant evidence in which the Court can make a decision under the case law, and I believe Criminal Court Rule 7.6(a)(3), RCW 10.73.170, and other evidence that the Court should consider.

So, I -- I hear you now. So, you're -- would you say to the Court I can't consider any of those issues with respect to the record transcript the jury questions?

MR. MESTEL: I'm distinguishing jury questions from testimony.

THE COURT: Okay.

Mr. Bloor, I cut you off. My apology.

MR. BLOOR: Well, I was gonna say that that was very professional by my colleague to jump up on a

question that probably doesn't really help him, but I appreciate that and I agree that the -- the jury's verdict inheres -- the jury verdict inheres in the verdict.  The deliberations inhere in the verdict.

So, it doesn't matter how many questions they ask or how long they were out or anything else, what they said in post-exit interviews, the verdict is the verdict.

THE COURT:  I agree.

MR. BLOOR:  Okay.

Did I -- I'm not sure you were asking a different question though concerning the 911 transcript?

THE COURT:  I think you both have answered it because I believe -- I agree with defense those questions and asking for the 911 transcript that they were asking of the trial judge is not part of my decision.  It would -- I would agree with all of you.

I -- I just -- I saw that in the transcript, and what I was trying to -- just for my record, I was trying to articulate, as best I can, what evidence the Court can consider, A, at trial, B, at this hearing.

So, now that I've asked a lot of questions, I think it's indicative of me I want to hear any closing arguments by either party that they want to emphasize based on my questions.

Counsel?

**Ex. 17 at 142**

MR. MESTEL:  Well, your Honor, I -- I think I've already closed.  I just have two more things to add --

THE COURT:  Sure.

MR. MESTEL:  -- which I'm hoping will help us.

The State charged with -- the State charged Mr. Goering with this crime.  Mr. Goering didn't work there.  He didn't have access to the manager's office.

THE COURT:  Uh-huh.

MR. MESTEL:  He didn't have access to the keys.  That didn't bother the State when they accused this man of class A felonies that were gonna take him to prison for the rest of his life.  They did it based on the identification.  "I'm positive that this is the man who raped me.  Not Kloepper.  I know him.  He's been to my apartment.  He's not the man who raped me.  Goering is the man who raped me, even though his hair looks a little different."

THE COURT:  Yeah.

MR. MESTEL:  Okay, so the same argument applies that Contreras didn't work at the apartments, and we don't know if he had access to the manager but we know that his sperm was in there.

Now, with regard to the other DNA.  I don't believe, and I think it was Lorraine Heath who was the scientist

**Ex. 17 at 143**

who testified/identified any of that staining as containing sperm, and -- and that's huge, you know?  As you say, you know, hair, skin, all these other things that we shed are things that you expect to find in public.  What we found here isn't something you expect to find in public.

Thank you.

THE COURT:  Thank you.

Anything else, Mr. Bloor or Mr. Clark?

MR. BLOOR:  Well, concerning Mr. Goering, at least he was consistent with the victim's description of the perpetrator.  Mr. Contreras is not.

THE COURT:  Okay, thank you.

MR. BLOOR:  Thank you.

THE COURT:  Well, thank you all for your patience with the Court, and I appreciate your arguments.

As I previously indicated, I'm gonna do my best to have it out in 30 days.  I will tell the folks from out of town, we're down two judges.  I'm doin' my best to juggle dockets, other issues, and try to get my opportunity to do chambers time.

I've been very consistent over the last 15 years to say generally my decision will be within 30 days.  I may be a little over, but I think it's really imperative to get my decision out as quickly as possible after I've

**Ex. 17 at 144**

reviewed all the evidence and made an opportunity to -- to look at it and apply the law to that evidence and then make my decision.

I will, at my utmost, try very hard to do 30 days from today.

MR. MESTEL:  Thank you, your Honor.  We appreciate that.

The last matter from me, your Honor, is whether you can ask Mr. Kloepper whether he's been present during these proceedings and whether he's been able to hear the whole thing.

THE COURT:  That's probably a fair statement.

Mr. Kloepper, can you still hear -- let me unmute you real quick.

Sir, can you hear the Court?

(Whereupon no audible response was made.)

THE COURT:  Sir, I can't -- let me see.  Let me make sure I've got the right one.  There we go.

For the record, can you hear me, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay, at any -- were you able to hear and see these proceedings from where you're located?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And at any time was there any break that you couldn't hear or -- or see anything that was

COLLOQUY                    145

**Ex. 17 at 145**

occurring in the courtroom today?

THE DEFENDANT:  No, your Honor.

THE COURT:  All right, and -- and --

Is there anything else you'd like to ask?

MR. MESTEL:  No.  I just wanted the record to be complete.

THE COURT:  I appreciate that.

I will indicate, for the record, we're on Webex.  I can see and hear him, and I'm grateful for that record now.  I appreciate everybody's time.

If there's nothing further, I'm gonna take a recess.

MR. MESTEL:  Thank you.

THE COURT:  I really appreciate it.  Have a safe trip back.  Nice to see everybody.

MR. MESTEL:  You too.  Thank you, your Honor.

THE COURT:  You bet.  We're in recess.  Have a good afternoon.

Lori, I'll come back in and get the rest of the information, okay?  Thank you.  All right.

(Whereupon the audio recorded proceedings concluded at 12:08 p.m.)

**Ex. 17 at 146**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF BENTON

DEPARTMENT C    HON. JOSEPH BURROWES, JUDGE

STATE OF WASHINGTON,    )
                        )
        Plaintiff,      )
                        )
    vs.                 )         NO. 10-1-01156-4
                        )
CODY KLOEPPER,          )
                        )
        Defendant.      )
                        )

Kennewick, Washington    Wednesday    July 13, 2022

VERBATIM TRANSCRIPT OF

AUDIO-RECORDED HEARING

APPEARANCES:

For the Plaintiff:    **TERRY BLOOR**
                      Deputy Prosecuting Attorney
                      7122 W. Okanogan Place, Bldg. A
                      Kennewick, WA  99336

For the Defendant:    **MARK MESTEL**
                      Attorney at Law
                      221 Oakes Avenue
                      Everett, WA  98201-4407

Transcribed by:    RENEE L. MUNOZ, CCR, RPR, CRR, CRC

JULY 13, 2022 PROCEEDINGS                    147

**Ex. 17 at 147**

Wednesday, July 13, 2022

Kennewick, Washington

(Whereupon the following transcript was created from an audio recording.)

THE COURT:  Okay.  Good morning.

We're here on the matter of State of Washington versus Cody Kloepper, case number 10-1-01156-4.

Counsel, can you hear and see me okay?

MR. MESTEL:  Your Honor, this is Mark Mestel.  I can hear you.

Can you hear me?

THE COURT:  Yes, I can.  Thank you, counsel.

And we have also Mr. Bloor here in the courtroom.

Thank you for following up.  I apologize.  I know it was set a week or so ago, and I was in a trial.  So, I'm sorry for the delay.

MR. BLOOR:  That's okay.  Let me hand up the three orders that we prepared.  I -- I -- you know, in reviewing the orders on the motion for a new trial, the order denying the motion for new trial, I -- to be honest with you, I initially couldn't recollect which order was prepared by me or Mr. Mestel.  I think they're very similar.

**Ex. 17 at 148**

So, you know, they both refer to the Court's findings in its written order, and I think that's all we need to do.  The motion for reconsideration, I think, is a little bit different because I think that there needs to be some -- some finding or some conclusion.  So, I prepared that one.

As I understand it, the defense has not prepared a motion or an order for -- for the motion to reconsider.  So, I ask the Court to sign either.  I prefer mine, but either order on the motion denying -- or the order denying the motion for new trial and then my order on the motion for reconsideration.

I'd also like to, if I could, I think the defense prepared an order of indigency.  You might have that.

THE COURT:  I don't.

MR. BLOOR:  Okay.  Well, just -- just a -- I'll just put on the record the order of indigency provides that the clerk -- at the end provides that the clerk will allow somebody to take the file out of their office for one day and copy it.

I -- I don't think that's a standard deal or a standard provision.  I checked with the clerk, Elaine Osborne, and she is opposed to that.  Adamantly opposed.  So, I'd ask the Court to not -- or at least to strike that provision on the order of indigency if that comes

**Ex. 17 at 149**

before your desk.

I -- I don't -- I don't have any problems with the other provisions and the order for indigency.

THE COURT:  Okay.

MR. BLOOR:  Okay.

THE COURT:  Thank you, Mr. Bloor.

Mr. Mestel, let's -- let's try, I guess, to handle one of them at a time.  I do say I had an email from Josee from Mr. Mestel on the orders, one order denying defendant's motion for a new trial, order on denying defendant's -- there actually were two for a new trial, and then I have Findings Conclusions of Law and order on defendant's motion for reconsideration.

So, Mr. Mestel, why -- why don't we take the one with the motion for a new trial, and -- and then we'll kind of work our way kind of in chronological order.

MR. MESTEL:  Thank you, your Honor.

THE COURT:  You're welcome.

MR. MESTEL:  Your Honor, we asked that this matter be noted before you because we thought there was some tension between the local Civil Rule 52, which required specific findings of fact and conclusions of law, and then recent case law.  There's a case called State versus Frohs, F-r-o-h-s, excuse me, out of Division 1 decided on May 16th.  It was just ordered published,

**Ex. 17 at 150**

and I don't have a cite.

In that case it said it's not always necessary for the Court to issue specific findings of fact and conclusions of law on a CrR 7.8 motion, but we don't want to be in the situation, since this matter's going to go up on appeal, where the State at some point argues that we were procedurally barred because we had not either filed objections to the proposed Findings of Fact Conclusions of Law or some other procedural matter.

We wanted to make certain that a Court of Appeals could hear this matter on -- substantively rather than on some procedural glitch that we may have encountered.  So, that's why we didn't find the initial proposed order denying our motion for new trial.

So, this is our concern, your Honor.  We want to be able to appeal what the -- we want the Court to be able to address the matter on the merits, and we don't want there to be an argument that we somehow had waived an issue because we didn't specifically file formal objections to the findings of fact or conclusions of law.

If that's not an issue, then we don't have a problem with the State's first proposed order simply denying our motion for new trial.  And if that's the case, then we would like a similar order denying the motion to reconsider or for the Court to sign our proposed order

**Ex. 17 at 151**

which simply denotes that there was an evidentiary hearing before the Court, the Court denied our motion, there was a motion to reconsider, and the Court denied that.

We would then file our notice of appeal and go up and explore the matter with the Court of Appeals.

THE COURT:  So -- so, Mr. Mestel, I -- and I'm telegraphing just to some extent, I -- I agree.  I've read the Division III.  I think that it's a de novo review, and obviously I don't want to hamper the State or the defense with respect to any ruling I make on an objectionable issue, and I'm not addressing any of those: my decision and my findings -- I guess my findings and my decision.

So I really -- to that extent, that's just my, I guess, dicta and my -- my comment on my decision.

But I really want to get the case movin' to the extent I want to find an order so that it's -- it's consistent with my ruling for denial of a new trial, and then I don't know how you want to address the motion for reconsideration.  I think I prepared an order, and I think I -- I outlined what I considered in evidence.

So, let me try to back up.  Let's -- again, the order denying defendant's motion for new trial, I have Mr. Bloor's order that is basically one paragraph and my

**Ex. 17 at 152**

signature, and then I have another order that has a -- a number of issues.  It starts out with "this matter" and then it has another paragraph that says, "The Court has issued a letter on April 30th.  The Court denies the defense motion for a reconsideration on May 27th."

I -- I guess, I think, Mr. Mestel, you're trying to combine both of them into one order.

MR. MESTEL:  Yes, your Honor.

THE COURT:  Okay, and -- and, Mr. Bloor, have you seen this order?

MR. BLOOR:  Yes.

THE COURT:  Okay.

MR. BLOOR:  I did.  To be honest with you, I didn't understand that they were trying to combine both orders.

THE COURT:  Yeah.  Mr. Bloor, do you want to approach just to make sure or -- I -- I think they're trying to combine it.  I think it's the --

MR. BLOOR:  Yes.  Mr. Mestel --

THE COURT:  Okay.

MR. BLOOR:  -- sent that to me several weeks ago.

THE COURT:  Okay, thank you.

Is that correct, Mr. Mestel, you're trying to combine both of those -- those orders into one order?

**Ex. 17 at 153**

MR. MESTEL:  Yes, your Honor.

THE COURT:  Okay, and, Mr. Bloor, do you object to that order being combined?

MR. BLOOR:  Well, I think -- I think there should be two separate orders.  I mean, at least have one paragraph saying that the order -- or the motion for a new trial is denied, and then a second paragraph saying the motion for reconsideration -- reconsideration is denied.

THE COURT:  Okay.  With respect to the order for denying the defendant's motion for a new trial, Mr. Bloor, I'm gonna sign your order.  It is just cut and dry denied, and it does not limit anyone's authority to appeal any of my decisions or argue my decisions.

So, I'm gonna sign that one.

And then, Mr. Mestel, I -- I think I -- let me just ask ya', and Mr. Bloor, I think I prepared -- and I do.  It's been filed, an order to motion for reconsideration.

Are you both arguing now that it's insufficient or you want me to modify it in some way or amend it in some way?  Because I think I have an order.

MR. MESTEL:  Your Honor, I -- I need to see the order that you're referring to, if it's possible, because I now have more orders than I can keep track of.

THE COURT:  Yeah.  I -- Mr. Mestel, I sometimes

**Ex. 17 at 154**

get that way too.

I'm referring to an order, my order, signed May 27, 2021, and it's also stamped by the clerk on May 27, 2022, at 11:04 a.m. and it sets forth -- again, it says - when you get there - what evidence I considered.  It's spelling out one and two, and then I just said, "Therefore, the defendant's motion for reconsideration is denied."

And it's -- I think it embraces both parties' intent that it doesn't limit any argument by either party, but I'll hear from you, Mr. Mestel.

MR. MESTEL:  Your Honor, I hate to impose upon you, but I can't find it.

Can you just read the order to me?

THE COURT:  Sure.  Absolutely.  No problem.  You gotta love technology.

MR. BLOOR:  Mr. Mestel, if it helps, this was the memorandum decision by the Court denying the motion for reconsideration.  It was --

THE COURT:  So -- go ahead, Mr. Bloor.

MR. BLOOR:  Go ahead.

THE COURT:  Okay.  So -- so my order, as indicated, dated May 27, 2022, it says,

"Comes now the Court having considered the defendant's motion for reconsideration filed on May 11,

**Ex. 17 at 155**

2022 and reviewed the following:

(1)  Plaintiff's motion to reconsider pursuant to Civil Rule 59(a)(7) and (9).

(a)  Exhibit 1 stipulation with appendix one.

(b)  Exhibit 2 Gmails from Mark Mestel versus Terry Bloor dated February 24th, 2022, March 2nd, 2022, March 7th -- March 2nd, 2022, March 7th, 2022.

(c)  Proposed order on motion for reconsider.

(d)  Defendant's reply memorandum reference motion to reconsider received May 24th, 2022.

(2)  Plaintiff's response to defendant's motion to reconsider.  Bench copy received May 19th, 2022.

Therefore, the defendant's motion for reconsideration is denied.

It is further ordered that the Court Administration office shall forthwith send copies of this order to the parties or attorneys, if represented, at their respective address of record.

Dated 27th day of May, 2021."

And it's wrong.  It should be 2022.

MR. MESTEL:  Thank you.  Thank you very much, your Honor.

THE COURT:  Yeah.

MR. MESTEL:  I have no -- no other objection to the Court entering that order.

**Ex. 17 at 156**

THE COURT:  Looks like --

MR. MESTEL:  I don't believe --

THE COURT:  Go ahead.

MR. MESTEL:  I don't believe I ever received that order initially, and I would appreciate it if the clerk would send me a copy once it's signed.

THE COURT:  I think I have to amend the order now to indicate that it's the wrong year.

MR. MESTEL:  Okay.

THE COURT:  I think it -- it was my error for noting it was May 27, 2021, and it really needs to be May 27, 2022, and I'll write "amended" and I'll make sure you get a copy, Mr. Bloor.  I'll also email you.  I just want it to be correct --

MR. MESTEL:  Thank you, your Honor.

THE COURT:  -- for the appeals.

So, I don't think I need any other order unless Mr. Bloor or Mr. Mestel would want to make an argument.

MR. BLOOR:  No, I don't want to --

MR. MESTEL:  Your Honor?

MR. BLOOR:  Go ahead, Mr. Mestel.

MR. MESTEL:  Your Honor, I did send Josee a proposed order of indigency to allow Mr. Kloepper to pursue an appeal at public expense.  In Snohomish County where I predominantly practice, we are allowed to check

out -- attorneys are allowed to check out files overnight, which is why we use that provision, but if that's not the practice in Benton County - assuming you get my proposed order - then I have no objection to the Court striking that and whatever attorney is appointed to represent Mr. Kloepper on appeal can simply come to the courthouse and then copy whatever portions of the file are necessary.

THE COURT:  Counsel, I -- I appreciate your comments.  It is not the practice.  I've never -- even as a practicing attorney, as a district court judge, and now a Superior Court judge - I don't want to go sideways with the clerk - they never let me take the file out of my office or the courthouse.  I may have taken it out of their office, but I don't want to go sideways with the clerk on that.

So, I -- I will strike that out.  I'll strike that, but I haven't seen the order.  And my apologies.  I printed everything out that was sent to me in email.  So, I will go searching for it and try to find it for you folks, and then sign it and get it to you.  I will also amend the order on the motion for order on reconsideration to correct the correct year.  My apologies for that error on my behalf.

So, anything else for the good of the court?

**Ex. 17 at 158**

MR. BLOOR:  No.

MR. MESTEL:  None, your Honor.  Thank you very much.

MR. BLOOR:  I just -- just for the record, I would request -- I'm not gonna argue with the Court, and I understand --

THE COURT:  No.  No.  No.

Go ahead.

MR. BLOOR:  I think there might be some additional findings that you could make along the lines that we've suggested, but if --

THE COURT:  I'm -- I'm willing to hear it, Mr. Bloor.  So, if you'd like to make -- are these the findings you handed me?

MR. BLOOR:  Yes.

THE COURT:  Okay, and, Mr. Mestel, based on my error, I'll be happy to consider the Findings of Fact Conclusions of Law and order on defendant's motion for reconsideration.

And have you had an opportunity to look at the -- Mr. Bloor's order?

MR. MESTEL:  I have, your Honor, and we object to it.  We think he's just kind of cherry picking things to put in there to try to make an appeal less likely to succeed and doesn't really reflect what you put in your

**Ex. 17 at 159**

letter and order denying the motion to reconsider.

We are content with the order that you read to us and which you indicated you were going to enter.

THE COURT:  And -- and if I could, if I -- since I'm here and I want to make sure I have a meaningful hearing, if you could go -- do you have the order, Mr. Mestel?  Do you have the order from Mr. Bloor?

What I'm attempting to do is maybe make an argument and strike or leave some of the information in there and then just get this order signed.

MR. MESTEL:  I do have -- I do have what I believe was Mr. Bloor's proposed order if it's called "Findings of Fact Conclusions of Law and Order on the Motion For Reconsideration."

THE COURT:  Yes.

MR. MESTEL:  It has two exhibits referenced in the body of the proposed order?

THE COURT:  Correct.

MR. MESTEL:  Yeah.  I have that.

THE COURT:  And if you could, just for the record, tell me what part of the order you object to?

MR. MESTEL:  Yes, your Honor.

One, we object to paragraph three, which references a police interview.  We don't believe that was properly before the Court and that it was hearsay.  We object to

**Ex. 17 at 160**

paragraph four, which is the Court indicating its opinion of the credibility of Mr. Contreras.

THE COURT:  Okay, and, Mr. Bloor, back to you. This is on the motion to reconsider specifically; is that correct?

MR. BLOOR:  Correct.

THE COURT:  Okay, and -- and obviously it's your order.  You -- you would like those three and four in there; is that correct?

MR. BLOOR:  Correct.

THE COURT:  And the basis for that -- you know, I'm -- I'm trying to balance the issues not only my decision and the motion to reconsideration and what I considered in the motion to reconsideration.

So, how -- strike that.

What's your proposition for the justification of three and four?

MR. BLOOR:  Well, as I've heard the Court speak today, it's pretty clear to me that you were referring back to your order denying the motion for a new trial along with the other memorandums and information, and I tried, I think, with that understanding that -- and I hope the Court of Appeals understands that too: that your order denying the motion for a new trial did include comments about the strength of the State's case and the

**Ex. 17 at 161**

credibility of Mr. Contreras.

So, you know, I -- I think that I understand the reasoning by the Court, and I -- I believe that I probably think you'll say well the findings that you proposed are already -- are already in your motion or in your order denying the motion for a new trial.

THE COURT:  Correct.

MR. BLOOR:  So, on that basis, I think I'll -- I'll withdraw the suggestion.

THE COURT:  Okay.

MR. BLOOR:  If you want, if you're going to prepare a new order denying the motion for new -- for reconsideration --

THE COURT:  I am.

MR. BLOOR:  -- changing the order -- changing the year, if you want anything else from us let me know, but I'd be glad --

THE COURT:  No.

MR. BLOOR:  -- to prepare an order like I did on the order denying a motion for new trial just saying you considered it and it's just denied.

However, I think that the memorandum decision is fine.

THE COURT:  Okay.  So, Mr. Mestel, I'm going to agree with you.

**Ex. 17 at 162**

Thank you, Mr. Bloor, for that.

He is withdrawing three and four, and I'm removing three and four.  Once I've removed three and four, are you in agreement as to form only on that order?

MR. MESTEL:  Well, your Honor, I'm not sure why there are any findings of fact concerning the motion to reconsider.  I -- I -- I thought the order that you had read earlier simply denying the motion was sufficient.  We put into our motion to reconsider that there really was no need for us to file a motion to strike or to do something when you said you had read the entire trial.

THE COURT:  Yeah.

MR. MESTEL:  I'd also pointed out that the Court's presumed to only rely on admissible testimony.  These are issues that are best served by arguments at the Court of Appeals.  We just don't want to get caught in a quagmire of dealing with findings that we don't believe are necessary.

So, once again, we have no objection to the order that the Court read with the understanding that you were going to change the date to 2022.  We do have objection to the State's proposed order.  Three and four were my most significant objections, but I object to all the findings of fact.

THE COURT:  Thank you.

**Ex. 17 at 163**

The Court will prepare its own order amending the year and leave it as is.  I'll amend it today, sign it today, and I'll get it out to the parties.

The -- the other issue, I just want to make sure, I'm not -- I want to be on the record.  I haven't seen the -- the indigency order.  It's not been filed with the clerk.  It is not on eMotion.  I just checked before I walked in this door if there was any additional information.

So, I will try to track it down through Josee, and I -- I really -- I don't want to hold anything up on my part.  So, that's my record.

MR. MESTEL:  Your Honor, I emailed it to Josee yesterday, and I received an email back informing me that she was out of the office.

THE COURT:  Okay.  Maybe that's why I didn't get it.

MR. MESTEL:  She wouldn't be back until today.

THE COURT:  I'll go looking for it then.

MR. MESTEL:  All right.

THE COURT:  Thank you.

MR. MESTEL:  Okay.  Thank you very much.

THE COURT:  You're welcome.

Anything else?

MR. BLOOR:  No, your Honor.

**Ex. 17 at 164**

THE COURT:  Thank you.  Thank you both.  Have a wonderful day.

We'll be in recess.

MR. MESTEL:  Thank you.

THE COURT:  Thank you.

MR. MESTEL:  Bye.

(Whereupon the audio recorded proceedings concluded.)

**Ex. 17 at 165**

STATE OF WASHINGTON      )
                         )              SS.
COUNTY OF BENTON         )

    I, RENEE L. MUNOZ, do hereby declare under penalty of perjury under the laws of the State of Washington that the following is true and correct:

    1.   That I am an authorized transcriptionist;

    2.   I received the electronic recording from the Benton County Clerk's Office;

    3.   This transcript is a true and correct record of the proceedings to the best of my ability, including any changes made by the trial judge reviewing the transcript;

    4.   I have no financial interest in the litigation.

    Dated in Kennewick, Washington, this _____ day of _____, 2023.

_____
RENEE L. MUNOZ, RPR, CRR, CRC
State of Washington CCR #2330
Official Court Reporter
Benton-Franklin Counties

AUDIO TRANSCRIPTION CERTIFICATE                    166

**Ex. 17 at 166**

STATE OF WASHINGTON        )
                          )          SS.
COUNTY OF BENTON           )

I, RENEE L. MUNOZ, Official Certified Court Reporter of the Superior Court of the Kennewick Judicial District, State of Washington, in and for the County of Benton, hereby certify under penalty of perjury that the foregoing pages comprise a full, true, and correct transcript of the proceedings had in the within-entitled matter, recorded by me in stenotype on the date and at the hour herein written, and thereafter transcribed by computer-aided transcription into typewriting to the best of my ability, including any changes made by the trial judge reviewing the transcript.  I am in no way related to or employed by any party in this matter, nor any counsel in the matter, I have no financial interest in the litigation, and that I am certified to report Superior Court proceedings in the State of Washington.

SIGNED and DATED this __10th__ day of _____March_____, 2023.

_____
RENEE L. MUNOZ, RPR, CRR, CRC
State of Washington CCR #2330
Official Court Reporter
Benton-Franklin Counties

VERBATIM TRANSCRIPTION CERTIFICATE                    167

**Ex. 17 at 167**

**March 10, 2023 - 10:31 AM**

**Transmittal Information**

| | |
|---|---|
| **Filed with Court:** | Court of Appeals Division III |
| **Appellate Court Case Number:** | 39076-4 |
| **Appellate Court Case Title:** | State of Washington v. Cody Joseph Kloepper |
| **Superior Court Case Number:** | 10-1-01156-4 |

**The following documents have been uploaded:**

- 390764_Report_of_Proceedings - Volume 1_20230310103007D3662433_8216.pdf
    This File Contains:
    Report of Proceedings - Volume 1, Pages 01 to 167, Hearing Date(s):
  09/29/2021;11/12/2021;12/03/2021;03/22/2022;07/13/2022    *Report of Proceedings is Under 500 pages*
    *No Hard Copy will be Filed*

    *The Original File Name was St V C Kloepper.pdf*

**A copy of the uploaded files will be sent to:**

- greg@washapp.org
- prosecuting@co.benton.wa.us
- wapofficemai@washapp.org
- wapofficemail@washapp.org

**Comments:**

---

Sender Name: Renee Munoz - Email: rmunozrptr@aol.com
Address:
Superior Court Administration
7122 W. Okanogan Pl., Bldg. A
Kennewick, WA, 99336
Phone: (509) 736-3071 EXT 3187

**Note: The Filing Id is 20230310103007D3662433**

**Ex. 17 at 168**

# EXHIBIT 18

JOSIE DELVIN
BENTON COUNTY CLERK

2022 MAY -2 AM 8: 54

FILED

BENTON COUNTY JUSTICE CENTER
FRANKLIN COUNTY COURTHOUSE

# SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR BENTON AND FRANKLIN COUNTIES

7122 W. Okanogan Place, Ste.A130, Kennewick, WA 99336

SUPERIOR COURT JUDGE
JOSEPH M. BURROWES

TELEPHONE (509) 736-3071
FAX (509) 736-3057

April 30, 2022

Mr. Terry Bloor
Attorney at Law
Benton County Prosecutors Office
7122 W. Okanogan Place, Ste. A-130
Kennewick, WA 99336

Mr. Andrew Clark
Attorney at Law
Benton County Prosecutors Office
7122 W. Okanogan Place, Ste. A-130
Kennewick, WA. 99336

Ms. Jacqueline McMurtrie
Attorney at Law
Washington Innocence Project
P.O. Box 85869
Seattle, WA 98145

Mr. Mark Mestel
Attorney at Law
Washington Innocence Project
P.O. Bo 85869
Seattle, WA 98145

Ms. Lara Zarowsky
Attorney at Law
Washington Innocence Project
P.O. Box 85869
Seattle, WA 98145

***Re: State of Washington vs. Cody Joseph Kloepper, Case #10-1-01156-4***

Dear Attorneys,

Please accept this letter as my decision in the above-referenced matter.

## I.  BACKGROUND

On December 5, 2009, Richland Police received a report of an assault and rape that had taken place at 250 Gage Boulevard (the Villa Apartments), apartment #L4086, in Richland, Washington.

According to Richland Police Officer Calvin Nash, he met the victim, D.W., in which he described her as being covered in blood in the head region as well as both her arms and hands.

1

D.W. told Officer Nash she had woken up at around 4 a.m. to make coffee in her kitchen when a man struck her with what she believed to be a tire iron. She said he then pushed her into the living room and continued to assault her on her head and arms. At one point, she told the male suspect to just rape her and not to kill her. The male pulled her pants down and attempted to penetrate her but was unable to obtain an erection. D.W. said he penetrated her with his finger and rubbed his penis around her anal region. When the suspect was finished, he told D.W. that if she ever identified him, he would kill her.

D.W. indicated she was not sure how the suspect entered her apartment, as she believed the door was locked. When officers arrived on the scene there were no signs of forced entry. Officers attempted to collect fingerprints at the scene; however, there were no prints lifted from the residence. Officers were able to collect what appeared to be a fingertip fragment of a latex glove.

The fingertip fragment evidence collected was covered in blood and was found on the living room floor as along with hair samples. Both samples were collected and sent to the Washington State Patrol Crime Lab for Deoxyribonucleic Acid (DNA) exam.

D.W. was provided a photo montage of 23 potential suspects. She originally identified Karl Goering out of the photos as well as a line up, as he fit the description she had given of a white Caucasian male with long hair. However, one of the suspects in the photo montage was Cody Kloepper. According to the evidence, Mr. Kloepper had cut his hair the day the photo was taken.

Officers interviewed Mr. Kloepper and he told them he had gone out drinking on December 4, 2009 with friends for a few hours and afterward followed a friend home to Kennewick to make sure he got home safe. Mr. Kloepper said he was going home when he realized he was too drunk to drive, so he stopped at the Villa Apartments where he works and spent the night in one of the vacant apartments. He said he had a key to the manager's office where all the keys to the complex were kept and he grabbed the keys to a vacant apartment.

On April 30, 2010, Richland Police Department received information that the fingertip of the latex glove sent to Washington State Patrol Crime Lab for DNA testing proved to be a match with Mr. Kloepper and not Mr. Karl Goering, who was the other suspect identified by D.W.

A forensic examination of Mr. Kloepper's computer showed he logged onto his computer at 11:44 pm, on December 4, 2009. Mr. Kloepper's computer showed he visited Craigslist, specifically viewing a "men seeking men" personal ad. Mr. Kloepper begin emailing one email address from this ad five minutes later at 11:49 pm. According to the forensic examination, the email belonged to Salvador Contreras.

2

**Ex. 18 at 002**

Officers contacted Mr. Contreras who stated that he took out the Craigslist ad "men seeking men" and that Mr. Klopper responded to the ad. He indicated the Mr. Kloepper came to his residence early in the morning of December 5, 2009, for a sexual encounter.

According to Mr. Contreras, they did not have sexual intercourse. He stated that he and Mr. Kloepper were at least partially undressed, and Mr. Kloepper touched his penis and chest. Mr. Contreras indicated it was a "good possibility" that he ejaculated during the encounter with Mr. Kloepper. He stated he normally ejaculated quickly with minimum stimulation and even without an erection.

On November 12, 2010, Mr. Kloepper was arrested and charged for Rape in the First Degree With a Deadly Weapon Allegation and Deadly Weapon Enhancement; Assault in the First Degree With a Deadly Weapon Allegation and Deadly Weapon Enhancement; and Burglary in the First Degree With a Deadly Weapon Allegation and Deadly Weapon Enhancement.

On August 15, 2011, the defendant was convicted as charged following a jury trial.

On February 28, 2018, the Court entered a Stipulation and Order for Preservation of Evidence in the case for a period of one year from the date of this Order.

On February 7, 2019, the Court entered a Stipulation and Order for Preservation of Evidence in the case through February 28, 2020.

On February 21, 2020, the Court entered a Stipulation and Order for Preservation of Evidence to submit items of evidence to the Washington State Patrol Crime Laboratory for postconviction DNA analysis and testing pursuant to RCW 10.73.170. This Order extended the preservation of evidence until February 28, 2022.

On August 8, 2021, the defendant filed a Motion and Memorandum to Vacate Judgment, pursuant to Criminal Court Rule 7.8, and Order a New Trial and/or request for an Evidentiary Hearing.

On January 4, 2022, a Motion for Pre-Assignment and to Schedule Evidentiary Hearing was entered by the Court, pursuant to the defendant's Motion for New Trial.

On March 22, 2022, the Court held an evidentiary hearing on the defendant's Motion for New Trial.

## II. LEGAL STANDARD – MOTION TO VACATE JUDGMENT AND ORDER NEW TRIAL

3

**Ex. 18 at 003**

A. Superior Court Criminal Rules

Washington Criminal Court Rules (CrR) specify the grounds upon which a Court may grant a motion for a new trial. The purpose of a motion for a new trial is to accord the trial judge an opportunity to consider and correct, if necessary, any erroneous rulings made by the Court during the proceeding.

Grounds for a new trial are considered when it affirmatively appears that a substantial right of the defendant was materially affected. CrR 7.5. The Court, upon the defendant's motion, may grant a new trial for any one of the following reasons:

> (1) Receipt by the jury of any evidence, paper, document or book not allowed by the court;
>
> (2) Misconduct by the prosecution or jury;
>
> (3) Newly discovered evidence material to the defendant's case, which could not have been discovered with reasonable diligence and produced at trial;
>
> (4) Accident or surprise;
>
> (5) Irregularity in the proceedings of the court, jury or prosecution, or any court order or abuse of discretion which prevented the defendant from having a fair trial;
>
> (6) Error of law occurring at trial and objected to at that time by the defendant;
>
> (7) That the verdict or decision is contrary to law and the evidence;
>
> (8) That substantial justice has not been done. When the motion is based on matters outside the record, the facts shall be shown by affidavit. ...

CrR 7.5(a).

Criminal Rule 7.8, Relief from Judgement or Order, provides in part:

"... **(b) Mistake; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc.**

On motion and upon such terms as are just, the Court may relieve a party from a final judgment, order or proceeding for the following reasons...:

"... (2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5; ..."

"... **(c) Procedure on Vacation of Judgment.**

4

**Ex. 18 at 004**

"(1) Motion. Application shall be made by motion stating the grounds upon which relief is asked, and supported by affidavits setting forth a concise statement of the facts or errors upon which the motion is based. ..."

"... (3) Order to Show Cause. If the court does not transfer the motion to the Court of Appeals, it shall enter an order fixing a time and place for hearing and directing the adverse party to appear and show cause why the relief asked for should not be granted."

CrR 7.8.

   B. Case Law

As stated in *State v. Letellier,*

"[F]rom a substantial body of cumulative law, come well-defined principles declaring that a new trial will not be granted on the ground of newly discovered evidence unless five elements are established:

   (1) The claimed newly discovered evidence must be such that it will probably change the result if a new trial is granted.
   (2) The evidence must have been discovered since the trial.
   (3) It must be shown that the evidence could not have been discovered before the trial by the exercise of due diligence.
   (4) The evidence must be material to the issue and admissible.
   (5) The newly discovered evidence cannot be merely cumulative or impeaching.

*State vs. Letellier,* 16 Wash.App. 695, 699-700, 558 P.2d 838, 841 (1977). *See also State v. Williams,* 96 Wn.2d 215, 223, 634 P.2d 868 (1981).

In ruling on a motion for a new trial based on newly discovered evidence, broad discretion is vested in the trial court which will not be disturbed except for a manifest abuse of that discretion. *Letellier,* 16 Wash.App. at 700, *quoting Nelson v. Mueller,* 85 Wash.2d 234, 240, 533 P.2d 383 (1975). In exercising its discretion as to whether newly discovered evidence requires a new trial, the trial court must evaluate the credibility, significance, and cogency of the proffered evidence. *State v. Barry,* 25 Wn.App. 751, 758, 611 P.2d 1262 (1980); *State v. Castro,* 32 Wash.App. 559, 565, 648 P.2d 485 (1982).

"[A] burden thus falls on the party seeking a new trial based on newly discovered evidence, not only that the other four elements are met, but to show the court that the newly discovered evidence will probably change the result of the trial." *Letellier,* 16 Wash.App. at 702-703; *State v. Peele,* 67 Wn.2d 724, 409 P.2d 663 (1966); and *State v. Mesaros,* 62 Wash.2d 579, 384 P.2d 372 (1963).

5

**Ex. 18 at 005**

Accordingly, a new trial may be granted on the basis of newly discovered evidence if (1) the evidence has been discovered since the trial, (2) it could not have been discovered before trial by the exercise of diligence, (3) it is material, (4) it is not merely cumulative or impeaching, and (5) it will probably change the result if a new trial is granted. *See* CrR 7.5(a)(3) and *Castro*, 32 Wn. App. at 565.

While a trial judge has broad discretion in granting motions for a new trial, such discretion does not give the court license to weigh the evidence and substitute its judgment for that of the jury, simply because the court may disagree with the verdict. *State v. Williams*, 96 Wn.2d 215, 221, 634 P.2d 868 (1981). Thus, where there is substantial evidence on both sides of an issue, the finding of the jury is final, it is an abuse of discretion for a trial court to grant a new trial "simply because it may disagree with the verdict." *Id.*

A new trial may be granted on the grounds that substantial justice has not been done only if the trial judge gives definite reasons of law and facts to justify the order. *Williams*, 96 Wn.2d at 228.

    C.  Revised Code of Washington.

According to Revised Code of Washington (RCW) 10.73.100, "Collateral Attack – When one year limit not applicable," the time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on one or more of the following grounds:

(1) Newly discovered evidence, if the defendant acted with reasonable diligence in discovering the evidence and filing the petition or motion;

(2) The statute that the defendant was convicted of violating was unconstitutional on its face or as applied to the defendant's conduct;

(3) The conviction was barred by double jeopardy under Amendment V of the United States Constitution or Article I, section 9 of the state Constitution;

(4) The defendant pled not guilty and the evidence introduced at trial was insufficient to support the conviction;

(5) The sentence imposed was in excess of the court's jurisdiction; or

(6) There has been a significant change in the law, whether substantive or procedural, which is material to the conviction, sentence, or other order entered in a criminal or civil proceeding instituted by the state or local government, and either the legislature has expressly provided that the change in the law is to be applied retroactively, or a court, in interpreting a change in the law that lacks express legislative intent regarding retroactive application, determines that sufficient reasons exist to require retroactive application of the changed legal standard.

RCW 10.73.170, "DNA testing requests," provides for the following:

(1)    A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the

6

motion provided to the state office of public defense.

(2) The motion shall:
  (a) State that:
    (i) The court ruled that DNA testing did not meet acceptable scientific standards; or
    (ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
    (iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;
  (b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and
  (c) Comply with all other procedural requirements established by court rule.

(3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

(4) Upon written request to the court that entered a judgment of conviction, a convicted person who demonstrates that he or she is indigent under RCW 10.101.010 may request appointment of counsel solely to prepare and present a motion under this section, and the court, in its discretion, may grant the request. Such motion for appointment of counsel shall comply with all procedural requirements established by court rule.

(5) DNA testing ordered under this section shall be performed by the Washington state patrol crime laboratory. Contact with victims shall be handled through victim/witness divisions.

(6) Notwithstanding any other provision of law, upon motion of defense counsel or the court's own motion, a sentencing court in a felony case may order the preservation of any biological material that has been secured in connection with a criminal case, or evidence samples sufficient for testing, in accordance with any court rule adopted for the preservation of evidence. The court must specify the samples to be maintained and the length of time the samples must be preserved.

According to RCW 5.70.005, "DNA Evidence," it provides, in part, the following:

(1) "Amplified DNA" means DNA generated during scientific analysis using a polymerase chain reaction.

(2) "Association" means the Washington association of sheriffs and police chiefs.

(3) "DNA work product" means (a) product generated during the process of scientific analysis of such material, except amplified DNA, material that had been subjected to DNA extraction, screening by-products, and DNA extracts from reference samples; or (b) any material contained on a microscope slide, swab, in a sample tube, cutting, DNA extract, or some other similar retention method used to isolate potential biological

7

**Ex. 18 at  007**

evidence that has been collected by law enforcement or a forensic nurse as part of an investigation and prepared for scientific analysis, whether or not it is submitted for scientific analysis and derived from:

(i)     The contents of a sexual assault examination kit;
(ii)    Blood;
(iii)   Semen;
(iv)    Hair;
(v)     Saliva;
(vi)    Skin tissue;
(vii)   Fingerprints;
(viii)  Bones;
(ix)    Teeth; or
(x)     Any other identifiable human biological material or physical evidence. Notwithstanding the foregoing, "DNA work product" does not include a reference sample collected unless it has been shown through DNA comparison to associate the source of the sample with the criminal case for which it was collected.

(4) "Governmental entity" means any general law enforcement agency or any person or organization officially acting on behalf of the state or any political subdivision of the state involved in the collection, examination, tracking, packaging, storing, or disposition of biological material collected in connection with a criminal investigation relating to a felony offense.

(5) "Investigational status" means:

a.     The agency case or incident number;
b.     The date the request for forensic examination of the sexual assault kit was submitted to the Washington state patrol crime laboratory;
c.     The date the forensic examination was complete and reported to the law enforcement agency;
d.     Whether the case is open or closed;
e.     Whether the case was reopened as a result of the hit in the combined DNA index system;
f.     For open cases, whether the case remains:
       (i)     An active investigation;
       (ii)    Open pending forensic examination results; or
       (iii)   Open and inactive, in which case the agency must include a brief description as to why the case is inactive; and

(6) "Reference sample" means a known sample collected from an individual by a governmental entity for the purpose of comparison to DNA profiles developed in a criminal case.

8

(7) "Screening by-product" means a product or waste generated during examination of DNA evidence, or the screening process of such evidence, that is not intended for long-term storage.

"Preservation of DNA Work Product," RCW 5.70.010, provides, in part, the following:

(1) In any felony case initially charged as a violent or sex offense, as defined in RCW 9.94A.030, a governmental entity shall preserve any DNA work product that has been secured in connection with the criminal case, including related investigatory reports and records, according to the following guidelines:

(a) Except as provided in (b) of this subsection, where a defendant has been charged and convicted in connection with the case, the DNA work product and investigatory reports and records must be maintained throughout the length of the sentence, including any period of community custody extending through final discharge;

(b) Where a defendant has been convicted and sentenced under RCW 9.94A.507 in connection with the case, the DNA work product and investigatory reports and records must be maintained for ninety-nine years or until the death of the defendant, whichever is sooner; and

(c) Where no conviction has been made in connection with the case, the DNA work product and investigatory reports and records must be maintained for ninety-nine years or throughout the period of the statute of limitations pursuant to RCW 9A.04.080, whichever is sooner.

(2) Notwithstanding subsection (1) of this section, in any felony case regardless of whether the identity of the offender is known and law enforcement has probable cause sufficient to believe the elements of a violent or sex offense as defined in RCW 9.94A.030 have been committed, a governmental entity shall preserve any DNA work product secured in connection with the criminal case and investigatory reports and records for ninety-nine years or throughout the period of the statute of limitations pursuant to RCW 9.9A.04.080, whichever is sooner...."

D. Evidence Rules

Evidence Rules (ER) "shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained, and proceedings justly determined." ER 102.

In criminal cases, the State has the usual burden of proving the guilt of the defendant beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L.Ed. 2d 368 (1970). RCW 9A.04.100 provides: "(1) Every person charged with the commission of a crime is

9

**Ex. 18 at  009**

presumed innocent unless proved guilty. No person may be convicted of a crime unless each element of such crime is proved by competent evidence beyond a reasonable doubt."

"[U]nless all of the evidence viewed in the light most favorable to the prosecution could permit a rational trier of fact to have found proof of the essential elements of a crime beyond a reasonable doubt, a conviction cannot be constitutionally affirmed." *State v. Edwards*, 23 Wash.App. 893, 897, 600 P.2d 566 (Div. I, 1979), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct 2781 (1979).

ER 401 provides "'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A question whether evidence is relevant is for the judge to determine. *Davidson v. Municipality of Metropolitan Seattle*, 43 Wash.App. 569, 573-74, 719 P.2d 569 (Div. I, 1986).

Relevant evidence must be of probative value and material. Relevant evidence is broadly defined as "evidence having any tendency to make the existence of any fact ... more probable or less probable[.]" *Salas v. Hi-Tech Erectors*, 168 Wash.2d 664, 669, 230 P.3d 583 (2010).

"Materiality is judged not only upon what the evidence shows standing alone, but also on whatever inferences may be drawn when it is viewed in connection with other evidence. Relevant and material evidence is admissible. Its cogency and the degree to which it elucidates facts in issue become matters of the weight given the evidence by the jury." *State v. Whalon*, 1 Wash.App. 785, 791, 464 P.2d 730 (Div. II, 1970)

The admissibility of evidence often turns on factual determinations. The evidence rules reflect the widely held view that a reasoned evaluation of the facts is often impossible without the proper application of scientific, technical, or specialized knowledge. *Wash.Practice 702.1* and *Fed.R.Evid. 702 Advisory Committee Note.*

Expert testimony is expressly permitted under ER 702, and the normal rules requiring a witness to avoid opinion testimony and to testify from firsthand knowledge are modified to accommodate the testimony of the expert. ER 702 permits expert testimony, opinion or otherwise, in order to assist the trier of fact in understanding the evidence or issues. The rule gives the trial court considerable discretion in determining the circumstances under which expert testimony will be allowed. *See State v. Stenson*, 132 Wash.2d 668, 715-16, 940 P.2d 1239 (1997).

Generally, no expert opinion is admissible over objection unless the witness has first been qualified by a showing that he or she has sufficient expertise to state a helpful and meaningful opinion. *See Sehlin v. Chicago Milwaukee, St. Paul and Pacific R. Co.*, 38 Wash.App. 125, 686 P.2d 492 (Div. III 1984). Ordinarily, the necessary foundation is established by questioning the expert himself or herself. Karl B. Tegland, COURTROOM HANDBOOK ON WASHINGTON EVIDENCE §702:2 at 327 (2018-2019 Ed.).

10

The witness need not possess the academic credentials of an expert; practical experience may suffice. *See Watness v. City of Seattle*, 11 Wash.App. 2d 722, 751, 457 P.3d 1177 (Div. I 2019). Training in a related field or academic background alone may also be sufficient. *See Johnston-Forbes v. Matsunage*, 177 Wash.App. 402, 411, 311 P.3d 1260 (Div. II 2013). Rule 702 provides a very broad view that the witness may qualify as an expert by virtue of knowledge, skill, experience, training, *or* education. Tegland, *supra* at §702:2.

Assuming the witness qualified as an expert and his or her opinion is otherwise admissible, the opinion is not objectionable simply because it is qualified by the words or phrases such as "I think," "could have been," "possible," or the like. *Stenson*, 132 Wash.2d at 715-716, 940 P.2d (1997).

"It has been scientifically established that there is a unique pattern to the chemical structure of the deoxyribonucleic acid (DNA) contained in each cell of the human body." RCW 43.43.753. The legislature went on to state that DNA typing "is superior to that of any presently existing technique and recognizes the importance of this scientific breakthrough in providing a reliable and accurate tool for the investigation and prosecution of sex offenses as defined in RCW 9.94A.030(26) and violent offenses as defined in RCW 9.94A.030(29). *See RCW 43.43.752, RCW 43.43.753,* Legislative finding, accompanying RCWA 43.43.752 and Karl B. Tegland, COURTROOM HANDBOOK ON WASHINGTON EVIDENCE §702:40 (6th Ed.).

In *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502 (1993), the Supreme Court expressed confidence in DNA testing but cautioned that the technique must be carefully applied on a case-by-case basis. In *Cauthron*, the defendant was charged with multiple counts of rape. *Cauthron*, 120 Wash.2d at 882. The defendant was convicted and, on appeal, argued that evidence based upon DNA testing should not have been admitted at trial. *Id*. The Supreme Court chose to analyze the issue in two steps. The court first examined the validity of the underlying scientific principles and the technical aspects of DNA testing. After an extensive review of the literature, the court concluded that the restricted fragment length polymorphism (RFLP) method of DNA testing, as employed in the present case, was generally accepted in the scientific community, thus satisfying the *Frye* rule. *Id*. at 896-98. Because DNA evidence is now widely accepted, it is normally unnecessary for the trial court to hold a *Frye* hearing to determine whether the underlying theories and the testing methods are generally accepted in the scientific community. *See State v. Bander*, 150 Wash.App. 690, 208 P.3d 1242 (Div. I 2009).

## III.     ARGUMENTS

### A. Summary of the Defendant's Arguments

The defense argues that Cody Kloepper is innocent based on newly discovered DNA evidence identifying Salvador Contreras's sperm on stains taken from six crucial locations on the clothing worn by the victim as she was sexually assaulted in her apartment. Mr. Kloepper was excluded as a contributor to the sperm fractions and cell fractions from each of the six stains.

11

**Ex. 18 at 011**

Postconviction DNA testing also included Mr. Contreras as a contributor to a Y-STR mixture from a rubber fingertip fragment found in the victim's apartment, which was covered in her blood.

When the newly discovered DNA results are considered in the context of the evidence admitted at Mr. Kloepper's trial, the defendant argues that the result of his trial would probably be different. The victim, who knew Mr. Kloepper because he worked as a maintenance man at her apartment complex, viewed two separate photo line-ups with Mr. Kloepper's photograph. She recognized him and did not select his photo. Another suspect was arrested after the victim identified him as her attacker in two separate procedures.

At Mr. Kloepper's 2011 trial, the prosecutor argued Mr. Kloepper was the only person whose DNA was linked to the apartment based on a Y-STR result found a rubber fingertip fragment that was consistent with Mr. Kloepper. The Defendant asserts that had Mr. Kloepper's 2011 jury been aware of the new DNA evidence identifying Mr. Contreras, and excluding Mr. Kloepper, as the man who left semen and sperm all over the victim's clothing, and matching Mr. Contreras's to a DNA profile on the rubber fingertip fragment, the result of the trial would have probably been different.

The State argues that Mr. Contreras's DNA could have been transferred to the scene by Mr. Kloepper, a new theory that was not presented at trial. Mr. Kloepper asserts that he is entitled to subject the government's new transfer scenario to adversarial testing at a retrial. The defendant argues that *In re Bradford*, a Division III case, reached this conclusion when granting a new trial based on postconviction DNA results. *In re Bradford*, 140 Wn.App. 124, 165 P.3d 31 (2007).

*Bradford* stated the prosecutor's new theories about postconviction DNA results, as well as matters disputed by the parties at the original trial, "remain open questions for a jury to resolve upon retrial and in the context of the new DNA evidence." *Id. at 132.*

The Defendant argues that, as in *Bradford*, matters which were disputed in his original trial, as well as the prosecutor's new theory about the postconviction DNA results, are questions to resolve at retrial in the context of the new DNA evidence.

The defendant proposes that the newly discovered DNA results, identifying Contreras's sperm on six stains on D.W.'s clothing, while excluding Mr. Kloepper as a contributor to all six stains, and including Contreras as a contributor to the Y-STR mixture on the rubber fingertip fragment, constitute grounds for granting a new trial under CrR 7.8(b).

When a court assesses whether newly discovered DNA results will probably change the outcome of the trial, it considers the new evidence in the context of the other evidence offered at trial.

The newly discovered DNA results are material. Evidence is material, meeting the fourth criteria for a new trial, if it strongly indicates the defendant did not commit the crime. *State v. Scott*, Wn.App. 281, 297, 207 P.3d 495 (2009). Furthermore, the newly discovered DNA results are not merely cumulative or impeaching.

12

**Ex. 18 at 012**

A report by Charlotte J. Word, Ph.D, suggests two possibilities as to how Mr. Contreras's semen came to be present at the scene of the crime:

1) Direct deposition of a fresh ejaculate by and from the assailant on the interior, exterior, front and back of the clothing of D.W.

2) Deposition of ejaculate collected at a prior time (i.e. "planting of the semen")
   a. This scenario would require:
      i. the collection of a sufficient amount of ejaculate, presumably without knowledge of the donor, for future deposition at the numerous and varied sites on both items of clothing;
      ii. transport of the collected semen to the crime and maintenance in a manner to preserve it in a form suitable for deposition and retention on the clothing;
      iii. deposition on multiple areas (front and back, internal and external) of both items of clothing by the assailant;
      iv. constraint that all actions were performed without the introduction of DNA from the assailant during the collection, maintenance and storage of the semen, and deposition on the clothing in detectable amounts; and
      v. absence of deposition of DNA from the assailant while removing the clothing of D.W., handling D.W., and talking/yelling in close proximity to the clothing during the commission of the crime in all of the areas tested.

Finally, the Defendant argues that the newly discovered DNA results would raise doubt in a reasonable juror's mind about the State's secondary transfer theory, given the multiple points of contact described above. A reasonable juror would probably conclude, based on the victim's description of the sexual assault and the location of the six stains, that Mr. Contreras deposited his semen and sperm on her clothing directly. A reasonable juror would probably conclude, based on the nature of the intimate contact between Mr. Contreras and Mr. Kloepper, along with newly discovered evidence establishing Mr. Contreras matched a mixed Y-STR profile on a rubber fragment found in the victim's apartment, that Mr. Contreras deposited biological material on the rubber fragment and transferred a DNA profile matching Mr. Kloepper to the fragment, rather than the other way around.

Therefore, the defendant requests a new trial.

B. Summary of the State's Arguments

The State argues that the discovery of Mr. Contreras's DNA on the stains of the victim's sweatpants and sweatshirt do not change the key facts. The State asks the Court to consider these facts:

- The defendant had access to a key to D.W.'s apartment. Mr. Contreras did not.

13

**Ex. 18 at 013**

- The perpetrator used a key to enter D.W.'s apartment. There were no signs of a forced entry and D.W. testified she locks her door religiously, even checking to make sure she locked the door in the morning before the perpetrator entered her apartment.
- D.W. always described the perpetrator as a white man. She told the 911 dispatcher the perpetrator was white, repeated that to the first responding officer and testified that he was white. Mr. Contreras is, and appears to be, Hispanic.
- D.W.'s description of the perpetrator -- tall, thin, white, with shaggy hair -- matched the defendant, at least until he cut his hair shortly after the assault. She even told the 911 caller that the perpetrator "looked like one of the Villa people. The Villas' maintenance people." The defendant worked as a maintenance person at the Villas at the time of this assault.
- The defendant's DNA matches the major contributor to the glove in the blood pool in D.W.'s apartment.
- The defendant lied about his whereabouts to the police and changed his appearance after the attack on D.W. by cutting his hair. Mr. Contreras was forthcoming to police, even traveling to Washington State from Florida without being subpoenaed.
- The defendant knew where D.W. lived and would have known she lived alone. Mr. Contreras did not know D.W. and had no knowledge of where her apartment complex was located.
- Mr. Contreras would have no reason to take off his shirt before entering D.W.'s apartment. The defendant could have reasoned that the logo on his shirt, identifying him as an employee of The Villas apartment complex, would have given him away. He could have taken off his shirt, even though it was in the middle of winter, to try to hide his identity.

The State argues that Mr. Contreras's DNA on the victim's pants and sweatshirt was most likely transferred from the defendant to D.W. because DNA transfer is well-established by scientific studies.

The State argues that there are numerous factors indicating Ms. Contreras's DNA was transferred by the defendant to this victim's sweatpants and sweatshirt because of the minimal amount of spermatozoa found on D.W.'s clothing. Such trace amounts are indicative not of direct ejaculation, but of transfer of ejaculate, the State suggests.

For a person with a normal sperm count, the typical ejaculation contains 15 million to 200 million sperm per milliliter[1]   Compare this to the total amount of spermatozoa found in all of the stains detected by the new DNA technology:

On D.W.'s sweatpants:

- Stain 1:        No spermatozoa
- Stain 2:        5 spermatozoa
- Stain 3:        0-1 spermatozoa observed per field of view, with 8 representative cuttings

---

[1] https://www.healthline.com/health/semen-vs-sperm#sperms-volume

14

made.
- Stain 4:    No spermatozoa
- Stain 5:    No spermatozoa
- Stain 6:    No spermatozoa
- Stain 7:    No spermatozoa
- Stain 8:    1 spermatozoa
- Stain 9:    No spermatozoa
- Stain 10:   No spermatozoa
- Stain 11:   No spermatozoa

On D.W.'s sweatshirt:

- Stain 1:    1 spermatozoa
- Stain 2:    4 spermatozoa
- Stain 3:    No spermatozoa
- Stain 4:    0-1 spermatozoa observed per field of view, with 10 cuttings made.
- Stain 5:    0-1 spermatozoa observed per field of view, with 10 cuttings made.
- Stain 6:    No spermatozoa
- Stain 7:    6 spermatozoa

These were samples of spermatozoa examined under slides. This does not represent all of the spermatozoa found. Nevertheless, the number of sperm expected in a normal ejaculation is not present here. The State argues that if Mr. Contreras, or the defendant, or anyone, had ejaculated directly onto D.W. or her clothes, there would have been much more spermatozoa found, up to 15 million to 200 million more. D.W. was correct that the perpetrator did not ejaculate. Otherwise, there would have been millions of spermatozoa on D.W.'s clothing.

The scientific literature, and the experts thus far interviewed, say the evidence is consistent with a transfer, from Mr. Contreras to the defendant, and then to the victim, D.W. The perpetrator was most likely sweaty and sweat promotes DNA transfer.

The State also argues that the collection of D.W.'s sweatshirt and sweatpants and the way they were folded into evidence bags may have added to the detection of the spermatozoa.

Finally, the State argues that discovery of Mr. Contreras's DNA on D.W.'s clothing is consistent with the defendant's guilt and does not change all of the direct and circumstantial evidence against him.

The jury knew that there was unidentified male DNA on the glove. Advanced testing has now put a name to the unidentified male -- Mr. Contreras. The question is: how did Mr. Contreras's DNA get there? The State asserts that the mostly likely explanation is that the defendant transferred Mr. Contreras's DNA from his contact with him to D.W.'s clothes and the glove. The DNA evidence thus confirms the defendant's guilt, according to the State.

15

**Ex. 18 at 015**

The direct evidence was from D.W., pointing to the defendant and testifying that he was the attacker. Nevertheless, a jury could consider that D.W. was being attacked, and thus that her basis for identification of her attacker was compromised. Also, given her misidentification of Karl Goering as her attacker initially, the jury may not have convicted the defendant based on D.W.'s testimony alone. The circumstantial evidence, however, is convincing, according to the State.

First, the perpetrator had to use a key to enter D.W.'s apartment on the night in question. D.W. testified she locked her door at night and checked to make sure the door was locked when she got up. The defendant was the only person who went into the apartment manager's office and accessed a box holding a key to D.W.'s apartment the morning of the attack.

Second, the perpetrator matched D.W.'s physical description to the police and 911, including her statement that she thought the perpetrator was on the apartment complex's maintenance staff.

Third, the defendant lied about his whereabouts and his staying overnight in the apartment complex, which was not allowed by his employer.

Fourth, there is strong evidence that the defendant changed his appearance after the attack by going from long hair to a buzz cut.

Fifth, the perpetrator was not wearing a shirt on this cold winter night, which is not explained unless the shirt had a logo which could be used to identify him. On the morning of the attack, the defendant was still wearing his work shirt, which had a logo identifying him as an employee of the apartment complex.

Sixth, the defendant's DNA was on a key piece of evidence, the piece of the glove found in a blood pool. This has not been explained by the defense. Although the DNA alone would not have convicted the defendant, since the probability it was his was only one in 440, all of the circumstantial evidence together with D.W.'s testimony, presented an overwhelming case for the defendant's guilt. The State suggests that it is still overwhelming, and the DNA results do not change that.

Finally, the State argues that the defendant cannot establish that the new evidence would likely have changed the outcome of the case. Therefore, the defendant's motion for a new trial should be denied.

## IV.    EVIDENCE THE COURT CONSIDERED

The Court considered the following evidence:

(1) Defendant's Motion and Memorandum to Vacate Judgment pursuant to CRR 7.8, filed August 18, 2021.

(2) State's Response to Motion for New Trial, filed October 7, 2021.

16

(3) Defendant's Reply to Response to Motion to Vacate Judgment pursuant to CrR 7.8 and Order a New Trial and/or Grant an Evidentiary Hearing, filed October 26, 2021.

(4) Declaration of Counsel in Support of Reply to Response to Motion to Vacate Judgment Pursuant to CrR 7.8 and Order a New Trial and/or Request for an Evidentiary Hearing, filed October 26, 2021.

The following evidence was stipulated by the parties by way of an Order, signed by the Court, on March 16, 2022, to include Appendix 1-15. A thumb drive containing these Exhibits was provided to the Court and admitted into evidence at the March 22, 2022 evidentiary hearing.

**Exhibit 1**: Dr. Charlotte Word, reports, dated April 9, 2021, and October 21, 2021, and her curriculum vitae (CV).

> **Summary**: A total of 13 different areas on the two items of clothing tested positive for the presence of semen. Semen and/or sperm were identified on seven different stains on the interior (crotch), exterior, front and back of sweatpants. Semen and/or sperm were identified on six different stains on the exterior, front and back of the sweatshirt. The DNA profiles obtained from all six of the areas tested are different from the DNA profile obtained from Cody J. Kloepper. Therefore, Cody J. Kloepper is excluded as a possible contributor and thus cannot be the source of the DNA obtained from the sperm fraction or the cell fraction of any of the six samples tested.

> Working under the assumption that the semen was deposited on the clothing during the commission of the crime, there are two possible scenarios that may be considered for its presence: (1) Direct deposit of a fresh ejaculate by and from the assailant on the interior, exterior, front and back of the clothing of D.W. – This fits the key points listed above based on the screening and DNA testing results obtained without additional conditions; (2) Deposition of ejaculate collected at a prior time (i.e., "planting" of the semen) – This scenario would require the: 1) collection of a sufficient amount of ejaculate, presumably without knowledge of the donor, for future deposition at the numerous various sites on both items of clothing; 2) transport of the collected semen to the crime scene and maintenance in a manner to preserve it in a form suitable for deposition and retention on the clothing; 3) deposition on multiple areas (front and back, internal and external) of both items of clothing by the assailant; 4) constraint that all actions were performed without the introduction of DNA from the assailant during the collection, maintenance and storage of the semen, and deposition on the clothing in detectable amounts; and 5) absence of deposition of DNA from the assailant while removing the clothing, handling D.W. and talking/yelling in close proximity to the clothing during the commission of the crime in all of the areas tested.

**Exhibit 2**: Stephen J. Ross, report, dated June 29, 2021, and his CV

17

**Summary**: Consideration related to D.W.'s memory is the quality and strength of the witness/victim's initial memory of the perpetrator. When considering the probative value of witness statements and suspect identification, the Court should carefully assess relevant case facts to estimate the initial quality/strength of the witness's memory for the events and perpetrator.

In my view of the investigative material made available to me, I have identified several factors that should be considered when evaluating the likely quality and strength of D.W.'s initial memory for the individual that assaulted her on 12/5/09. These factors include the impact of mild traumatic brain injury (mTBI) on memory including potential post-traumatic amnesia (PTA) and retrograde amnesia (RA), weapon presence, exposure duration, stress, disguise, and potential inconsistencies between distinctive features present on both Cody Kloepper and Karl Goering that were not reported by D.W.

Finally, the fact that D.W. did not identify Cody Kloepper in two identification procedures conducted early in the investigation should be considered.

**Exhibit 3**: Photos of defendant

**Summary**: Eleven photos of the defendant's body tattoos.

**Exhibit 4**: Photos of Salvador Contreras

**Summary**: Photos of Mr. Contreras's: (1) driver license; (2) enlarged photo of Mr. Contreras's picture; (3) photo of Mr. Contreras's federal probation photo; (4) eight photos with/without Mr. Contreras.

**Exhibit 5**: Laboratory Reports as follows:

5.1 Laboratory Report of Lorraine Heath, dated April 9, 2010

**Summary**: Staining consistent with blood was detected on the white socks (Item #JMT12) and the glove fragment (Item #RS5). No blood was detected on the jeans (Item #JMT10) or shoes (Item #JMT23).

The DNA typing profile obtained from the staining on the sock (Item #JMT12) is from an unknown male individual designated Individual A. Karl Goering and D.W. are excluded as the donor of this profile.

The Y-STR DNA typing profile obtained from the glove fragment (Item #RS5) is a mixture consistent with having originated from two male individuals. The major component is from an unknown male designated Individual B. The minor component is suitable for exclusionary purposes only. Karl Goering and Individual C are excluded as contributors to this mixed profile.

18

The Y-STR DNA typing obtained from the left fingernail scrapings (Item #JMT42) is from a single unknown male designated as Individual C. Karl Goering and Individual B are excluded as the donor of this profile.

The Y-STR DNA typing profile obtained from the left fingernail swab (Item #JMT40) is a mixture consistent with having originated from at least two male contributors. Karl Goering and Individual B are excluded as possible contributors to this mixture. Individual C can be neither included nor excluded as a possible contributor to this mixture.

5.2 Laboratory Report of Kevin C. Jenkins, dated June 15, 2010

**Summary:** Those hairs which were deemed to be possibly suitable for further nDNA analysis, one probable pubic hair from RJS4 (Black underwear identified as recovered from D.W.) and two hairs from RJS-6 (red hooded sweatshirt identified as recovered from D.W.), were packaged in individual glassine envelopes and placed into one larger envelope. This item was assigned a new crime laboratory evidence item number (SPO028) and transferred to Lorraine Heath, DNA Section Supervising Forensic Scientist, for possible nDNA analysis. Any such analysis will be the subject of a separate report.

5.3 Laboratory Report of Lorraine Heath, dated June 18, 2010

**Summary:** Cody Kloepper (Item #RS-8) matches the Y-STR DNA typing profile of Individual B previously obtained from the major component of the male DNA on the glove (Item #RS5). Therefore, neither Cody Kloepper, nor any of his paternal relatives can be excluded as the donor of the human DNA from this sample. This Y-STR profile has been observed 11 times in the U.S. Y-STR database and is not expected to occur more frequently than 1 in 440 male individuals in the U.S. population. Statistics were calculated using U.S. YSTR Database, version 2.2. www.usystrdatabase.org.

Cody Kloepper (Item #RS-8), Christopher Byrd (Item DTJ9) and Lance Greenwood (Item DTJ10) are excluded as being Individual C, the donor of the Y-STR DNA typing profile obtained from the left fingernail scaping (Item #JMT42)

5.4 Laboratory Report of Lorraine Heath, dated July 16, 2010

**Summary:** The DNA typing contained from the staining on the glove (Item #RS5) matches D.W. (Item #DM1). The estimated probability of selecting an unrelated individual at random the U.S. population with a matching profile is 1 in 8.6 quadrillion.

The Y-STR DNA typing profile obtained from the head hair from the sweatshirt (Item #RJS-6) is of mixed origin consistent with originating from two male individuals. The major component is from an unknown male individual, designated Individual D. A trace

19

**Ex. 18 at 019**

component also exists. Karl Goering (Item #JMT37), Cody Kloepper (Item #RS-8), David Halls (Item #RS-11), Christopher Hyrd (Item #DTJ9), Lance Greenwood (Item #DTJ10), and Individual C (from Item #JMT42) are excluded as contributors to this mixed profile.

No DNA was detected on the pubic hair from the underwear (Item #RJS-4)

5.5. Laboratory Report of Lorraine Heath, date September 7, 2010

**Summary:** A DNA typing profile was obtained from the reference sample of Cody Kloepper (Item #RS-8). A one-time search of the DNA typing profile obtained from Cody Kloepper was performed against the Washington State Patrol Combined DNA Index System (CODIS) databank and no probative matches were obtained.

5.6 Laboratory Report of DNA Labs International, dated June 26, 2020

**Summary:**

• RJS-4 Underwear from D.W. Blood was indicated on the underwear. No spermatozoa were identified, and no seminal fluid was indicated on the underwear. No further analysis was performed. No analysis was performed on apparent hairs/fibers observed on the underwear.

• RJS-5 Sweatpants from D.W. Blood was indicated on the sweatpants. Seminal fluid was indicated on stains designated as Stain 4 and 5 on the wearer's left exterior front of the sweatpants; however, no spermatozoa were identified. Seminal fluid was indicated on a stain designated as Stain 7 on the wearer's left exterior back of the sweatpants; however, no spermatozoa were identified. Seminal fluid was indicated on a stain designated as Stain 10 on the wearer's right exterior back of the sweatpants; however, no spermatozoa were identified. No further analysis was performed on these stains.

Spermatozoa were identified on stains designated as Stain 2 and Stain 3 on the wearer's right exterior front of the sweatpants. One spermatozoon was identified on a stain designated as Stain 8 on the wearer's left exterior back of the sweatpants. Samples were collected from these stains for DNA analysis.

Stain 2

The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as contributor to this mixed DNA profile.

20

**Ex. 18 at 020**

Assuming D.W. as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.

Stain 3

The DNA profile obtained from this sample indicates a mixture of at least two individuals with a least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.

Assuming D.W. as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.

Stain 8

The DNA profile obtained from this sample indicates a mixture of at least three individuals with a least one male contributor. Cody J. Kloepper is excluded as a contributor to this mixed DNA profile.

Assuming D.W. as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of three overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile. The DNA profile of the remaining contributor to the mixture was not determined; however, the results are suitable for comparison.

No analysis was performed on apparent hairs observed on the sweatpants.

• RJS-6 Sweatshirt from D.W. Blood was indicated on the sweatshirt. One spermatozoon was identified on a stain designated as Stain 1 on the wearer's exterior hood of the sweatshirt. Spermatozoa were identified on a stain designated as Stain 5 on the wearer's exterior left sleeve of the sweatshirt. Seminal fluid was indicated on a stain designated as Stain 6 on the wearer's exterior upper back of the sweatshirt; however, no spermatozoa were identified. No further analysis was performed on these stains.

Spermatozoa were identified on stains designed as Stain 2 and Stain 4 on the wearer's exterior front and right sleeve of the sweatshirt, respectively, and on Stain 7 on the wearer's exterior lower back of the sweatshirt. Samples were collected from these stains for DNA analysis.

Stain 2

The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as contributor to this mixed DNA profile.

21

Assuming D.W. as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.

Stain 4

The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as contributor to this mixed DNA profile.

Assuming D.W. as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered. UNKNOWN#1 cannot be excluded as a contributor to this determined DNA profile.

Stain 7

The DNA profile obtained from this sample indicates a mixture of at least two individuals with at least one male contributor. Cody J. Kloepper is excluded as contributor to this mixed DNA profile.

Assuming D.W. as a contributor to this mixed DNA profile, a DNA profile was determined when a proposition of two overall contributors was considered and is suitable for comparison. This determined DNA profile will be labeled as UNKNOWN#1.

Additional alleles were detected in the cell fraction at the D12S391 and D18S51 loci, which may indicate additional contributor; however, due to the limited information obtained this data is inconclusive for comparison purposes.

No analysis was performed on apparent hairs observed on the sweatshirt.

- SP0028 Hair.
- SP0029 Tape lifts.

**Summary**: No analysis was performed.

- DM-1 Buccal swabs from D.W.
- RS-8 Buccal swabs from Cody Kloepper

**Summary**: DNA profiles suitable for comparison purposes were obtained from these swabs.

22

**Final Summary**: Additional DNA comparisons can be conducted upon submission of a reference standard from a consensual partner, suspect, and/or other individuals(s) of interest.

5.7 <u>Laboratory Report of Denise N. Rodler, dated August 6, 2020</u>

**Summary**: A male DNA profile obtained from the sweatshirt (Item RJS-6; DNA Labs International item 20-02132) was entered into the Combined DNA Index System (CODIS) database and searched. A match to Salvador Castillo-Sanchez (DOB: 08/02/1976, FBI# 852944EA8, BOP# 17543-085, aka of Salvador Cosio-Contreras) was declared. It is requested that a reference sample for Salvador Castillo-Sanchez aka Salvador Cosio-Contreras be submitted to DNA Labs International to confirm this match.

Cody Kloepper (Item RS-8, DNA International Item 20-02136) was excluded as the source of this DNA profile.

Individual A (Item JMT 12) and Karl Goering (item JMT37) are also excluded as the source of this DNA profile.

5.8 <u>Laboratory Report of DNA Labs International, dated October 8, 2020.</u>

**Summary:**

- RJS-5, Sweatpants from D.W. The sweatpants were previously analyzed and reported in the Certificate of Analysis dated June 26, 2020. Samples were previously collected from stains designed as Stain 2, Stain 3, and Stain 8 for DNA analysis.

<u>Stain 2</u>

Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 54 quadrillion times more probable if the sample original from Salvador Cosio-Contreras and D.W. than if it originated from D.W. and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and D.W. contributed to this DNA profile, rather than D.W. and an unknown person.

<u>Stain 3</u>

Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 190 quadrillion times more probable if the sample originated from Salvador Cosio-Contreras and D.W. than if it

23

**Ex. 18 at 023**

originated from D.W. and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and D.W. contributed to this DNA profile, rather than D.W. and an unknown person.

Stain 8

Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 110 quadrillion times more probable if the sample original from Salvador Cosio-Contreras and D.W. than if it originated from D.W. and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and D.W. contributed to this DNA profile, rather than D.W. and an unknown person.

- RJS-6 Sweatshirt from D.W.

The sweatshirt was previously analyzed and reported in the Certificate of Analysis dated June 26, 2020. Samples were previously collected from stains designed as Stain 2, Stain 4, and Stain 7 for DNA analysis.

Stain 2

Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 200 quadrillion times more probable if the sample original from Salvador Cosi-Contreras and D.W. than if it originated from D.W. and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and D.W. contributed to this DNA profile, rather than D.W. and an unknown person.

Stain 4

Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 190 quadrillion times more probable if the sample original from Salvador Cosio-Contreras and D.W. than if it originated from D.W. and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and D.W. contributed to this DNA profile, rather than D.W. and an unknown person.

<u>Stain 7</u>

Salvador Cosio-Contreras cannot be excluded as a contributor to the determined DNA profile previously obtained from this sample.

The DNA profile obtained from this sample is approximately 200 quadrillion times more probable if the sample original from Salvador Cosio-Contreras and D.W. than if it originated from D.W. and an unknown person. Therefore, there is extremely strong support that Salvador Cosio-Contreras and D.W. contributed to this DNA profile, rather than D.W. and an unknown person.

20-07980 Buccal swab from Salvador Cosio-Contreras: Two samples were collected from the swabs for DNA analysis. No reportable DNA results were obtained from the first sample due to quality control reasons. A DNA profile suitable for comparison purposes was obtained from the second sample.

5.9 <u>Laboratory Report of Anna J.B. Wilson, dated January 7, 2021</u>

**Summary:** The Y-STR profile previously obtained from the glove fragment (Item RS5) is of mixed origin consistent with having originated from two male individuals. A minor male component was deduced and matches Salvador Cosio-Contreras. Therefore, Salvador Cosio-Contreras nor any of his paternal male relatives can be excluded as a minor contributor of male DNA from this sample. This minor Y-STR profile has been observed 96 times in the Y Chromosome Haplotype Reference Database and is not expected to occur more frequently than 1 in 250 male individuals in the U.S. population.

Salvador Cosio-Contreras is not the source of the STR DNA profile obtained from the staining on the sock (Item #JMT12), previously designated Individual A.

Salvador Cosio-Contreras can neither be included nor excluded as possible contributor to the mixed Y-STR DNA profile obtained from the left fingernail swabs (Item #JMT40).

Salvador Cosio-Contreras is not the source of the Y-STR DNA profile obtained from the left fingernail scrapings (Item #JMT42), previously designated Individual C.

Salvador Cosio-Contreras is not the source of the major Y-STR DNA profile obtained from the head hair from the sweatshirt (Item #RJS-6), previously designated Individual D. Salvador Cosio-Contreras can neither be included nor excluded as a possible contributor to the mixed Y-STR profile from the head hair from the sweatshirt.

A onetime search of the DNA profile obtained from the reference sample of Salvador Cosio-Contreras was performed against the state level of the Combined DNA Index System (CODIS) database and no probative matches were found.

25

**Ex. 18 at 025**

**Exhibit 6:** 911 call transcript:

**Summary**: Transcript Date: December 5, 2009, at 4 hours 43 minutes 53 seconds.

Dana: "Hi my – my address is 9... 250 Gage Boulevard L4806...80 – 4086. I've been raped and – and beat really badly.

Dana: I'm in my apartment
911: Ok.
Dana: He beat on my – at my head and raped me. Tried to rape me.
911: And how long ago did he leave?
Dana: I don't know about, he left the water running so I wouldn't know he left or not. I'm walking around but I'm badly beaten up.

911: I understand you don't...what was his name? Do you...
Dana: I don't have...I don't know. He said it was because of Obama. I hurt.
911: Did you meet him anywhere or?
Dana: I don't...he looked familiar. He looked like one of the Villa people. The Villa's maintenance people
911: Ok. Where did you meet him at?
Dana: I don't know. I don't think I've ever met him before.
911: Did he just break into your apartment or what happen?
Dana: He said he-he I left my door open. I know I didn't. I always lock my door and I just checked it. I-I'm absolutely have no place to sit down.

911: Is-Is your front door locked now Dana?
Dana: No...ya it's locked now.

911: So did he rape you or not rape you?
Dana: He tried to.

911: Did he break anything?
Dana: No, I was in the kitchen making coffee and he snuck up on me from behind. He didn't have a shirt on.
911: And he just surprised you?
Dana: Surprised hit me from behind with a tire iron and then um continued to hit me until I was fighting him.

911: ...Do you remember what he was wearing or what he looks like?
Dana: He had jeans on he was white and he had, he was tall and thin probably.
911: About how tall would you say?
Dana: Six feet at least,
911: Ok.
Dana: Six-2 maybe he was thin. He had brown hair.
911: Brown hair. Ok. Was it short or long or..,?

26

**Ex. 18 at 026**

Dana: It was…

911: Shaggy or curly?

Dana: Shaggy. No-no shirt. He looked like I hate to say it. I don't know who he was. I just don't know who he was. I hadn't seen him before. He scared me.

Ending date, Saturday, December 5, 2009 at 4 hours 54 minutes and 37 seconds.

**Exhibit 7:** Darren Wright Statement, DNA Analyst with DNA Labs International, dated January 13, 2022.

**Summary:** Performed laboratory tests on various items in number 20-1410. Was asked if it was possible for a third person, Cody Kloepper, to transfer Salvador Contreras's seminal fluid onto the clothing items examined. That would be considered a secondary transfer and it is a documented phenomenon that does occur. There are factors and variables that would affect the possibility of a secondary transfer, but there is no way to quantify or determine whether or not the DNA found was a result of a direct or indirect transfer.

There is no way to determine if a stain is a direct or secondary transfer by looking at it. It is easier to transfer a stain when it is wet, but additional factors such as the surface must be considered.

In this case, there was a sufficient quantity of DNA to examine and a direct transfer will typically have a higher level of spermatozoa, as opposed to a secondary transfer, but science cannot determine whether these were secondary or direct transfers.

There is a possibility that the stains were transferred when the clothing was packaged. But, as stated above I cannot give a probability of this transfer occurring. Other factors, such as whether the stains were dry when the clothing was packaged, need to be considered.

There is no protocol in place at DNA Labs International to give a probability of the likelihood of a secondary or direct transfer.

**Exhibit 8:** A list of twenty-three (23) suspects shown to D.W. in the hospital, including the defendant (Exhibit No.74 at trial)

**Exhibit 9:** Preliminary Analysis Worksheet 20-1410: Photos of Stain of D.W.'s clothes, from DNI Labs International, dated April 4, 15, 2020, April 16, 2020 and May 18, 2020.

**Summary:**

- RJS-4 One pair of Black underwear. No photo provided.

- RJS-5: Photos – One pair of blue sweatpants from victim both front and back.

27

RJS-6: Photos – One red sweatshirt from the victim both front and back.

**Exhibit 10:** Photo of piece of latex recovered from the crime scene

**Exhibit 11:** Criminal Complaint, Plea Agreement and Judgment in a Criminal Case, United States v. Salvador Cosio-Contreras.

**Exhibit 12:** Scientific Studies:

12.1 Could secondary DNA transfer falsely place someone at the scene of a crime?

**Summary:** The occurrence of secondary DNA transfer has been previously established. However, the transfer of DNA through an intermediary has not been revisited with more sensitive current technologies implemented to increase the likelihood of obtaining results from low-template/low-quality samples. This study evaluated whether this increased sensitivity could lead to the detection of interpretable secondary DNA transfer profiles. After two minutes of hand-to-hand contact, participants immediately handled assigned knives. Swabbing of the knives with detectable amounts of DNA were amplified with the Identifiler Plus Amplification Kit and injected on a 3130xL. DNA typing results indicated that secondary DNA transfer was detected in 85% of the samples. In five examples, the secondary contributor was either the only contributor or the major contributory identified despite never coming into direct contact with the knife. This study demonstrates the risk of assuming that DNA recovered from an object resulted from direct contact.

12.2 Science News, February 26, 2019, "A long handshake can spread your DNA to objects you didn't touch."

**Summary:** A 10-second handshake could transfer a person's DNA to an object that he or she never touched. In handshaking experiments, people who never picked up a knife became the major source of DNA on the handle about 7 percent of the time.

12.3 Prevalence of human cell material: DNA and RNA profiling of public and private objects and after activity scenarios.

**Summary:** Especially when minute evidentiary traces are analyzed, background cell material unrelated to the crime may contribute to detectable levels in the genetic analyses. To gain understanding on the composition of human cell material residing on surfaces contributing to background traces, we performed DNA and MRNA profiling on samplings of various items. Samples were selected by considering events contributing to cell material deposits in exemplary activities (e.g. dragging a person by the trouser ankles), and can be grouped as public objects, private samples, transfer-related samples and washing machine experiments. Results show that high DNA yields do not necessarily relate to an increased number of contributors or to the detection of other cell

28

**Ex. 18 at 028**

types than skin. Background cellular material may be found on any type of public or private item. When a major contributor can be deduced in DNA profiles from private items, this can be a different person than the owner of the item.

Also, when a specific activity is performed and the areas of physical contact are analyzed, the "perpetrator" does not necessarily represent the major contributor in the STR profile. Washing machine experiments show that transfer and persistence during laundry is limited for DNA and cell type dependent of RNA. Skin conditions such as the presence of sebum or sweat can promote DNA transfer. Results of this study, which encompasses 549 samples, increase our understanding regarding the prevalence of human cell material in background and activity scenarios.

12.4 <u>DNA transfer in Forensic Science: A review.</u>

**Summary:** Understanding the variables impacting DNA transfer, persistence, prevalence and recovery (DNA-TPPR) has become increasingly relevant in investigations of criminal activities to provide opinion on how the DNA of a person of interest became present within the sample collected. This review considers our current knowledge regarding DNA-TPPR to assist casework investigations of activities. There is a growing amount of information available on DNA-TPPR to inform the relative probabilities of evidence given alternative scenarios relating to the presence or absence of DNA from a specific person in a collected sample of interest. This information should be used where relevant. However, far more research is still required to better understand the variables impacting DNA-TPPR and to generate more accurate probability estimates of generating particular types of profiles in more casework relevant situations. This review explores means of achieving this. It also notes the need for all those interacting with an item of interest to have an awareness of DNA transfer possibilities post criminal activity, to limit the risk of contamination or loss of DNA.

Appropriately trained forensic practitioners are best placed to provide opinion and guidance on the interpretation of profiles at the activity level. However, those requested to provide expert opinion on DNA-related activity level issues are often insufficiently trained to do so. We advocate recognition of DNA activity associated expertise to be distinct from expertise associated with the identification of individuals. This is to be supported by dedicated training, competency testing, authorization, and regular fit for purpose proficiency testing

The possibilities for experts to report on activity-related issues will increase as our knowledge increases through further research, access to relevant data is enhanced, and tools to assist interpretations are better exploited. Improvement opportunities will be achieved, if more laboratories accept the need to invest in these aspects as well as the training of practitioners.

12.5 <u>Persistence of DNA deposited by the original user on objects after subsequent use by a second person.</u>

29

**Summary:** There is a paucity of data regarding the persistence of DNA from prior user of an object after its use by another person. To acquire a greater understanding of persistence we performed controlled experiments encompassing over 179 objects that had only been used by one individual for an extended period before being used by a second person for various but known duration. Our findings show that the profile percentage contribution of the first user relative to the second user of an object declines in a linear manner over time. The retrieval of the profile of the initial user of the object is dependent on the type of substrate and use of the object. When considering a hard non-porous object, the first user's profile percentage contribution drops 50% immediately upon use by a second person and drops to 15 percent after 90 minutes. When considering a soft porous object, the first wearer's profile contribution remains higher than that of the second wearer during the first 10 hours of wear by the second wearer and still accounts for 12 percent after 96 hours. This substrate associated difference was also observed in an assessment of a wide range of personal objects used by second users for different durations. Particular areas of certain objects were more likely to retain a greater proportion of the first user's DNA than other areas. Alleles of unknown sources were present on the majority of objects but rarely exceeded 10 percent of the total profile. Greater knowledge of persistence will inform investigators regarding the likelihood of detecting a profile of a particular individual based on the type of object and its history, and assist with identifying the best areas of an object to target for DNA sampling.

12.6. Assessing primary, secondary and tertiary DNA transfer using Promega ESI-17 Fast PCR chemistry

**Summary:** The current generation of PCR chemistries used in many forensic laboratories offer improved sensitivity and detection. In a criminal justice setting, it can often be important for the forensic scientists to be able to address the issue of how and when DNA might have been deposited, and not simply the issue of from whom the DNA might have originated.

We have used the Promega ESI-17 Fast system to investigate DNA transfer in a series of three experiments with known donors. The experiments all involved participants gripping a plastic tube, with hand shaking then progressively introduced to preciplate the possibility of secondary and tertiary transfer events. The level of DNA transfer as result of direct contact, as well as secondary and tertiary transfer events, were then measured and compared.

Our results show the variable nature of primary transfer and also clear examples of secondary transfer, including occasional examples where the degree of secondary transfer exceeded primary transfer. Unambiguous tertiary transfer was difficult to detect but cannot be ruled out.

12.7 Persistence of DNA from laundered semen stains: Implications for child sex trafficking cases.

30

**Ex. 18 at 030**

**Summary:** In sexual assault cases, particularly those involving internal child sex trafficking (ICST), victims often hide their semen-strained clothing. This can result in a lag time of several months before the items are laundered and subsequently seized during a criminal investigation. Although it has been demonstrated previously that DNA can be recovered from clothing washed immediately after semen deposition, laundered items of clothing are not routinely examined in ICST cases, due to the assumption that the time delay and washing would result in no detectable DNA. The aim of this study was to examine whether viable DNA profiles could be recovered from laundered semen strains where there has been a significant lag time between semen deposition from one or more individuals and one or more washes of the stained clothing.

Items of UK school uniform (T-shirts, trousers, tights) were stained with fresh semen (either from a single donor or a 1:1 mixture from two donors) and stored in a wardrobe for eight months. Stained and unstained items (socks) were then washed at 30C or 60C and with non-biological or biological detergent. DNA samples extracted from the semen-stained sites and from the unstained socks were quantified and profiled.

High quantities of DNA (6-18 μg) matching the DNA profiles of the semen donors were recovered from all semen-stained clothing that had been laundered once, irrespective of washing conditions. This quantity, and profile quality, did not decline significantly with multiple washes. The two donor semen samples yielded 10-fold more DNA from the T-shirt than from the trousers. This disparity resulted in the T-shirt yielding a 1:1 mixture of DNA from the two donors, whereas the trousers yielded a major DNA profile matching only that of the second donor. The quantities of DNA recovered from the unstained socks were order of magnitude lower, with most of the DNA being attributable to the donor of the semen on the stained clothing within the same wash, demonstrating the transfer of semen-derived DNA among items of clothing in the washing machine.

This study demonstrates that complete DNA profiles can be obtained from laundered semen stains on school uniform-type clothing, with an eight-month lag time between semen deposition and laundering, despite multiple washes and stains from two semen donors. These data emphasis the need to recover and examine the clothing of victims for semen and DNA evidence, even if the clothing has been stored for several months or washed multiple times since the sexual offence took place.

12.8 DNA transfer within forensic exhibit packaging: Potential for DNA loss and relocation

**Summary:** Crime scene samples are collected, packaged, and transported to the laboratory for examination and DNA analysis. The amount and location of DNA-containing material retrieved from an exhibit can be critical in acquiring a profile for incrimination or exclusion purposes and for elucidating criminal events. This paper shows that significant quantities of DNA are frequently: (a) transferred from the exhibit to the inside of the packaging and (b) transferred from its area of initial deposit to other

31

areas of the same exhibit and/or to other exhibits within the same package. There is a distinct possibility of failing to generate adequate profiles in instances where the DNA content may otherwise have been adequate, and for the misinterpretation of a result that could impact negatively on the criminal investigation and court outcome. These findings highlight the need for improvements in the collection and packaging of forensic casework exhibits for DNA analysis.

12.9 Secondary and subsequent DNA transfer during criminal investigation

**Summary:** With the introduction of new multiplex PCR kites and instrumentation such as the Applied Biosystems 3500xl, there has recently been a rapid change in technology that has greatly increased sensitivity of detection so that a DNA profile can routinely be obtained from only a few cells. Research to evaluate the risks of passive transfer has not kept pace with this development; hence the risk of innocent DNA transfer at the crime-scene is currently not properly understood. The purpose of this study was to investigate the possibility of investigators-mediated transfer of DNA traces with disposable nitrile-gloves used during crime-scene examinations. We investigated the primary transfer for freshly deposited DNA from touched plastic, wood or metal substrates and secondary and tertiary transfer by a person wearing disposable nitrile-gloves and onto a third object. We show that with use of the new highly sensitive technologies available in forensic DNA analysis there is an enhanced probability to obtain DNA profile which has not been directly deposited on the object but is an outcome of one or more transfer events. The nitrile-gloves used by investigators during exhibit examination can act as a vector for DNA transfer from one item to another. We have shown that the amount of DNA deposited on an object affects the probability of transfer. Secondly, the type of substrate material that DNA is deposited onto has an impact on transfer rates.

12.10 DNA transfer through nonintimate social contact

**Summary:** The UK and Ireland Association of Forensic Science Providers (AFSP) Body Fluid Forum (BFF) set out to assist in the interpretation of sexual offence cases where semen is absent on vaginal swabs, but female DNA is present on penile swabs or male underwear, and the issue to be addressed is whether or not sexual intercourse occurred. This study aims to investigate the frequency and amount of female DNA transferred to the penis and underwear of males following staged nonintimate social contact with females and to compare the findings with the amount of female DNA transfer to the penis and subsequently to the underwear of a male who had engaged in unprotected sexual intercourse with a female. In this study, no matching female DNA was detected on the inside front of the 44 items of male underwear used in this research following staged contact of a nonintimate nature and subsequent secondary transfer to the penis. After sexual intercourse, full profiles matching the female participant were found on the inside front of the males' underwear with maximum peak heights in the range between 1898 and 3157 rfu. It was possible to demonstrate that DNA can occasionally transfer to the waistband and outside front of underwear worn by a male following staged nonintimate social contact. Data obtained in this study suggest that a matching female DNA profile

32

below a peak height 1000 rfu on the waistband of a male's underwear might be explained by nonintimate social contact with secondary transfer of female DNA from the male's hands.

12.11 Sperm Content of Pre-Ejaculatory Fluid

**Summary:** This study was designed to establish whether motile spermatozoa are released with pre-ejaculatory fluid and whether this fluid therefore poses a risk for unintended pregnancy. Forty samples of pre-ejaculatory fluid were examined from 27 volunteer men. Samples were obtained by masturbation and by touching the end of the penis with a Petri dish prior to ejaculation. Eleven of the 17 subject (41%) produced pre-ejaculatory samples that contained spermatozoa and in 10 of these cases (37%), a reasonable proportion of the sperm was motile. The volunteers produced pre-ejaculate on up to five separate occasions and sperm were found in either all or none of their pre-ejaculatory samples. Hence, condoms should continue to be used from the first moment of genital contact, although it may be that some men, less likely to leak spermatozoa in their pre-ejaculatory fluid, are able to practice coitus interruptus more successfully than others.

**Exhibit 13:** Murstig report, dated August 20, 2020, with attachments

**Summary:** As a result of the new testing performed by DLI, the presence of semen was located on the victim's sweatpants and sweatshirt. The sweatpants and sweatshirt were being worn by the victim at the time of the assault. With the presence of semen, further testing for the presence of spermatozoa was performed. From the analysis, spermatozoa was in fact located in singular quantities. Ultimately, DLI eliminated Cody Kloepper as the contributor for the semen and spermatozoa found. An unknown male DNA profile was established. This unknown male DNA profile was sent to the WSP Crime Lab to search CODIS database. From the CODIS search a match was declared to a name of Salvador Castillo-Sanchez with FBI#852944EA8.

**Exhibit 14:** Declaration for search warrant for of DNA of Salvador Contreras

**Summary:** Probable Cause statement by Officer Dean Murstig as follows:

On 12/05/2009 at 0445 hours, the Richland Police Department respondent to a 911 call in which a female was reporting her apartment had just been unlawfully entered and she had been severely assaulted. The caller was able to provide her address of 250 Gage #4086. This location is the Villas Apartment Complex with several hundred individual living units in the complex. At the time RPD Ofc. Nash was the initial responding Officer and the first on scene. Upon arrival Ofc. Nash contacted the caller, a 48-year-old adult female, who was identified as [D.W.]. Upon initial contact Ofc. Nash noted [D.W.] was bleeding from the head and arms. [D.W.] stated at that time to Ofc. Nash that unknown male was in her apartment and did sexually assault her by penetrating her with a finger and tried, but was unable, to penetrate her with his penis, attempted to sexually assault her, but he was not successful. [D.W.] reported that due to the attack she had defecated

33

in her pants and partially on the floor when the suspect pulled her pants down. At the time she told Ofc. Nash that she was struck in the head several times with a metal bar and her injuries were consistent with this description. [D.W.] stated at one point she just laid on the floor to survive the incident. The suspect then covered her with a blanket and told her that if she got up and tried to look at his face again, he would kill her. Due to the severity of her injuries [D.W.] was immediately transported by Ambulance to Kadlec Medical Center.

RPD Detectives were notified of the Assault and respondent to process the scene. Det. Shepherd was initially the lead investigator assigned to the case and is now retired. I was a Detective at the time and assisted with supporting Det. Shepherd process the crime scene at the apartment where the incident occurred. At the apartment there was blood present, hairs and a small piece of rubber like material that appeared to be a partial chunk of a latex type of glove. These items were collected for evidence for the purpose of locating any trace fluids or trace human tissue that might produce a DNA profile as the donor.

[D.W.] told the initial responding Officer that she was certain that her door was locked to her apartment, which was located on the fourth floor of a building, eliminating someone crawling through a window. [D.W.] was a single female that lived alone. She was not in any relationships at the time. The door and lock area were examined, and they did not appear to be tampered with and there was no damage consistent with a subject forcing open a deadbolted door. It was believed that the suspect at the time might have had a key or access to a key. There was no one known at the time to have a key to her apartment.

Later in the morning on the day of the Assault I went to contact the Managers Office for the apartment complex. It was at that time that I was informed that a Maintenance Person by the name of Cody J. Kloepper (1/8/1978) had actually been seen by a co-worker coming out of the managers office earlier that day. Further inquiry revealed Cody Kloepper did not live on-site at the apartments. The managers office he was seen coming out of that morning is where the master keys to the apartments are kept. There was not one master's key for all the apartments, rather the manager retained a copy of all apartment keys. These keys to all the apartments were commonly used by maintenance persons to enter an apartment if maintenance was needed or for emergency lock outs. Cody told the co-worker he slept overnight in the apartments because he was too drunk to drive home.

Cody Kloepper was contacted by Detective Shepherd and I in the afternoon and he agreed to questioning. He was cooperative at the time of the contact and the vehicle he had been driving did not have any signs of a metal bar present used in an assault. At the time of the initial contact, he admitted to being at the Villa Apartments during the time of the assault. He claimed he had stopped in there to sleep in an empty apartment he had been renovating. He arrived there sometime after mid-night. He claimed at that time he slept there because he was attempting to drive home while intoxicated the prior night and was all over the road, so he stopped to sleep it off. At the time Kloepper lived in north

34

Richland and stated he was in south Richland because he had followed a friend to Kennewick to make sure he was ok getting home. No probable cause was developed for Kloepper that day and he was released on his own.

As a part of the ongoing investigation at the time the chunk of rubber collected at the apartment was labeled evidence item #RS5. This item was later sent to the WSP Crime lab for analysis. WSP Forensic Scientist Lorraine Heath issued a lab report dated 4/9/2010 with a conclusion that blood was present on the glove and an unknown male DNA profile (individual B) was detected.

Cody Kloepper's buccal swab was sent to the WSP Crime Lab for analysis. WSP Forensic Scientist Lorraine Heath issued a lab report dated 6/18/2010 with a conclusion that the unknown male individual B was Cody Kloepper with odds of a random match to another male at 1 in 440.

Further testing on the blood staining was requested and WSP Forensic Scientist Lorraine Heath issued a lab report dated 7/16/20 with a conclusion that the blood staining detected was contributed to [D.W.] with Kloepper's DNA being present on an item that had the victim's blood mixed in from the actual assault.

Further investigation into Cody Kloepper was conducted seeking electronic data and records. A search warrant for his home computer, cell phone and cellular records was conducted. Through a forensic search of the computer key information was obtained that Kloepper was browsing Craigslist ads for sexual encounters of men seeking men during the late night hours of 12/4/2009. Kloepper's cell phone records revealed he made phone calls to a cellular phone number registered out of Florida shortly after midnight on 12/5/2009. Kloepper's call detail records were looked at and I found that while making phone calls from his cellular phone it was pinging off of different towers as it went to the area of East Kennewick and/or East Pasco.

The phone records for the subscriber of the cellular number from Florida that Kloepper was communicating with were obtained and a male subject that provided a name of Salvador Contreras was identified. In 2010 Salvador Contreras provided identifying information about himself that matched a person already located in ileads with this information. He provided a business address of 1717 W. Court St. and explained he lived in Florida. A Washington DOL record for Salvador Contreras had listed him as being associated with Washington Driver's License #CONSTRA*347NA. Contreras admitted he had been in the Tri-Cities in December 2009. He admitted he had placed an ad on Craigslist to meet men. He advised that he remembered meeting up with someone around that time believed to be Cody Kloepper.

With this information the Benton County Prosecutor's Office filed formal charges against Cody J. Klopper for Rape 1st degree, Burglary 1st Degree and Assault 1st Degree. Kloepper was arrested and he was booked into the Benton County Jail on 11/12/2010.

35

Cody Kloepper went to trial in Benton County Superior Court in September of 2011. At trial Salvador Contreras testified that he had placed an ad in Craigslist seeking a sexual encounter for another man. At trial Contreras identified that he gave directions to Cody Kloepper to come to a Finley home where he was staying to meet. Contreras testified that Kloepper came into his home and was there for 15-20 minutes. Contreras testified that Kloepper took off his shirt and was very "eager" for a sexual encounter. Contreras testified that no sexual contact occurred between the two because he was turned off by Kloepper.

Cody Kloepper testified at this trial. He testified that he met up with Salvador Contreras at a home in Finley for sex. Kloepper testified that there was in fact a sexual encounter between he and Contreras. Kloepper testified that Contreras performed oral sex on him. Kloepper testified that after the encounter he left and went to the Villa Apartments where he slept for the night in an apartment that was being renovated.

Kloepper was subsequently found guilty by a jury trial of the crimes of Rape 1st, Burglary 1st Degree and Assault 1st Degree. Kloepper was sentenced to 24.5 years in prison after his trial in Benton County.

Kloepper maintained his innocence after the trial and sought appeals to overturn his conviction, all of them failing.

In late 2019 Cody Kloepper requested additional postconviction DNA testing be performed in this case. The Benton County Prosecutors Office stipulated to the defendant's request.

On 1/9/2020 Richland P.D. sent items related to this case to the WSP Crime Lab for the post-conviction analysis. One of the items sent for analysis was a sweatshirt worn by [D.W.] at the time of the Assault, RPD Evidence item #RJS-6. This item was outsourced to DNA Labs International by the WSP Crime Lab for further analysis. DNA Labs International analyzed the items submitted for testing and issued a report of the results and conclusion dated 6/26/2020 by Forensic DNA Analyst Darren Wright.

The DNA Labs International report indicates that RPD Evidence Item #RJS-6 was analyzed. The report indicates the presence of blood. One Spermatozoon was identified on the exterior hood of the sweatshirt. Spermatozoa was identified on the exterior left sleeve of the sweatshirt. Seminal fluid was indicated on the upper back of the sweatshirt. Samples from these stains were then collect for DNA analysis.

A DNA profile was obtained from these stains with at least one male contributor. The DNA for Cody Kloepper was checked against the DNA profile of the male contributor, and he was EXCLUDED as the male contributor.

DNA Labs International then sent the items back to the WSP Crime Lab for disposition.

36

With these findings that Cody Kloepper was excluded, the WSP Lab checked the unknown male DNA profile from Items #RJS-6 against the Combined Index System CODIS) databank. A match was found in CODIS to a subject identified in CODIS as Salvador Castillo-Sanchez FBI#852944EA8, BOP#17543-085. As a standard practice the WSP Lab has requested a reference confirmation DNA sample be submitted for the subject identified in CODIS.

**Exhibit 15** - Verbatim Report of Proceedings – Volume 1-8

Summary:

- Volume 1 of 8 – August 4, 2011 – pages 1-35
- Volume 2 of 8 – August 8, 2011 – pages 36-46
- Volume 3 of 8 – August 9, 2011 – pages 47-202

Testimony of the following witnesses:

1. Calvin Nash
2. D.W.
3. Mary Phillips
4. Brenda Rodgers
5. Lance Greenwood
6. Fermin Godinez, M.D.
7. Jeramie David Morrow
8. Heather Lea Morrow
9. Katherine Colleran
10. Salvador Contreras
11. Robert Benson
12. Dean Murstig
13. Linda Metz
14. Dane Scott
15. Jordan Schlenker
16. Curtis Smith
17. Damon Jensen
18. Roy Shepherd
19. Lorraine Heath
20. Joseph Kloepper

Witness Summary, Lorraine Heath, Supervising Forensic Scientist with the Washington State Patrol Crime Lab.

- JMT 1, "grey" sweatshirt. No blood was detected. No further analysis was performed
- JMT 10, pair of jeans. No blood was detected. No further analysis was performed.
- JMT, black t-shirt. No blood detected. No further analysis was performed.
- JMT 23, pair of white shoes. No blood detected. No further analysis was performed.
- JMT 30, Timex watch. No blood detected. No further analysis was performed.
- JMT 39, fingernail swab reported collected from D.W. Looking for male DNA as an assailant of a female. No male DNA was detected. No further analysis performed.
- JMT 41, right fingernail scraping (clippings) reportedly collect from D.W. No analysis performed.
- JMT 12, pair of white socks. Did find staining consistent with blood on those white socks. Further testing was performed and determined that the blood was from an **unknown male individual, calling the Individual A**. Excluded both Karl Goehring and D.W. as possible donors of the profile.
- JMT 40, left fingernail swab from D.W.

Type of testing performed is called Y-STR. It looks at different parts of your DNA in comparison to Y-STR testing and looks at DNA on the Y chromosome. Because of that,

37

**Ex. 18 at 037**

only men have a Y chromosome and that type of testing is male specific. The reason we perform Y-STR testing is that during our regular testing we can detect a mixture of DNA from more than one person. Found a lot of DNA from one person and a little bit of DNA from the other person, there needs to be about a ten to one ratio for use to detect that other person. "**So that's the type of testing that was performed on JMT 40. And I actually obtained a mixture of DNA consistent originating two male contributors.**" "**I excluded Carl Goehring and Individual B, who is from another item, which we haven't got yet, as being donors of this profile. And Individual C that we also haven't gotten to yet, could be neither included nor excluded as a possible contributor to this mixture.**"

Basically, with mixtures from the Y-STR testing it can sometimes be difficult to separate out the components as to which one came from which male. And in those circumstances, we can say – We can't say for sure that an individual is included, but we also can't say for sure they're excluded. So essentially it means, I don't know. That really depends on the quality of the samples, the amount of DNA that's present, and the complexity of the mixture. And so in this particular case, Individual C, I just don't know if they're there or not. They might be present. They might not be present. I can't tell one way or the other. So that's the origin of that conclusion.

Page 580, transcript:

Question: Why would there be two different male contributors to scraping or things under a woman's fingernail?

Answer: "It's actually very common on both men and women to have DNA from multiple people under your fingernails. Even people –anybody you live with, even if you're not intimate with them, you're quite likely to have their DNA under your fingernail.

If you have children or a spouse or partner, you're intimate with, most likely you'll have their DNA under your fingernails. But you can also end up with DNA under your fingernails from just incidental contact with someone. Something like shaking hands with them or, you know, touching something that had their salvia on that you don't know about or that you did know about. So, it's not uncommon for us to get a minutia of DNA under people's fingernails. This is just a fact of life."

- JMT 42, left fingernail scraping. I performed the Y-STR testing on this item, and I got a single male profile and identified, at the time, that person as Individual C.

- RS 5 was fragment or small piece of what appeared to be an off-white latex glove.

This item was pretty much covered in staining consistent with blood. There were also hairs stuck in that blood and those were left there. I performed Y-STR testing on this glove and obtained a mixture consistent with originating from two male individuals and

38

determined that the major component – So if I have a mixture, something it's 50-50, a few drops of blood on top of each other, one from two different people, probably the DNA profile is gonna tell me that's roughly a 50-50 mixture from the two individuals.

In other circumstances, there might be more DNA from one contributor than the other. And in that case, I might be able to say there is a major contributor, so one person gave more DNA, and a potentially minor contributor so less DNA from this other person. So, in the particular case, I was able to distinguish between the major contributor and there were – it was a very, very small amount of this minor component. Actually, so low that I really can't do much analyses with it, other than saying there was a tiny, tiny amount of DNA from this other contributor. The major component was originally designated as Individual B.

So, Cody Kloepper's reference sample, which was RS 8, matched the Y-STR profile from Individual B. That means neither Cody Kloepper nor any of his paternal male relatives can be excluded as a donor in this profile. The reason I say that is because men have one Y Chromosome. It's in fact, directly inherited from father to son.

So in addition, we put weight to this observation and so the statistic I included with my report on this was that the Y-STR profile from this glove has been observed eleven times in the U.S. data base. And is not expected to occur more frequently than 1 in 440 males in the U.S. population. So if I start grabbing men off the street, I would expect no more than 1 in 440 of them to share this Y-STR profile.

- Back to number 12, the socks.

Question: "…So you would be able to say – or would you be able to say that anybody in particular is excluded?

Answer: Everybody I tested is excluded as Individual A. It's not Goehring. It's not Greenwood. It's not Kloepper. It's not Hall. And it's not Byrd. And it's not [D.W.], either.

**Note:**

Item #JMT 12 and JMT 42 are listed as an "Unknown Individual."

Item RS 5, major component matches the profile of Cody Kloepper, RS 8

**Cross Examination:**

Page 600, line 12, transcript

Question: And sweat and saliva, that the is pure – if there is such a thing – does that have any DNA?

39

Answer: No. The liquid, by itself, doesn't. The reason we get DNA profiles from saliva or from where there is sweat is because of the skin cells that are carried in the liquid. The liquid, itself, doesn't contain DNA. It's the fact that the skin cells get carried along in it that results in a DNA profile.

Question: And that is quite common. There is probably very little pure saliva because it gets quickly contaminated by sloughing skin cells.

Answer: Yes. Saliva is actually a very good source of DNA because so many skin cells are coming off in your mouth and during the formation of the saliva that it's a good source of DNA because it's got a lot in there from being carried along.

Question: Same thing with sweat?

Answer: Sweat is actually typically not as good. If you look in areas on your clothing, where you would expect sweat, you will get a DNA profile. But it's not considered a top source of sampling.

Questions: Probably depends on the degree of friction while a person is sweating?

Answer: Yes. Friction or rubbing off of skin cells onto whatever the item is you're gonna test is a big factor in how much DNA is gonna be up there, how many skin cells are there gonna be for use to test.

Page 603, line 9:

Question: And you've testified on this transfer of DNA. I want you to talk about transfer DNA and touch DNA. Is it just theoretical or is it practical that if – when I'm in trial, I'm kind under some stress and it's not uncommon to perspire. And I come up here and I'm talking to you – I've left DNA there.

Answer: Yes. Anytime you touch anything, you have left DNA. So, all the chairs you're sitting in and wherever your skin has touched, you've probably left your DNA. Touch DNA is a very variable sample type for us, and we get requests to analyze it fairly frequently, but there is some limitations to it. Your DNA is undoubtedly there, so where you just touched the wood, here, most certainly his DNA is physically present. Whether there is enough there for us to detect is a different question. We do have limits of detection. It's not an infinite science yet.

Page 609, line 2:

Questions: And DNA – or there is a, I don't know if you even call it DNA, but the carrier of the DNA, whatever – saliva, blood, sweat, tissues – this persists over time on a surface?

40

Answer: Yes. DNA is actually quite robust, especially indoors where it's in a fairly temperature-controlled environment. DNA can be degraded over time by things like sunlight.

Page 609, Line 10:

Answer: It can also be degraded by moisture, water getting in there. And it can be degraded by things like heat and bacteria.

Page 610, line 11.

Question: RJS, I don't think that's on your list there, but I believe it's in your report.

Answer: Yes, I see RJS 6.

Questions: And that is a head hair from a sweatshirt?

Answer: It was hairs, plural, that I received from a sweatshirt.

Question: All right. Did you do DNA analysis on that?

Answer: There were a total of three – I'm sorry, two hairs that were listed as being collected from RJS 6, victim's sweatshirt.

Question: And that's [D.W.'s]? Or did you identify her as [D.W.] or just as victim?

Answer: Yes, sorry. Yes, indeed, yes, [D.W.].

Questions: Okay. The sweatshirt was hers?

Answer: The information I had was that the sweatshirt belonged to her, yes.

Question: And you found two hairs?

Answer: I did not find those.

Question: I'm sorry. You're making me be very precise. You examined the two hairs that were sent to you by the detective or law enforcement source?

Answer: No.

Question: No, not even that? I got that wrong, too?

41

Answer: Another forensic scientist at the Crime Lab, Kevin Jennings, examined the sweatshirt. He is a trace analyst. Part of his job is to identify hairs on the item. And in the case, he examined the sweatshirt and some underwear. And he was the one that provided the hairs from the sweatshirt, of which there were two.

One, he determined to be a head hair. And the other, he determined to be, umm, you know, a limb or body hair. So maybe from an arm or leg, as opposed to the head or pubic area. And I was able to get a very, very tiny bit of information from the limb or body hair. It was so low that I can't make any comparisons to it. So basically, it was a useless sample from the perspective of identifying its donor.

In comparison, I obtained a mixed DNA profile from the head hair on the sweatshirt. That was consistent with originating from two males. The major component was from another unknown male, who I designate as Individual D.

Page 612, Line 1.

Question: D?

Answer: D. And there was a trace – a very, very low minor component from that hair. And all of the individuals that I typed, Mr. Goehring, Mr. Kloepper, Mr. Halls, Mr. Byrd and Mr. Greenwood and individual C were all excluded as contributors to the mixture.

Questions: Okay. All excluded?

Answer: Yes

Question: All right. And you can - were given no information to tell you who person C is, other than that it's a male?

Answer: Correct. None of the references that I obtained or that were submitted to me matched items C – or individual C, sorry.

Question: And individual A – I'm trying to adopt your nomenclature.

Answer: (Nods head up and down)

Question: Same individual A, no idea?

Answer: (Nods)

Question: Individual A is just an unknown male?

Answer: Correct.

42

**Ex. 18 at 042**

Question: Individual D is an unknown male?

Answer: Correct.

Question: And that's a total of three unknown males in terms of the items you were sent?
Answer: Yes.

Page 613, Line 16:

Question: All right. JMT 42 or left fingernail scrapings?

Answer: Yes

Questions JMT 42

Answer: Yes

Question: Scraping?

Answer: Yes

Questions: And what did you -- You did DNA analysis of that, of those scrapings?

Answer: Yes

Questions: And what was it you found? You found unknown male DNA there?

Answer: Yes, unknown male, individual C.

Witness Summary: Salvador Contreras

A. At Trial.

   Summary: Generally, Mr. Contreras testimony was very limited in scope because of the facts lacked any connection to the case in chief other than a timeline for Mr. Kloepper's actions on the night of December 4, 2009, and the morning of December 5, 2009.

B. Police Interview on August 19, 2020, Defense Attachment, F-3, pages 1-95.

   Summary:

   Page 6 of 95, line 15:

43

**Ex. 18 at 043**

Officer Murstig: And, you know, that what we talked about and what was talked about ten years ago was kind of sensitive.

Mr. Contreras: It is very sensitive.


Pages 16, 17, 18 of 95

Mr. Contreras: So, I would be chatting with other people about the present situation at that point and came across this gentleman, the one that we're here for.

Officer Murstig: Okay,

Mr. Contreras: In which I remember him very, I'd saying into it, trying to connect. And I would just text him back and he asked me for directions. I said –give him the directions, thinking that he was never going to really make it obviously. But at the same time, I wanted to meet somebody to explore some. And I had painted in my head a different person, of course.

But once he arrived, it was get late. He arrived and he was not in a good hygiene situation, I guess. He was very dirty and smelly, like he has been drinking. He appeared to be really drunk and he just came what kind of car he drove. He came to the door, and he was the one that was talking to me.

I let him in. He was too drunk and too smelly. I asked him to come to the kitchen and he sat at the kitchen. I offered him something to drink, and I believe it was coffee, so I served him something and he was sitting there. Across from that kitchen table there was a couch where I normally sit and – to read or to just lay down.

And so, he finished, he came over to the couch and he was sitting – we were apart, I would say about three feet apart on the couch.

Officer Murstig: Uh-huh

Mr. Contreras: And he was moving around the other way too much on the couch, like wanting to have sex obviously. That was the intention. And I, I had mentioned to him that it was not what I expected. That's not what I wanted to do. So basically, that's how we ended up meeting.

And I remember him going to the bathroom a couple of times. Came back and I think one of the times he came back to the bathroom, he came up closer to me, touching my, my, my legs because I was wearing a pair of shorts, and touching my upper body. And I

44

**Ex. 18 at 044**

said, you know what? This is not what I expected. This is not what I want. And I don't want to do this.

So, he kept on touching and touching. I think he said, well, if nothing's going to happen then I have to go. He was quite upset. So, he got up and I remember him leaving and I just was watching him through the door going out, get into his car and leaving.

But other than that, that's all I – the type of contact that I had with him at that point. And I had no recollection of any event at this point between he and I, I mean, to do anything sexually. Yeah, there was some touching, that he would be touching me, but other than that, I don't, I don't recall any, any, anything – and I would remember because that's very important thing, of course, in my life that I would either appreciate it or regret it, one of the two, but I don't.

Pages 28, 29 of 95

Mr. Contreras: "… I don't remember any type of an oral sex being performed or him going down on me or something or my, or my penis would get hard enough to – for him to do anything or I would do anything to him. "

Officer Murstig: And so, when you're laying down, is he laying down on top of you?

Mr. Contreras: At one point he got on top of me, yes.

Officer Murstig: And are his clothes on or are they off?

Mr. Contreras: When he came back from the bathroom, he had – I assume because I don't remember that part – he showered, or he got some water on him because he was wet.

Officer Murstig: Okay.

Mr. Contreras: So, his hands, his body felt wet.

Officer Murstig: And so is his clothes off when he comes – it's –

Mr. Contreras: His clothes off, yeah, out of the bathroom.

Officer Murstig: So, his clothing are off. And is that – that's when he lays on top of you?

45

**Ex. 18 at 045**

Mr. Contreras: Well, he was touching first. He sat down right in the same spot where he was sitting.

Officer Murstig: Okay.

Mr. Contreras: And he started rubbing one hand. And then he sat down and started rubbing with two hands and then he laid on top of me. That's when I got up and said, you know, this is not working out.
Page 31 of 95, line 4

Mr. Contreras: I do remember still having my shorts on, but these are loose shorts that he was touching from inside, from the sides.

Officer Murstig: So, he's touching inside your shorts?

Mr. Contreras: Uh-huh.

Page 38 of 95

Officer Murstig: And when you say touch there, what do you mean?

Mr. Contreras: The penis.

Officer Murstig: Penis?

Mr. Contreras: Uh-huh.

Officer Flohr: After, after that, after he was touching you underneath your shorts and had touched your penis, did he go to the restroom after that or not anymore?

Mr. Contreras: No, I don't recall him leaving – or going to the bathroom anymore, just freshening up and leaving.

Page 39 of 95

Officer Murstig: Is your penis erect? Is it hard at that point?

Mr. Contreras: I don't think it was because there was no attraction whatsoever.

Officer Murstig: And then was there an ejaculant (sic)? Did you climax at that point –

Mr. Contreras: Well, back then, I remember ejaculating very fast.

46

**Ex. 18 at 046**

Page 40 of 95

**Mr. Contreras:** I don't recall intentionally cuming or ejaculating. But I do know and recognize that I am very sensitive, and I can ejaculate within a minute or so.

**Officer Murstig:** Okay. And so, on this particular encounter, how did that happen? What happened?

**Mr. Contreras:** I don't recall ejaculating. Then again, it's a good possibility because knowing myself that I would ejaculate quite fast from any touching or anything, and sometimes even if my penis is not erect completely then it would ejaculate.

C.  Mr. Contreras's testimony on March 22, 2022. (Attached Transcript)

**Summary:** Generally, Mr. Contreras's testimony appears to provide specific details regarding his contact with Mr. Kloepper on the morning of December 5, 2009. While some of his testimony in August 2020 was consistent with statements to police officers from 2009-2010, other specific details Mr. Contreras could not recall, or the parties failed specifically ask him for details about his prior statements. Moreover, Mr. Contreras testified his memory was not as good as it used to be because this case is over ten years old, and his memory has been affected by COVID-19.

## V. COURT'S DECISION

There are two discrete pieces of newly discovered evidence at issue: Mr. Contreras's DNA in the rubber glove found in the victim's residence (glove DNA), and Mr. Contreras's semen on the sweatshirt and sweatpants of the victim (clothing DNA). The Defendant asks for a new trial on the basis of this DNA evidence linking Mr. Contreras to previously unknown DNA samples from the crime scene.

To grant the requested relief, the Court must find that all five factors laid out in *Letellier* are met with the discovery of the new evidence. Those five factors are:

1.  The claimed newly discovered evidence must be such that it will probably change the result if a new trial is granted.
2.  The evidence must have been discovered since the trial.
3.  It must be shown that the evidence could not have been discovered before the trial by the exercise of due diligence.
4.  The evidence must be material to the issue and admissible.
5.  The newly discovered evidence cannot be merely cumulative or impeaching.

47

**Ex. 18 at  047**

*State vs. Letellier*, 16 Wash.App. 695, 699-700, 558 P.2d 838, 841 (1977).

As to the glove DNA, at the time of trial, the evidence was that there were two male contributors to DNA from the glove: one an unknown minor contributor, and one a major contributor, identified as the defendant. The minor contributor to the rubber glove fragment has subsequently been identified as Mr. Contreras, with the possibility of a random match at 1 in 250 males in the U.S. population. This finding does not contradict the 2010 lab determination that the defendant was the major contributor, with the possibility of a random match with his DNA at one in 440 males in the U.S. population.

Given the evidence from the trial that Mr. Contreras and Mr. Kloepper were in close physical contact prior to the attack on D.W., and given the testimony from the reference hearing about the nature of the physical contact between the two men, testimony from forensic experts on touch and trace DNA, as well as information from the scholarly articles entered into evidence at the reference hearing about the transfer of one person's DNA to another person, the Court does not believe that the identification of Mr. Contreras as the minor contributor to the glove DNA would likely result in a different outcome at trial if the jury were to have that information. The Court does not believe that the jury would change its verdict if it knew the identity of the minor contributor was the man the defendant had intimate physical contact with in the hours prior to the attack, in light of the overall evidence.

With respect to the victim's sweatpants (clothing DNA), stain number 2 on the sweatpants was from the right exterior front and had Mr. Contreras's DNA with a random match possible in 1 in 200 quadrillion cases. Stain number 3 also was on the right exterior front of sweatpants and had a mixture of a least two individuals with Contreras's DNA matching with a possible random match at 1 in 190 quadrillion. Stain number 8 was on the left exterior back of the sweatpants and had a mixture of a least three individuals with Contreras's DNA matching with a possible random match at 1 in 110 quadrillion. The defendant was excluded as a contributor on these stains.

With respect to the victim's sweatshirt, it also had three stains with Mr. Contreras's DNA. Stain number 2 was on the wearer's exterior front of the sweatshirt and contained Mr. Contreras's DNA with the odds of a random match at 1 in 54 quadrillion. Stain number 4 was on the wearer's right sleeve and had Mr. Contreras's DNA with the odds of a random match at 1 in 190 quadrillion. Stain number 7 was on the wearer's exterior lower back and had Mr. Contreras's DNA with the odds of a random match at 1 in 200 quadrillion. The defendant was excluded as a contributor on these stains.

The lack of DNA evidence from Mr. Kloepper on the victim's clothing is material.

After the police learned that Mr. Contreras's DNA was found on D.W.'s clothes, they questioned Mr. Contreras more extensively and asked for more of an explanation of what happened between he and defendant in 2009.

48

**Ex. 18 at 048**

Mr. Contreras stated he remembered the defendant using the bathroom, and showering, and coming out of the bathroom naked. Mr. Contreras states that he was laying down on a couch and the defendant, still naked, got on top of him and ran his hands from Mr. Contreras's legs to chest.

At one point, the defendant put his hands under Mr. Contreras's shorts and touched his penis. Mr. Contreras stated that he has a long history of premature ejaculation and there was a "good possibility" that he ejaculated when the defendant put his hands down his shorts. He ejaculates quickly, with or without his penis being erect, without masturbation, and with minimal stimulation.

This suggests Mr. Contreras's sperm was transferred to Mr. Kloepper during physical contact on Mr. Kloepper's naked body (chest and lower body) and his hands. Mr. Contreras does not remember Mr. Kloepper going into the bathroom after the sexual contact, which also suggests that Mr. Contreras's sperm and DNA was never washed off Mr. Kloepper. This may account for both Mr. Kloepper's and Mr. Contreras's DNA on the rubber glove.

According to Mr. Darren Wright, the forensic scientist who found Mr. Contreras's DNA, the DNA could have been transferred from Mr. Contreras to the defendant to D.W., or it could have been directly transferred. He stated there is no way to quantify or determine whether or not the DNA found was a result of a direct (Mr. Contreras to D.W.) or indirect (Mr. Contreras to Mr. Kloepper to D.W.) transfer.

Mr. Wright said a secondary transfer is possible, but he would not comment on how probable it is. He stated that he could not tell by the nature of the stain if it was direct or secondary transfer. That could not be determined visually. There was nothing scientifically that he could point to that indicates whether there was a direct or secondary transfer.

Moreover, in the collection of evidence, D.W.'s sweatshirt and sweatpants and the way they were folded into evidence bags may have transferred Mr. Contreras's DNA, which may have added to the detection of the spermatozoa.

The defendant also suggests that the semen (sperm) was deposited on the clothing during the commission of the crime, in two possible ways: (1) it was a direct deposition of a fresh ejaculate by and from the assailant on the interior, exterior, front and back of the clothing of D.W., or (2) deposition of ejaculate collected at a prior time, i.e., "planting of the semen." However, there is no evidence that the perpetrator ejaculated based upon the amount of sperm found on the victim's clothing, and the testimony of D.W. that the perpetrator did not ejaculate during the incident.

Finally, the argument that Mr. Kloepper is entitled to new trial to be allowed to subject the government's new transfer scenario to adversarial testing at a retrial is interesting, but ultimately without merit. Mr. Kloepper suggests that the *Bradford* case stated the prosecutor's new theories about postconviction DNA results, as well as matters disputed by the parties at the original trial, "remain open questions for a jury to resolve upon retrial and in the context of the new DNA

49

evidence." However, this is not the holding of *Bradford* and *Bradford* does not state that any new prosecution theory about DNA automatically mandates a new trial.

In *Bradford*, a new trial was ordered when DNA evidence for an unknown male was located on tape from a mask that had been put over the rape victim's head during her assault. *In Re Bradford*, 140 Wash.App. at 126-27. No DNA from Bradford was found on that tape. *Id.* Bradford had been convicted largely on the basis of a confession he had given where he indicated to officers that he "probably did it." *Id.* at 127. There was disputed testimony at trial as to Bradford's alibi for the day of the rape, the victim's description of the assailant, and there were numerous discrepancies between Bradford's confession and the victim's recitation of her attack. *Id.* at 128. Because the DNA evidence, which was not available at all at the time of the first trial and which excluded Bradford as a contributor to the DNA, could have led a reasonable jury to conclude that Bradford was not present at the scene of the crime, the trial court determined after a reference hearing that a new trial was warranted because that newly discovered evidence could lead to a different jury verdict. *Id.* at 129. Only because the Court of Appeals determined that the trial court properly granted a new trial did the court state that "[t]he factual disputes regarding Mr. Bradford's confession and alibi, like the other factual disputes noted by the parties, remain open questions for a jury to resolve upon retrial and in the context of the new DNA evidence." *Bradford*, 140 Wash.App. at 132. In other words, this was not the holding of the case, as defendant argues, but simply the logical consequence of granting a request for a new trial.

Mr. Kloepper's case is unlike *Bradford* because the direct and circumstantial evidence of Mr. Kloepper's guilt was much more overwhelming. In Mr. Kloepper's case, the jury was aware that the rubber glove contained a minor contribution of DNA from an unknown male; the new evidence merely identifies that male as Mr. Contreras. The jury knew that Mr. Kloepper had contact with Mr. Contreras in the hours prior to being at the Villa Apartments, and that that contact was sexual in nature. The presence of Mr. Contreras's semen on the outside of the victim's clothing, with such small quantities of spermatozoa, would not likely convince a jury that the perpetrator was Mr. Contreras, especially in light of the victim's testimony that the perpetrator did not ejaculate and Mr. Contreras's testimony that he easily ejaculated.

The jury was presented with evidence that the victim identified her assailant as a tall, thin, shaggy-haired white male, which matched Mr. Kloepper prior to cutting his hair. The jury was presented with evidence that Mr. Kloepper had access to a key to the victim's apartment and there was no forced entry on the locked door; that Mr. Kloepper worked at the apartment complex as a maintenance man and that the victim initially told 911 that the assailant looked like a maintenance person from her apartment complex; that Mr. Kloepper admitted to being at the apartment complex the night of the attack; that Mr. Kloepper changed his appearance after the attack; that he was wearing a shirt with the apartment complex logo on it after the attack and the attacker removed his shirt despite the cold winter temperatures; that Mr. Kloepper lied to law enforcement about his whereabouts when initially questioned; and that Mr. Kloepper was the major contributor to the DNA found in a bloody rubber glove fragment recovered from inside the victim's apartment. For all those reasons, the Court does not find *Bradford* persuasive or find

50

that the new DNA evidence automatically confers a right to challenge a new prosecution theory of the DNA in a new trial.

Based upon the analysis above, the Court will find the following:

1. The Court will find that the newly discovered DNA evidence was discovered since the trial.

2. The Court will find that the DNA evidence could not have been discovered before the trial by the exercise of due diligence.

3. The Court will find that the newly discovered DNA evidence is material to the issue and admissible.

4. The Court will find that the newly discovered DNA evidence is not merely cumulative or impeaching.

5. The Court will find that DNA evidence can be transferred from one human to another and it is well-established in the scientific community, which is supported by scientific experiments.

6. The Court will find that the direct and circumstantial evidence presented at trial was overwhelming against the defendant. The identity of Mr. Contreras's DNA evidence on the tip of the rubber glove fragment as the minor contributor to the DNA profile, and his sperm located on the victim's sweatpants and sweatshirt, would not likely change the result of the verdict, in light of the other overwhelming evidence against Mr. Kloepper.

Therefore, the defendant's motion for a new trial, pursuant to CrR 7.8(b) is thereby DENIED.

Please prepare the final order consistent with the Court's decision.

Very truly yours,

Joseph M. Burrowes
Superior Court Judge
Benton and Franklin County Superior Court

JMB/jmb

superiorcourt/civil/ruling/2022 April State vs Kloepper

51

**Ex. 18 at  051**

# EXHIBIT 19

**From: Andy Miller** <Andy.Miller@co.benton.wa.us>
Date: Tue, Aug 18, 2020 at 1:14 PM
Subject: RE: State v. Kloepper
To: Jackie McMurtrie <jackiem@uw.edu>, Terry Bloor <Terry.Bloor@co.benton.wa.us>, Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
Cc: Dean Murstig <dmurstig@ci.richland.wa.us>, Flohr, Luke <LFlohr@ci.richland.wa.us>, Andy Miller <Andy.Miller@co.benton.wa.us>

Yes, the detectives were able to get Contreras's reference samples

The detectives are copied on this email and can forward the photos. They also discussed the various photos with Mr Contreras and he confirmed that they were all of him. He discussed his "arrest" by immigration back in the 80s, his use of a false name to obtain a social security card when he overstayed his VISA, and his criminal conviction that led to him being placed on federal probation

---

**From:** Jackie McMurtrie <jackiem@uw.edu>
**Sent:** Tuesday, August 18, 2020 12:37 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
**Cc:** Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: State v. Kloepper

Andy,

Waiting to talk until after Detectives Flohr and Murstig meet with Contreras again makes sense.

Can you confirm that the Detectives were able to get Contreras' reference samples?

And, in a previous call there was a discussion about RPD having Contreras' booking photos and other photos (driver's license?). We would appreciate getting copies of the photographs.

Thank you,
Jackie

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, August 18, 2020 11:35 AM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
**Cc:** Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: State v. Kloepper

Jackie,

Sorry for the delay. I just got out of the briefing.

I had meant to forward Terry's email to Kristin and I last night. I have attached it to this email.

During our meeting with Detectives Flohr and Murstig they mentioned that since Contreras was caught off guard they talked to Contreras yesterday about meeting again. They exchanged phone numbers to facilitate that. They are calling him to follow up on that and they also think that they will be able to record this interview.

Could we have the call you suggested after that?

---

**From:** Jackie McMurtrie <jackiem@uw.edu>
**Sent:** Tuesday, August 18, 2020 10:04 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
**Cc:** Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: State v. Kloepper

**Ex. 19 at 001**

Thank you for the update. Can we schedule a time to talk afterwards – perhaps 1:00 p.m.?

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, August 18, 2020 9:35 AM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
**Cc:** Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: State v. Kloepper

RPD did contact Mr Contreras yesterday late afternoon/ early evening.
They are coming to our office at 10am to brief us as to the interview

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Friday, August 14, 2020 3:20 PM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
**Cc:** Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: State v. Kloepper

I do not believe that Richland PD has interviewed Mr Contreras yet. They have been doing some checking on his location.

Detective Murstig and Detective Flohr did discuss their intent to record the interview with Mr Contreras. That of course depends on Mr Contreras' consent to be recorded. I would also expect that there will be some preliminary discussion before they ask for permission to record

---

**From:** Jackie McMurtrie <jackiem@uw.edu>
**Sent:** Friday, August 14, 2020 3:01 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
**Cc:** Dean Murstig <dmurstig@CI.RICHLAND.WA.US>
**Subject:** RE: State v. Kloepper

Andy,

I appreciate the quick action on the search warrant. Please keep us posted on RPD's efforts to locate Contreras. We also request that any interviews with Contreras be recorded.

Thank you,
Jackie

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Wednesday, August 12, 2020 6:03 PM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>
**Cc:** Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: State v. Kloepper

Thank you for your patience

We did follow up on your suggestion that we call the WSP Crime Lab and had a conference call at 4pm.

In discussions about secondary transfer etc.. the scientists said that much would depend on the type of stains and that DSI would be the best source for that information. I asked how they were going to get that information from DSI and they said that there was a scheduled conference call tomorrow with DSI, the WSP crime lab and the Innocence Project.

We thought it might be helpful if we could participate in that call. Your thoughts?

Also, we did get a search warrant signed today for Contreras DNA—RPD is taking steps to locate Mr Contreras

**Ex. 19 at 002**

**From:** Jackie McMurtrie <jackiem@uw.edu>
**Sent:** Tuesday, August 11, 2020 9:04 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: State v. Kloepper

We look forward to talking with you soon.

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Monday, August 10, 2020 5:20 PM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** State v. Kloepper

We need to cancel the phone call set for tomorrow.  We will reschedule as soon as possible.

**From:** Jackie McMurtrie <jackiem@uw.edu>
**Sent:** Tuesday, August 11, 2020 9:04 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>

**Ex. 19 at 003**

Case 4:26-cv-05057-TOR    ECF No. 1-2    filed 04/17/26    PageID.537    Page 247 of 386



**Sarah Beth Johnson <sarah@wainnocenceproject.org>**

# Fwd: Cosio-Contreras, Salvador, #852944EA8/ Scan of NCIC III

**Lara Zarowsky** <lara.zarowsky@wainnocenceproject.org>  
To: Sarah Beth Johnson <sarahbeth.johnson@wainnocenceproject.org>  
Cc: Kloepper LS Email <23-0000177@waship.legalserver.org>

Mon, Apr 28, 2025 at 12:41 PM

**Lara Zarowsky**  
Executive & Policy Director  
Support our Work HERE



---------- Forwarded message ---------  
From: **Andy Miller** <Andy.Miller@co.benton.wa.us>  
Date: Wed, Sep 16, 2020 at 3:33 PM  
Subject: RE: Cosio-Contreras, Salvador, #852944EA8/ Scan of NCIC III  
To: Jackie McMurtrie <jackiem@uw.edu>, Terry Bloor <Terry.Bloor@co.benton.wa.us>, Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>  
Cc: Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>, Andy Miller <Andy.Miller@co.benton.wa.us>

Please find the attached that we received from the Richland police department

---

**From:** Jackie McMurtrie <jackiem@uw.edu>  
**Sent:** Wednesday, September 9, 2020 5:29 PM  
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>  
**Cc:** Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>  
**Subject:** RE: [EXTERNAL] RE: Cosio-Contreras, Salvador, #852944EA8

I figured that is what you meant about the NCIC III, but appreciate the clarification. We can wait until next week, when Andy Miller is back, for your office's response.

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>  
**Sent:** Wednesday, September 9, 2020 5:14 PM  
**To:** Jackie McMurtrie <jackiem@uw.edu>; Andy Miller <Andy.Miller@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>  
**Cc:** Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>  
**Subject:** RE: [EXTERNAL] RE: Cosio-Contreras, Salvador, #852944EA8

Ex. 19 at 004

It's late.  I meant "If we get a NCIC III on *Mr. Cosio-Contreras*, we'll sent it ASAP."

---

**From:** Terry Bloor
**Sent:** Wednesday, September 9, 2020 5:03 PM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Andy Miller <Andy.Miller@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>
**Cc:** Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: [EXTERNAL] RE: Cosio-Contreras, Salvador, #852944EA8


Ms. McMurtie:  Actually we were working on this issue last week with Det. Flohr.  If we get a NCIC III on your client, we'll send it ASAP.

---

**From:** Terry Bloor
**Sent:** Wednesday, September 9, 2020 4:45 PM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Andy Miller <Andy.Miller@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>
**Cc:** Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: [EXTERNAL] RE: Cosio-Contreras, Salvador, #852944EA8


Ms. McMurtie:  Andy is out of the office this week.  I'd like to get his thoughts before responding to your email.  Let me know if you have any problems waiting until next week on this.  Thanks.

---

**From:** Jackie McMurtrie <jackiem@uw.edu>
**Sent:** Wednesday, September 9, 2020 3:18 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>
**Cc:** Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** [EXTERNAL] RE: Cosio-Contreras, Salvador, #852944EA8

---

CAUTION: This email originated from outside of Benton County. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Andy,

We know about Contreras's 2014 federal court conviction. The attached RPD NCIC III report indicating he has "no convictions" is incorrect. Given that, we are requesting Contreras's complete FBI III report (including arrests and dismissed charges) provided either by your office or through an agreed court order.

The August 10, 2020 RPD supplemental report states two different birthdates (███ 1967 and ███ 1966), and numerous alias names are linked to Contreras: Castillo, Salvador Sanchez; Cosio Contreras, Salvador; Cosio, Salvador; Cosio-Contreras, Sal; Cosio-Contreras, Salvador; Cosiocontreras, Salvador; Gardener-Sanchez, Salvador; and Sanchez, Salvador Castillo.

Thank you,

Jackie

Ex. 19 at 005

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, September 1, 2020 3:54 PM
**To:** Jackie McMurtrie <jackiem@uw.edu>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>
**Cc:** Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

Jackie,

We made a formal request to the Richland police department for the criminal history of Mr Cosio-Contreras. I have attached what we received.

Please let us know if you would like anything else on the criminal history issue

---

**From:** Jackie McMurtrie <jackiem@uw.edu>
**Sent:** Tuesday, August 25, 2020 4:20 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>
**Cc:** Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

Andy,

We would like Contreras's full criminal conviction history. Is it possible to obtain that from the WA State Patrol?

Thank you,

Jackie

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, August 25, 2020 3:20 PM
**To:** Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Jackie McMurtrie <jackiem@uw.edu>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** FW: Cosio-Contreras, Salvador, #852944EA8

Jackie and Lara,

Please see the below email string with federal probation.

Does this satisfy your request for criminal history information or do have additional suggestions? I can ask RPD to confirm that this is his only criminal conviction data, I'll copy them on this email

Ex. 19 at 006

**From:** Jose Zepeda <Jose_Zepeda@waep.uscourts.gov>
**Sent:** Tuesday, August 25, 2020 9:53 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

Hi Terry,

We unfortunately have very strict policies what information we are allowed to share. I can share Cosio-Contreras' general demographics, photo, and judgment. Aside from that, any other requested information will need to come to us through a court order. The Honorable Thomas O. Rice is the assigned judge.

## GENERAL and DEMOGRAPHICS

| | | | |
|---|---|---|---|
| Name: | Cosio-Contreras, Salvador | Citizen: | U.S. Citizen |
| Sex: | Male | SSN/EIN: | ▓▓▓ |
| Race: | White | Hispanic: | Hispanic origin |
| Birth Date: | ▓▓▓1966 | Register/Marshal's No: | 17543-085 |
| Height: | 6 ft. 1 in. | FBI Number/UCN: | 852944EA8 |
| Weight (lbs.): | 195 | State Identification No: | X |
| Eye Color: | Brown | Driver Lic. No: | |
| Hair Color: | Brown | ICE No: | A093377288 |
| | | DNA No: | C0412585 |

Thank you!

Jose Zepeda

Supervisory U.S. Probation Officer

Eastern District of Washington

509-574-5527

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Monday, August 24, 2020 5:10 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>; Jose Zepeda <Jose_Zepeda@waep.uscourts.gov>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

**Ex. 19 at 007**

Mr. Zepeda:  I used an incorrect email address for you originally.  This caused the elected prosecutor, Andy Miller, to use an incorrect email address.  Please see his email below.  We're working with the Innocence Project a case and let us know if there are certain items that you do not think should it would be appropriate to forward to them.  Thanks.

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 24, 2020 5:05 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Jose.Zepeda@waep.uscourts.gov; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

Did you include my follow up email?

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Monday, August 24, 2020 4:36 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Jose.Zepeda@waep.uscourts.gov; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

Sorry.  I forwarded my email to Mr. Zepeda at the correct address.

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 24, 2020 3:36 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Jose.Zepeda@waep.uscourts.gov; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

The email to Mr Zepeda bounced back—Dean is the one Terry used the one that you used?

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 24, 2020 3:34 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Jose.Zepeda@waep.uscourts.gov; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Cosio-Contreras, Salvador, #852944EA8

Thank you

Mr Cosio-Contreras is involved in a rape case that we are working on with the Innocence Project. We intend to forward what we receive from your office to the Innocence Project. If there are any items you forward to us that you do not think appropriate to forward to them, please let us know

**Ex. 19 at 008**

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Monday, August 24, 2020 2:52 PM
**To:** Jose.Zepeda@waep.uscourts.gov; Andy Miller <Andy.Miller@co.benton.wa.us>; Kristin McRoberts <Kristin.McRoberts@co.benton.wa.us>; Dean Murstig <dmurstig@CI.RICHLAND.WA.US>; Flohr, Luke <LFlohr@CI.RICHLAND.WA.US>
**Subject:** Cosio-Contreras, Salvador, #852944EA8

Mr. Zepeda:  You recently corresponded with Dean Murstig of the Richland Police Department regarding the above individual. Could you please send to entire file US Probation has on Mr. Cosio-Contreras to our office, including any photos or criminal history to:

Benton County Prosecuting Attorney

7122 W. Okanogan Pl.

Kennewick, Wa. 99336.

If it's easier, please email it to the terry.bloor@co.benton.wa.us.

Please contact me if you have any questions.  Thanks.

 **SKM_80820091615290.pdf**
224K

 **Gmail**

Peno Mclean-Riggs <peno.mclean-riggs@wainnocenceproject.org>

---

## Re: State v. Kloepper
6 messages

---

**Mark Mestel** <mark.mestel@gmail.com>                              Tue, Nov 9, 2021 at 9:40 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andrew Clark <Andrew.Clark@co.benton.wa.us>, Andy Miller <Andy.Miller@co.benton.wa.us>

Terry:  Let me look through the material and get back to you prior to
Friday.


Mark



On Tue, Nov 9, 2021 at 8:59 AM Terry Bloor <Terry.Bloor@co.benton.wa.us>
wrote:

Mark:  Just to follow up on our conversation Friday, you mentioned
stipulating to the affidavits of the experts.  Did you mean the reports of
the DNA scientists?  The reports are acceptable to us.  This agreement
would only extend to documents we have in our possession which are:

6-15-10:  Kevin Jenkins
6-18-10:  Lorraine Heath
7-16-10:  Lorraine Heath
9-7-10:   Lorraine Heath
6-26-20:  DNA Labs International
10-8-20:  DNA Labs International
8-6-20:   Denise Rodler
1-7-21:   Anna Wilson
4-9-21:   Charlotte Ward
10-21-21:  Charlotte Ward

Was there any other report the defense was planning to submit?

We need to get an affidavit or declaration from Darren Wright, the
forensic scientist for DNA Labs International that is consistent with the
police report we submitted.  I will volunteer to draft the affidavit and
run it by you before sending it to him.  We're open to other options if
you have any.

Concerning Salvador Contreras, do you have an objection if we submit his
video interview at the Richland Police Department on August 19, 2021?
You've already submitted the transcript from that interview.



--

Mark Mestel
2707 Colby Avenue, Suite 901

Ex. 19 at 010

Everett, WA.  98201
425.339.2383
mark.mestel@gmail.com

NOTICE:  This communication and the information contained within, along
with any items attached as an enclosure, are privileged and confidential.
This communication is intended solely for the use of the individual(s)
named above.  If you are not one of the intended addressee(s) or you
believe you have received this communication in error, you are hereby
notified that any consideration, dissemination or duplication of this
communication is strictly prohibited.  In addition, you shall not print,
copy, retransmit,
disseminate or otherwise use this information in any form without first
receiving specific written permission from the author of this
communication.  If you have received this communication in error, please
reply to the sender indicating that fact and delete this message from your
system immediately.

📄 **winmail.dat**
7K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                                    Tue, Nov 9, 2021 at 9:49 AM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andrew Clark <Andrew.Clark@co.benton.wa.us>, Andy Miller
<Andy.Miller@co.benton.wa.us>

Mark:  If I wasn't clear, we are willing to stipulate to the reports as
written, without the need to get further declarations or affidavits from
the scientists.

Also, I'm working on a motion asking the court to request Judge Runge
hear the motion for new trial.  I should have that done today, and will
email it to you three.

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Tuesday, November 9, 2021 9:40 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Jacqueline McMurtrie <jackiem@uw.edu>; Lara Zarowsky
<lara.zarowsky@wainnocenceproject.org>; Andrew Clark
<Andrew.Clark@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
Subject: [EXTERNAL] Re: State v. Kloepper

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton
County. DO NOT click links or open attachments unless you recognize the
sender and know the content is safe.
[Quoted text hidden]

📄 **winmail.dat**
9K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                                    Tue, Nov 9, 2021 at 3:18 PM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark
<Andrew.Clark@co.benton.wa.us>

I have no objection to you submitting the Contreras video so long as we
also can admit the transcript.  That's acceptable.

Ex. 19 at 011

With regard to retired Judge Runge, is your intent to argue the motion this Friday?  No, unless you want to argue it.  But you haven't seen it at this point.

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Tuesday, November 9, 2021 3:08 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Jacqueline McMurtrie <jackiem@uw.edu>
Subject: Re: [EXTERNAL] Re: State v. Kloepper

Terry:  We will stipulate to the reports that you identified, without need to submit them as affidavits.  I'll withhold judgment on a statement from Darren Wight until you send it to me.  In addition to the documents identified in your email, we also may want to introduce Exhibits B (Dr. Ross) and E (4/9/10 Crime lab report authored by Heath) attached to our Reply Brief.  We anticipate obtaining a new report from Dr. Ross and will send it to you for your review once received.  I have no objection to you submitting the Contreras video so long as we also can admit the transcript.

With regard to retired Judge Runge, is your intent to argue the motion this Friday?

My thought with regard to Friday's hearing is that we obtain a date for the hearing and set a schedule for disclosure of exhibits and witnesses, if any, perhaps 2 weeks prior to the hearing.  That should give the Judge ample time to review the material prior to the hearing.

Mark

On Tue, Nov 9, 2021 at 9:49 AM Terry Bloor <Terry.Bloor@co.benton.wa.us>
[Quoted text hidden]

📄 **winmail.dat**
12K

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>    Tue, Nov 9, 2021 at 6:01 PM
To: Mark Mestel <mark.mestel@gmail.com>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark <Andrew.Clark@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>

Mark:  I haven't finished the motion to request Judge Runge.  That should be done tomorrow.  It won't be fair to either you or Judge Swanberg to have the motion argued Friday.   I'd rather have a specific time for the argument.

I may have spoken too soon concerning a stipulation to the reports.  We'll agree on Charlotte Word's reports, and the DLI reports as long as there is an agreement that we can submit a summary of the conversation with Darren Wright.  I'll aim for a declaration from him with the process outlined by my earlier email—I'll draft the affidavit and run it by you.

We're concerned about the report from Dr. Ross.  Although his report was dated before the motion for a new trial was filed, it was provided as a rebuttal to our response, which means that we did not have an opportunity to comment on it.  And now there is another report coming from him?

Perhaps it would be better to state on Friday that the parties have a general agreement but we are still working on the specific exhibits that will be considered by the Judge.  We could set a time to argue the motion

**Ex. 19 at 012**

to request Judge Runge hear the case and have another pre-hearing that could be waived upon entry of an agreed order of what exhibits will be admitted at the hearing.

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Tuesday, November 9, 2021 3:08 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Jacqueline McMurtrie <jackiem@uw.edu>
Subject: Re: [EXTERNAL] Re: State v. Kloepper

Terry:  We will stipulate to the reports that you identified, without need to submit them as affidavits.  I'll withhold judgment on a statement from Darren Wight until you send it to me.  In addition to the documents identified in your email, we also may want to introduce Exhibits B (Dr. Ross) and E (4/9/10 Crime lab report authored by Heath) attached to our Reply Brief.  We anticipate obtaining a new report from Dr. Ross and will send it to you for your review once received.  I have no objection to you submitting the Contreras video so long as we also can admit the transcript.

With regard to retired Judge Runge, is your intent to argue the motion this Friday?

My thought with regard to Friday's hearing is that we obtain a date for the hearing and set a schedule for disclosure of exhibits and witnesses, if any, perhaps 2 weeks prior to the hearing.  That should give the Judge ample time to review the material prior to the hearing.

Mark

On Tue, Nov 9, 2021 at 9:49 AM Terry Bloor <Terry.Bloor@co.benton.wa.us>
[Quoted text hidden]

📄 **winmail.dat**
13K

---

**Mark Mestel** <mark.mestel@gmail.com>                              Tue, Nov 9, 2021 at 6:43 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark <Andrew.Clark@co.benton.wa.us>, Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>

Terry:  I'm going to confer with my associates.  I do think that it would be beneficial for us to sit down on Friday, after the hearing assuming you have some time, and go over exactly what each side wishes to admit as evidence.  I'm not convinced that I need the State's stipulation to admit the substance of an exhibit.  My concern is whether I need "affidavits" rather than reports/letters and/or witnesses rather than documents.  We can discuss how many hoops each of us will make the other jump through and how that may impact the length of the substantive hearing.

Mark

On Tue, Nov 9, 2021 at 6:01 PM Terry Bloor <Terry.Bloor@co.benton.wa.us>
[Quoted text hidden]

📄 **winmail.dat**
13K

Ex. 19 at 013

**Andy Miller** <Andy.Miller@co.benton.wa.us>      Wed, Nov 10, 2021 at 10:59 AM
To: Mark Mestel <mark.mestel@gmail.com>, Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Andrew Clark <Andrew.Clark@co.benton.wa.us>, Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>

Terry has been the lead on this but has been keeping me in the loop. Unfortunately, on Friday I am doing a resentencing on a defendant who was convicted of murder 24 years ago and was sentenced to LWOP but needs to be resentenced as his prior strikes were for Robbery 2. It may take a long time because defense counsel and I disagree about whether Oregon convictions are comparable for purpose of determining sentencing range, surviving family members plan on giving victim impact statements and defense wants to emphasize the defendant's progress in prison.

I do agree with Mark's suggestion in general. I don't think they all need to be in affidavit form, but I had noted that past email exchanges seemed to use the words affidavit and report almost interchangeably. I think the main thing is that we all need to be on the same page with our understanding of what will be admitted. Again, I agree with Mark that it will be best of all if the hearing itself can focus on the substantive issues

[Quoted text hidden]

---

📄 **winmail.dat**
15K

**Ex. 19 at 014**

 Gmail

Peno Mclean-Riggs <peno.mclean-riggs@wainnocenceproject.org>

## Darren Wright
4 messages

**Mark Mestel** <mark.mestel@gmail.com>                                      Thu, Nov 18, 2021 at 11:15 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>

Terry:  Do you plan on speaking with Mr. Wright again regarding the
statement that you drafted?  If so, I would ask to be included in the
phone call.  This would give me a better basis to determine whether I will
agree to his report or need him to testify at the hearing.


Mark


--



Mark Mestel
2707 Colby Avenue, Suite 901

Everett, WA.  98201
425.339.2383
mark.mestel@gmail.com

NOTICE:  This communication and the information contained within, along
with any items attached as an enclosure, are privileged and confidential.
This communication is intended solely for the use of the individual(s)
named above.  If you are not one of the intended addressee(s) or you
believe you have received this communication in error, you are hereby
notified that any consideration, dissemination or duplication of this
communication is strictly prohibited.  In addition, you shall not print,
copy, retransmit,
disseminate or otherwise use this information in any form without first
receiving specific written permission from the author of this
communication.  If you have received this communication in error, please
reply to the sender indicating that fact and delete this message from your
system immediately.

📄 **winmail.dat**
7K

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                               Thu, Nov 18, 2021 at 11:56 AM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark
<Andrew.Clark@co.benton.wa.us>

Mark:  No problem.  Are you available to talk to Mr. Wright with me next
week before Thanksgiving?

Ex. 19 at 015

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Thursday, November 18, 2021 11:15 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Jacqueline
McMurtrie <jackiem@uw.edu>
Subject: [EXTERNAL] Darren Wright

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton
County. DO NOT click links or open attachments unless you recognize the
sender and know the content is safe.

[Quoted text hidden]

📄 **winmail.dat**
   8K

---

**Mark Mestel** <mark.mestel@gmail.com>                    Thu, Nov 18, 2021 at 12:01 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark
<Andrew.Clark@co.benton.wa.us>

Yes.  My only conflicts are on Monday and Wednesday between 10 and noon.


Mark
[Quoted text hidden]

📄 **winmail.dat**
   8K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                    Thu, Nov 18, 2021 at 12:48 PM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark
<Andrew.Clark@co.benton.wa.us>

Mark:  Just to be clear, I was only going to give him a heads up to expect
a document for his signature that was based on his interview with Ms.
Zarowsky, Ms. McMurtrie and the prosecution team.  How about if I send him
the document I gave you and ask him if he has any comments, additions or
subtractions?
[Quoted text hidden]

📄 **winmail.dat**
   9K

**Ex. 19 at 016**

# EXHIBIT 20

 Gmail

Peno Mclean-Riggs <peno.mclean-riggs@wainnocenceproject.org>

## RE: DLI#20-1410 ~ Cody J. Kloepper
2 messages

<>          Thu, Nov 18, 2021 at 10:39 AM
To: Andy Miller <Andy.Miller@co.benton.wa.us>, Debbie Parker <Debbie@dnalabsinternational.com>,
"marion.clark@wsp.wa.gov" <Marion.Clark@wsp.wa.gov>
Cc: Diana Hoffman <Diana@dnalabsinternational.com>, Nicole Mallon <Nicole@dnalabsinternational.com>, Mark Mestel
<mark.mestel@gmail.com>
Bcc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>

Thank you for checking in. I will confer with Mark Mestel, who is part of
our legal team. We will get back to you shortly.

Best,
Jackie

Jacqueline McMurtrie
Betts, Patterson & Mines Emerita Professor of Law
Of Counsel, Washington Innocence Project


From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Thursday, November 18, 2021 10:09 AM
To: Debbie Parker <Debbie@dnalabsinternational.com>; Jackie McMurtrie
<jackiem@uw.edu>; marion.clark@wsp.wa.gov
Cc: Diana Hoffman <Diana@dnalabsinternational.com>; Nicole Mallon
<Nicole@dnalabsinternational.com>
Subject: RE: DLI#20-1410 ~ Cody J. Kloepper

Thank you for checking on this. I will let the others confirm or correct,
but it was actually Mark Mestel who is an attorney working with Jackie
McMurtrie who asked Terry to ask for a CV. Mr Mestel also discussed with
Terry about Terry talking to Mr Wright and then prepare a proposed
stipulation of summary of the earlier call we had earlier. I believe the
plan was for Mr Mestel to then review that

From: Debbie Parker <Debbie@dnalabsinternational.com>
Sent: Thursday, November 18, 2021 10:06 AM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Jackie McMurtrie
<jackiem@uw.edu>; marion.clark@wsp.wa.gov
Cc: Diana Hoffman <Diana@dnalabsinternational.com>; Nicole Mallon
<Nicole@dnalabsinternational.com>
Subject: RE: DLI#20-1410 ~ Cody J. Kloepper

Good afternoon,

I wanted to advise you we received a call today from Deputy Prosecutor
Terry Bloor today regarding the above case.   He requested a copy of
Darren Wright's CV and  would like to speak to him regarding the case.
Since you are the parties we have been corresponding with regarding the
case, I thought I would double-check with you before Darren speaks to him.
Thank you.


"Click on the Brochure"
    Debbie Parker
Administrative Specialist
DNA Labs International
260 SW Natura Avenue, 2nd Floor

 Deerfield Beach, FL 33441
office: (954) 426-5163
email: Debbie@Dnalabsinternational.com
Family Owned & Run Laboratory,
Founded 2004

Our specialty is forensic DNA Analysis, Genealogy,
& our customer service rocks!

WE GET DNA RESULTS
        43% COMPARABLE RESULTS FROM SPENT SHELL CASINGS!

Confidentiality Notice: This e-mail message, including any attachments, is
for the sole use of the intended recipient(s) and may contain confidential
and/or privileged information. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message.

From: Andy Miller [mailto:Andy.Miller@co.benton.wa.us]
Sent: Thursday, February 18, 2021 11:36 AM
To: Jackie McMurtrie; Diana Hoffman; Philip Hodge
Cc: Debbie Parker; Danielle Gluth; Terry Bloor
Subject: RE: DLI#20-1410

Thanks Jackie!

From: Jackie McMurtrie <jackiem@uw.edu>
Sent: Wednesday, February 17, 2021 5:33 PM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Diana Hoffman
<Diana@dnalabsinternational.com>; Philip Hodge <Philip.Hodge@wsp.wa.gov>
Cc: Debbie Parker <Debbie@dnalabsinternational.com>; Danielle Gluth
<dani@dnalabsinternational.com>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
Subject: RE: DLI#20-1410

Andy:

Phil Hodge emailed us the DLI laboratory notes on August 13, 2020 and
followed up with an email on August 14, 2020 with additional photographs.
I will forward the emails to the people cc:d on this email, so DLI doesn't
have to duplicate its efforts.

Jackie McMurtrie

Jacqueline McMurtrie
Betts, Patterson & Mines Emerita Professor of Law
Clinic Director, Washington Innocence Project
University of Washington School of Law
P.O. Box  85110, Seattle, WA  98145-1110
PH: (206) 543-5780
Faculty Bio | SSRN

From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Wednesday, February 17, 2021 11:25 AM
To: Diana Hoffman <Diana@dnalabsinternational.com>; Philip Hodge
<Philip.Hodge@wsp.wa.gov>; Jackie McMurtrie <jackiem@uw.edu>
Cc: Debbie Parker <Debbie@dnalabsinternational.com>; Danielle Gluth
<dani@dnalabsinternational.com>; Terry Bloor
<Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
Subject: RE: DLI#20-1410

Thank you

Case 4:26-cv-05057-TOR    ECF No. 1-2    filed 04/17/26    PageID.553    Page 263 of 386

I think it would have been Terry Bloor who made the request. I am assuming that Ms McMurtrie would also want the notes.

Thank you for your prompt reply and explanation of process

From: Diana Hoffman <Diana@dnalabsinternational.com>
Sent: Wednesday, February 17, 2021 11:01 AM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Philip Hodge
<Philip.Hodge@wsp.wa.gov>; Jackie McMurtrie <jackiem@uw.edu>
Cc: Debbie Parker <Debbie@dnalabsinternational.com>; Danielle Gluth
<dani@dnalabsinternational.com>
Subject: DLI#20-1410

Good afternoon,

Our office received an e-mail request from an individual at the Benton County Attorney's Office for the laboratory notes in this case.  We typically only have one entity who submits a case to us but all three of you are listed on our case submission form as a point of contact and therefore can only discuss and provide results to you unless you give us permission otherwise.

Attorney Miller, your name was on this e-mail and since you are a point of contact we can and will provide the laboratory notes associated with this case.  This won't be forwarded until next week but I will give you all notice of when to expect it in your inbox.

Please know and pass on also, that anything additional that will be requested will need a court order and there will be an associated cost. The additional material I am referring to could be SOPs, manuals, audit information, etc.

Please let me know if any of you have any questions or concerns regarding this.

Thank you!


"Click on the Brochure"
     V/R,

Diana Hoffman
Case Manager
DNA Labs International
260 SW Natura Avenue, 2nd Floor
 Deerfield Beach, FL 33441
office: (954) 426-5163
email: Diana@Dnalabsinternational.com
Family Owned & Run Laboratory,
Founded 2004

Our specialty is forensic DNA Analysis, Genealogy,
& our customer service rocks!

WE GET DNA RESULTS
     40% COMPARABLE RESULTS FROM SPENT SHELL CASINGS!

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**10 attachments**


**image001.png**
49K


**image002.png**
1K


**image006.png**
2K


**image009.png**
1K


**image012.gif**
2K


**image013.jpg**
4K


**image003.png**
1K

**image004.png**
1K


**image007.png**
1K

**image010.png**
1K

---

**Andy Miller** <Andy.Miller@co.benton.wa.us>                          Thu, Nov 18, 2021 at 10:46 AM
To: Debbie Parker <Debbie@dnalabsinternational.com>, "marion.clark@wsp.wa.gov" <Marion.Clark@wsp.wa.gov>
Cc: Diana Hoffman <Diana@dnalabsinternational.com>, Terry Bloor <Terry.Bloor@co.benton.wa.us>, Nicole Mallon
<Nicole@dnalabsinternational.com>, Mark Mestel <mark.mestel@gmail.com>, Andy Miller <Andy.Miller@co.benton.wa.us>

Thanks for adding Mark. That made me check and see that Terry Bloor also
was not on the email string. I am adding him

[Quoted text hidden]

---

**10 attachments**

**Ex. 20 at 004**



**image001.png**
49K



**image002.png**
1K



**image006.png**
2K



**image009.png**
1K

 **image012.gif**
2K

**image013.jpg**
4K

**image003.png**
1K

**image004.png**
1K

**image007.png**
1K

**image010.png**
1K

**Ex. 20 at 005**

 Gmail

Peno Mclean-Riggs <peno.mclean-riggs@wainnocenceproject.org>

---

## Darren Wright

4 messages

---

**Mark Mestel** <mark.mestel@gmail.com>                                   Thu, Nov 18, 2021 at 11:15 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>

Terry:  Do you plan on speaking with Mr. Wright again regarding the
statement that you drafted?  If so, I would ask to be included in the
phone call.  This would give me a better basis to determine whether I will
agree to his report or need him to testify at the hearing.


Mark


--



Mark Mestel
2707 Colby Avenue, Suite 901

Everett, WA.  98201
425.339.2383
mark.mestel@gmail.com

NOTICE:  This communication and the information contained within, along
with any items attached as an enclosure, are privileged and confidential.
This communication is intended solely for the use of the individual(s)
named above.  If you are not one of the intended addressee(s) or you
believe you have received this communication in error, you are hereby
notified that any consideration, dissemination or duplication of this
communication is strictly prohibited.  In addition, you shall not print,
copy, retransmit,
disseminate or otherwise use this information in any form without first
receiving specific written permission from the author of this
communication.  If you have received this communication in error, please
reply to the sender indicating that fact and delete this message from your
system immediately.

📄 **winmail.dat**
7K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                             Thu, Nov 18, 2021 at 11:56 AM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark
<Andrew.Clark@co.benton.wa.us>

Mark:  No problem.  Are you available to talk to Mr. Wright with me next
week before Thanksgiving?

Ex. 20 at 006

From: Mark Mestel <mark.mestel@gmail.com>
Sent: Thursday, November 18, 2021 11:15 AM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>; Jacqueline
McMurtrie <jackiem@uw.edu>
Subject: [EXTERNAL] Darren Wright

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton
County. DO NOT click links or open attachments unless you recognize the
sender and know the content is safe.

[Quoted text hidden]

---

📄 **winmail.dat**
8K

---

**Mark Mestel** <mark.mestel@gmail.com>                                     Thu, Nov 18, 2021 at 12:01 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark
<Andrew.Clark@co.benton.wa.us>

Yes.  My only conflicts are on Monday and Wednesday between 10 and noon.


Mark

[Quoted text hidden]

---

📄 **winmail.dat**
8K

---

**Terry Bloor** <Terry.Bloor@co.benton.wa.us>                                     Thu, Nov 18, 2021 at 12:48 PM
To: Mark Mestel <mark.mestel@gmail.com>
Cc: Lara Zarowsky <lara.zarowsky@wainnocenceproject.org>, Andy Miller <Andy.Miller@co.benton.wa.us>, Andrew Clark
<Andrew.Clark@co.benton.wa.us>

Mark:  Just to be clear, I was only going to give him a heads up to expect
a document for his signature that was based on his interview with Ms.
Zarowsky, Ms. McMurtrie and the prosecution team.  How about if I send him
the document I gave you and ask him if he has any comments, additions or
subtractions?

[Quoted text hidden]

---

📄 **winmail.dat**
9K

**Ex. 20 at 007**

**Andrea Brown**

| | |
|---|---|
| **From:** | Erin <e.ehlert@comcast.net> |
| **Sent:** | Wednesday, February 17, 2021 6:03 AM |
| **To:** | Terry Bloor; Andy Miller; Brian Hultgrenn; Laurel Holland; Deme Murphy; Cheryl Pochert |
| **Subject:** | RE: [EXTERNAL]   RE: DNA case |

Good morning everyone!

First off, please call me Erin.

Next, I think I've got everything you sent.  I'm going to focus on the crime lab reports.  It looks like I've got all of the WSP reports and the two reports from DNA Labs Intl.  Do you have the notes from the work done by WSP and have you requested the notes from DNA Labs Intl?   Before you send me the WSP notes, let me go through their reports and I can probably identify which notes I would like to review.

Finally, what's your timeline?  I can work with anything but I'll have more time on the weekends to devote to this review.  In fact, I should be able to set up an initial conversation next week.  Thanks to covid, my weekends aren't exactly busy!

Thanks!
Erin

**From:** Terry Bloor
**Sent:** Tuesday, February 16, 2021 3:41 PM
**To:** E.Ehlert@comcast.net; Andy Miller; Brian Hultgrenn; Laurel Holland; Deme Murphy; Cheryl Pochert
**Subject:** FW: [EXTERNAL] RE: DNA case

Ms. Ehlert:  I copied everyone on the below email except you—the one it was addressed to!  (Thanks for noticing, Deme.)

**From:** Terry Bloor
**Sent:** Tuesday, February 16, 2021 1:52 PM
**To:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andy Miller (Andy.Miller@co.benton.wa.us) <Andy.Miller@co.benton.wa.us>; Deme Murphy <Deme.Murphy@co.benton.wa.us>
**Cc:** Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: DNA case

Ms. Ehlert:  Thanks for offering to help.  I'm looking forward to working with you!



**Ex. 20 at 008**



If you have any questions, my office cell is 509-820-5776.  Our office number is 509-735-3591.  I've been working from home most days.

**Deme:**  If possible could you send Ms. Ehlert the following



Thanks.

**Cheryl:**  If possible, please send Ms. Ehlert

Thanks.

---

**From:** Erin <e.ehlert@comcast.net>
**Sent:** Saturday, February 13, 2021 8:01 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Cc:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** [EXTERNAL] RE: DNA case

2

**Ex. 20 at 009**

CAUTION: This email originated from outside of Benton County. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Andy
Thanks for the opportunity.  The DNA cases were always my favorite so I hope I'm able to provide some assistance to your already exceptional team.

Erin

**From:** Andy Miller
**Sent:** Friday, February 12, 2021 4:22 PM
**To:** E.Ehlert@comcast.net; Terry Bloor
**Cc:** Brian Hultgrenn; Laurel Holland; Andy Miller
**Subject:** DNA case

Erin,

I just briefed the deputy prosecutors who are either already working on the case (Terry) or may step up(Laurel and Brian)—they are very exciting at the thought of your help. [REDACTED: AWP] and now of course they have your email address.

Again, thank you

**Ex. 20 at 010**

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Deme Murphy <Deme.Murphy@co.benton.wa.us> |
| **Sent:** | Tuesday, February 16, 2021 3:47 PM |
| **To:** | E.Ehlert@comcast.net |
| **Cc:** | Terry Bloor; Andy Miller; Brian Hultgrenn; Laurel Holland; Cheryl Pochert |
| **Subject:** | RE: [EXTERNAL]   RE: DNA case |
| **Attachments:** | Kloepper testimony.pdf; Contreras testimony.pdf; Widrig testimony.pdf; ATPFile_CE6EEE48-3663-4393-AEBB-9A55F7C1723F.token |

Good afternoon Ms. Ehlert,

Please find attached the testimony transcripts.

Thank you,


Demetra Murphy
Appellate Secretary
Benton County Prosecutor's Office
7122 W. Okanogan Pl., Bldg. A
Kennewick, WA 99336
T: 509-735-3591 ext. 3359
F: 506-736-3066
E: deme.murphy@co.benton.wa.us


---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, February 16, 2021 3:41 PM
**To:** E.Ehlert@comcast.net; Andy Miller <Andy.Miller@co.benton.wa.us>; Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>; Deme Murphy <Deme.Murphy@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] RE: DNA case

Ms. Ehlert:  I copied everyone on the below email except you—the one it was addressed to!   (Thanks for noticing, Deme.)

---

**From:** Terry Bloor
**Sent:** Tuesday, February 16, 2021 1:52 PM
**To:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andy Miller (Andy.Miller@co.benton.wa.us) <Andy.Miller@co.benton.wa.us>; Deme Murphy <Deme.Murphy@co.benton.wa.us>
**Cc:** Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: DNA case


Ms. Ehlert:  Thanks for offering to help.  I'm looking forward to working with you!

1

**BCPA #25-104, Install No. 1**                                                              **54**

**Ex. 20 at 011**



Attached are the following lab reports:

6-15-10:  Kevin Jenkins
6-18-10:  Lorraine Heath
7-16-10:  Lorraine Heath
9-7-10:    Lorraine Heath
6-26-20:  DNA Labs
10-8-20:  DNA Labs
8-6-20:    Denise Rodler
1-7-21:     Anna Wilson

# AWP

I'm asking our appeal paralegal to send you transcripts of the victim's testimony, the defendant's testimony and Mr. Contreras's testimony.  I'm also asking out support staff to send you a transcript and police reports  on recent interviews, on August 17, 2020 and August 19, 2020 with Salvador Contreras, which might include a video of his interview in which he says he ejaculated during the defendant's visit.

Also attached are my annotations on the transcripts, if that helps at all!

If you have any questions, my office cell is 509-820-5776.  Our office number is 509-735-3591.  I've been working from home most days.

**Deme:**  If possible could you send Ms. Ehlert the following transcripts:
Dana Widrig:  p. 123-165
Salvador Contreras:  p. 292-312, and
Cody Kloepper:  p 628-651.

Thanks.

**Cheryl:**  If possible, please send Ms. Ehlert a copy of the police reports concerning the 8-17-20 interview and the 8-19-20 interview with Mr. Contreras.  This is in the 10-19-20 Supplemental Report in eProsecutor, p. 9=18.  Could you also send her the tape of the interview from 8-19-20 or the transcript of that interview?  The videotape is in the 8-29-20 "mixed media" entry in eProsecutor.  Thanks.

**BCPA #25-104, Install No. 1**                                                                                            **55**

**From:** Erin <e.ehlert@comcast.net>
**Sent:** Saturday, February 13, 2021 8:01 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Cc:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** [EXTERNAL] RE: DNA case

CAUTION: This email originated from outside of Benton County. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Andy
Thanks for the opportunity.  The DNA cases were always my favorite so I hope I'm able to provide some assistance to your already exceptional team.

Erin

**From:** Andy Miller
**Sent:** Friday, February 12, 2021 4:22 PM
**To:** E.Ehlert@comcast.net; Terry Bloor
**Cc:** Brian Hultgrenn; Laurel Holland; Andy Miller
**Subject:** DNA case

Erin,

I just briefed the deputy prosecutors who are either already working on the case (Terry) or may step up(Laurel and Brian)—they are very exciting at the thought of your help.
They are going to get together to decide what materials to forward to you and now of course they have your email address.

Again, thank you

3

**BCPA #25-104, Install No. 1**                                                                     **56**

**Andrea Brown**

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Friday, August 13, 2021 9:30 AM |
| **To:** | Cheryl Pochert |
| **Subject:** | FW: [EXTERNAL]   RE: request for bench notes |

Do you have these CDs?  We would like to send a copy to an expert in Utah.  I'm not sure where mine are.

**From:** Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>
**Sent:** Wednesday, February 24, 2021 9:45 AM
**To:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: request for bench notes

Yes, that was my plan for you and Laurel.  😊



**Felony Division, *LS Supervisor***
**BENTON COUNTY PROSECUTOR'S OFFICE**
**7122 West Okanogan Place, Bldg. "A"**
**Kennewick, WA  99336**
☎ **PH: 509.735.3591**
🖨 **FAX: 509.736.3066**
💻 Cheryl.Pochert@co.benton.wa.us
**T.E.A.M.:   Together Each Achieves Magnificence**

*"Handle them carefully, for words have more power than atom bombs."*

**From:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>
**Sent:** Wednesday, February 24, 2021 9:44 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Rodier, Denise (WSP) <Denise.Rodier@wsp.wa.gov>; Andy Miller <Andy.Miller@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: request for bench notes

Cheryl, you can just drop me a copy in bvh or in the epro file.

Thanks

Brian Hultgrenn
Deputy Prosecutor
Benton County Prosecutor's Office
7122 W. Okanogan Pl., Bldg. A
Kennewick, Washington 99336
Work Mobile: 509-820-5767
Phone: 509-735-3591
brian.hultgrenn@co.benton.wa.us

1

**BCPA #24-1261, Install No. 4**                                                    **5**

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, February 24, 2021 9:04 AM
**To:** Rodier, Denise (WSP) <Denise.Rodier@wsp.wa.gov>; Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: request for bench notes

Denise:  I have the CDs.  Thanks.

Cheryl:  Would you mind making copies for Andy, Laurel and Brian?  I put the box with the CDs in your office.  Thanks.

---

**From:** Rodier, Denise (WSP) <Denise.Rodier@wsp.wa.gov>
**Sent:** Tuesday, February 23, 2021 5:21 PM
**To:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: request for bench notes

Sorry, I meant UPS Ground.

Thanks,

Denise


**Denise Rodier**
**Technical Lead Forensic Scientist**
**Sexual Assault Kit Outsourcing Coordinator**
**Washington State Patrol Seattle Crime Laboratory**
**2203 Airport Way S., Suite 250**
**Seattle, WA 98134**
**Phone: 206-262-6020**
**Fax: 206-262-6033**



*Please help us improve by taking a Customer Survey*

*This e-mail might contain information that is confidential and legally privileged.  If you have received this message in error, please notify the sender immediately and delete this message.  Any unauthorized copying, disclosure, distribution or other use of this information is prohibited.*

---

**From:** Rodier, Denise (WSP)
**Sent:** Tuesday, February 23, 2021 5:19 PM
**To:** 'Brian Hultgrenn' <Brian.Hultgrenn@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: request for bench notes

Good afternoon,

The bench notes are being mailed out today (Fed Ex), so you should see them within the next few days.

Thanks,

Denise

**BCPA #24-1261, Install No. 4**                                                                                   **6**

**Ex. 20 at 015**

**Denise Rodier**
**Technical Lead Forensic Scientist**
**Sexual Assault Kit Outsourcing Coordinator**
**Washington State Patrol Seattle Crime Laboratory**
**2203 Airport Way S., Suite 250**
**Seattle, WA 98134**
**Phone: 206-262-6020**
**Fax: 206-262-6033**

*Please help us improve by taking a **Customer Survey***

*This e-mail might contain information that is confidential and legally privileged.  If you have received this message in error, please notify the sender immediately and delete this message.  Any unauthorized copying, disclosure, distribution or other use of this information is prohibited.*

---

**From:** Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>
**Sent:** Friday, February 19, 2021 10:47 AM
**To:** Rodier, Denise (WSP) <Denise.Rodier@wsp.wa.gov>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: request for bench notes

> **WARNING: This message originated from outside the agency. Do not click links or open attachments unless you recognize the sender and are expecting the content.**

This works

**Brian Hultgrenn**
**Deputy Prosecutor**
**Benton County Prosecutor's Office**
**7122 W. Okanogan Pl., Bldg. A**
**Kennewick, Washington 99336**
Work Mobile: 509-820-5767
Phone: 509-735-3591
brian.hultgrenn@co.benton.wa.us

---

**From:** Rodier, Denise (WSP) <Denise.Rodier@wsp.wa.gov>
**Sent:** Friday, February 19, 2021 10:29 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** [EXTERNAL] RE: request for bench notes

> CAUTION: This email originated from outside of Benton County. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning,

What is the address for me to send these?

Thanks,

Denise

3

**Denise Rodier**
**Technical Lead Forensic Scientist**
**Sexual Assault Kit Outsourcing Coordinator**
**Washington State Patrol Seattle Crime Laboratory**
**2203 Airport Way S., Suite 250**
**Seattle, WA 98134**
**Phone: 206-262-6020**
**Fax: 206-262-6033**

*Please help us improve by taking a* <u>**Customer Survey**</u>

*This e-mail might contain information that is confidential and legally privileged. If you have received this message in error, please notify the sender immediately and delete this message. Any unauthorized copying, disclosure, distribution or other use of this information is prohibited.*

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, February 17, 2021 9:46 AM
**To:** Rodier, Denise (WSP) <Denise.Rodier@wsp.wa.gov>; Andy Miller <Andy.Miller@co.benton.wa.us>; Brian Hultgrenn <Brian.Hultgrenn@co.benton.wa.us>; Laurel Holland <Laurel.Holland@co.benton.wa.us>
**Subject:** request for bench notes

Ms. Rodier:  This is to request any bench notes or lab notes concerning:

Laboratory No:          209-001537
Request No:              0011, 0012
Suspect:                    Cody Kloepper
Victim:                      Dana Widrig
Agency NO:               09-30208
Report Date:             8-6-2020

Please contact me at the email address in this chain or at 509-735-3591 (office) or 509-820-5776 (office cell).

4

**Andrea Brown**

| | |
|---|---|
| **From:** | Erin Ehlert <e.ehlert@comcast.net> |
| **Sent:** | Saturday, August 21, 2021 11:52 AM |
| **To:** | Andy Miller |
| **Subject:** | RE: FW: Benton County DNA Case |

Oh my, I was raised on Peanuts - not only the cartoon but much better through the Sunday comics!

Thanks for keeping in touch - I'll always have a passion for these cases!

On 08/19/2021 5:14 PM Andy Miller <andy.miller@co.benton.wa.us> wrote:

You can count on me contacting you! Not only does your involvement motivate Danny a bit, you're also kind of like Linus's security blanket, just having you available makes us feel better

And please don't tell me that you're too young to know about Linus's blanket

**From:** Erin Ehlert <e.ehlert@comcast.net>
**Sent:** Sunday, August 15, 2021 7:06 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** Re: FW: Benton County DNA Case

Andy:

It's a complex case, there's no doubt.  I hope Danny is able to give you some guidance.  Don't hesitate to reach out if you want to discuss again - I'd love to hear updates!

Erin

On 08/02/2021 1:41 PM Andy Miller <andy.miller@co.benton.wa.us> wrote:

1

**BCPA #25-519, Install No. 2**                                          **695**

**Ex. 20 at 018**

Erin,

Thank you!
I've deleted you from this email string to set up the logistics of our conference call with Danny. We feel so much better with you as a resource, and it was nice to get such a quick reply from Danny

---

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Monday, August 2, 2021 12:43 PM
**To:** Erin <e.ehlert@comcast.net>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Hi Erin!

So great to hear from you.  Hope life is well in the private world for you.

Thank you for the introduction.  Andy: I'd be happy to help in any manner that I can.  If you'd like to give me a call, we can certainly schedule a meeting to discuss.  Our non-profit lab is doing casework and is finalizing accreditation.  In short, we can help in a variety of different ways if that makes sense!

When is a good time to chat?

*Thank you,*

### *Daniel Hellwig*

*Laboratory Director*

**Salt Lake City, Utah 84117**

mobile: +1 505-577-1459

office:  +1 801-904-2230

2

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

---

**From:** Erin <e.ehlert@comcast.net>
**Sent:** Monday, August 2, 2021 11:20 AM
**To:** Danny Hellwig <danny@intermountainforensics.com>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** Benton County DNA Case


Hi Danny!

As you know, I've transitioned into private practice but I've been chatting with Andy Miller, the elected prosecutor in Benton County, Washington, regarding a fascinating case and conviction that is being challenged by the Innocence Project. I suggested to Andy that he should reach out and talk with you, so I'm making the introduction through this email. I have no doubt you will enjoy working together.


Hope all is well!

Erin

**BCPA #25-519, Install No. 2**                                                                                    **697**

**Ex. 20 at 020**

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Andy Miller <Andy.Miller@co.benton.wa.us> |
| **Sent:** | Tuesday, August 10, 2021 5:37 PM |
| **To:** | 'andymiller101@yahoo.com' |
| **Subject:** | FW: Benton County DNA Case |

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 10:36 AM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

I just called him and he said no problem to 8:15 our time, 9:15 his time.  Hope that is OK with you, Andy.

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 10:33 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Sorry, is there any chance we can move that up to 8 or 830?  I'm in a long series of back to back witness interviews on the Summers vehicular homicide from 9-11 and 4-5 Friday.


Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 10:28
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

We set 9:00 am our time, 10:00 am his time, on Friday, 8-13-21 and we'll call his office number, 1-801-904-2230.  He said he didn't need anything in advance.

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 10:14 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Yes, that would be great

1

**Ex. 20 at 021**

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 9:47 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Andy:  Assuming you haven't heard from Mr. Hellwig, what do you think about me calling him to set up an appointment?

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Thursday, August 5, 2021 5:59 PM
**To:** Danny Hellwig <danny@intermountainforensics.com>
**Cc:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Danny,

I am out of the office tomorrow but Andrew Clark and Terry Bloor are in and can assist in any scheduling. I will keep Monday open and am also available for most of next week except for Thursday

Would it be at all helpful for us to send you some written summary or materials to give you a background or would it be better to talk first. We are flexible either way

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 4:47 PM
**To:** Danny Hellwig <danny@intermountainforensics.com>
**Cc:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Danny,

Does sometime next Monday, August 9th, work for you?

---

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Monday, August 2, 2021 1:41 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Cc:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Sounds great.  I look forward to hearing from you.

*Thank you,*
## Daniel Hellwig
*Laboratory Director*
**Salt Lake City, Utah 84117**
mobile: +1 505-577-1459
office:  +1 801-904-2230
www.intermountainforensics.com

2

**BCPA #24-1261, Install No. 4**                                                                                          **2**

**Ex. 20 at 022**



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 2:40 PM
**To:** Danny Hellwig <danny@intermountainforensics.com>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Thanks Danny!
I'm dropping Erin from this email on logistics and adding Terry Bloor and Andrew Clark who are the two deputy prosecutors who are leads on the case, though I will continue to be involved as the case is important and interesting. I also have found money in our budget for this so I can give green light to Terry and Andrew.

Let's have them check their schedules and we'll get back with you shortly

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Monday, August 2, 2021 12:43 PM
**To:** Erin <e.ehlert@comcast.net>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Hi Erin!

So great to hear from you.  Hope life is well in the private world for you.

Thank you for the introduction.  Andy: I'd be happy to help in any manner that I can.  If you'd like to give me a call, we can certainly schedule a meeting to discuss.  Our non-profit lab is doing casework and is finalizing accreditation.  In short, we can help in a variety of different ways if that makes sense!

When is a good time to chat?

*Thank you,*
### Daniel Hellwig
*Laboratory Director*
**Salt Lake City, Utah 84117**
mobile: +1 505-577-1459
office:  +1 801-904-2230
www.intermountainforensics.com

3



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

**From:** Erin <e.ehlert@comcast.net>
**Sent:** Monday, August 2, 2021 11:20 AM
**To:** Danny Hellwig <danny@intermountainforensics.com>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** Benton County DNA Case

Hi Danny!
As you know, I've transitioned into private practice but I've been chatting with Andy Miller, the elected prosecutor in Benton County, Washington, regarding a fascinating case and conviction that is being challenged by the Innocence Project.  I suggested to Andy that he should reach out and talk with you, so I'm making the introduction through this email.  I have no doubt you will enjoy working together.

Hope all is well!
Erin

4

**Andrea Brown**

| | |
|---|---|
| **From:** | Andrew Clark <Andrew.Clark@co.benton.wa.us> |
| **Sent:** | Monday, August 2, 2021 4:02 PM |
| **To:** | Terry Bloor; Andy Miller |
| **Subject:** | RE: [EXTERNAL]   RE: Benton County DNA Case |

That works for me.

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 15:59
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Benton County DNA Case

That's good with me.

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 3:59 PM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Benton County DNA Case

How about we suggest next Monday?

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 3:55 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Benton County DNA Case

Probably not.  I'll be much further through the materials by Friday than by Wednesday.

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

1

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 15:50
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Benton County DNA Case

Would you be ready by this Wed?
I have a Chiefs and Sheriffs meeting at 1:30 that day; I am scheduled to be out of the office on Friday. But my attendance is not necessarily required

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 3:45 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Benton County DNA Case

I'm available anytime Wednesday, anytime Friday except for ICAs at 9am to whenever they actually start/finish, and Monday next week is wide open too.

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 13:43
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] RE: Benton County DNA Case

The only thing I have this week is a telephone hearing at 10:00 on Wednesday.  I'm sure Thursday is bad for Andrew.

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Monday, August 2, 2021 1:41 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Cc:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** [EXTERNAL] RE: Benton County DNA Case

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Sounds great.  I look forward to hearing from you.

*Thank you,*
### *Daniel Hellwig*
*Laboratory Director*
**Salt Lake City, Utah 84117**
mobile: +1 505-577-1459
office:  +1 801-904-2230

2

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, August 2, 2021 2:40 PM
**To:** Danny Hellwig <danny@intermountainforensics.com>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Thanks Danny!
I'm dropping Erin from this email on logistics and adding Terry Bloor and Andrew Clark who are the two deputy prosecutors who are leads on the case, though I will continue to be involved as the case is important and interesting. I also have found money in our budget for this so I can give green light to Terry and Andrew.

Let's have them check their schedules and we'll get back with you shortly

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Monday, August 2, 2021 12:43 PM
**To:** Erin <e.ehlert@comcast.net>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Hi Erin!

So great to hear from you.  Hope life is well in the private world for you.

Thank you for the introduction.  Andy: I'd be happy to help in any manner that I can.  If you'd like to give me a call, we can certainly schedule a meeting to discuss.  Our non-profit lab is doing casework and is finalizing accreditation.  In short, we can help in a variety of different ways if that makes sense!

When is a good time to chat?

*Thank you,*
### *Daniel Hellwig*
*Laboratory Director*
**Salt Lake City, Utah 84117**
mobile: +1 505-577-1459
office:  +1 801-904-2230
www.intermountainforensics.com

3

**Ex. 20 at 027**



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

**From:** Erin <e.ehlert@comcast.net>
**Sent:** Monday, August 2, 2021 11:20 AM
**To:** Danny Hellwig <danny@intermountainforensics.com>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** Benton County DNA Case

Hi Danny!
As you know, I've transitioned into private practice but I've been chatting with Andy Miller, the elected prosecutor in Benton County, Washington, regarding a fascinating case and conviction that is being challenged by the Innocence Project. I suggested to Andy that he should reach out and talk with you, so I'm making the introduction through this email. I have no doubt you will enjoy working together.

Hope all is well!
Erin

4



## Chat between Andrew Clark, Megan Killgore

**Andrew Clark -** Aug 10, 2021 5:39 PM

FYI, Friday i've been scheduled an 8:15 on this innocence project case with Andy, Terry, and the DNA expert. so i might be sliding in at the last minute to the 9am call

**Megan Killgore -** Aug 10, 2021 5:39 PM

ok

**Andrew Clark -** Aug 10, 2021 6:17 PM

fyi just got email from Derek. Him and Scott are coming in on that new VH on Leslie

**Megan Killgore -** Aug 10, 2021 6:17 PM

lovely

**Andrew Clark -** Aug 10, 2021 6:17 PM

actually email was from scott himself, rare these days lol

**Andrew Clark -** Aug 10, 2021 6:24 PM

Summers is on Thursday already

**Andrew Clark -** Aug 10, 2021 6:29 PM

to a certain extent i feel the raise of the delta variant is pretty much sealing our fate right now

**Megan Killgore -** Aug 10, 2021 6:29 PM

i agree

**Andrew Clark -** Aug 10, 2021 6:29 PM

i see no reason to set to Sept, which means I'm thinking Trial of 12/6

**Megan Killgore -** Aug 10, 2021 6:30 PM

shit

BCPA #24-1262

1

Ex. 20 at 029

**Andrew Clark -** Aug 10, 2021 6:31 PM

well i'm not here 2 straight jury weeks in Oct/Nov...

**Megan Killgore -** Aug 10, 2021 6:31 PM

I know

**Megan Killgore -** Aug 10, 2021 6:31 PM

that's not the reason for my cursing

**Megan Killgore -** Aug 10, 2021 6:31 PM

AWP

**Andrew Clark -** Aug 10, 2021 6:32 PM

AWP

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Tuesday, August 10, 2021 10:36 AM |
| **To:** | Andrew Clark; Andy Miller |
| **Subject:** | RE: Benton County DNA Case |

I just called him and he said no problem to 8:15 our time, 9:15 his time.  Hope that is OK with you, Andy.

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 10:33 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Sorry, is there any chance we can move that up to 8 or 830?  I'm in a long series of back to back witness interviews on the Summers vehicular homicide from 9-11 and 4-5 Friday.


Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 10:28
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

We set 9:00 am our time, 10:00 am his time, on Friday, 8-13-21 and we'll call his office number, 1-801-904-2230.  He said he didn't need anything in advance.

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 10:14 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Yes, that would be great

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, August 10, 2021 9:47 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Benton County DNA Case

Andy:  Assuming you haven't heard from Mr. Hellwig, what do you think about me calling him to set up an appointment?

1

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Andy Miller <Andy.Miller@co.benton.wa.us> |
| **Sent:** | Wednesday, August 18, 2021 1:55 PM |
| **To:** | Andrew Clark; Terry Bloor; Cheryl Pochert |
| **Subject:** | RE: Kloepper--materials to send to Danny Hellig |

Thank you

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 1:52 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>
**Subject:** RE: Kloepper--materials to send to Danny Hellig

I got the case opened and materials submitted earlier today

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 13:20
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper--materials to send to Danny Hellig

Thank you

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 8:50 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper--materials to send to Danny Hellig

Andrew worked on this yesterday.  I believe he was able to open the portal and we're waiting for Intermountain Forensics to give us a client number.

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 8:17 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper--materials to send to Danny Hellig

Yes, I thought of that while hiking Monday and Tuesday!

1

**BCPA #24-1261, Install No. 4**                                          **258**

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Monday, August 16, 2021 3:23 PM
**To:** Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: Kloepper--materials to send to Danny Hellig

Just a reminder:  We told Mr. Hellig we would send the lab reports, bench notes and other items today.  Are we ready to do that?  Is there anything else I need to include?  Has the portal he talked about been set up?

Thanks.

---

**From:** Terry Bloor
**Sent:** Friday, August 13, 2021 11:02 AM
**To:** Andy Miller (Andy.Miller@co.benton.wa.us) <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** Kloepper--materials to send to Danny Hellig

Attached are:

DLI lab notes
PDF with lab reports for:
      6-15-10:  Kevin Jenkins
      6-18-10:  Lorrraine Heath
      7-16-10:   Lorraine Heath
     9-7-10:    Lorranie Heath
      6-26-20:   DNA Labs
      10-8-20:   DNA Labs
      1-7-21:   Anna Wilson
Report of interview with DNI expert
Report of interview with Salvador Contreras
Defense motion
Attachments-defense motion.  **I didn't include some of the attachments and cut it off at p. 120**
My draft response opposing motion for new trial

Is there anything else we need to send?

**BCPA #24-1261, Install No. 4**                                                                 **259**

Ex. 20 at 033

**Andrea Brown**

| | |
|---|---|
| **From:** | Andrew Clark <Andrew.Clark@co.benton.wa.us> |
| **Sent:** | Friday, September 17, 2021 10:10 AM |
| **To:** | Terry Bloor; Andy Miller |
| **Subject:** | RE: [EXTERNAL]   State v. Kloepper, IMF No. 21-0064 |

That works for me.

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Friday, September 17, 2021 10:00
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

I called Derek and he wants to move the time back to 2:00 pm our time, 3:00 his time.  I'll come to the office for the call.

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 4:24 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

I can make that work

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 4:16 PM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

How about if I suggest to Derek a 1:30 pm phone call on our time, 2:30 his time?

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 4:00 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

Yes, only thing I have tomorrow is advance sheets so I'm available anytime

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A

1

**Ex. 20 at 034**

Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 15:47
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

Andy and Andrew:  Do you want to try to call him tomorrow?

---

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Thursday, September 16, 2021 3:42 PM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** Re: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

This is a document that I received. I did find a quant page on PDF page 86 but it only shows concentrations. In order to determine the total amount of DNA we would also need the amount of extract that they have the EZ1 instrument elute to. The instrument has several options so I can give numbers for each one, or a minimum amount but it ranges from 40ul to 200ul which can double the value depending on which one it is.

Below are the expected minimums based on 40ul extraction volume.

Sweat Pants - Minimum amount of male DNA
20-02131.01 -          0.328ng

20-02131.03 -          0.660ng

20-02131.05 -          0.288ng

Sweat Shirt - Minimum amount of male DNA
20-02132.01 -          0.776ng

20-02132.03 -          6.788ng

20-02132.05 -          4.592ng

This information does not rule out either secondary or primary transfer but would indicate that a significant amount of DNA (sperm cells) would need to be present in order to support a secondary transfer scenario.

*Thank you,*

## *Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

2

**Ex. 20 at 035**

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 4:38 PM
**To:** Derek Cutler <derek@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

Derek,

Thanks for meeting with us.  Attached is what we had received from their lab when we had requested their file.  There are a lot of numbers in it but I can't say I'd know what a quantity number would look like, and I know we had some issues with email and files sizes so I just wanted to confirm the attached is something you had received and is devoid of quantities of DNA?  If so, then we'll respond back to their lab from this production asking for where their quantity records are.

Thanks again for your time on this.

Andrew


Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Andrew Clark
**Sent:** Wednesday, August 18, 2021 13:59
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

This is email 2

Lets hope they both went through


Andrew J. Clark
Deputy Prosecuting Attorney

**Ex. 20 at 036**

Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Andrew Clark
**Sent:** Wednesday, August 18, 2021 12:16
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

Thanks. I've submitted it. I've also attached the records for review.


Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 12:12
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

I am sorry. Go ahead and select anything and once you hit "submit to lims", I will fix it on my end.

*Thank you,*
*Alyssa McElreath*
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 1:04 PM

**Ex. 20 at 037**

**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Danny Hellwig <danny@intermountainforensics.com>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

The problem I'm having with "service type" is there is nothing in that drop down to select from. The only thing to select under that drop down is what is pictured below which is "please select". I'm guessing there is a bug on the website with that drop down; I tried it on two browsers (Chrome and Edge) and it did not make a difference.

Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 11:54
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Danny Hellwig <danny@intermountainforensics.com>
**Subject:** [EXTERNAL] RE: Intermountain Forensics

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Hello Mr. Clark,

You will want to select "Case Review" for both the department and service type.

We are unable to upload files to the portal at this time, however you can still send over any documents directly to me and I will get them to our reviewer.

*Thank you,*
*Alyssa McElreath*
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

**Ex. 20 at 038**

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 12:20 PM
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Intermountain Forensics

Alyssa,

I was on the portal trying to setup a new submission for a case review and had two questions.

First, where do I upload the reports, prior testing etc.?  I saw the add evidence tab but it didn't have any option to attach anything.

Second, in the requests, I tried to select case review, but it wants a "service type" as a required field but there was nothing to pick from, so it would not let me save:



Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney

6

**Ex. 20 at 039**

Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Prosecuting <Prosecuting@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 09:56
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: Intermountain Forensics

Here you go.

---

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 9:53 AM
**To:** Prosecuting <Prosecuting@co.benton.wa.us>
**Cc:** Danny Hellwig <danny@intermountainforensics.com>; Derek Cutler <derek@intermountainforensics.com>
**Subject:** Intermountain Forensics

Greetings,
I have set you up with an account and I am also attaching the instructions that will help you go through the steps when adding cases that you would like to have us test.

The following is the link to our portal:
https://portal.intermountainforensics.com
Username: **MILLERA**

Temporary Password: ▊▊LOG▊▊

You will need to add your case to the portal before we can receive it and start testing. Also, you will need to require a signature and ship overnight Monday thru Wednesday.

If you have any additional questions or concerns, please let me know.
Thank you and have a great day.


*Thank you,*
***Alyssa McElreath***
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

7

**Ex. 20 at 040**

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Wednesday, September 8, 2021 10:16 AM |
| **To:** | Danny Hellwig; Alyssa McElreath; Andrew Clark |
| **Cc:** | Andy Miller |
| **Subject:** | RE: [EXTERNAL]   RE: Intermountain Forensics |

Thanks.  I didn't get an email yesterday, but you have the correct email address for us now.

---

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Wednesday, September 8, 2021 10:13 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Alyssa McElreath <alyssa@intermountainforensics.com>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

I'm sorry.  I sent an e-mail out last night, but maybe it wasn't to the right recipients.  Your review is compete and is just waiting on technical review.  We've got the documents and have written up the case, I just need to complete the technical review of the information and we can send it to the portal for you to download.  Should be completed shortly!

*Thank you,*
## *Daniel Hellwig*
*Laboratory Director*
**Salt Lake City, Utah 84117**
mobile: +1 505-577-1459
office:  +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, September 8, 2021 9:45 AM
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Danny Hellwig <danny@intermountainforensics.com>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

Mr. Hellwig and Ms. McElreath:

**Ex. 20 at 041**

I called the office number for Ms. McElreath and the cell number for Mr. Hellwig this morning and just left a message for Danny. Did you receive the documents from our office sent on August 18? Are there any other documents Mr. Hellwig needs for his review? Although it won't be a substantive hearing, we do have a hearing set for September 29, 2021. Please let us know how your review is going. You can reach me at (509) 735-3591, or my office cell is (509) 820-5776 or by email. Thanks.

---

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 11:54 AM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Danny Hellwig <danny@intermountainforensics.com>
**Subject:** [EXTERNAL] RE: Intermountain Forensics

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Hello Mr. Clark,

You will want to select "Case Review" for both the department and service type.

We are unable to upload files to the portal at this time, however you can still send over any documents directly to me and I will get them to our reviewer.

*Thank you,*
**Alyssa McElreath**
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 12:20 PM
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Intermountain Forensics

Alyssa,

I was on the portal trying to setup a new submission for a case review and had two questions.

First, where do I upload the reports, prior testing etc.? I saw the add evidence tab but it didn't have any option to attach anything.

**BCPA #25-519, Install No. 2**      **707**

**Ex. 20 at 042**

Second, in the requests, I tried to select case review, but it wants a "service type" as a required field but there was nothing to pick from, so it would not let me save:



Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Prosecuting <Prosecuting@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 09:56
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: Intermountain Forensics

Here you go.

3

**BCPA #25-519, Install No. 2**                                    **708**

**Ex. 20 at 043**

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 9:53 AM
**To:** Prosecuting <Prosecuting@co.benton.wa.us>
**Cc:** Danny Hellwig <danny@intermountainforensics.com>; Derek Cutler <derek@intermountainforensics.com>
**Subject:** Intermountain Forensics

Greetings,
I have set you up with an account and I am also attaching the instructions that will help you go through the steps when adding cases that you would like to have us test.

The following is the link to our portal:
https://portal.intermountainforensics.com
Username:  LOG

Temporary Password:  LOG

You will need to add your case to the portal before we can receive it and start testing. Also, you will need to require a signature and ship overnight Monday thru Wednesday.

If you have any additional questions or concerns, please let me know.
Thank you and have a great day.


*Thank you,*
*Alyssa McElreath*
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

4

**Andrea Brown**

| | |
|---|---|
| **From:** | Andrew Clark <Andrew.Clark@co.benton.wa.us> |
| **Sent:** | Wednesday, August 18, 2021 1:59 PM |
| **To:** | Alyssa McElreath |
| **Cc:** | Terry Bloor |
| **Subject:** | RE: [EXTERNAL]   RE: Intermountain Forensics |
| **Attachments:** | SKM_80821021110000.pdf; DNI interview.pdf; Salvador-interview.pdf; Defense motion.pdf; attachments-defense motion.pdf; Kloepper-new-trial-response.docx |

Got a return from the email server saying the email was too large so I'm breaking this into 2 emails

This is email 1

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Andrew Clark
**Sent:** Wednesday, August 18, 2021 12:16
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

Thanks. I've submitted it. I've also attached the records for review.

Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 12:12
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

I am sorry. Go ahead and select anything and once you hit "submit to lims", I will fix it on my end.

*Thank you,*

1

**BCPA #24-1261, Install No. 4**                                      **260**

**Ex. 20 at 045**

*Alyssa McElreath*
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 1:04 PM
**To:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Danny Hellwig <danny@intermountainforensics.com>
**Subject:** RE: [EXTERNAL] RE: Intermountain Forensics

The problem I'm having with "service type" is there is nothing in that drop down to select from.  The only thing to select under that drop down is what is pictured below which is "please select".  I'm guessing there is a bug on the website with that drop down; I tried it on two browsers (Chrome and Edge) and it did not make a difference.

Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 11:54
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Danny Hellwig <danny@intermountainforensics.com>
**Subject:** [EXTERNAL] RE: Intermountain Forensics

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Hello Mr. Clark,

You will want to select "Case Review" for both the department and service type.

We are unable to upload files to the portal at this time, however you can still send over any documents directly to me and I will get them to our reviewer.

2

*Thank you,*
***Alyssa McElreath***
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
[www.intermountainforensics.com](www.intermountainforensics.com)



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

---

**From:** Andrew Clark <[Andrew.Clark@co.benton.wa.us](Andrew.Clark@co.benton.wa.us)>
**Sent:** Wednesday, August 18, 2021 12:20 PM
**To:** Alyssa McElreath <[alyssa@intermountainforensics.com](alyssa@intermountainforensics.com)>
**Cc:** Terry Bloor <[Terry.Bloor@co.benton.wa.us](Terry.Bloor@co.benton.wa.us)>
**Subject:** RE: Intermountain Forensics

Alyssa,

I was on the portal trying to setup a new submission for a case review and had two questions.

First, where do I upload the reports, prior testing etc.?  I saw the add evidence tab but it didn't have any option to attach anything.

Second, in the requests, I tried to select case review, but it wants a "service type" as a required field but there was nothing to pick from, so it would not let me save:



**BCPA #24-1261, Install No. 4**                                                          **262**

**Ex. 20 at 047**



Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Prosecuting <Prosecuting@co.benton.wa.us>
**Sent:** Wednesday, August 18, 2021 09:56
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: Intermountain Forensics

Here you go.

**From:** Alyssa McElreath <alyssa@intermountainforensics.com>
**Sent:** Wednesday, August 18, 2021 9:53 AM
**To:** Prosecuting <Prosecuting@co.benton.wa.us>
**Cc:** Danny Hellwig <danny@intermountainforensics.com>; Derek Cutler <derek@intermountainforensics.com>
**Subject:** Intermountain Forensics

Greetings,
I have set you up with an account and I am also attaching the instructions that will help you go through the steps when adding cases that you would like to have us test.

4

**BCPA #24-1261, Install No. 4**                                                                      **263**

**Ex. 20 at 048**

The following is the link to our portal:
https://portal.intermountainforensics.com
Username:  █ LOG █

Temporary Password: █ LOG █

You will need to add your case to the portal before we can receive it and start testing. Also, you will need to require a signature and ship overnight Monday thru Wednesday.

If you have any additional questions or concerns, please let me know.
Thank you and have a great day.


*Thank you,*
***Alyssa McElreath***
*Laboratory Manager/Forensic Molecular Biologist*
**Salt Lake City, Utah 84117**
office: +1 801-904-2230
www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL: This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it. Also, please notify the sender by replying to this transmission.

**Ex. 20 at 049**

**Andrea Brown**

___

| | |
|---|---|
| **From:** | Andrew Clark <Andrew.Clark@co.benton.wa.us> |
| **Sent:** | Friday, August 20, 2021 1:15 PM |
| **To:** | Terry Bloor; Cheryl Pochert; Andy Miller |
| **Subject:** | RE: Kloepper, Cody J. - Note for Hearing |

I concur its not something we should contest, but it is a technicality we have to cross through first. A technicality that has another 7.8 motion on a case of mine tied up for the past 4 months without court admin having been able to sort out.

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

___

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Friday, August 20, 2021 12:08
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Kloepper, Cody J. - Note for Hearing

You're right, Andrew—the court would have to make a decision not to transfer the motion to the Court of Appeals under CrR 7.8 (c).  We can talk about it more, but I don't think we should contest it.  The motion is not barred by RCW 10.73.090, since they have new evidence, and there is a substantial showing that the defendant is entitled to relief and the resolution of the motion might involve a factual hearing.

Good point about the docket.  In reviewing Andy's 8-5-21 email to Lara, maybe we should add that the 9-29 hearing won't be anything more than a status hearing as it's presently set?

___

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Friday, August 20, 2021 11:50 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Kloepper, Cody J. - Note for Hearing

Well to be clear they can't get the hearing on the actual docket; court won't allow it on the main docket; at least as anything more than a status.  All substantive hearings have to be special set or on the 3.5/3.6.  So if they do nothing between now and 9/29 all that will happen that day is a future status date place holder for the parties to have time to get a special set or onto the 3.5/3.6. And I'd note you can't get on the 3.5/3.6 until all parties briefing is done.

Also where this is a 7.8 motion doesn't the court have to make the decision to set a show cause per 7.8(c)?  I believe the court has a 7.8(c)(2) finding to make before any 7.8 hearing is set.

1

**BCPA #25-519, Install No. 2**                                                      **692**

**Ex. 20 at 050**

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Friday, August 20, 2021 11:08
**To:** Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper, Cody J. - Note for Hearing

Yes, I called Dana. Whether it remains on the regular docket is up to the defense. Andy told Ms. Zarowsky that she might want to get a special set. Erin was looped in. We have contacted Intermountain Forensics, thanks to Andrew opening a portal and sending them several documents.

---

**From:** Cheryl Pochert <Cheryl.Pochert@co.benton.wa.us>
**Sent:** Friday, August 20, 2021 11:02 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** Kloepper, Cody J. - Note for Hearing

Please see attached, which I know you were aware of. I found it in OnBase this morning, and wanted to follow up. Terry indicated as follows in a previous email:

"I'll call Dana and let her know about the 9-29-21 hearing. I assume this is on the regular criminal docket, not a special set. Does anyone think I should tell Ms. Zarowsky that she might want the 3.5/ 3.6 docket or a special set? I'm not sure a status hearing should be on the regular docket. Maybe I should ask if she wants to propose a scheduling or discovery order?

~~I'd like to finalize who will be a co-counsel with me. I know Brian and Laurel are very busy.~~ And there are at least two things to do: Loop in Erin Ehlert again after we've read the motion and take her advice about calling the laboratory."

Was Dana contacted? Will this remain on the regular docket, or do we need to schedule a special set or scheduling/discovery order? Was Erin looped in? Was the laboratory called?

Is there anything I can do to help?

😊

*Cheryl L. Pochert*

**Felony Division,** *LS Supervisor*
**BENTON COUNTY PROSECUTOR'S OFFICE**
**7122 West Okanogan Place, Bldg. "A"**
**Kennewick, WA  99336**
☏ **PH: 509.735.3591**
🖨 **FAX: 509.736.3066**
 Cheryl.Pochert@co.benton.wa.us

2

**Andrea Brown**

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Monday, September 13, 2021 3:20 PM |
| **To:** | Andrew Clark; Andy Miller |
| **Subject:** | RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review |

You guys can call me at 820-5776 today.  I'm also in the office at 1:00 pm tomorrow and should be available after 2:00.

-----Original Message-----
From: Andrew Clark <Andrew.Clark@co.benton.wa.us>
Sent: Monday, September 13, 2021 3:18 PM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

I have ICAs in the morning so from 9 - to possibly 11am I'm unavailable.  Should we chat sometime tomorrow afternoon?  I'm also available rest of today and I can step into Andy's office and we can just do a phone call this afternoon?


Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

-----Original Message-----
From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Monday, September 13, 2021 14:53
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Okay,

I realize that we have burned six days as of tomorrow

-----Original Message-----
From: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Sent: Monday, September 13, 2021 2:44 PM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

I'm in the office tomorrow.  I have a short appointment at 9:30.  But should be available sometime before or after.

-----Original Message-----
From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Monday, September 13, 2021 2:40 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: FW: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

1

**BCPA #24-1261, Install No. 3**                                                        **29**

We should schedule discussion on this

-----Original Message-----
From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 5:29 PM
To: Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Ginny Baddley <Ginny.Baddley@co.benton.wa.us>
Cc: Andy Miller <Andy.Miller@co.benton.wa.us>
Subject: FW: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Thanks Andrew

This is what we were waiting for. And lab never said they sent the document yesterday, I just thought that Danny had emailed in reply to Terry today that he had emailed yesterday saying that he was waiting for technical review.
Can we discuss tomorrow?
I'm also going to send to Erin

-----Original Message-----
From: Andrew Clark <Andrew.Clark@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 5:21 PM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Sorry, I just got out of a family meeting on the Summers trial.

General PA address I believe was used when we setup the portal.  But I don't see anything in Ginny's image of what came in yesterday that is this case.  So I have no idea what he emailed yesterday or to where.

Attached is what I found on the portal.

Thanks
Andrew

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

-----Original Message-----
From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 16:57
To: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Thanks!

2

**BCPA #24-1261, Install No. 3**                                    **30**

**Ex. 20 at 053**

-----Original Message-----
From: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:25 PM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Attached is a look at what was received in the PA email yesterday...


-----Original Message-----
From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:18 PM
To: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Thanks Ginny. So we did not receive an email yesterday from them yesterday through our generic email

It is troublesome that they sent their email today to our generic email address when Terry emailed from his direct email and mentioned that this is the address. I thought Danny's email this morning said that he had emailed yesterday that they were waiting for technical review before sending it out? No big deal, just trying to get on same page

-----Original Message-----
From: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:14 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

The email sent to the PA email was sent today at 3:44.

-----Original Message-----
From: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:12 PM
To: Andy Miller <Andy.Miller@co.benton.wa.us>; Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Danny's email this morning said the review hadn't yet been sent out.  So, I assumed that the item Ginny received was the followup.  If he sent some email to the portal yesterday evening, then I should clarify and say we hadn't checked the portal.

-----Original Message-----
From: Andy Miller <Andy.Miller@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:07 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Cc: Andy Miller <Andy.Miller@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

3

**BCPA #24-1261, Install No. 3**                                                    **31**

So Ginny had forwarded the email to Terry yesterday afternoon? Which means that Terry's email to Danny that we didn't receive his email was not completely accurate? Did Andrew use the prosecuting attorney generic email address in putting it through the portal? I'm thinking I should clarify that?

-----Original Message-----
From: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 3:57 PM
To: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

This is probably the review we were asking for on State v. Kloepper, #10-1-01156-4.  Was there an attachment?  If so, could you please send it to Andy, Andrew Clark and me?  Thanks.

-----Original Message-----
From: Prosecuting <Prosecuting@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 3:50 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Subject: FW: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Hi, Terry.

This was sent to the PA email address.  The case number pulls up Karl Goering 09-1-01182-0 in ePros and you are assigned on that case.

Ginny Baddley
Office Administrator
Benton County Prosecutor's Office
7122 W Okanogan Place
Kennewick WA 99336
(509)735-3591

-----Original Message-----
From: Do Not Reply <no-reply@intermountainforensics.com>
Sent: Wednesday, September 8, 2021 3:44 PM
To: Prosecuting <Prosecuting@co.benton.wa.us>
Subject: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

A Lab Report has been released for this case number, please check portal.

4

BCPA #24-1261, Install No. 3                                                                                    32

**Ex. 20 at 055**

**Andrea Brown**

| | |
|---|---|
| **From:** | Andy Miller <Andy.Miller@co.benton.wa.us> |
| **Sent:** | Wednesday, September 8, 2021 4:08 PM |
| **To:** | Ginny Baddley; Terry Bloor; Andrew Clark |
| **Subject:** | RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review |

Did Andrew check the portal?

-----Original Message-----
From: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:01 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

LOL.  You ARE lucky!!!!

-----Original Message-----
From: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:00 PM
To: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Luckily, Andy and I have a co-counsel, named Andrew Clark!

-----Original Message-----
From: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 3:59 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

There wasn't.  It looks like it was just a notice that the lab report was released.  It instructs to check the portal(?)

-----Original Message-----
From: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 3:57 PM
To: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

This is probably the review we were asking for on State v. Kloepper, #10-1-01156-4.  Was there an attachment?  If so, could you please send it to Andy, Andrew Clark and me?  Thanks.

-----Original Message-----
From: Prosecuting <Prosecuting@co.benton.wa.us>

1

<span style="color:orange">**BCPA #24-1261, Install No. 3**</span>                                                     <span style="color:orange">**54**</span>

**Ex. 20 at 056**

Sent: Wednesday, September 8, 2021 3:50 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Subject: FW: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Hi, Terry.

This was sent to the PA email address.  The case number pulls up Karl Goering 09-1-01182-0 in ePros and you are assigned on that case.

Ginny Baddley
Office Administrator
Benton County Prosecutor's Office
7122 W Okanogan Place
Kennewick WA 99336
(509)735-3591

-----Original Message-----
From: Do Not Reply <no-reply@intermountainforensics.com>
Sent: Wednesday, September 8, 2021 3:44 PM
To: Prosecuting <Prosecuting@co.benton.wa.us>
Subject: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

A Lab Report has been released for this case number, please check portal.

2

BCPA #24-1261, Install No. 3

55

**Andrea Brown**

| | |
|---|---|
| **From:** | Andy Miller <Andy.Miller@co.benton.wa.us> |
| **Sent:** | Wednesday, September 8, 2021 4:08 PM |
| **To:** | Ginny Baddley; Terry Bloor; Andrew Clark |
| **Subject:** | RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review |

Did Andrew check the portal?

-----Original Message-----
From: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:01 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

LOL.  You ARE lucky!!!!

-----Original Message-----
From: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 4:00 PM
To: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Luckily, Andy and I have a co-counsel, named Andrew Clark!

-----Original Message-----
From: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 3:59 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

There wasn't.  It looks like it was just a notice that the lab report was released.  It instructs to check the portal(?)

-----Original Message-----
From: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Sent: Wednesday, September 8, 2021 3:57 PM
To: Ginny Baddley <Ginny.Baddley@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
Subject: RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

This is probably the review we were asking for on State v. Kloepper, #10-1-01156-4.  Was there an attachment?  If so, could you please send it to Andy, Andrew Clark and me?  Thanks.

-----Original Message-----
From: Prosecuting <Prosecuting@co.benton.wa.us>

1

**BCPA #24-1261, Install No. 3**          **56**

**Ex. 20 at 058**

Sent: Wednesday, September 8, 2021 3:50 PM
To: Terry Bloor <Terry.Bloor@co.benton.wa.us>
Subject: FW: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

Hi, Terry.

This was sent to the PA email address.  The case number pulls up Karl Goering 09-1-01182-0 in ePros and you are assigned on that case.

Ginny Baddley
Office Administrator
Benton County Prosecutor's Office
7122 W Okanogan Place
Kennewick WA 99336
(509)735-3591


-----Original Message-----
From: Do Not Reply <no-reply@intermountainforensics.com>
Sent: Wednesday, September 8, 2021 3:44 PM
To: Prosecuting <Prosecuting@co.benton.wa.us>
Subject: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- Case Review

A Lab Report has been released for this case number, please check portal.

2

**BCPA #24-1261, Install No. 3**                                      **57**

**Ex. 20 at 059**

**Andrea Brown**

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Tuesday, September 14, 2021 11:21 AM |
| **To:** | Andrew Clark; Andy Miller |
| **Subject:** | RE: Kloepper--- email to Intermountain Forensics |

Thanks.  I'll do that now.

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 11:20 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

I'd say send it directly to Danny.  I did not see anything on the portal for communications back and forth

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 11:19
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

Andrew:  Can you send this to the Intermountain Forensics portal, or do you want me to send it directly to Danny Hellwig?

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 11:17 AM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

Agreed—thank you!

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 11:11 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

That looks good.

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A

1

**BCPA #24-1261, Install No. 3**                                                                                  **8**

**Ex. 20 at 060**

Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 11:05
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics



**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 10:42 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

Ordinarily I would like Andrew's suggestion. But given our experience with the lab, I think the more we ask, the less likely we are going to get our other questions answered. We can follow up and get input on Word report later—after we talk with them

Your thoughts?

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 9:43 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

AWP

2

**BCPA #24-1261, Install No. 3**                                                   **9**

**Ex. 20 at 061**



**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Monday, September 13, 2021 5:19 PM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>; Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

Andrew and I crossed each other in cyber space

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Monday, September 13, 2021 5:13 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Kloepper--- email to Intermountain Forensics

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066

3

**BCPA #24-1261, Install No. 3**                                    **10**

[Andrew.Clark@co.benton.wa.us](mailto:Andrew.Clark@co.benton.wa.us)

**From:** Terry Bloor <[Terry.Bloor@co.benton.wa.us](mailto:Terry.Bloor@co.benton.wa.us)>
**Sent:** Monday, September 13, 2021 17:00
**To:** Andy Miller <[Andy.Miller@co.benton.wa.us](mailto:Andy.Miller@co.benton.wa.us)>; Andrew Clark <[Andrew.Clark@co.benton.wa.us](mailto:Andrew.Clark@co.benton.wa.us)>
**Subject:** Kloepper--- email to Intermountain Forensics



BCPA #24-1261, Install No. 3                                              11

Ex. 20 at 063

**Andrea Brown**

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Wednesday, September 15, 2021 11:12 AM |
| **To:** | Derek Cutler; Andy Miller; Andrew Clark |
| **Subject:** | RE: [EXTERNAL]   Re: State v. Kloepper, IMF No. 21-0064 |

Great.  We'll call you at your cell number.

---

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Wednesday, September 15, 2021 11:07 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** Re: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

4:00 works for me. My cell is 801-644-9691.


*Thank you*,

### *Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 12:01 PM
**To:** Derek Cutler <derek@intermountainforensics.com>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

Derek,

Ironically we received the below email from Erin Ehlert, a former deputy prosecutor from King County. She is the one

1

who recommended that we contact your lab based on her extensive work with Danny. We have been using her as a sounding board given her expertise in DNA cases. Our office is much smaller than King County meaning that we don't have someone with her type of expertise.

Maybe we could also discuss this when we talk?  **Could we call you today at 4:00 pm your time, 3:00 pm our time?**

Here's the email with Erin Ehlert:

**From:** Erin <e.ehlert@comcast.net>
**Sent:** Tuesday, September 14, 2021 6:54 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- CaseReview

Andy:



Let me know if that makes sense or its helpful.  This case hurts my head – did I mention to you that in that last big trial I did in King County, the private lab found a mixture of 3 male profiles on the victim's tampon string that had been pulled out of her body.  We only had 2 suspects.  The lab said the DNA probably came during the manufacturing process of the tampon – but of course that was just a guess.  Sigh….

**From:** Andy Miller
**Sent:** Wednesday, September 8, 2021 5:30 PM
**To:** Erin Ehlert
**Cc:** Terry Bloor; Andrew Clark; Andy Miller
**Subject:** FW: Lab Case # IMF-21-0064 (ACN: RPD 09-30208) Request # 0001- CaseReview

Erin,

AWP

---

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Wednesday, September 15, 2021 10:16 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

2

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

I believe I have pulled out the questions. I am generally in agreement with Mr. Wright. Though DNA testing can't give specific likelihoods in terms of primary and secondary transfer we can use basic generalities to help understand which scenarios may be more likely than others.

1. Is the summary of the interview with DNA Analyst Darren Wright sound?
    a. Yes
    b.
2. Can DNA testing determine if transfer is primary or secondary?
    a. DNA testing cannot tell us <u>when</u> or <u>how</u> DNA was deposited on the item being tested, but it can provide information as to what circumstances would need to be present for the transfer.
    b.
3. Can DNA testing provide how probable secondary transfer would be?
    a. Not numerically but more in generals.
        i. Primary transfer is more likely than secondary
        ii. High amounts of DNA is less likely of a secondary transfer than low DNA amounts.
        iii.
4. Does the packaging affect secondary transfer?
    a. As I understand the response, I believe the intention was to point out that clothing in the package may transfer from one stain to another along the same transfer principals, which may create additional stain areas on the packaged item. If a stain happened to still be wet, the transfer would generally be more substantial.
    b.
5. Clarification on additional reports:
    a. The additional reports would be for the quantification data obtained in the previous testing. Low male DNA give a higher possibility of secondary transfer than a higher amount.

Let me know if you have any additional questions and when you have time for the call.


*Thank you,*

### *Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments

**BCPA #24-1261, Install No. 2**                                    **41**

thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 12:27 PM
**To:** Danny Hellwig <danny@intermountainforensics.com>; Derek Cutler <derek@intermountainforensics.com>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** State v. Kloepper, IMF No. 21-0064

Mr. Hellwig and Mr. Cutler:  Thanks for your report dated September 8, 2021, which is attached.  We would like to set up a time to discuss so we make sure we accurately understand your report.  In the meantime, we had a couple of questions.

We have also attached a summary of the joint interview with DNA Analyst Darren Wright who did the DNA analysis on this case for DNA Labs International.   Is that summary basically sound?  This includes Mr. Wright's conclusion that DNA testing cannot determine if the transfer was direct or secondary, that secondary transfer is possible, but that it cannot be determined how probable the second transfer could be.  We are also curious about Mr. Wright's answer about the packaging of the clothes affecting secondary transfer.

Under your "Additional Notes" you stated that additional laboratory reports to include the amounts of DNA in the samples and fractions tested may provide additional details about the likelihoods of a deliberate transfer scenario.  We are unclear if the additional laboratory reports would involve additional testing or laboratory reports based on testing that is already done.

We look forward to talking to you.  If you could provide days and times that work for you, we can try to fit into your schedule.

**BCPA #24-1261, Install No. 2**                                                                                        **42**

**Ex. 20 at 067**

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Andrew Clark <Andrew.Clark@co.benton.wa.us> |
| **Sent:** | Wednesday, September 15, 2021 10:59 AM |
| **To:** | Terry Bloor; Andy Miller |
| **Subject:** | RE: [EXTERNAL]   Re: State v. Kloepper, IMF No. 21-0064 |

I'm teleworking today but I'm available for a conference call at 3pm or anytime this afternoon

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 10:37
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

Is 3:00 OK with you, Andrew?

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 10:37 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

I have Metro meeting at 1:30 which should last between 30 and 60 minutes
Could we suggest 2:30 or 3?

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 10:35 AM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

OK, I'll send him the email and suggest 2:00 today as the time we'll call.  Are you both in the office today?

---

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 10:33 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

Yes—and I also just gave a suggestion for Erin's email

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 10:20 AM

1

**BCPA #24-1261, Install No. 2**                                                                                  **50**

**Ex. 20 at 068**

**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

Do you want to see if we can call him this afternoon?

---

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Wednesday, September 15, 2021 10:16 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** [EXTERNAL] Re: State v. Kloepper, IMF No. 21-0064

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

I believe I have pulled out the questions. I am generally in agreement with Mr. Wright. Though DNA testing can't give specific likelihoods in terms of primary and secondary transfer we can use basic generalities to help understand which scenarios may be more likely than others.

1. Is the summary of the interview with DNA Analyst Darren Wright sound?
   a. Yes
   b.
2. Can DNA testing determine if transfer is primary or secondary?
   a. DNA testing cannot tell us <u>when</u> or <u>how</u> DNA was deposited on the item being tested, but it can provide information as to what circumstances would need to be present for the transfer.
   b.
3. Can DNA testing provide how probable secondary transfer would be?
   a. Not numerically but more in generals.
      i. Primary transfer is more likely than secondary
      ii. High amounts of DNA is less likely of a secondary transfer than low DNA amounts.
      iii.
4. Does the packaging affect secondary transfer?
   a. As I understand the response, I believe the intention was to point out that clothing in the package may transfer from one stain to another along the same transfer principals, which may create additional stain areas on the packaged item. If a stain happened to still be wet, the transfer would generally be more substantial.
   b.
5. Clarification on additional reports:
   a. The additional reports would be for the quantification data obtained in the previous testing. Low male DNA give a higher possibility of secondary transfer than a higher amount.

Let me know if you have any additional questions and when you have time for the call.

*Thank you,*

### Derek Cutler

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

2

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 12:27 PM
**To:** Danny Hellwig <danny@intermountainforensics.com>; Derek Cutler <derek@intermountainforensics.com>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** State v. Kloepper, IMF No. 21-0064

Mr. Hellwig and Mr. Cutler:  Thanks for your report dated September 8, 2021, which is attached.  We would like to set up a time to discuss so we make sure we accurately understand your report.  In the meantime, we had a couple of questions.

We have also attached a summary of the joint interview with DNA Analyst Darren Wright who did the DNA analysis on this case for DNA Labs International.   Is that summary basically sound?  This includes Mr. Wright's conclusion that DNA testing cannot determine if the transfer was direct or secondary, that secondary transfer is possible, but that it cannot be determined how probable the second transfer could be.  We are also curious about Mr. Wright's answer about the packaging of the clothes affecting secondary transfer.

Under your "Additional Notes" you stated that additional laboratory reports to include the amounts of DNA in the samples and fractions tested may provide additional details about the likelihoods of a deliberate transfer scenario.  We are unclear if the additional laboratory reports would involve additional testing or laboratory reports based on testing that is already done.

We look forward to talking to you.  If you could provide days and times that work for you, we can try to fit into your schedule.

3

**BCPA #24-1261, Install No. 2**                                                                                    **52**

**Andrea Brown**

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Tuesday, September 14, 2021 4:45 PM |
| **To:** | Derek Cutler; Andy Miller; Andrew Clark |
| **Subject:** | RE: [EXTERNAL]   Automatic reply: State v. Kloepper, IMF No. 21-0064 |

Mr. Cutler:  Why don't you go ahead with the email response, and we can call you later if we still have questions?

---

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Tuesday, September 14, 2021 4:25 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** Re: [EXTERNAL] Automatic reply: State v. Kloepper, IMF No. 21-0064

Absolutely. I was preparing the email with the response to the questions but we can go over it verbally. I am free most of the day tomorrow.

*Thank you,*

## *Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 5:22 PM
**To:** Derek Cutler <derek@intermountainforensics.com>; Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Automatic reply: State v. Kloepper, IMF No. 21-0064

Mr. Cutler:  If Mr. Hellwig will be out into next week, could we speak to you about our email attached?

1

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Tuesday, September 14, 2021 11:28 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** [EXTERNAL] Automatic reply: State v. Kloepper, IMF No. 21-0064

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Hello,

I will be out of the office attending the International Symposium on Human Identifion and will be sporadic in checking e-mails and limited in my response. Should you have urgent need of our services, please contact our Senior DNA Analyst, Derek Cutler at derek@intermountainforensics.com.

Thank you for the patience,

2

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Andy Miller <Andy.Miller@co.benton.wa.us> |
| **Sent:** | Tuesday, September 14, 2021 4:20 PM |
| **To:** | Andrew Clark; Terry Bloor |
| **Cc:** | Andy Miller |
| **Subject:** | RE: [EXTERNAL]   Automatic reply: State v. Kloepper, IMF No. 21-0064 |

Agree

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 3:40 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Automatic reply: State v. Kloepper, IMF No. 21-0064

I think that is a good idea so he doesn't assume we are waiting for Mr. Hellwig to return.

Andrew J. Clark
Deputy Prosecuting Attorney
Benton County Prosecutor's Office
7122 Okanogan Place, Building A
Kennewick, WA 99336
(509) 735-3591   FAX (509) 736-3066
Andrew.Clark@co.benton.wa.us

---

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Tuesday, September 14, 2021 15:31
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] Automatic reply: State v. Kloepper, IMF No. 21-0064



---

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Tuesday, September 14, 2021 11:28 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** [EXTERNAL] Automatic reply: State v. Kloepper, IMF No. 21-0064

> EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Hello,

I will be out of the office attending the International Symposium on Human Identifion and will be sporadic in checking e-mails and limited in my response.  Should you have urgent need of our services, please contact our Senior DNA Analyst, Derek Cutler at derek@intermountainforensics.com.

**BCPA #24-1261, Install No. 2**                                                                                       **81**

**Ex. 20 at 073**

Thank you for the patience,

2

**Andrea Brown**

---

| | |
|---|---|
| **From:** | Terry Bloor <Terry.Bloor@co.benton.wa.us> |
| **Sent:** | Tuesday, September 14, 2021 1:41 PM |
| **To:** | Andy Miller; Andrew Clark |
| **Subject:** | FW: [EXTERNAL]   Automatic reply: State v. Kloepper, IMF No. 21-0064 |

Derek Cutler was also on the email we sent this morning.

---

**From:** Danny Hellwig <danny@intermountainforensics.com>
**Sent:** Tuesday, September 14, 2021 11:28 AM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Subject:** [EXTERNAL] Automatic reply: State v. Kloepper, IMF No. 21-0064

EXTERNAL EMAIL WARNING!!!: This email originated from outside of Benton County. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Hello,

I will be out of the office attending the International Symposium on Human Identifion and will be sporadic in checking e-mails and limited in my response.  Should you have urgent need of our services, please contact our Senior DNA Analyst, Derek Cutler at derek@intermountainforensics.com.

Thank you for the patience,

**Andrea Brown**

| | |
|---|---|
| **From:** | Andy Miller <Andy.Miller@co.benton.wa.us> |
| **Sent:** | Friday, September 17, 2021 9:34 AM |
| **To:** | Terry Bloor; Andrew Clark |
| **Cc:** | Andy Miller |
| **Subject:** | RE: [EXTERNAL]   State v. Kloepper, IMF No. 21-0064 |



**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 4:35 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

AWP

Anyway, I'm looking forward to talking to him.

**From:** Andy Miller <Andy.Miller@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 4:23 PM
**To:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** RE: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

AWP

**From:** Terry Bloor <Terry.Bloor@co.benton.wa.us>
**Sent:** Thursday, September 16, 2021 3:47 PM
**To:** Andy Miller <Andy.Miller@co.benton.wa.us>; Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

Andy and Andrew:  Do you want to try to call him tomorrow?

**From:** Derek Cutler <derek@intermountainforensics.com>
**Sent:** Thursday, September 16, 2021 3:42 PM
**To:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** Re: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

This is a document that I received. I did find a quant page on PDF page 86 but it only shows concentrations. In order to determine the total amount of DNA we would also need the amount of extract that they have the EZ1

1

**Ex. 20 at 076**

instrument elute to. The instrument has several options so I can give numbers for each one, or a minimum amount but it ranges from 40ul to 200ul which can double the value depending on which one it is.

Below are the expected minimums based on 40ul extraction volume.

Sweat Pants - Minimum amount of male DNA
20-02131.01 -          0.328ng

20-02131.03 -          0.660ng

20-02131.05 -          0.288ng

Sweat Shirt - Minimum amount of male DNA
20-02132.01 -          0.776ng

20-02132.03 -          6.788ng

20-02132.05 -          4.592ng

This information does not rule out either secondary or primary transfer but would indicate that a significant amount of DNA (sperm cells) would need to be present in order to support a secondary transfer scenario.


*Thank you,*

### *Derek Cutler*

*Senior DNA Analyst*

**Salt Lake City, Utah 84117**

office:  +1 801-904-2230

www.intermountainforensics.com



PRIVILEGED & CONFIDENTIAL:  This e-mail from Intermountain Forensics, and any attachments thereto, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, you must delete this message, any attachment, and any copy of it (in any form) without disclosing it.  Also, please notify the sender by replying to this transmission.

---

**From:** Andrew Clark <Andrew.Clark@co.benton.wa.us>
**Sent:** Wednesday, September 15, 2021 4:38 PM
**To:** Derek Cutler <derek@intermountainforensics.com>
**Cc:** Terry Bloor <Terry.Bloor@co.benton.wa.us>; Andy Miller <Andy.Miller@co.benton.wa.us>
**Subject:** FW: [EXTERNAL] State v. Kloepper, IMF No. 21-0064

Derek,

**Ex. 20 at 077**

# EXHIBIT 21

ORIGINAL

JOSIE DELVIN
BENTON COUNTY CLERK

SEP 23 2011

FILED

SUPERIOR COURT OF WASHINGTON
COUNTY OF BENTON

**JUDGMENT DOCKET**
**NO 11-9-02292-0**

STATE OF WASHINGTON,

Plaintiff,

vs.

CODY JOSEPH KLOEPPER ,

Defendant.

SID:
DOB:

NO. 10-1-01156-4

**FELONY JUDGMENT AND SENTENCE** (FJS)
[ X] Prison  [X] RCW 9.94A.712 Prison Confinement

**CLERK'S ACTION REQUIRED:**
[X] Restraining Order
[X] Firearms Rights Revoked
[X] Clerk's Action Required, para 4.1, 4.3, 5.6 and 5.8

RPD    # 09-30208

## I. HEARING

1.1    A sentencing hearing was held and the defendant, the defendant's lawyer and the (deputy) prosecuting attorney were present.

## II. FINDINGS

There being no reason why judgment should not be pronounced, the Court FINDS:

2.1  **CURRENT OFFENSE(S):**  The defendant was found guilty on  8-15-11
by  [] plea   [X] jury-verdict   [ ] bench trial of:

| COUNT | CRIME | RCW | DATE OF CRIME |
|---|---|---|---|
| 1 | RAPE IN THE FIRST DEGREE | RCW 9A.44.040(1)(a) | 12/05/2009 |
| 2 | ASSAULT IN THE FIRST DEGREE | RCW 9A.36.011(1)(a) | 12/05/2009 |
| 3 | BURGLARY IN THE FIRST DEGREE | RCW 9A.52.020(1)(b) | 12/05/2009 |

(X) as charged in the  Amended Information.

[x ]    The court finds that the defendant is subject to indeterminate sentencing under **RCW 9.94A.712 on Count I.**

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 1*

00009

Ex. 21 at 001

[X]  The defendant used a **deadly weapon other than a firearm** in the commission of the offense in Count(s)

I.  RCW 9.94A.602, 9.94A.533.

**2.2   CRIMINAL HISTORY RCW 9.94A.525:**

| CRIME | DATE OF SENTENCE | SENTENCING COURT (County & State) | DATE OF CRIME | A or J Adult Juv | TYPE OF CRIME |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |

[ ]  The defendant committed a current offense while on community placement/community custody (adds one point to score). RCW 9.94A.525

[ ]  The prior convictions listed as number(s) _____ above, the court finds that they are one offense for purposes of determining the offender score. RCW 9.94A.525.

[ ]  The prior convictions listed as number(s) _____ above, are not counted as points but as enhancements pursuant to RCW 46.61.520.

**2.3   SENTENCING DATA:**

| COUNT NO. | OFFENDER SCORE | SERIOUSNESS LEVEL | STANDARD RANGE (Not Including Enhancements) | PLUS ENHANCEMENTS* | TOTAL STANDARD RANGE (Including Enhancements) | MAXIMUM TERM/FINE |
|---|---|---|---|---|---|---|
| 1 | 2 | XII | 111-147 MONTHS | D | 135-171 MONTHS | LIFE |
| II | 0 | XII | 93-123 MONTHS | | | LIFE |
| III | 4 | VII | 36-48 MONTHS | | | LIFE |

\*   (F) Firearm, (D) Other deadly weapons, (V) VUCSA in a protected zone, (VH) Veh. Hom, See RCW 46.61.520 (JP) Juvenile present, (SM) Sexual motivation, RCW 9.94A.533(8). (SCF) Sexual conduct with a child for a fee, RCW 9.94A.533(9), (CSG) criminal street gang involving minor, (AE) endangerment while attempting to elude.

For violent offenses, most serious offenses, or armed offenders recommended sentencing agreements or plea agreements are [ ] attached [ ] as follows: _____

**2.5   ABILITY TO PAY LEGAL FINANCIAL OBLIGATIONS.**   The court has considered the total amount owing, the defendant's past, present and future ability to pay legal financial obligations, including the defendant's financial resources and the likelihood that the defendant's status will change.

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 2*

00010

Ex. 21 at 002

[ ]  The court finds that the defendant has the ability or likely future ability to pay the legal financial obligations imposed herein.  RCW 9.94A.753

[ ] The following extraordinary circumstances exist that make restitution inappropriate (RCW 9.94A.753):

[ ] The defendant has the present means to pay costs of incarceration. RCW 9.94A.760.

## III.  JUDGMENT

**3.1**   The defendant is GUILTY of the Counts and Charges listed in Paragraph 2.1.

**3.2**   [ ]  The Court DISMISSES  Counts _____ in the charging documents.

**3.3**   [ ] The Defendant is found NOT GUILTY of Counts_____ in the charging documents.

## IV.  SENTENCE AND ORDER

**IT IS ORDERED**:

**4.1**   Defendant shall pay to the Clerk of this Court:

*JASS CODE*

RTN/RJN        Restitution to:

CRIME VICTIMS COMPENSATION............................................................................$10994.00
CLAIM# VN 25452 #PO BOX 44520
OLYMPIA, WA  985044520

TOTAL ORDERED:        $10994.00

(Name and Address--address may be withheld and provided confidentially to Clerk's Office).

| | | | |
|---|---|---|---|
| PCV | $ 500 | Victim assessment | RCW 7.68.035 |
| CRC | $ See Attached Cost Bill | Court costs, including          RCW 9.94A.760, 9.94A.505, 10.01.160, 10.46.190 *(Transportation costs on FTA Warrants in this case will be assessed at the current legal rate. Other costs as assessed by the Clerk and set forth in the Cost Bill to be attached upon filing of this Judgment and Sentence. If FTA costs and fees are contested, a hearing must be requested at the time of sentencing.)* | |
| EXT | $ | Extradition Costs | RCW 9.94A.120 |
| FCM/MTH | $ 500 | Fine | RCW 9A.20.021 |
| CDF/LDI/FCD | $ | Drug enforcement fund of _____ | RCW 9.94A.760 |
| CLF | $ | *Crime lab fee* [ ] suspended due to indigency | RCW 43.43.690 |
| | $ 100 | Felony DNA collection fee [ ] not imposed due to hardship | RCW 43.43.7541 |
| | $ | Emergency response costs (Vehicular Assault, Vehicular Homicide only, $1000 maximum) | RCW 38.52.430 |
| | $ | Other costs for: | |
| | $ | TOTAL | RCW 9.94A.760 |

[ ] The above total does not include all restitution or other legal financial obligations, which may be set by later order of the court.  An agreed restitution order may be entered.  RCW 9.94A.753.  A restitution hearing:
    [ ] shall be set by the prosecutor
    [ ] is scheduled for _____

---

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 3*

00011

[ ] The defendant waives any right to be present at any restitution hearing (sign initials):_____

[ ] RESTITUTION. Schedule attached.

[ ] The Department of Corrections (DOC) or the clerk of the court may *immediately issue* a Notice of Payroll Deduction. RCW 9.94A.7602, RCW 9.94A.760(8).

All payments shall be made in accordance with the policies of the clerk and on a schedule established by the Department of Corrections, commencing immediately, unless the court specifically sets forth the rate here: Not less than $_____per month commencing_____. RCW 9.94A.760

**The defendant shall report to the Benton County Clerk, 7320 W. Quinault, Kennewick, WA and provide financial information as requested. RCW 9.94A.760(7)(b).**

[ ] The court orders the defendant to pay costs of incarceration at the rate of $_____per day, (actual costs not to exceed $100 per day). (JLR) RCW 9.94A.760.

**The financial obligations imposed in this judgment shall bear interest from the date of the Judgment until payment in full, at the rate applicable to civil judgments. RCW 10.82.090. An award of costs on appeal against the defendant may be added to the total legal financial obligations. RCW 10.73.160.**

[X] The defendant shall pay up to $50.00 per month to be taken from any income the defendant earns while in the custody of the Department of Corrections. This money is to be applied towards legal financial obligations.. ESB 5990

**4.2 DNA TESTING.** The defendant shall have a biological sample collected for purposes of DNA identification analysis and the defendant shall fully cooperate in the testing. The appropriate agency shall be responsible for obtaining the sample prior to the defendant's release from confinement. RCW 43.43.754

[X] **HIV TESTING.** The defendant shall submit to HIV testing. RCW 70.24.340

**4.3 OTHER:** _____

_____

**4.4 CONFINEMENT OVER ONE YEAR.** The defendant is sentenced as follows:

(a) **CONFINEMENT.** RCW 9.94A.589. Defendant is sentenced to the following term of total confinement in the custody of the Department of Corrections (DOC):

See section 4.4    Months on Count    I

| | | | |
|---|---|---|---|
| 147 | | _____ months on Count | _____ |
| 123 | Months on Count  II | _____ months on Count | _____ |
| 36 | Months on Count  III | _____ months on Count | _____ |

[ ] The confinement time on Count(s)_____ contain(s) a mandatory minimum term of _____.

[X] The confinement time on Count____I____ includes __24_____ months as enhancement for [ ]firearm [X] deadly weapon [ ] sexual motivation [ ] VUCSA in a protected zone { } manufacture of methamphetamine with juvenile present [ ] sexual conduct with a child for a fee.

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 4*

Count I and Count II shall run consecutively. The 24 month enhancement for a Deadly WeaponCount III shall run concurrently with Counts I and II.

Confinement shall commence immediately unless otherwise set forth here:_____

(b) **CONFINEMENT.** RCW 9.94A.712 (Sex offenses only): The defendant is sentenced to the following term of confinement in the custody of the DOC:

Count_____I_____ minimum term_____ maximum term__LIFE

Count_____ minimum term_____ maximum term__Statutory Maximum

(c) The defendant shall receive credit for time served prior to sentencing if that confinement was solely under this cause number. RCW 9.94A.505. The time served shall be computed by the jail unless the credit for time served prior to sentencing is specifically set forth by the court: _____.

Actual number of months of total confinement ordered is: **294 months minimum, Life maximum.**

4.5 **[X] COMMUNITY PLACEMENT or COMMUNITY CUSTODY (To determine which offenses are eligible for or required for community placement or community custody see RCW 9.94A.700, .705, and .715).**

(A) The defendant shall be on community placement or community custody for the longer of:

(1) the period of early release. RCW 9.94A.728(1)(2); or
(2) the period imposed by the court, as follows:

Count_____I_____ for LIFE;
Count_____II_____ for  LIFE;
Count_____III_____ for 18 months.

*The above term of community custody or community placement shall be reduced by the court whenever an offender's term of confinement, in combination with the term of community custody or community placement exceeds the statutory maximum for the crime as provided in RCW 9A.20.021. The term of confinement shall be completed when the defendant has served the confinement imposed herein or is released from custody pursuant to any earned early release credits.*

**(B) DOC shall supervise the defendant if DOC classified the defendant in the A or B risk categories; or, DOC classifies the defendant in the C or D rish categories and at least one of the following apply:**

| a) The defendant committed a current or prior: | | |
|---|---|---|
| i) sex offense | ii) violent offense | iii) crime against a person  RCW 9.94A.411 |
| iv) domestic violence offense RCW 10.99.020 | v) residential burglary offense | |
| vi) offense for manufacture, delivery or possession with intent to deliver methamphetamine including its salts, isomers, and salts of isomers | | |
| vii) offense for deliver of a controlled substance to a minor; or attempt, solicitation or conspiracy (vi,vii) | | |
| b) The conditions of community placement or community custody include chemical dependency treatment | | |
| c) The defendant is subject to supervision under the interstate compact agreement, RCW 9.94A.745 | | |

While on community placement or community custody, the defendant shall: (1) report to and be available for contact with the assigned community corrections officer as directed; (2) work at Department of Corrections-approved education, employment and/or community restitution; (3) notify DOC of any change in defendant's address or employment; (4) not consume controlled substances except pursuant to lawfully issued prescriptions; (5) not unlawfully possess controlled substances while in community custody; (6) not own, use, or possess firearms or

---

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 5*

00013

ammunition; (7) pay supervision fees as determined by the Department of Corrections; (8) perform affirmative acts necessary to monitor compliance with the orders of the court as required by the Department of Corrections; (9) for sex offenses, submit to electronic monitoring if imposed by DOC; (10) abide by any additional conditions imposed by DOC under RCW 9.94A.720. The defendant's residence location and living arrangements are subject to the prior approval of the Department of Corrections while in community placement or community custody. Community custody for sex offenders sentenced under RCW 9.94A.710 may be extended for up to the statutory maximum term of the sentence.

The court orders that during the period of supervision the defendant shall:

[ ] not consume any alcohol.

[ ] have no contact with: _____ .

[ ] remain [ ] within [ ] outside of a specified geographical boundary, to wit: _____

_____ .

[ ] participate in the following crime-related treatment or counseling services:

_____ .

[ ] undergo an evaluation for treatment for [ ] domestic violence [ ] substance abuse [ ] mental

health [ ] anger management and fully comply with all recommended treatment.

[ ] comply with the following crime-related prohibitions:_____

_____

[ ] Other conditions: _____

_____

(C) For sentences imposed under RCW 9.94A.712, the Indeterminate Sentence Review Board may be impose other conditions, including electronic monitoring if DOC so recommends. In an emergency, DOC may impose other conditions for a period not to exceed seven (7) working days.

Court Ordered Treatment: If any court orders mental health or chemical dependency treatment, the defendant must notify DOC and the defendant must release treatment information to DOC for the duration of incarceration and supervision. RCW 9.94A.562.

Department of Corrections shall notify the sentencing court of any violations during the time of supervision.

## V. NOTICES AND SIGNATURES

5.1 **COLLATERAL ATTACK ON JUDGMENT.** Any petition or motion for collateral attack on this judgment and sentence, including but not limited to any personal restraint petition, state habeas corpus petition, motion to vacate judgment, motion to withdraw guilty plea, motion for new trial or motion to arrest judgment, must be filed within one year of the final judgment in this matter, except as provided for in RCW 10.73.100. RCW 10.73.090

5.2 **LENGTH OF SUPERVISION.** For an offense committed prior to July 1, 2000, the defendant shall remain under the court's jurisdiction and the supervision of the Department of Corrections for a period up to ten years from the date of sentence or release from confinement, whichever is longer, to assure payment of all legal financial obligations unless the court extends the criminal judgment an additional 10 years. For an offense committed on or after July 1, 2000, the court shall retain jurisdiction over the offender, for the purposes of the offender's compliance with payment of the legal financial obligations, until the obligation is completely satisfied, regardless of the statutory maximum for the crime. RCW 9.94A.760 and RCW 9.94A.505(5). The clerk of the court is authorized to collect

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 6*

unpaid legal financial obligations at any time the offender remains under the jurisdiction of the court for purposes of his or her legal financial obligations. RCW 9.94A.760(4) and RCW 9.94A.753(4).

**5.3  NOTICE OF INCOME-WITHHOLDING ACTION.** If the court has not ordered an immediate notice of payroll deduction in Section 4.1, you are notified that the Department of Corrections or the clerk of the court may issue a notice of payroll deduction without notice to you if you are more than 30 days past due in monthly payments in an amount equal to or greater than the amount payable for one month. RCW 9.94A.7602. Other income-withholding action under RCW 9.94A.760 may be taken without further notice. RCW 9.94A.7606.

**5.4  COMMUNITY CUSTODY VIOLATION** (a) If you are subject to a first or second violation hearing and DOC finds that you committed the violation, you may receive as a sanction up to 60 days of confinement per violation. RCW 9.94A.634. (b) If you have not completed your maximum term of total confinement and you are subject to a third violation hearing and DOC finds that you committed the violation, DOC may return you to a stae correctional facility to serve up to the remaining portion of your sentence. RCW 9.94A.737(2).

**5.5  FIREARMS. You must immediately surrender any concealed pistol license and you may not own, use or possess any firearm unless your right to do so is restored by a court of record.** (The court clerk shall forward a copy of the defendant's driver's license, identicard, or comparable identification to the Department of Licensing along with the date of conviction or commitment). RCW 9.41.040, 9.41.047

*Cross off if not applicable*:

**5.6  SEX AND KIDNAPPING OFFENDER REGISTRATION    RCW 9A.44.130, RCW 10.01.200**

**(1) GENERAL APPLICABILITY AND REQUIREMENTS:** Because this crime involves a sex offense or kidnapping offense involving a minor as defined in RCW 9A.44.130, you are required to register with the sheriff of the county of the state of Washington where you reside. If you are not a resident of Washington but you are a student in Washington or you are employed in Washington or you carry on a vocation in Washington, you must register with the sheriff of the county of your school, place of employment, or vocation. You must register immediately upon being sentenced unless you are in custody, in which case you must register within 24 hours of your release.

**(2) OFFENDERS WHO LEAVE THE STATE AND RETURN:** If you leave the state following your sentencing or release from custody but later move back to Washington, you must register within three (3) business days after moving to this state or within 24 hours after doing so if you are under the jurisdiction of this state's Department of Corrections. If you leave this state following your sentencing or release from custody but later while not a resident of Washington you become employed in Washington, carry out a vocation in Washington, or attend school in Washington, you must register within three (3) business days after starting school in this state or becoming employed or carrying out a vocation in this state, or within 24 hours after doing so if you are under the jurisdiction of this state's Department of Corrections.

**(3) CHANGE OF RESIDENCE WITHIN STATE AND LEAVING THE STATE:** If you change your residence within a county, you must send signed written notice of your change of residence to the sheriff within 72 hours of moving. If you change your residence to a new county within this state, you must send signed written notice of your change of residence to the sheriff of your new county of residence at least 14 days before moving and register with that sheriff within 24 hours of moving. You must give signed written notice of your change of address to the sheriff of the county where last registered within 10 days of moving. If you move out of Washington state, you must also send written notice within 10 days of moving to the county sheriff with whom you last registered in Washington state.

**(4) ADDITIONAL REQUIREMENTS UPON MOVING TO ANOTHER STATE:** If you move to another state, or if you work, carry on a vocation, or attend school in another state you must register a new address, fingerprints, and photograph with the new state within 10 days after establishing residence, or after beginning to work, carry on a vocation, or attend school in the new state. You must also send written notice within 10 days of moving to the new state or to a foreign country to the county sheriff with whom you last registered in Washington State.

**(5) NOTIFICATION REQUIREMENT WHEN ENROLLING IN OR EMPLOYED BY A PUBLIC OR PRIVATE INSTITUTION OF HIGHER EDUCATION OR COMMON SCHOOL (K-12):** If you are a resident of Washington and you are admitted to a public or private institution of higher education, you are required to notify the sheriff of the county of your residence of your intent to attend the institution within 10 days of enrolling or by the first business day after arriving at the institution, whichever is earlier. If you become employed at a public or private institution of higher education, you are required to notify the sheriff for the county of your residence of your employment by the institution within 10 days of

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 7*

00015

**Ex. 21 at 007**

accepting employment or by the first business day after beginning to work at the institution, whichever is earlier. If your enrollment or employment at a public or private institution of higher education is terminated, you are required to notify the sheriff for the county of your residence of your termination of enrollment or employment within 10 days of such termination. **(Effective September 1, 2006)** If you attend, or plan to attend, a public or private school regulated under Title 28A RCW or chapter 72.40 RCW, you are required to notify the sheriff of the county of your residence of your intent to attend the school. You must notify the sheriff within 10 days of enrolling or 10 days prior to arriving at the school to attend classes, whichever is earlier. If you are enrolled on September 1, 2006, you must notify the sheriff immediately. The sheriff shall promptly notify the principal of the school.

**(6) REGISTRATION BY A PERSON WHO DOES NOT HAVE A FIXED RESIDENCE:** Even if you do not have a fixed residence, you are required to register. Registration must occur within 24 hours of release in the county where you are being supervised if you do not have a residence at the time of your release from custody. Within 48 hours, excluding weekends and holidays, after losing your fixed residence, you must send signed written notice to the sheriff of the county where you last registered. If you enter a different county and stay there for more than 24 hours, you will be required to register in the new county. You must also report weekly in person to the sheriff of the county where you are registered. The weekly report shall be on a day specified by the county sheriff's office, and shall occur during normal business hours. You may be required to provide a list of the locations where you have stayed during the last seven days. The lack of a fixed residence is a factor that may be considered in determining an offender's risk level and shall make the offender subject to disclosure of information to the public at large pursuant to RCW 4.24.550.

**(7) REPORTING REQUIREMENTS FOR PERSONS WHO ARE RISK LEVEL II OR III:** If you have a fixed residence and you are designated as a risk Level II or III, you must report, in person, every 90 days to the sheriff of the county where you are registered. Reporting shall be on a day specified by the county sheriff's office, and shall occur during normal business hours. If you comply with the 90-day reporting requirement with no violations for at least 5 years in the community, you may petition the superior court to be relieved of the duty to report every 90 days.

**(8) APPLICATION FOR A NAME CHANGE:** If you apply for a name change, you must submit a copy of the application to the county sheriff of the county of your residence and to the state patrol not fewer than five days before the entry of an order granting the name change. If you receive an order changing your name, you must submit a copy of the order to the county sheriff of the county of your residence and to the state patrol within five days of the entry of the order. RCW 9A.44.130(7).

6.0   OTHER_____

DONE IN OPEN COURT and in the presence of the defendant this date: ___9/23/11___

_Carrie Runge_
JUDGE  Print name: _____

_[signature]_
Deputy Prosecuting Attorney
OFC WSBA #
Print name: TERRY J. BLOOR
OFC ID #91004

Attorney for Defendant
WSBA # _10575_
Print name: D. ARNOLD

Defendant
Print name:
CODY JOSEPH KLOEPPER

**VOTING RIGHTS STATEMENT:** I acknowledge that I have lost my right to vote due to this felony conviction. If I am registered to vote, my voter registration will be cancelled. My right to vote may be restored by: a) A certificate of discharge issued by the sentencing court, RCW 9.94A.637; b) A court order issued by the sentencing court restoring the right, RCW 9.92.066; c) A final order of discharge issued by the indeterminate sentence review board, RCW 9.96.050; or d) A certificate of restoration issued by the governor, RCW 9.96.020. Voting before the right is restored is a class C felony, RCW 92A.84.660. Termination of monitoring by DOC does not restore my right to vote.
Defendant's signature: _____

Translator signature/Print name:_____

**FELONY JUDGMENT AND SENTENCE (FJS)**
_Prison – Sex Offense_
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
_Page 8_

00016

I am a certified interpreter of, or the court has found me otherwise qualified to interpret, the _____ language, which the defendant understands. I translated this Judgment and Sentence for the defendant into that language.

CAUSE NUMBER of this case: _____

I, _____ , Clerk of this Court, certify that the foregoing is a
full, true and correct copy of the Judgment and Sentence in the above-entitled action now on record in this office.

   **WITNESS** my hand and seal of the said Superior Court affixed this date: _____ .
   Clerk of said County and State, by: _____ , Deputy
Clerk

### IDENTIFICATION OF DEFENDANT

SID No:                                           Date of Birth: 01/08/1978
   (If no SID take fingerprint card for State Patrol)

FBI No:                                           Local ID No: KLOEPCJ221BH

PCN No:                                           SS No: 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

Alias name, SSN, DOB: _____ Other_____
Race: M                   Ethnicity:                          Sex: W
                          [ ] Hispanic

                          [ ] Non-Hispanic

---

**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 9*

<u>FINGERPRINTS</u>  I attest that I saw the same defendant who appeared in Court on this document affix his or her fingerprints

And signature thereto.  Clerk of the Court: _J. Manell_ , Deputy Clerk/Bailiff.  Dated: _09-23-11_

**DEFENDANT'S SIGNATURE:** _____

| Left four fingers taken simultaneously | Left Thumb | Right Thumb | Right four fingers taken simultaneously |
|---|---|---|---|



**FELONY JUDGMENT AND SENTENCE (FJS)**
*Prison – Sex Offense*
(RCW 9.94A.500,.505)(WPF CR 84.0400 (6/2008))
*Page 10*

00018

**Ex. 21 at 010**

**JOSIE DELVIN**
**BENTON COUNTY CLERK**

SEP 2 3 2011

**FILED**

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF BENTON

| | |
|---|---|
| **STATE OF WASHINGTON** ] | **Cause No: 10-1-01156-4** |
| ] | |
| Plaintiff ] | |
| v. ] | **JUDGEMENT AND SENTENCE (FELONY)** |
| Cody Joseph Kloepper | **APPENDIX F** |
| Defendant ] | **COMMUNITY PLACEMENT / CUSTODY** |
| ] | |
| DOC No. 351638 ] | |

The court having found the defendant guilty of offense(s) qualifying for community placement, it is further ordered as set forth below.

**COMMUNITY PLACEMENT/CUSTODY:** Defendant additionally is sentenced on convictions herein, for the offenses under RCW 9.94A.712 committed on or after September 1, 2001 to include up to life community custody; for each sex offense and serious violent offense committed on or after June 6, 1996 to community placement/custody for three years or up to the period of earned early release awarded pursuant to RCW 9.94A.150 (1) and (2) whichever is longer; and on conviction herein for an offense categorized as a sex offense or serious violent offense committed on or after July 1, 1990, but before June 6, 1996, to community placement for two years or up to the period of earned release awarded pursuant to RCW 9.94A.150 (1) and (2) whichever is longer; and on conviction herein for an offense categorized as a sex offense or a serious violent offense committed after July 1, 1988, but before July 1, 1990, assault in the second degree, any crime against a person where it is determined in accordance with RCW 9.94A.125 that the defendant or an accomplice was armed with a deadly weapon at the time of commission, or any felony under chapter 69.50 or 69.52 RCW, committed on or after July 1, 1988, to a one-year term of community placement.

Community placement/custody is to begin either upon completion of the term of confinement or at such time as the defendant is transferred to community custody in lieu of early release.

Page 1 of 3

DOC 09-131 (F&P Rev. 06/18/04) OCO                     APPENDIX H – FELONY COMMUNITY PLACEMENT

00019

**Ex. 21 at 011**

(a) **MANDATORY CONDITIONS:** Defendant shall comply with the following conditions during the term of community placement/custody:

(1) Report to and be available for contact with the assigned Community Corrections Officer as directed;

(2) Work at Department of Corrections' approved education, employment, and/or community service;

(3) Not consume controlled substances except pursuant to lawfully issued prescriptions;

(4) While in community custody not unlawfully possess controlled substances;

(5) Pay supervision fees as determined by the Department of Corrections;

(6) Receive prior approval for living arrangements and residence location;

(7) Defendant shall not own, use, or possess a firearm or ammunition when sentenced to community service, community supervision, or both (RCW 9.94A, 120 (13));

(8) Notify community corrections officer of any change in address or employment; and

(9) Remain within geographic boundary, as set forth in writing by the Community Corrections Officer.

**WAIVER:** The following above-listed mandatory conditions are waived by the Court:

(b) **OTHER CONDITIONS:** Defendant shall comply with the following other conditions during the term of community placement / custody:

1) Within 30 days of release from confinement, enter into and make reasonable progress in sexual deviancy therapy, as directed, with a therapist approved by your Community Corrections Officer.

2) Have no contact, either direct or indirect, with the victim Dana Widrig.

3) Submit to polygraph and plethysmograph testing upon the request of your therapist and/or Community Corrections Officer, at your own expense.

4) Do not change therapists without prior approval of your Community Corrections Officer.

5) Do not possess or view material that includes images of nude women, men and/or children.

6) Do not attend X-rated movies, peep shows, or adult book stores.

7) If directed by your sexual deviancy treatment specialist or Community Corrections Officer, undergo an evaluation regarding substance abuse at your expense, and follow any recommended treatment as a result of that evaluation.

8) Inform the Community Corrections Officers of any romantic relationships.

9) Offender's employment and volunteer activities must be approved of in advance by the supervising Community Corrections Officer.

10) Do not purchase, possess or use alcohol (beverage or medicinal) and submit to testing and searches of your person, residence and vehicle by the Community Corrections Officer to monitor compliance.

11) Do not enter any business where alcohol is the primary commodity for sale.

12) Do not hold employment without first advising the employer of your conviction for this offense, as directed by the Community Corrections Officer.

13) Defendant shall obey all laws.

14) Submit to urinalysis and breathalyzer testing as directed.

15) Must consent to DOC home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of residence in which the offender lives

00020

**Ex. 21 at 012**

or has exclusive/joint control/access.

16) Do not possess or view material that shows women, men and/or children engaging in sexual acts with each other, themselves, with an object, or animal.

_9/23/11_
DATE

_Carrie Runge_
JUDGE, BENTON COUNTY SUPERIOR COURT

00021

**Ex. 21 at 013**

# EXHIBIT 22

JOSIE DELVIN
BENTON COUNTY CLERK

MAR 30 2016 42

FILED

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 10-1-01156-4 |
| Plaintiff, | |
| vs. | **MOTION AND ORDER TO CORRECT JUDGMENT AND SENTENCE PURSUANT TO COURT OF APPEALS DECISION** |
| CODY JOSEPH KLOEPPER, | |
| Defendant. | |

## I.  MOTION

The State moves to correct the community custody awarded the defendant in Count II, Assault in the First Degree, in the Judgment and Sentence entered on September 23, 2011. The correct amount of community custody for that charge is 36 months. The defendant will still be on community custody for the remainder of his life pursuant to Count I, Rape in the First Degree.

Dated: March 30, 2016.

Terry J. Bloor, WSBA No. 9044
Deputy Prosecuting Attorney
Ofc. Id. No:  91004

MOTION AND ORDER TO CORRECT
JUDGMENT AND SENTENCE PURSUANT
TO COURT OF APPEALS DECISION

Ex. 22 at 001

## II. ORDER

THIS MATTER having come before the Court on the State's Motion to Correct the community custody awarded on Count II, Assault in the First Degree, and the Court being advised, NOW, THEREFORE,

IT IS HEREBY ORDERED THAT section 4.5 of the Judgment and Sentence is amended as follows:

**4.5[X ] COMMUNITY PLACEMENT or COMMUNITY CUSTODY  (To determine which offenses are eligible for or required for community placement or community custody see RCW 9.94A.700, .705, and .715).**

**(A)** The defendant shall be on community placement or community custody for the longer of:

**(1)** the period of early release. RCW 9.94A.728(1)(2); or
**(2)** the period imposed by the court, as follows:

Count_____I_____ for LIFE;
Count_____II_____ for   ~~LIFE~~ for 36 months;
Count_____III_____ for 18 months.

IT IS FURTHER ORDERED THAT all other provisions of the Judgment and Sentence remain in effect.

DATED: March _30_, 2016.

_Carrie Runge_
CARRIE L. RUNGE, JUDGE

Presented by:

_Terry J. Bloor_
Terry J. Bloor, WSBA No. 9044
Deputy Prosecuting Attorney
Offc. Id. No:  91004

---

MOTION AND ORDER TO CORRECT
JUDGMENT AND SENTENCE PURSUANT
TO COURT OF APPEALS DECISION

BENTON COUNTY PROSECUTING ATTORNEY
7122 West Okanogan Place, Bldg. A
Kennewick, Washington 99336
PH:  509.735.3591
FAX:  509.736.3066

Ex. 22 at 002

# EXHIBIT 23

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

CODY KLOEPPER,

                                    Petitioner,

        v.

JEFFERY UTTECHT,

                                    Respondent.

NO. 4:17-CV-5008-TOR

ORDER DENYING PETITION

        BEFORE THE COURT is Petitioner Cody Kloepper's Petition for Writ of

Habeas Corpus (ECF Nos. 1; 5).  This matter was submitted for consideration

without oral argument.  The Court has reviewed the record and files herein, the

completed briefing and is fully informed.  For the reasons discussed below, the

Petition is **DENIED**.

## BACKGROUND

        The instant petition for habeas corpus arises out of a gruesome attack and

rape of a 48 year old female and Petitioner's subsequent conviction for the crime.

ORDER DENYING PETITION ~ 1

**Ex. 23 at 001**

Relevant to the decision, the victim (D.W.) arose around 4:00 a.m. in her fourth floor apartment to prepare for work. Soon after, although the victim did not hear anyone enter the apartment, someone approached her quickly from behind and hit her repeatedly with a metal bar. There was no evidence of forced entry and the victim stated that she kept her door locked. The assault ended and the assailant then raped the victim. During the rape, the victim heard the assailant use latex gloves. The assailant then left.

After the assailant left, the victim called 911 and reported that a man with a slender build and shaggy hair that was about 6' or 6'2" assaulted and raped her. The victim believed the assailant could have been one of the workers at the apartment complex because she believes the door was locked but there was no sound or signs of forced entry. The Washington Court of Appeals summarized what followed:

> D.W. was taken to a Spokane hospital for treatment of her head injuries. An officer there subsequently showed her a six-person photomontage that included a picture of Mr. Kloepper with short hair; D.W. did not identify anyone in the montage. Five days later she was shown a 23–person photomontage that included the same photo of Mr. Kloepper with short hair. [Kloepper had long hair at the time of the assault.] D.W. told officers that she recognized Mr. Kloepper with the short hair, but identified Mr. Karl Goering from the montage as the man who attacked her. She also identified Goering from an in-person line-up. He was arrested and charged for the attack on D.W.
>
> The crime scene investigators found what appeared to be the tip of a latex glove covered in D.W.'s blood. A small amount of male deoxyribonucleic acid (DNA) was recovered and subjected to Y-chromosome Short Tandem

ORDER DENYING PETITION ~ 2

**Ex. 23 at 002**

Repeat (Y–STR) DNA testing.  The result excluded Mr. Goering, but matched 1/440 males in the United States population, including Mr. Kloepper.  The police advised D.W. on May 5, 2010, that the DNA "matched" Mr. Kloepper and excluded Mr. Goering.  The police also advised that they would continue their investigation and had not ruled Goering out as a suspect.

D.W. returned to the police station on July 28, 2010, and gave a recorded statement that she now believed Mr. Kloepper was the attacker.  When asked why she changed her mind, D.W. said, "Well the DNA thing."  Mr. Kloepper was charged with the three noted offenses, all of which carried a deadly weapon enhancement.  Charges against Mr. Goering were dropped.  Mr. Kloepper met the victim's original identification of the assailant far better than Mr. Goering did.

The defense moved to exclude D.W.'s anticipated in-court identification on the basis that her receipt of the DNA information was impermissibly suggestive and had tainted the identification.  The trial court denied the motion on the basis that the information went to the weight to be given the testimony rather than its admissibility.

Prior to opening statements, juror 8 indicated by note to the court that his parents were friends of D.W.'s parents while he was growing up.  The court did not find a basis for excusal for cause, noting that Juror 8 had not seen D.W. in 40 years and probably would not recognize her.

The jury convicted Mr. Kloepper on all three counts and also found that he was armed with a deadly weapon on each count.  The trial court ruled that the rape and assault convictions arose from separate conduct and the sentences would be served consecutively to each other, while the burglary count would be served concurrently with those counts.  Mr. Kloepper then timely appealed to this court.

*State v. Kloepper*, 179 Wash. App. 343, 348–49 (2014) (footnote omitted).

//

//

ORDER DENYING PETITION ~ 3

**Ex. 23 at 003**

Case 4:26-cv-05057-TOR    ECF No. 11-2    filed 04/17/26    PageID.649    Page 359
of 386
Case 4:17-cv-05008-TOR    ECF No. 112    filed 12/14/17    PageID.1595    Page 4 of 59

## SCOPE OF FEDERAL HABEAS CORPUS REVIEW

Per 28 U.S.C. § 2254(a), "[t]he Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." As the Supreme Court has stated, "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Smith v. Phillips*, 455 U.S. 209, 221 (1982). In other words, Federal habeas corpus relief does not lie for errors or perceived errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Rose v. Hodges*, 423 U.S. 19, 21-22 (1975) (per curiam).

Federal habeas corpus relief will not be granted unless the challenged trial error caused "actual prejudice" or had "substantial and injurious effect or influence" in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Habeas relief may not be granted if there is merely a reasonable possibility that trial error contributed to the verdict. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998); *Brecht*, 507 U.S. at 637. In § 2254 proceedings the federal court must assess the prejudicial impact of a constitutional error under the

ORDER DENYING PETITION ~ 4

Case 4:26-cv-05057-TOR    ECF No. 112    filed 04/17/26    PageID.1596    Page 360
Case 4:17-cv-05008-TOR    ECF No. 11    filed 12/14/17    PageID.650    Page 5 of 19
of 386

*Brecht* standard whether or not the state court recognized the error and reviewed it for harmlessness. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

## DISCUSSION

Petitioner asserts four grounds for habeas relief. However, as discussed below, the claims either fail or are otherwise not subject to habeas review.

### 1. **In-Court Identification of Petitioner by Victim**

The Due Process Clause of the Fourteenth Amendment protects an individual from conviction based on suggestive pretrial identification procedures arranged by the police, such as showups, lineups, or photographic montages. Judicial screening, or even suppression, of eyewitness identification testimony may be required if the identification procedure used in the defendant's case "was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) (use of one-person showup at witness's hospital bed), abrogated on other grounds by *Griffith v. Kentucky*, 479 U.S. 314 (1987); *see also Simmons v. United States*, 390 U.S. 377, 384 (1968) (suppression required if there is a "very substantial likelihood of irreparable misidentification") (photo lineup). The Due Process Clause, however, does not mandate the exclusion of all out-of-court identifications arranged by the police. *Manson v. Brathwaite*, 432 U.S. 98, 109-14 (1977). Rather, due process requires courts to assess – on a case-by-case, under the

ORDER DENYING PETITION ~ 5

"totality of the circumstances" – whether improper police conduct created a "substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 199-201 (1972).

Courts apply a two-part test, first determining whether the challenged identification procedure was impermissibly suggestive, and second, examining the totality of circumstances to decide whether the witness's in-court identification is nonetheless reliable despite the suggestiveness of the confrontation procedure. *Biggers*, 409 U.S. at 198-99; *Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984). The factors to be considered in assessing the reliability of eyewitness identification include:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. The reliability of the particular identification is the "linchpin" in determining its admissibility. *Brathwaite*, 432 U.S. at 114. Exclusion is required if there is "a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384.

The mere presence of some questionable reliability, alone, does not automatically require the exclusion of identification evidence; there is no per se rule of exclusion for unnecessarily suggestive identification techniques.

ORDER DENYING PETITION ~ 6

**Ex. 23 at 006**

Case 4:26-cv-05057-TOR    ECF No. 112    filed 04/17/26    PageID.652    Page 362
Case 4:17-cv-05008-TOR    ECF No. 11-2    filed 12/14/17    PageID.598    Page 7 of 10
of 386

*Brathwaite*, 432 U.S. at 109-14.  As the Supreme Court has observed, "evidence with some element of untrustworthiness is customary grist for the jury mill.  Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.* at 116.  Moreover, there are multiple safeguards built into the adversary system that adequately caution juries against placing undue weight on dubious identification evidence, such as the defendant's right to cross-examine the witness and expose the testimony's fallibility, opening statements and closing arguments by counsel, the rules of evidence, jury instructions, and the reasonable doubt standard.  *Perry v. New Hampshire*, 565 U.S. 228, 244-47 (2012).

Petitioner argues the victim's in-court identification of Petitioner as the assailant was the result of impermissibly suggestive out-of-court procedures that created a substantial likelihood of irreparable misidentification, thereby violating his right to due process.  ECF No. 8 at 5.  Petitioner argues that the trial court should have excluded the victim's identification of Petitioner because she only positively identified Petitioner as the assailant after the police informed her that there was a chance the DNA found at the scene of the crime matched Petitioner's, but did not match the person she originally picked in the photo montage and the in-person line-ups.

Petitioner brought this same argument before the Washington Court of

ORDER DENYING PETITION ~ 7

**Ex. 23 at 007**

Case 4:26-cv-05057-TOR    ECF No. 11-2    filed 04/17/26    PageID.653    Page 363
Case 4:17-cv-05008-TOR    ECF No. 11    filed 12/14/17    PageID.1599    Page 8 of 19
of 386

Appeals. The Washington Court of Appeals found the trial court did not abuse its

discretion in denying the motion to exclude. The Court of Appeals found:

> As to the first factor, it is a close question whether there was suggestive behavior by the government. The communication of the DNA results by a government agent clearly affected the prior identification and, to that extent, can be seen as suggestive behavior. But, critically in our view, the suggestive behavior was not directed to D.W.'s identification of her assailant. Rather, it was made as part of an update of the pending case against Mr. Goering and used to explain to the victim that despite the filing of charges, the investigation was continuing against both men. D.W.'s change in her identification occurred 12 weeks after the communication from the detectives. This case is thus distinguishable from [*State v. McDonald*, 40 Wash. App. 743 (1985),] where the suggestive communication was made directly in response to the line-up identification. In light of these circumstances, we are not convinced that this truly was a suggestive identification procedure.

> However, we need not decide the case solely on that basis as we also doubt that the changed identification resulted in a "substantial likelihood" of a misidentification. If anything, the change prevented a misidentification. The other evidence in the case pointed to Mr. Kloepper, not Mr. Goering, as the assailant. Besides the DNA, Mr. Kloepper better fit D.W.'s initial description of the attacker as a thin, tall (6'2") man with long hair. Mr. Kloepper stood 6'4" and was thin with long hair at the time of the attack. [Mr. Goering was 5'10".] Additionally, against company policy shortly prior to the assault he accessed the supervisor's office in the middle of the night where keys to the apartments, including D.W.'s, could be accessed. D.W. reported that she had locked her door, but the assailant gained entry without force, a fact suggesting that a key was used.

> There was not a substantial likelihood of misidentification. Even without D.W.'s identification, the evidence pointed at Mr. Kloepper as the assailant. The defense was thoroughly able to develop D.W.'s earlier identifications of Goering and the reason for her change of mind in order to attack the reliability of her identification testimony. We believe this comported with due process of law. This court recently noted that the United States Supreme Court has declared that the protection "'against a conviction based on evidence of questionable reliability'" is not exclusion of the evidence,

ORDER DENYING PETITION ~ 8

**Ex. 23 at 008**

Case 4:26-cv-05057-TOR ECF No. 112 filed 04/17/26 PageID.654 Page 364
Case 4:17-cv-05008-TOR ECF No. 112 filed 12/14/17 PageID.1600 Page 9 of 19
of 386

but, rather is "'affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.'" *State v. Sanchez,* 171 Wash. App. 517, 572 (2012) (quoting *Perry,* 565 U.S. at 237).

As noted, Mr. Kloepper exercised his ability to cross-examine D.W. and argue the reliability of her identification to the jury. In this case he was even able to show why she changed her mind, allowing him to note that the identification testimony was merely derived from the DNA evidence, which was admittedly not very powerful. D.W.'s testimony on this point was effectively impeached.

Under these circumstances, Mr. Kloepper was afforded due process of law. The deficiencies in D.W.'s identification properly went to the weight to be given that information by the jury rather than its admissibility. The trial court did not abuse its discretion in declining the motion to exclude.

*State v. Kloepper*, 179 Wash. App. at 351–52 (footnote replaced with bracketed information; citations altered).

The Court agrees with the Court of Appeals' conclusion and supporting rationale, especially that there was not a substantial likelihood of misidentification. Importantly, the description given by the victim matched that of Petitioner, and the victim later explained she did not pick Petitioner in the first instance because Petitioner had short hair in the photo presented to her. Given the totality of circumstances, the trial court properly allowed the jury to assess the credibility of the identification rather than exclude it entirely.

Moreover, there is nothing to suggest allowing the victim to identify Petitioner ultimately caused "actual prejudice" or had "substantial and injurious effect or influence" in determining the jury's verdict. *Brecht*, 507 U.S. 619, 637

ORDER DENYING PETITION ~ 9

**Ex. 23 at 009**

(1993).  Petitioner's counsel was able to present to the jury the surrounding circumstances of the victim's identification of Petitioner in order to impeach her testimony, which allowed the jury to assess the credibility and veracity of the identification.  *See Brathwaite*, 432 U.S. at 116 ("We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill.  Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

There was sufficient other evidence to tie Petitioner to the scene of the crime given his access to the room and the evidence showing he was the only person who retrieved a key to an apartment.  His statements to the police about his whereabouts the night before were also blatantly contradicted,[1] and his statements to other

---

[1]    Petitioner told the police he was at a bar until around midnight when he followed his friend home and then, after realizing he was too intoxicated to drive home, decided to spend the night at the apartment complex.  ECF No. 7 at 25.  However, Petitioner's friend actually left with his wife around 8:30 p.m. and Petitioner drove home around 11:00 p.m., where he began checking Craigslist ads seeking a sexual encounter with a stranger.  ECF No. 7 at 25.  Petitioner argues that he lied to the police to hide his true whereabouts from his girlfriend, ECF No.

ORDER DENYING PETITION ~ 10

Case 4:26-cv-05057-TOR   ECF No. 11-2   filed 04/17/26   PageID.656   Page 366
Case 4:17-cv-05008-TOR   ECF No. 11-2   filed 12/14/17   PageID.602   Page 11 of 19
of 386

persons regarding his conduct and where he spent the night were markedly inconsistent.[2] Further, among other things, the jury was presented evidence that Petitioner cut his hair to avoid matching the original description of the assailant given by the victim. *See* ECF No. 7 at 26. Taking the totality of evidence

---

5 at 42, but this does not comport with the fact that he was at his residence (where he lived with his girlfriend) by 11:00 and left around 12:43 since his story to the police would directly conflict with what his girlfriend knew to be true and also fails to explain how his story otherwise covered his late-night encounter. *See* ECF No. 7 at 25-26. Petitioner's account does not otherwise explain why he chose to go to the apartment complex after his late-night encounter.

[2] "Kloepper . . . told Jeramie Morrow that he met a girl and went to a motel with her. ECF 8-1 at 250. He told Heather Morrow and Katherine Colleran (his longtime girlfriend) that he had stayed in the rec room of the apartment complex, not a vacant apartment. ECF 8-1 at 258, 289. He told Linda Metz, The Villas' apartment manager, that he had slept in a vacant apartment in the "D" building of the complex. ECF 8-1 at 458. However, Metz testified that particular vacant apartment was "stinky" and "nasty" and the carpet had to be changed due to pets. *Id.* at 430, 458. The police did not see any signs that the vacant apartment had been slept in. ECF 8-1 at 480." ECF No. 7 at 26 (citations altered)

ORDER DENYING PETITION ~ 11

Case 4:17-cv-05058-TOR   ECF No. 11-2   filed 12/14/17   PageID.653   Page 12 of 25
Case 4:26-cv-05057-TOR   ECF No. 11-2   filed 04/17/26   PageID.657   Page 367
of 386

presented before the jury, the in-court identification – buttressed by an explanation by Petitioner's counsel – does not give rise to more than a reasonable possibility that trial error contributed to the verdict. *Calderon*, 525 U.S. at 146-47; *Brecht*, 507 U.S. at 637.

### 2. **Ineffective assistance of counsel**

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). A claim of ineffective assistance of counsel is subject to a two-pronged analysis:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for

ORDER DENYING PETITION ~ 12

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Sixth Amendment imposes a "highly demanding" standard upon petitioner to prove "gross incompetence." *Kimmelman*, 477 U.S. at 382. The reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Judicial review of a defense attorney's performance, therefore, is "doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

"The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 105.

ORDER DENYING PETITION ~ 13

**Ex. 23 at 013**

Petitioner argues ineffective assistance of trial counsel violated his due process rights under the Sixth Amendment because counsel failed to interview, investigate or call witnesses identifiable from transcribed police interviews to corroborate Petitioner's third party perpetrator defense.  ECF No. 5 at 26-27.

The Washington Court of Appeals adjudicated this ineffectiveness claim in Kloepper's personal restraint proceeding, concluding Kloepper's counsel's decision not to call the three witnesses Kloepper identified was a reasonable strategic decision:

> Mr. Kloepper asserts that trial counsel was ineffective for failing to interview and present the testimony of witnesses who purportedly would have corroborated his defense that Karl Goering committed the crimes.  Mr. Kloepper cites to *State v. Visitacion*, a case in which counsel's performance was deemed deficient because counsel failed to contact or interview witnesses before trial.  *State v. Visitacion*, 55 Wn. App. 166, 174 (1989).
>
> In *Visitacion*, the attorney evaluated the witnesses' potential testimony based on their police statements.  The witnesses did not testify at trial and later changed their stories in written statements that corroborated the defendant's version of events.  *Visitacion*, 55 Wn. App. at 174.  The court held that the failure to investigate the witnesses' potential testimony fell below prevailing professional norms.  *Id*.
>
> *Visitacion* does not help Mr. Kloepper.  Mr. Kloepper identifies three witnesses (Clair Doyle, Kathy Cordle, and Megan Coop) who purportedly would help his defense.  He notes that these three witnesses described Mr. Goering as a "racist" who had a "creepy" infatuation with a woman ("Sarah") who later had sex with a black man.  Petitioner's Exhibit 1 at 27, Exhibit 2 at 11, Exhibit 3 at 20.  Mr. Kloepper points out that these witnesses stated that Mr. Goering became angry when he learned that Sarah had sex with the black man.  All of these witnesses told a detective that they did not know Mr. Goering's location on the night of the crimes.  Mr.

ORDER DENYING PETITION ~ 14

Case 4:26-cv-05057-TOR   ECF No. 11-2   filed 04/17/26   PageID.660   Page 370
of 386
Case 4:17-cv-05058-TOR   ECF No. 11-2   filed 12/14/17   PageID.606   Page 15 of 19

> Kloepper argues that these witness statements establish Mr. Goering's motive for committing the crimes.  His argument fails.
>
> None of these witness statements are relevant to the defense; accordingly, defense counsel's failure to call these witnesses can be attributed to trial tactics.  Deficient performance is not shown by matters that go to trial strategy or tactics.  *State v. Cienfuegos*, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001).  Mr. Kloepper's ineffective assistance of counsel argument fails.

ECF No. 7 at 38-39 (citing ECF No. 8-1 at 437-438).

The Commissioner of the Washington Supreme Court agreed with the

Chief Judge's decision:

> A review of the transcripts of the police interviews of these witnesses shows that counsel was not professionally deficient in declining to pursue them.  They suggested that Mr. Goering was upset that a woman with whom he had been infatuated (not the victim) had had sexual relations with another man, one of the witnesses saying he "snapped."  But none of them knew Mr. Goering's whereabouts on the night of the crimes, and none of them conveyed any information connecting him to the crimes.  DNA on a latex glove used in committing the crimes excluded Mr. Goering and pointed to Mr. Kloepper.  And as a maintenance person at the apartment complex where the victim lived, Mr. Kloepper had access to the apartment keys (the victim was certain she had locked her door, and there was no evidence of forced entry.)  Mr. Kloepper simply does not show that counsel's failure to pursue these witnesses fell outside the realm of reasonable tactical decisions, nor does he demonstrate that had counsel presented these witnesses there is a reasonable probability the outcome would have been different.

ECF No. 7 at 39-40 (quoting ECF No. 9-1 at 469).

The Court agrees with the conclusion of the Washington Court of Appeals

and the Washington Supreme Court.  The witnesses Petitioner points to did not

have pertinent information to his trial.  Petitioner fails to address the relevance of

ORDER DENYING PETITION ~ 15

**Ex. 23 at 015**

the testimony in his Response.  ECF No. 10 at 6.  Relief is thus not available based on Petitioner's claim of ineffective assistance.

### 3. **Removal of juror**

Petitioner asserts that the trial court committed error of a constitutional dimension in failing to dismiss a juror.  However, as Respondent observes,

> Kloepper's third ground for relief, alleging the trial court erred by failing to remove a juror who knew the victim and the victim's family, is unexhausted. He raised that claim on direct appeal in his Court of Appeals brief, *see* ECF No. 8-1 at 947-50, and the Court of Appeals discussed and rejected the claim in its published opinion. *State v. Kloepper*, 179 Wn. App. at 352- 54. However, Kloepper omitted the claim from his petition for review in the Washington Supreme Court.  ECF No. 9-1 at 50.

ECF No. 7 at 8-9 (citations altered).

Petitioner concedes that the third ground for relief was not presented to the Washington Supreme Court.  ECF No. 10 at 2.  Accordingly, habeas relief on this ground is not available because Petitioner failed to exhaust his remedies.

### 4. **Sentencing Court's decision to impose consecutive terms**

In his fourth ground for habeas relief, Kloepper argues that the state trial court erred by imposing consecutive prison terms: "Trial court imposed consecutive sentences for crimes that clearly satisfy the 'same criminal conduct' test and should be ran [sic] concurrently."  ECF No. 5 at 10, 55-60.  As Respondent observed, this claim is a state-law issue only and fails to present a

ORDER DENYING PETITION ~ 16

federal constitutional ground for habeas relief.  *See* ECF No. 7 at 42.  As Respondent argues:

> Although Kloepper's fourth ground for relief employs the phrase "cruel and unusual punishment" to describe his sentence, it does not appear that Kloepper intended to raise the claim as a violation of the Eighth Amendment's Cruel and Unusual Punishments Clause.  His supporting brief filed with this Court does not rely on the Eighth Amendment, nor does he cite any cases concerning the Eighth Amendment legal analysis.  *See* ECF No. 5, attached brief at 55-60 (argument in support of claim 4).  Moreover, Kloepper did not present his fourth ground to the state appellate courts as an Eighth Amendment issue.  His arguments in the state courts raised this claim as a purely state-law issue.  *See* Exhibit 8 (Court of Appeals brief), at 29-34; Exhibit 12 (petition for review), at 15-18.  Respondent will therefore address the merits of Kloepper's fourth ground for relief as a state-law error and not an Eighth Amendment claim.

ECF No. 7 at 8

The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Supreme Court has repeatedly held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 67-68.  "[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam) (emphasis in original).  This principle is applicable to habeas claims involving sentence challenges.  "Absent a showing of fundamental unfairness, a state court's

ORDER DENYING PETITION ~ 17

**Ex. 23 at 017**

misapplication of its own sentencing laws does not justify federal habeas relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994).  A state prisoner must show that an alleged state sentencing error was "so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Richmond v. Lewis*, 506 U.S. 40, 50 (1992).  A habeas challenge to a state trial court's exercise of discretion under state sentencing law fails to state a cognizable ground for federal habeas relief.  *Souch v. Schaivo*, 289 F.3d 616, 622-23 (9th Cir. 2002).

Petitioner did not respond to Respondent's position and did not otherwise demonstrate the application of the state statute resulted in fundamental unfairness. *See* ECF No. 10.  Accordingly, the Court cannot grant relief on this issue.

## CERTIFICATE OF APPEALABILITY

Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant."  A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A COA may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner

ORDER DENYING PETITION ~ 18

must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.").

Petitioner is not entitled to a COA because he has not demonstrated that jurists of reason could disagree with the Court's resolution of his constitutional claims or could conclude any issue presented deserves encouragement to proceed further.

**IT IS HEREBY ORDERED:**

1. Petitioner Cody Kloepper's Petition for Writ of Habeas Corpus (ECF Nos. 1; 5) is **DENIED**.

2. A Certificate of Appealability is **DENIED**.

The District Court Executive is directed to enter this Order and Judgment accordingly, furnish copies to the parties, and close the file.

**DATED** December 14, 2017.



THOMAS O. RICE
Chief United States District Judge

ORDER DENYING PETITION ~ 19

# EXHIBIT 24

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Washington

| | |
|---|---|
| CODY KLOEPPER, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   4:17-CV-5008-TOR |
| | ) |
| | ) |
| JEFFERY UTTECHT, | |
| *Defendant* | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐   the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐   the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ .

☑   other:   Petitioner Cody Kloepper's Petition for Writ of Habeas Corpus (ECF Nos. 1; 5) is DENIED. Judgment is entered for Respondent.

This action was *(check one)*:

☐   tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐   tried by Judge _____ without a jury and the above decision was reached.

☑   decided by Judge   THOMAS O. RICE   .

Date:   December 14, 2017

CLERK OF COURT

SEAN F. McAVOY

s/ Linda L. Hansen
*(By) Deputy Clerk*

Linda L. Hansen

**Ex. 24 at 001**

# EXHIBIT 25

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by State v. Drewery, Wash.App. Div. 1, April 1, 2019

179 Wash.App. 343
Court of Appeals of Washington,
Division 3.

STATE of Washington, Respondent,

v.

Cody Joseph KLOEPPER, Appellant.

No. 30294–6–III.
|
Feb. 4, 2014.

**Synopsis**
**Background:** Defendant was convicted in the Superior Court, Benton County, Carrie L. Runge, J., of first-degree rape, first-degree burglary, and first-degree assault. Defendant appealed.

**Holdings:** The Court of Appeals, Korsmo, C.J., held that:

[1] identification procedure was not impermissibly suggestive;

[2] any suggestiveness did not result in substantial likelihood of misidentification;

[3] admission of victim's identification testimony did not deprive defendant of due process of law;

[4] juror who indicated that his parents were friends of victim's parents was not subject to dismissal for cause; and

[5] trial court did not abuse its discretion in determining that assault and rape convictions constituted separate and distinct conduct meriting imposition of consecutive sentences.

Affirmed.

Brown, J., concurred in part and dissented in part with opinion.

West Headnotes (22)

**[1]**  **Criminal Law**  Necessity and scope of proof
**Criminal Law**  Reception and Admissibility of Evidence

Typically, a trial judge has discretion to admit or exclude evidence at trial, which discretion is abused when it is exercised on untenable grounds or for untenable reasons.

**[2]**  **Constitutional Law**  Identification Evidence and Procedures

When impermissibly suggestive government behavior results in the substantial likelihood of the misidentification of a suspect, due process of law requires that trial courts exclude the identification. U.S.C.A. Const.Amend. 14.

**[3]**  **Criminal Law**  Identity of Accused

In determining whether to exclude identification on the basis of impermissibly suggestive government behavior, if suggestive government behavior is found, the court must then determine if there was a substantial likelihood that the resulting identification was erroneous; however, if there was no suggestive behavior, then the argument fails and there is no need to consider whether there was a substantial likelihood of misidentification.

**[4]**  **Criminal Law**  Identity of Accused

Procedure by which victim of rape, burglary, and assault identified defendant was not rendered impermissibly suggestive by communication to victim of DNA test results excluding individual she initially identified as perpetrator and potentially including defendant, whom she had previously recognized in photo lineup as an acquaintance but had not identified as perpetrator, where communication occurred in context of update of pending case against

Ex. 25 at 001

individual identified by victim, to explain to victim why investigation was continuing against both individual identified by her and defendant, and victim did not change her identification until 12 weeks after being notified of DNA test results.

**[5]    Criminal Law** 👈 Identity of Accused

Any suggestiveness inherent in communication to victim of rape, burglary, and assault of DNA test results excluding individual she initially identified as perpetrator and potentially including defendant did not result in substantial likelihood of misidentification, where evidence exclusive of victim's identification pointed to defendant and defense was able to cross-examine victim to attack reliability of her identification testimony; defendant fit victim's description of her attacker much better than individual originally identified, and defendant accessed office in which keys to apartments in victim's building were kept just before incident.

**[6]    Constitutional Law** 👈 In-Court Identification

**Constitutional Law** 👈 Effect of improper pretrial identification

**Criminal Law** 👈 Identity of Accused

Admission of victim's identification testimony in prosecution for rape, burglary, and assault did not deprive defendant of due process of law, where law enforcement conduct was not unduly suggestive, any suggestiveness did not result in substantial likelihood of misidentification, and any deficiencies in victim's identification properly went to weight to be given that information by jury rather than its admissibility. U.S.C.A. Const.Amend. 14.

**[7]    Jury** 👈 Discretion of court

Trial court has fact finding discretion in determining whether to grant or deny a juror's dismissal based on bias, which discretion allows the court to weigh the credibility of the prospective juror based on its observations. West's RCWA 2.36.110.

2 Cases that cite this headnote

**[8]    Criminal Law** 👈 Jury selection

Appellate courts defer to the trial court's decision as to whether to grant or deny a juror's dismissal based on bias.

1 Case that cites this headnote

**[9]    Jury** 👈 Personal relations in general

Juror in prosecution for rape, burglary, and assault, who indicated that his parents were friends of victim's parents, was not subject to dismissal for cause, where juror indicated that he did not socialize with victim, had not seen victim in 40 years, and would not know her by sight, and felt he could be fair and impartial juror and that he could listen with blank slate.

**[10]    Criminal Law** 👈 Incompetency or neglect of counsel for defense

**Criminal Law** 👈 Standard of Effective Assistance in General

Sixth Amendment guaranty of counsel requires that an attorney perform to the standards of the profession, and counsel's failure to live up to those standards will require a new trial when the client has been prejudiced by counsel's failure. U.S.C.A. Const.Amend. 6.

**[11]    Criminal Law** 👈 Introduction of and Objections to Evidence at Trial

Defense counsel's decision, in prosecution for rape, burglary, and assault, not to object to police witness' passing reference to fact that police identification database contained a picture of defendant was tactical decision which would not support claim of ineffective assistance of counsel. U.S.C.A. Const.Amend. 6.

3 Cases that cite this headnote

**[12]    Criminal Law** 👈 Introduction of and Objections to Evidence at Trial

Ex. 25 at 002

Decision to object, or to refrain from objecting even if testimony is not admissible, is a tactical decision not to highlight the evidence to the jury, and is not a basis for finding counsel ineffective. U.S.C.A. Const.Amend. 6.

9 Cases that cite this headnote

**[13]    Criminal Law**  Counsel for Accused

Only in egregious circumstances, on testimony central to the state's case, will the failure to object to testimony constitute incompetence of counsel justifying reversal. U.S.C.A. Const.Amend. 6.

5 Cases that cite this headnote

**[14]    Criminal Law**  Limiting and curative instructions

Decision to decline a limiting instruction for evidence of other crimes, wrongs, or acts is a tactical decision not to highlight damaging evidence, and is not a basis for finding counsel ineffective. U.S.C.A. Const.Amend. 6; ER 404(b).

9 Cases that cite this headnote

**[15]    Sentencing and Punishment**  Separate acts

Serious violent offenses are sentenced consecutively to each other if they arise from separate and distinct criminal conduct, that is, criminal conduct that does not satisfy the statutory definition of "same criminal conduct." West's RCWA 9.94A.589(1)(a).

4 Cases that cite this headnote

**[16]    Sentencing and Punishment**  Single act or transaction

Crimes that do not constitute the same criminal conduct are necessarily separate and distinct offenses for sentencing purposes. West's RCWA 9.94A.589(1)(a).

6 Cases that cite this headnote

**[17]    Sentencing and Punishment**  Acts or conduct connected by common objective or plan

Offenses have the same criminal intent for sentencing purposes when, viewed objectively, the intent does not change from one offense to the next. West's RCWA 9.94A.589(1)(a).

6 Cases that cite this headnote

**[18]    Sentencing and Punishment**  Single act or transaction

In the context of determining whether offenses were committed with separate intent, and are thus separate and distinct offenses for sentencing purposes, "intent" is not the particular mens rea element of the particular crime, but rather is the offender's objective criminal purpose in committing the crime. West's RCWA 9.94A.589(1)(a).

5 Cases that cite this headnote

**[19]    Sentencing and Punishment**  Single act or transaction

In the context of determining whether offenses were committed with separate intent, and are thus separate and distinct offenses for sentencing purposes, a court may consider whether one crime furthers the other or whether the offenses were part of a recognized plan or scheme. West's RCWA 9.94A.589(1)(a).

3 Cases that cite this headnote

**[20]    Criminal Law**  Sentencing

Sentencing court's same criminal conduct ruling is reviewed for abuse of discretion because it involves a factual inquiry. West's RCWA 9.94A.589(1)(a).

4 Cases that cite this headnote

**[21]    Sentencing and Punishment**  Single act or transaction

When the record supports only one conclusion on whether crimes constitute the same criminal

**Ex. 25 at 003**

conduct, a sentencing court abuses its discretion in arriving at a contrary result, but where the record adequately supports either conclusion, the matter lies in the court's discretion; this exception is generally construed narrowly to disallow most claims that multiple offenses constitute the same criminal act. West's RCWA 9.94A.589(1)(a).

3 Cases that cite this headnote

**[22]    Sentencing and Punishment 🔑 Distinct offenses**

Sentencing court did not abuse its discretion, in prosecution for rape, burglary, and assault, in determining that assault and rape convictions constituted separate and distinct conduct meriting imposition of consecutive sentences, where evidence permitted conclusion that rape was crime of opportunity which presented itself after assault, rather than objective of assault; defendant never expressed any intent to engage in sexual intercourse until victim broached subject, defendant's conduct in repeatedly striking victim on the head with metal bar evinced intent to cause serious physical injury rather than to facilitate sexual intercourse, and defendant did not threaten force to gain victim's cooperation. West's RCWA 9.94A.589(1)(a).

**Attorneys and Law Firms**

**\*\*1090** Eric J. Nielsen, David Bruce Koch, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.

Andrew Kelvin Miller, Benton County Prosecutors Office, Kennewick, WA, for Respondent.

**Opinion**

KORSMO, C.J.

**\*347** ¶ 1 Cody Kloepper challenges his convictions for first degree rape, first degree burglary, and first degree assault, primarily arguing that the victim should not have been allowed to identify him at trial. We affirm the convictions and sentence.

FACTS

¶ 2 D.W. awoke in her fourth floor Richland apartment at 4:00 a.m. to prepare for work. An unknown man with long hair attacked her and struck her repeatedly on the head with a metal bar. The two struggled and D.W. defecated in her pants. When asked why he was attacking her, the man responded, "[B]ecause Obama was elected president." The victim told the man that if he was there to rape her, "just do it and get it over with."

¶ 3 He made D.W. get down on her knees, but was unable to penetrate her with his penis. She then heard a package being opened and what she thought was latex gloves. The man then used his fingers to penetrate her vagina and her anus. He covered her with a blanket and told her that if she told anyone, he would "come back and finish it off." A few minutes later D.W. called 911.

**\*348** ¶ 4 D.W. was taken to a Spokane hospital for treatment of her head injuries. An officer there subsequently showed her a six-person photomontage that included a picture of Mr. Kloepper with short hair; D.W. did not identify anyone in the montage. Five days later she was shown a 23–person photomontage that included the same photo of Mr. Kloepper with short hair. D.W. told officers **\*\*1091** that she recognized Mr. Kloepper[1] with the short hair, but identified Mr. Karl Goering from the montage as the man who attacked her. She also identified Goering from an in-person line-up. He was arrested and charged for the attack on D.W.

¶ 5 The crime scene investigators found what appeared to be the tip of a latex glove covered in D.W.'s blood. A small amount of male deoxyribonucleic acid (DNA) was recovered and subjected to Y-chromosome Short Tandem Repeat DNA testing. The result excluded Mr. Goering, but matched 1/440 males in the United States population, including Mr. Kloepper. The police advised D.W. on May 5, 2010, that the DNA "matched" Mr. Kloepper and excluded Mr. Goering. The police also advised that they would continue their investigation and had not ruled Goering out as a suspect.

¶ 6 D.W. returned to the police station on July 28, 2010, and gave a recorded statement that she now believed Mr. Kloepper was the attacker. When asked why she changed her mind, D.W. said, "Well the DNA thing." Mr. Kloepper was charged with the three noted offenses, all of which carried a deadly weapon enhancement. Charges against Mr. Goering were

Case 4:26-cv-05057-TOR    ECF No. 1-2    filed 04/17/26    PageID.672    Page 382 of 386

dropped. Mr. Kloepper met the victim's original identification of the assailant far better than Mr. Goering did.

¶ 7 The defense moved to exclude D.W.'s anticipated in-court identification on the basis that her receipt of the DNA information was impermissibly suggestive and had tainted the identification. The trial court denied the motion on the basis that the information went to the weight to be given the testimony rather than its admissibility.

**\*349** ¶ 8 Prior to opening statements, juror 8 indicated by note to the court that his parents were friends of D.W.'s parents while he was growing up. The court did not find a basis for excusal for cause, noting that Juror 8 had not seen D.W. in 40 years and probably would not recognize her.

¶ 9 The jury convicted Mr. Kloepper on all three counts and also found that he was armed with a deadly weapon on each count. The trial court ruled that the rape and assault convictions arose from separate conduct and the sentences would be served consecutively to each other, while the burglary count would be served concurrently with those counts. Mr. Kloepper then timely appealed to this court.

ANALYSIS

¶ 10 This appeal raises four claims. Mr. Kloepper contends that the trial court erred in denying his motion to exclude the in-court identification and in failing to remove juror 8. He also argues that his trial attorney provided ineffective assistance and that the court was required to have sentenced him to concurrent terms on all three counts. We will address those issues in the noted order.

*Identification Testimony*

¶ 11 Mr. Kloepper asks us to expand the law concerning impermissibly suggestive identification to include this fact pattern. His argument could effectively prevent a witness from changing an incorrect (or what she perceived as incorrect) prior identification at trial. We conclude that this expansion is inappropriate.

**[1]** ¶ 12 Typically, a trial judge has discretion to admit or exclude evidence at trial. *State v. Kinard,* 109 Wash.App. 428, 432, 36 P.3d 573 (2001). Discretion is abused when it is exercised on untenable grounds or for untenable reasons.

*State ex rel. Carroll v. Junker,* 79 Wash.2d 12, 26, 482 P.2d 775 (1971).

**[2]** ¶ 13 When impermissibly suggestive government behavior results in the substantial likelihood of the misidentification of a suspect, due process of law requires that **\*350** trial courts exclude the identification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *State v. Vickers,* 148 Wash.2d 91, 118, 59 P.3d 58 (2002). Typically these types of issues concern pretrial identification procedures that allegedly taint a witness' initial and subsequent identifications. *E.g., Vickers,* 148 Wash.2d at 118, 59 P.3d 58; *State v. Cook,* 31 Wash.App. 165, 167–71, 639 P.2d 863 (1982). More recently, **\*\*1092** arguments have been advanced, unsuccessfully, calling for the exclusion of trial identification testimony on the basis that the witness had failed to identify the defendant during pretrial identification opportunities. *E.g., State v. Sanchez,* 171 Wash.App. 518, 288 P.3d 351 (2012), *review denied,* 177 Wash.2d 1024, 309 P.3d 504 (2013) (witness did not identify defendant until after seeing his picture on the news permitted to identify him at trial); *State v. Salinas,* 169 Wash.App. 210, 224, 279 P.3d 917 (2012), *review denied,* 176 Wash.2d 1002, 297 P.3d 67 (2013) (witness unable to identify defendant in montage permitted to do so at trial).

¶ 14 The argument that Mr. Kloepper raises is similar to that presented by *Sanchez* and *Salinas,* but with a twist—unlike those cases, there was no suggestion of any action by the government to taint the identification—here Mr. Kloepper contends that the sharing of the DNA results tainted the in-court identification. He finds support for his argument in *State v. McDonald,* 40 Wash.App. 743, 700 P.2d 327 (1985). There the victim, after the victim identified one of the suspects in a lineup and said that another might be the man, was told that the two men the victim had mentioned were the ones who had been arrested. *Id.* at 744–45, 700 P.2d 327. This court concluded that the information was tantamount to telling the witness that "this is the man." *Id.* at 746, 700 P.2d 327. The conviction of the man who had been equivocally identified was reversed. *Id.* at 747–48, 700 P.2d 327.

**[3]** ¶ 15 Similarly here, Mr. Kloepper argues with some force that *McDonald* applies and renders D.W.'s in-court identification invalid. When a court finds suggestive government behavior, the court must then determine if there was a **\*351** substantial likelihood that the resulting identification was erroneous. *Cook,* 31 Wash.App. at 171, 639 P.2d 863. If there was no suggestive behavior, then the

State v. Kloepper, 179 Wash.App. 343 (2014)

317 P.3d 1088

argument fails and there is no need to consider whether there was a substantial likelihood of misidentification. *Id.*

**[4]** ¶ 16 As to the first factor, it is a close question whether there was suggestive behavior by the government. The communication of the DNA results by a government agent clearly affected the prior identification and, to that extent, can be seen as suggestive behavior. But, critically in our view, the suggestive behavior was not directed to D.W.'s identification of her assailant. Rather, it was made as part of an update of the pending case against Mr. Goering and used to explain to the victim that despite the filing of charges, the investigation was continuing against both men. D.W.'s change in her identification occurred 12 weeks after the communication from the detectives. This case is thus distinguishable from *McDonald* where the suggestive communication was made directly in response to the lineup identification. In light of these circumstances, we are not convinced that this truly was a suggestive identification procedure.

**[5]** ¶ 17 However, we need not decide the case solely on that basis as we also doubt that the changed identification resulted in a "substantial likelihood" of a misidentification. If anything, the change prevented a misidentification. The other evidence in the case pointed to Mr. Kloepper, not Mr. Goering, as the assailant. Besides the DNA, Mr. Kloepper better fit D.W.'s initial description of the attacker as a thin, tall (6'2") man with long hair. Mr. Kloepper stood 6'4" and was thin with long hair at the time of the attack.[2] Additionally, against company policy shortly prior to the assault he accessed the supervisor's office in the middle of the night where keys to the apartments, including D.W.'s, could be accessed. D.W. reported that she had locked her door, but **\*352** the assailant gained entry without force, a fact suggesting that a key was used.

¶ 18 There was not a substantial likelihood of misidentification. Even without D.W.'s identification, the evidence pointed at Mr. Kloepper as the assailant. The defense was thoroughly able to develop D.W.'s earlier identifications of Goering and the reason for her change of mind in order to attack the reliability of her identification testimony. We believe this comported with due process of law. This court recently noted that the **\*\*1093** United States Supreme Court has declared that the protection " 'against a conviction based on evidence of questionable reliability' " is not exclusion of the evidence, but, rather is " 'affording the defendant means to persuade the jury that the evidence should be discounted as

unworthy of credit.' " *Sanchez,* 171 Wash.App. at 572, 288 P.3d 351 (quoting *Perry v. New Hampshire,* 565 U.S. ——, 132 S.Ct. 716, 181 L.Ed.2d 694, 705 (2012)).

¶ 19 As noted, Mr. Kloepper exercised his ability to cross-examine D.W. and argue the reliability of her identification to the jury. In this case he was even able to show why she changed her mind, allowing him to note that the identification testimony was merely derived from the DNA evidence, which was admittedly not very powerful. D.W.'s testimony on this point was effectively impeached.

**[6]** ¶ 20 Under these circumstances, Mr. Kloepper was afforded due process of law. The deficiencies in D.W.'s identification properly went to the weight to be given that information by the jury rather than its admissibility. The trial court did not abuse its discretion in declining the motion to exclude.

*Juror 8*

¶ 21 Mr. Kloepper also argues that the trial court erred in denying his challenge for cause to juror 8 after it came to light the juror had once been acquainted with D.W. and her family. Again, we conclude there was no abuse of the trial court's discretion.

**[7]** **[8]** **\*353** ¶ 22 RCW 2.36.110 requires a judge to dismiss "any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." " 'Actual bias' is 'the existence of a state of mind on the part of the juror in reference ... to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.' " *Hough v. Stockbridge,* 152 Wash.App. 328, 340, 216 P.3d 1077 (2009) (citing RCW 4.44.170(2)). The trial judge has fact finding discretion in determining whether to grant or deny a juror's dismissal based on bias. *State v. Jorden,* 103 Wash.App. 221, 229, 11 P.3d 866 (2000), *review denied,* 143 Wash.2d 1015, 22 P.3d 803 (2001). This discretion "allows the judge to weigh the credibility of the prospective juror based on his or her observations." *Id.* Appellate courts defer to the trial judge's decision. *Id.*

¶ 23 After being selected, juror 8 indicated in a note that he had learned that his parents were friends of D.W.'s parents. Juror 8 knew the parents of D.W. and would occasionally see

Ex. 25 at 006

them at the golf course. In response to questioning, juror 8 indicated that he did not have any social activities with D.W., that he would not know her by sight, and that it had been at least 40 years since he had seen her. He also responded that he felt he could be a fair and impartial juror, and that he could listen with a blank slate.

¶ 24 After hearing argument, the court decided that there was not a sufficient basis to excuse juror 8 for cause:

> He indicated that he was just an acquaintance, that he last saw the victim 40–some years ago. That he probably would not recognize her on [sight]. He's had no contact with her. He is older than her. That the only reason why this even jogged any sort of memory was because he advised his mother that he was on jury duty. From the Court's perspective, there has not been **\*354** a sufficient showing that this juror needs to be excused for cause.

Report of Proceedings at 63.

 **[9]**    ¶ 25 These were tenable grounds for denying the challenge for cause. The juror had only a passing acquaintance with D.W. 40 years earlier and indicated that nothing about that fact would affect his ability to serve in this case. The trial court was permitted to credit that information. Nothing in the record of this case suggests that juror 8 was biased in favor of D.W. or against Mr. Kloepper. An acquaintance with D.W.'s family 40 years earlier did not amount to bias as a matter of law.

¶ 26 The trial court did not abuse its discretion in denying the challenge to juror 8.

 **\*\*1094** *Ineffective Assistance of Counsel*

¶ 27 Mr. Kloepper also argues that his counsel provided ineffective assistance by failing to challenge a detective's statement that Mr. Kloepper's information was in a system used to record contacts with police. Counsel did not err in declining to challenge this passing information.

 **[10]**    ¶ 28 Well-settled standards govern our review of this argument. The Sixth Amendment guaranty of counsel requires that an attorney perform to the standards of the profession. Counsel's failure to live up to those standards will require a new trial when the client has been prejudiced by counsel's failure. *State v. McFarland,* 127 Wash.2d 322, 334–35, 899 P.2d 1251 (1995). In evaluating ineffectiveness claims, courts must be highly deferential to counsel's decisions. A strategic or tactical decision is not a basis for

finding error. *Strickland v. Washington,* 466 U.S. 668, 689–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* courts apply a two-prong test: whether or not (1) counsel's performance failed to meet a standard of reasonableness and (2) actual prejudice resulted from counsel's failures. *Id.* at 690–92, 104 S.Ct. 2052. When a claim can be disposed of on  **\*355** one ground, a reviewing court need not consider both *Strickland* prongs. *State v. Foster,* 140 Wash.App. 266, 273, 166 P.3d 726, *review denied,* 162 Wash.2d 1007, 175 P.3d 1094 (2007).

¶ 29 While defense counsel was cross-examining the lead detective on how the photomontages were constructed, the detective testified that the I–Leads system supplied many of the photos. I–Leads was described as a local system that included booking photos and other police contact information. The detective testified that while most of the montage photos came from I–Leads, the police had used Mr. Kloepper's employment photo. When asked by defense counsel if police had not also had a Department of Licensing (DOL) photo of Mr. Kloepper, the detective responded that police also had an I–Leads photo of Mr. Kloepper, but he was not sure if there was a DOL photo.

 **[11]**    ¶ 30 Defense counsel did not object to this testimony. Mr. Kloepper now argues that his counsel provided ineffective assistance by failing to object, contending that the information conveyed the fact that he had a criminal history. We do not believe the decision to not challenge the answer established defective performance by counsel.

 **[12]**    **[13]**    **[14]**    ¶ 31 The decision to object, or to refrain from objecting even if testimony is not admissible, is a tactical decision not to highlight the evidence to the jury. It is not a basis for finding counsel ineffective. *State v. Madison,* 53 Wash.App. 754, 763, 770 P.2d 662, *review denied,* 113 Wash.2d 1002, 777 P.2d 1050 (1989).[3] Similarly, our case law recognizes that the decision to decline a limiting instruction for ER 404(b) evidence likewise is a tactical decision not to highlight damaging evidence. *E.g., State v. Yarbrough,* 151 Wash.App. 66, 210 P.3d 1029 (2009) (failure to propose a limiting instruction presumed to be a legitimate trial tactic not to reemphasize damaging evidence); **\*356** *State v. Price,* 126 Wash.App. 617, 649, 109 P.3d 27 (2005) ("We can presume that counsel did not request a limiting instruction" for ER 404(b) evidence to avoid reemphasizing damaging evidence); *State v. Barragan,* 102 Wash.App. 754, 762, 9 P.3d 942 (2000) (failure to propose a limiting instruction for the proper use of ER 404(b) evidence of prior fights in prison

dorms was a tactical decision not to reemphasize damaging evidence).

¶ 32 The decision to not object to or seek a cure for damaging evidence is a classic tactical decision. Counsel did not provide ineffective assistance by ignoring the I–Leads comment.

*Consecutive Sentences*

¶ 33 Mr. Kloepper also argues that the trial court erred in deciding that the assault and rape convictions did constitute "separate and distinct conduct." Although the trial court could have decided the matter differently, there was no abuse of discretion in the court's ruling.

**\*\*1095** **[15]** **[16]** ¶ 34 Mr. Kloepper's convictions for first degree assault and first degree rape are classified as serious violent offenses. RCW 9.94A.030(45). RCW 9.94A.589(1) (b) provides that in sentencing serious violent offenses, the crimes will be sentenced consecutively to each other[4] if they arise from "separate and distinct criminal conduct." That standard is defined to be the same as the "same criminal conduct" standard of RCW 9.94A.589(1)(a). *State v. Brown,* 100 Wash.App. 104, 112–15, 995 P.2d 1278 (2000), *aff'd in part and rev'd in part,* 147 Wash.2d 330, 58 P.3d 889 (2002) (reviewing legislative history). Crimes that do not constitute the same criminal conduct are necessarily separate and distinct offenses. *Id.* at 115, 995 P.2d 1278.

**[17]** **[18]** **[19]** ¶ 35 "Same criminal conduct" means that the offenses occurred at the same time and same place, had the same **\*357** victim, and have the same criminal intent. RCW 9.94A.589(1)(a). Offenses have the same criminal intent when, viewed objectively, the intent does not change from one offense to the next. *State v. Dunaway,* 109 Wash.2d 207, 215, 743 P.2d 1237 (1987). "Intent, in this context, is not the particular *mens rea* element of the particular crime, but rather is the offender's objective criminal purpose in committing the crime." *State v. Adame,* 56 Wash.App. 803, 811, 785 P.2d 1144 (1990). Courts have also looked at whether one crime furthers the other or whether the offenses were part of a recognized plan or scheme. *Dunaway,* 109 Wash.2d at 215, 743 P.2d 1237 (furtherance test); *State v. Lewis,* 115 Wash.2d 294, 302, 797 P.2d 1141 (1990) (same scheme or plan).

**[20]** **[21]** ¶ 36 The trial court's same criminal conduct ruling is reviewed for abuse of discretion because it involves a factual inquiry. *State v. Graciano,* 176 Wash.2d 531, 536, 295 P.3d 219 (2013). Thus, "when the record supports only one

conclusion on whether crimes constitute the 'same criminal conduct,' a sentencing court abuses its discretion in arriving at a contrary result. But where the record adequately supports either conclusion, the matter lies in the court's discretion." *Id.* at 537–38, 295 P.3d 219 (citation omitted). This exception "is generally construed narrowly to disallow most claims that multiple offenses constitute the same criminal act." *State v. Porter,* 133 Wash.2d 177, 181, 942 P.2d 974 (1997).

¶ 37 The parties agree that the time, place, and victim elements of the same criminal conduct test were met in this case. They disagree whether the two offenses shared the same criminal intent.[5] Noting that the assault ended when the victim "submitted" to the rape, Mr. Kloepper argues that the assault furthered that crime and, hence, was not a separate and distinct offense. In this view, the assault overcame the anticipated resistance to the rape and was part and parcel of that offense.

**[22]** **\*358** ¶ 38 The trial court could have viewed the evidence that way. It did not, however, and this court is not in a position to overturn that decision because this incident did not have to be viewed in that manner. For one thing, the assailant never expressed any intent to engage in sexual intercourse until the victim broached the subject. Repeatedly striking a person on the head with a metal bar evinces an intent to cause serious physical injury rather than to facilitate sexual intercourse. More commonly, the threat to use force is at least initially made in order to obtain a victim's cooperation; that did not happen here. Additionally, severe injury also can effectively hinder sexual intercourse as occurred here when the victim defecated. We believe that the trial court was free to view the rape as a crime of opportunity that presented itself after the assault rather than as the object of the attack.

**\*\*1096** ¶ 39 Because we cannot say that the assault and the rape shared the same objective criminal intent, the trial court cannot have abused its discretion in treating the two crimes as separate and distinct offenses.

¶ 40 Affirmed.

I CONCUR: FEARING, J.

BROWN, J. (concurring in part, and dissenting in part).
¶ 41 I agree with and concur in Cody J. Kloepper's convictions and the resolution of the identification, ineffective assistance,

and juror selection issues. I disagree solely with the trial court's consecutive sentencing for first degree assault and first degree rape. In my view, the facts show "same criminal conduct" within the meaning of RCW 9.94A.589(1)(a), not "separate and distinct criminal conduct" under RCW 9.94A.589(1)(b). Our sole focus is "same criminal intent" because the parties agree the facts show the same victim, time, and place. Three parts of the record show Mr. Kloepper's criminal intent from beginning to end was assaulting D.W. to accomplish D.W.'s rape.

**\*359** ¶ 42 First, at the beginning, soon after his frustrated sexual encounter with a third person in his search for random sex, Mr. Kloepper entered D.W.'s apartment shirtless at 4:00 a.m. on a freezing winter's day and began brutally assaulting her. D.W. described Mr. Kloepper's Obama remark as a "sarcastic" answer to her question why all this was happening. Report of Proceedings (RP) at 137. Mr. Kloepper's criminal intent to rape then became plain to D.W. and objectively explains her submissive response "just do it [the rape] and get it [the rape] over with." RP at 129–30. D.W.'s explanation regarding Mr. Kloepper's criminal intent is undisputed; D.W. submitted to his rape to end the assault. Thus, according to D.W., the assault furthered the rape. Therefore, any other explanation is unpermitted conjecture.

¶ 43 Second, Mr. Kloepper communicated his true response to D.W.'s question and her submission with nonverbal conduct by immediately abating his assault and making her kneel so he could penetrate her. Mr. Kloepper used latex gloves he brought with him for that exact purpose, further revealing his intent throughout to rape D.W.

¶ 44 Third, at the end of D.W.'s ordeal, Mr. Kloepper threatened if she reported him, he would "come back and finish it off [singularly referring to the brutal rape]." RP at 131. Mr. Kloepper's threat unequivocally establishes the "same criminal intent" throughout D.W.'s assault and rape.

¶ 45 In sum, I would reverse the trial court's consecutively sentencing of Mr. Kloepper for first degree rape and first degree assault because the facts solely support a "same criminal conduct" finding under RCW 9.94A.589(1)(a). Accordingly, I respectfully dissent.

### All Citations

179 Wash.App. 343, 317 P.3d 1088

---

Footnotes

1    Kloepper worked for the apartment complex where D.W. lived.

2    In contrast, Mr. Goering stood only 5'10".

3    "The decision of when or whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Madison,* 53 Wash.App. at 763, 770 P.2d 662.

4    To mitigate the effects of the consecutive sentences, the other current serious violent offenses are not used in the offender score calculation and the offense(s) having the shorter sentence ranges are scored with an offender score of zero regardless of the offender's criminal history. RCW 9.94A.589(1)(b).

5    The trial court also treated the first degree burglary conviction as a separate offense for scoring purposes. Whether it did so on the basis of the same criminal conduct analysis of RCW 9.94A.589(1)(a) or by operation of the anti-merger statute, RCW 9A.52.050 is unclear.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---